**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

JESSICA L. PARADISO,

                         Petitioner,            No. 9:16-CV-1458
                                                  (DNH/CFH)

        v.

SABINA KAPLAN, Superintendent,

                         Respondent.
_____

**APPEARANCES:**                   **OF COUNSEL:**

Jessica L. Paradiso
Bedford Hills Correctional Facility
247 Harris Road
Bedford Hills, New York 10507

Attorney General for the           LISA E. FLEISCHMANN, ESQ.
State of New York                 ALYSON J. GILL, ESQ.
New York Office                    Assistant Attorney General
120 Broadway
New York, New York 10271
Attorneys for Respondents

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

                       **REPORT-RECOMMENDATION AND ORDER**[1]

       Presently pending before the Court is a petition for a writ of habeas corpus filed

pursuant to 28 U.S.C. § 2254 by petitioner pro se Jessica L. Paradiso, an inmate in the

custody of the New York State Department of Corrections and Community Supervision

("DOCCS"). Dkt. No. 1 ("Pet."). On January 14, 2016, petitioner pleaded guilty to two

_____

    [1] This matter was referred to the undersigned for Report-Recommendation and Order pursuant to
28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

counts of Attempted Grand Larceny in the Third Degree and one count of Conspiracy in the Fifth Degree. Id. at 33. Petitioner was sentenced to three consecutive indeterminate terms of two to four years imprisonment. Id. On November 28, 2016, petitioner filed a pro se petition seeking a writ of habeas corpus on the grounds that (1) the Appellate Division, Third Department improperly rejected her motion to file a late notice of appeal; and (2) her trial counsel was ineffective. See generally id. Respondent opposed the petition, and petitioner filed a reply. Dkt. Nos. 17, 23. For the reasons that follow, it is recommended that the petition be denied.

## I. Background

### A. Petitioner's Plea Proceeding

On January 14, 2016, petitioner and her attorney Paul Edwards appeared before Hon. Roger D. McDonough in Albany County Court. Dkt. No. 18 ("Tr.") at 4.[2] The prosecutor set forth the terms of the plea offer, which provided that petitioner plea to two counts of Attempted Grand Larceny in the Third Degree and one count of Conspiracy in the Fifth Degree as a hate crime. Id. at 4-5. The court could impose a sentence between one-and-a-half to three years minimum, two to four years maximum for each count to run either concurrently or consecutively. Id. at 5, 6. The plea also required that petitioner cooperate with the Albany County District Attorneys' Office regarding information as to the other co-conspirators, as well as similar conspiracies.

---

[2] The page numbers following Dkt. No. 18 refer to the pagination of the header numbers generated by CM/ECF, not the pagination provided in the transcripts.

2

<u>Id.</u> at 5.  The prosecutor also explained that petitioner's aggregate sentence could range from one-and-a-half to three years minimum, and six to twelve years maximum. <u>Id.</u>  The plea also required petitioner to pay restitution and execute no contact orders of protection against her co-conspirators.  <u>Id.</u> at 6.  The prosecutor stated that the plea "would be in full satisfaction of all known charged and uncharged crimes in Albany County" and that petitioner would waive her rights to appeal.  <u>Id.</u>  The court reiterated that a "[w]aiver of appeal would be a condition precedent to the effectuation of th[e] plea."  <u>Id.</u> at 6-7.  Mr. Edwards confirmed that this was his understanding of the plea deal.  <u>Id.</u> at 7.

The Clerk of the Court swore petitioner under oath.  Tr. at 7.  Petitioner affirmed that Mr. Edwards had explained to her that before the court could accept her guilty plea the court needed to ask her a series of questions.  <u>Id.</u>  She indicated that she had heard the application placed on the record by the prosecutor regarding the proposed plea offer, and confirmed that it was the basis on which she entered her plea.  <u>Id.</u> at 8. Petitioner stated that she took Prozac and other medications to address her anxiety, but the medications did not affect her ability to think clearly.  <u>Id.</u> at 10.  Petitioner affirmed that she could read and write in English, and that she was a citizen of the United States.  <u>Id.</u> at 9.  Petitioner agreed that she had sufficient time to discuss the proposed plea with Mr. Edwards.  <u>Id.</u> at 11.  The court described the plea bargain that Mr. Edwards had secured as "extremely advantageous" as petitioner faced "decades of incarceration" pursuant to the seventeen-count indictment.  <u>Id.</u>  The court again indicated that the plea deal offered "a minimum of one and a half to three or a

3

maximum of six to 12 years incarceration, depending upon [petitioner's] actions and [his] evaluation of those actions." Id. When asked if she understood, petitioner responded, "[s]ir, I completely do." Id. The court asked petitioner if she was "entirely satisfied" with Mr. Edwards' representation, and she stated, "I sure am." Id. at 12.

Petitioner indicated that she understood that by pleading guilty she waived her right to a trial, as well as "any and all defenses" she had with regard to the charges. Tr. at 12-13. Petitioner affirmed that no one had "threatened, coerced or forced" her into pleading guilty, and that her guilty plea was a "free and voluntary choice." Id. at 14. When asked if she was pleading guilty because she was guilty of the crimes, petitioner stated, "I sure am." Id. The court again reiterated to petitioner that she was "pleading guilty to three Class E felonies for which the maximum sentence on each would be two to four, and that they would run consecutively in a row." Id. The court explained that petitioner "could be given a sentence of two to four on each and that would run consecutively for a maximum period of incarceration of six to 12." Id. Petitioner indicated that she understood. Id. at 15. Petitioner further waived her right to any additional hearings in connection with the matter. Id.

The court questioned whether petitioner waived her right to appeal her conviction and sentence, and petitioner responded that she did. Tr. at 16. Mr. Edwards and petitioner reviewed the written waiver of right to appeal, and petitioner signed the document. Id. The court reminded petitioner that the court would determine her sentence, and the prosecutor and Mr. Edwards' recommendations would only be instructive and guide the court to an appropriate sentence. Id. at 17. The court

4

explained that if the prosecution informed him that petitioner "was cooperative and testified truthfully in the trials against co-defendants, and she provided the Court . . . and law enforcement with information that resulted in additional prosecutions or arrests of investigations," he would take that into consideration in her sentencing, but he was not bound by that information. Id. at 17-18. Petitioner indicated that she understood. Id. at 18.

The court amended the second count of the indictment to reflect that on or about and between September 29, 2014 and October 10, 2014 in Delmar, New York, petitioner attempted to steal property valued in excess of $3,000.00 "under false pretenses of performing work[.]" Tr. at 19-20. Petitioner stated that she had received and cashed a check for the above-mentioned amount from Henry Hicks. Id. at 20. Petitioner admitted that the work performed was not worth the price the victim had paid. Id. at 21. Petitioner then pleaded guilty to Attempted Grand Larceny in the Third Degree. Id. at 22. Petitioner further admitted that on or about and between September 15, 2014 and October 2, 2014 in Albany, New York, she, Henry Hicks, Brian Barr, and Susan Barr attempted to steal property in excess of $3,000.00 under false pretenses for work not actually performed. Id. at 22-23. Petitioner explained that the work Brian Barr and Henry Hicks performed "was never correct" and that they performed "very little" actual work. Id. at 24. Petitioner pleaded guilty to Attempted Grand Larceny in the Third Degree. Id. at 25.

The Court then explained that the Conspiracy in the Fifth Degree offense was being charged as a hate crime. Tr. at 26. The Court stated that between February 16,

2014 and November 18, 2014 at various locations in Albany County, petitioner agreed with Henry Hicks, Susan Barr, Brian Barr, John Larson, John Risto, and potentially others to commit a felony by targeting elderly people to overpay for subpar construction work. Id. at 26-28. Petitioner pleaded guilty to Conspiracy in the Fifth Degree. Id. at 28. The Court explained that petitioner was a "predicate felon" or second felony offender, and had previously been convicted of Criminal Possession of a Forged Instrument in the Second Degree in February 2013. Id. at 29. Petitioner acknowledged that she understood that she was a second felony offender, and that by accepting the plea deal, she waived the right to controvert her prior conviction. Id. at 30.

The Court reminded petitioner that cooperation would be in her "best interests, because it is those factors that would potentially give the Court a reason to give [her] a lesser sentence." Tr. at 31. Petitioner affirmed that she understood. Id. The Court informed petitioner that it expected her to be truthful with the Department of Probation during her pre-sentencing investigative interview. Id. at 32. If petitioner told Probation "something different" than what he told the court, such as "[o]h I didn't do that crime[ ] [o]r that is not what happened," petitioner would "have a problem going forward." Id. The Court adjourned. Id.

## B. Petitioner's Sentencing

On March 18, 2016, petitioner and Mr. Edwards appeared before the court for sentencing along with co-defendants Susan Barr, Brian Barr, Henry Hicks, and John Risto and their respective counsels. Tr. at 34-35. Several victims and/or family

members gave victim impact statements prior to the sentencing.  Id. at 38-47.

Petitioner acknowledged that she was a second felony offender, and the court

sentenced her as such.  Id. at 50-51.  The court also imposed a payment plan to assist

petitioner in meeting her restitution payments, and instituted orders of protection

against her co-defendants.  Id. at 51-52.

The prosecutor reminded the court that petitioner's sentencing range was based

on her cooperation in the ongoing investigation and any other information she may have

had in connection with other schemes.  Tr. at 53.  However, the prosecutor stated that,

her office provided petitioner with "multiple opportunities to provide [ ] information, and

she did not avail herself to that."  Id.  The prosecutor noted that petitioner provided

information that was already known to detectives and was "very hesitant to provide

information regarding more cases than [the District Attorney's Office] actually knew

about."  Id.  Moreover, while incarcerated, petitioner attempted to make arrangements

to have checks forged to fill her commissary.  Id. at 54.  The prosecutor indicated that

although petitioner appeared remorseful, she did not believe petitioner's "true self

[came] through during the[ ] court proceedings."  Id.  The prosecutor noted that, in a

letter to the court, petitioner referred to her actions as "mistakes" and stated that "we all

make them, that's why they are called mistakes."  Id. at 54-55.

Mr. Edwards also addressed the court and stated that he had submitted a

sentencing memorandum on petitioner's behalf, which included letters written by

petitioner's relatives and friends requesting a lenient sentence.  Tr. at 55-56.  Prior to

sentencing petitioner, the court acknowledged that petitioner had "a desire to

7

systematically take advantage of elderly people who were vulnerable because of not only their age, but [ ] because of the mental infirmity that sometimes goes along with age, and you used those people like an ATM machine." Id. at 58.  The court noted that this was petitioner's third conviction for crimes against the elderly, and that she had taken little responsibility for her part in the crimes.  Id.  As such, the court sentenced petitioner to three consecutive terms of two to four years, for a total of six to twelve years incarceration.  Id. at 59.  The court reminded petitioner that she had waived her right to appeal the sentencing at the time of her plea, and she had indicated in writing that she did not wish to appeal.  Id. at 60.  Mr. Edwards also signed the document.  Id.

## C. Post-Sentencing Motions

Petitioner failed to file a notice of appeal within the thirty-day window required by New York Criminal Procedure § 460.30; that window expired on April 18, 2016.  See Dkt. No. 17-1 at 11.  On April 30, 2018, petitioner filed Notice of Motion for Extension of Time to Appeal Pursuant to CPL § 460.30 with the Appellate Division, Third Department.  Tr. at 101.  In a letter attached to the motion, petitioner stated that her attorney failed to file a notice of appeal on her behalf, and had not answered her or her family's numerous telephone calls and letters requesting that he file such motion.  Id. at 103.  Petitioner sent a copy of her submission to Mr. Edwards.  Id. at 105.

On May 13, 2016, Mr. Edwards wrote petitioner a letter stating that petitioner had "directed [him **not** to file a Notice of Appeal," and such fact would be "reflected in the Sentencing transcript, at the point where you filled out a pre-printed form required by

8

the Appellate Division in which you state your intention regarding appeal."  Tr. at 105 (emphasis in original).  Mr. Edwards reiterated that petitioner "circled 'do not wish to appeal' and signed the form," which became part of the record.  Id.  Mr. Edwards further instructed that petitioner's verbal instructions that he not file any notice of appeal was also a part of the record.  Id.  Mr. Edwards informed petitioner that her sentence was not in excess of the terms of her plea agreement; in fact, petitioner's sentence was within those terms.  Id.  Mr. Edwards also indicated that he did not receive calls or messages from petitioner or her family members.  Id.  Mr. Edwards filed a notice of appeal on petitioner's behalf.  Id.

On May 28, 2016, Mr. Edwards wrote a letter to the Appellate Division concerning petitioner's allegations at the direction of the Chief Motion Attorney.  See Pet., Exhibit ("Ex.") G, at 33; Ex. F, at 31.  Mr. Edwards explained that pursuant to her plea agreement, petitioner's "minimum permissible sentence w[as] three concurrent indeterminate terms of 1 ½-3 years and her maximum permissible sentence w[as] three consecutive indeterminate terms of 2-4 years."  Id. at 33.  Petitioner had waived her right to appeal as a part of that plea agreement.  Id.  Mr. Edwards stated that petitioner was sentenced to three consecutive indeterminate terms of two to four years incarceration in accordance with her plea bargain.  Id.  He informed the Appellate Division that petitioner directed him not to file an Notice of Appeal, and circled "do not wish to appeal" on the pre-printed form required by the Appellate Division.  Id.  Mr. Edwards further indicated that petitioner affirmed on the record that she did not want Mr. Edwards to file an appeal.  Id.  Mr. Edwards stated that the allegations in

9

petitioner's April 30, 2016 affidavit to the court were false, and that petitioner's plea agreement had been honored.  Id. at 34.  Mr. Edwards indicated that he first learned petitioner wished to appeal on May 10, 2016 when he received her letter, and, in turn, filed the Notice of Appeal.  Id.  Mr. Edwards explained that he could not under penalty of perjury make a motion to file a late notice of appeal pursuant to CPL § 460.30 because he did not "neglect" to file a Notice of Appeal as petitioner instructed him that she did not wish to appeal.  Id.

The Appellate Division denied petitioner's motion to file a late notice of appeal on June 16, 2016.  Tr. at 100.  On June 22, 2016, petitioner filed a motion to renew and reargue the Appellate Division's denial.  See id. at 85, 89.  Petitioner attached copies of phone records and emails in support of her claims that she and her family attempted to contact Mr. Edwards in an attempt to timely file a Notice of Appeal.  See id. at 85, 93-97.  Petitioner argued that she did not "knowingly, intelligently and voluntarily waive her right to appeal" as she did and "still [did] not have a clear understanding of what she was signing immediately after the devastating upward departure from her understanding of her plea agreement."  Id. at 87.  On August 12, 2016, the Appellate Division denied petitioner's motion to renew/reargue.  Id. at 83.  On September 1, 2016, petitioner filed an application for permission to file a leave to appeal to the New York Court of Appeals.  See id. at 78-81.  On November 1, 2016, the Court of Appeals dismissed petitioner's application as "the order sought to be appealed from is not appealable under CPL 450.90(1)."  Id. at 112.

On November 28, 2016, petitioner filed a timely habeas corpus petition pursuant

to 28 U.S.C. § 2254.  See Pet.


## II. Discussion[3]

Petitioner argues that (1) the Appellate Division erred and deprived her of due process when they denied her motion to file a late notice of an appeal; and (2) Mr. Edwards was ineffective as he failed to preserve her right to appeal, ignored her communications regarding taking an appeal, and "disparaged" her to the Appellate Division.  See Pet. at 5-7.


## A. The AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that, when a state court has adjudicated the merits of a petitioner's claim, a federal court may grant an application for a writ of habeas corpus only if "the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); see also e.g., Noble v. Kelly, 246 F.3d 93, 98 (2d Cir. 2001); Brown v. Alexander, 543 F.3d 94, 100 (2d Cir. 2008).  This is a "difficult to meet," and "highly deferential standard" for evaluating state-court rulings, which

---

[3] All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to petitioner.

11

"demands that state-court decisions be given the benefit of the doubt." Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (citations omitted).

Under section 2254(d)(1), a state-court decision is contrary to clearly established Supreme Court precedent if its "conclusion on a question of law is 'opposite' to that of the Supreme Court or if the state court decides a case differently than the Supreme Court's decision 'on a set of materially indistinguishable facts.'" Brown, 543 F.3d at 100 (quoting Williams v. Taylor, 529 U.S. 362, 413 (2000)).  A state court decision involves an unreasonable application of clearly established Supreme Court precedent if it correctly identifies the governing legal principle, but unreasonably applies or unreasonably refuses to extend that principle to the facts of a particular case.  See Williams, 529 U.S. at 413; Ramdass v. Angelone, 530 U.S. 156, 166 (2000).

Under the AEDPA, a state court's factual findings are presumed correct, unless that presumption is rebutted by clear and convincing evidence.  28 U.S.C. § 2254(e)(1). If the state court failed to decide a claim "on the merits," the pre-AEDPA standard of review applies, and both questions of law and mixed questions of law and fact are reviewed de novo.  Washington v. Shriver, 255 F.3d 45, 55 (2d Cir. 2001).

### B. The Appellate Division's Denial of Petitioner's CPL § 460.30 Motion

Petitioner first argues that the Appellate Division erred in denying her § 460.30 motion after petitioner took "diligent and appropriate" actions and supported her claims of ineffectiveness with documentary evidence in her attempt to "correct attorney Edwards' abandonment[.]"  Pet. at 5.  Petitioner also argues that the Appellate Division

12

deprived her due process by preventing her from appealing her plea and sentencing.

See id.   Respondent argues that "petitioner's claims are not cognizable on habeas

review" as they concern matters of state law.  Dkt. No. 17-1 at 14.  Respondent further

contends that petitioner's claim fails on the merits.  Id. at 15.  The undersigned agrees.

"It is well established that a federal habeas court may not second-guess a state

court's construction of its own law."  Policano v. Herbert, 453 F.3d 79, 92 (2d Cir. 2006)

(citing Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a

federal habeas court to reexamine state-court determinations on state-law questions."));

see Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state

court's interpretation of state law, including one announced on direct appeal of the

challenged conviction, binds a federal court sitting in habeas corpus."); see also Dkt.

No. 17-1 at 14 (citing Estelle for the same proposition).  Further, petitioner "has not

demonstrated that [she] was deprived of any right guaranteed to [her] by the

Constitution, laws, or treaties of the United States."  Parker v. Herbert, No. 02-CV-0373

(RJA/VEB), 2009 WL 2971575, at *61 (W.D.N.Y. May 28, 2009) (citing  28 U.S.C. §

2254(a)).  The Supreme Court of the United States has made clear that a criminal

defendant does not have a right under the federal Constitution to appeal a conviction.

See id. (citing Jones v. Barnes, 463 U.S. 745, 751 (1983) ("There is, of course, no

constitutional right to an appeal . . . ."), Griffin v. Illinois, 351 U.S. 12, 18 (1955) ("It is

true that a State is not required by the Federal Constitution to provide appellate courts

or a right to appellate review at all.").

Moreover, as respondent sets forth,

13

> a claim that a habeas petitioner is entitled to "at least one
> appellate review of conviction" "cannot be the basis of his [or
> her] federal habeas petition, because it is state law, not federal
> law, that grants him [or her] the right to a direct appeal of his
> [or her] criminal conviction. There is no corresponding federal
> constitutional right."

Dkt. No. 17-1 at 14 (quoting Perez v. Lee, No. 14-CV-5763, 2017 WL 480619, at *9

(S.D.N.Y. Jan. 6, 2017) (citations omitted)).

Thus, because petitioner's claim that the Appellate Division erred in denying her

motion to file a late notice of appeal is based in New York law, not federal law, and

there is no corresponding right found in the Constitution, the undersigned concludes

there is no basis for federal habeas corpus relief.

Nevertheless, the undersigned agrees with respondent that petitioner's claims

have no merit as the Appellate Division properly denied petitioner's § 460.30 motion,

and there is no indication that the Appellate Division infringed on petitioner's due

process rights. See Dkt. No. 17-1 at 15. "It is well settled that 'a defendant's knowing

and voluntary waiver of his right to appeal a sentence within an agreed upon guideline

range is enforceable.'" Rosario v. United States, 348 F. Supp. 2d 288, 292 (S.D.N.Y.

2004) (quoting United States v. Djelevic, 161 F.3d 104, 106 (2d Cir. 1998)). "[T]he

Court will not enforce a waiver of appellate rights unless the 'record clearly

demonstrates that the waiver was both knowing (in the sense that the defendant fully

understood the potential consequences of his waiver) and voluntary.'" Id. (quoting

United States v. Monzon, 359 F.3d 110, 117 (2d Cir. 2004)).

The transcript clearly demonstrates that on at least three occasions during her

plea proceeding and sentencing, the court instructed petitioner that, as a consequence

of her pleading guilty, she would waive her right to appeal.  <u>See</u> Tr. at 6-7 ("Waiver of appeal would be a condition precedent to the effectuation of this plea."), 16 ("[I]n consideration of this negotiated plea do you waive your right to appeal the process that is ongoing right now.  By that I mean the plea and the sentence that results from that plea both constitutional and otherwise."), 60 ("I'm going to have the defendant review with her attorney the Third Department's waiver of appeal confirmation.  I'll note at the time of your plea, ma'am, you did, both orally and in writing, under oath, waive your right to appeal" and further noting "the defendant has indicated in writing, 'I do not wish to appeal,' signed by the defendant.").  Petitioner affirmed that she understood that she had waived her right to appeal, discussed the waiver with her attorney, and executed the waiver in writing.  <u>Id.</u> at 16, 60.

To the extent that petitioner argued in her June 22, 2016 motion to renew and reargue the Appellate Division's denial that she did not have a "clear understanding of what she was signing after the devastating upward departure from her understanding of her plea agreement" with regard to the Third Department waiver form, <u>see</u> Pet. at 87, the undersigned finds this argument is misplaced.  Petitioner's argument is belied by the transcript, which affirmatively establishes that petitioner understood that she was waiving her right to appeal prior to her sentencing when she executed her guilty plea on January 14, 2016.  When the court asked if she waived her right to appeal, petitioner replied, "[y]es."  <u>Id.</u> at 16.  The court then instructed petitioner's counsel to review the written waiver of her right to appeal and explained that the document was "basically a written confirmation of what [she] just told the Court under oath orally."  <u>Id.</u>  The court

told petitioner to discuss the waiver with her counsel and, if she understood and agreed to it, to sign the document.  Id.  Petitioner signed the waiver form.  Id.  Petitioner confirmed her understanding that she had waived her right to appeal at the sentencing, wherein she signed a "waiver of appeal confirmation" and indicated in writing, "I do not wish to appeal."  Id. at 60.  Thus, the record is clear that at the time petitioner executed the plea agreement on January 14, 2016 she fully understood the consequences of her waiver.  See Rosario, 348 F. Supp. 2d at 292.

Furthermore, Mr. Edwards explained to the Appellate Division in a letter dated May 28, 2016 that petitioner directed him not to file a Notice of Appeal.  Tr. at 33. Pursuant to that direction; the signed, pre-printed Third Department form indicating that petitioner did not wish to appeal; and the verbal confirmation on the record that she did not wish him to file an appeal, Mr. Edwards stated that he could not file a CPL § 460.30 motion because he could not "affirm under penalty of perjury . . . [petitioner's claims] that [he] 'neglected' to file a Notice of Appeal[ or] that she ever instructed [him] to file a Notice of Appeal."  Pet. at 33-34.

Petitioner also seems to suggest that the Appellate Division's denial of her motion, despite her diligence in attempting to effectuate an appeal and her submission of documentary evidence supporting her claims, deprived her of due process.  See Pet. at 5.  The undersigned agrees with respondent that petitioner's alleged diligence and submission of evidence does not mandate that the Appellate Division grant her motion. See Dkt. No. 17-1 at 16.  As respondent sets forth, CPL § 460.30 does not direct that the time for taking an appeal be extended, see CPL § 460.30(1), and may deny relief if

a petitioner fails to allege "facts constituting a legal basis for the motion, or if an essential allegation is conclusively refuted by unquestionable documentary proof," id. § 460.30(4).  Based on the facts before the Appellate Division, as set forth above, the Appellate Division properly denied the motion.  See supra, at 14-16.

Therefore, "[u]nder the circumstances, [p]etitioner has not shown that the Appellate Division committed any constitutional error, much less that its rejection of Petitioner's due process . . . claim[ ] was contrary to, or an unreasonable application of federal law."  Taylor v. Rivera, No. 07 CIV. 8668 PKC DF, 2011 WL 4471919, at *16 (S.D.N.Y. Apr. 18, 2011), report and recommendation adopted 2011 WL 4472146 (S.D.N.Y. Sept. 27, 2011), aff'd, 509 F. App'x 51 (2d Cir. 2013) (summary order) (citing 28 U.S.C. § 2254(d)).  Accordingly, it is recommended that petitioner's motion on this ground be denied.

### C. Ineffective Assistance of Counsel

Petitioner next argues that she received ineffective assistance of counsel because Mr. Edwards (1) failed to timely file a Notice of Appeal; (2) "disregarded [her] timely communication and multiple requests to file the notice of appeal"; and (3) "disparaged" her to the Appellate Division.  See Pet. at 5-7.  Respondent argues that a portion of petitioner's ineffective assistance of counsel claim is unexhausted, and can also be denied on the merits.  See Dkt. No. 17-1 at 17-23.[4]

---

[4] Respondent originally argued that "[p]etitioner never raised her challenges to her counsel's perceived failings in the appropriate state courts, so her claims are unexhausted."  Dkt. No. 17-1 at 17. However, on July 26, 2017, respondent filed a letter brief withdrawing a portion of that argument as

**1. Exhaustion**

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, . . . thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." Baldwin v. Reese, 541 U.S. 27, 29 (2004) (citing Duncan v. Henry, 513 U.S. 364, 365 (1995) (internal quotation and other citations omitted)); 28 U.S.C. § 2254(b)(1). The prisoner must "fairly present" his claim in each appropriate state court, including the highest court with powers of discretionary review, thereby alerting that court to the federal nature of the claim. Id.; Bossett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994).

> A habeas petitioner has a number of ways to fairly present a claim in state court without citing "chapter and verse" of the Constitution, including "(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation."

Hernandez v. Conway, 485 F. Supp. 2d 266, 273 (W.D.N.Y. 2007) (quoting Daye v. Attorney General, 696 F.2d 186, 194 (2d Cir. 1982)).

As to petitioner's contention that Mr. Edwards "disparaged" her to the Appellate Division by stating that "her plea was honored when it was clearly not adhered to per plea colloquy and allocution," Pet. at 7 (emphasis in original), the undersigned concludes that

---

petitioner "used the correct mechanism available to her to exhaust" her claims regarding her desire to file a notice of appeal. Dkt. No. 22 at 1. Respondent noted that petitioner's argument that Mr. Edwards "disparaged" her to the Appellate Division remained unexhausted as she "did not raise [that] claim in a CPL § 440.10 motion." Id.

this claim is unexhausted as petitioner did not "fairly present" her claim in each appropriate state court. See Baldwin, 541 U.S. at 29. As respondent contends in her July 26, 2017 letter brief, petitioner properly "availed herself of CPL § 460.30, which allowed her to seek permission to file a late notice of appeal, [and, therefore,] could not have later filed a coram nobis motion when her § 460.30 motion was denied." Dkt. No. 22 at 1 (citing People v. Andrews, 23 N.Y.3d 605, 614-15 (2014) (concluding that because the defendant "realized that a notice of appeal had not been filed within 30 days of sentencing and moved for CPL 460.30 relief before the one-year grace period elapsed[,] . . . he could not later seek similar relief in a coram nobis proceeding"; therefore "recourse to the common-law procedure was not available."). Petitioner could not have included her claim that Mr. Edwards "disparaged" her in her § 460.30 motion because Mr. Edwards sent his letter nearly two weeks after petitioner filed her motion. See Tr. at 105. There is no indication in the record that petitioner filed any additional motions challenging Mr. Edwards' alleged disparaging comments. As such, petitioner failed to present all of her arguments regarding ineffective assistance of counsel to the highest state court which may have rendered a decision; thus, petitioner's ineffective assistance claim is only exhausted with respect to the arguments that she did raise — failing to preserve her right to appeal and disregarding communications by petitioner and her family concerning her desire to file a notice of appeal. Petitioner's claim that Mr. Edwards made "disparaging" comments about her to the Appellate Division remains unexhausted. Thus, the undersigned will review only whether Mr. Edwards alleged failure to preserve her right to appeal and disregarding her communications concerning her right to appeal constitutes ineffective assistance of

counsel.

## 2. Merits

The Sixth Amendment mandates that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. CONST. amend. VI.  "[T]he right to counsel is the right to the effective assistance of counsel." McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970).  To prevail on this claim, a petitioner must satisfy a two-prong test showing that his counsel's performance was (1) deficient, and (2) that such deficient performance caused the petitioner actual prejudice. Strickland v. Washington, 466 U.S. 668, 687 (1984).  "Deficient performance" requires the petitioner to show that counsel's performance "fell below an objective standard of reasonableness." Murden v. Artuz, 497 F.3d 178, 198 (2d Cir. 2007) (quoting Strickland, 466 U.S. at 688).  "Prejudice" requires the petitioner to show that there is a reasonable probability that, but for counsel's deficient performance, the outcome would have been different. Strickland, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

Federal courts apply a "highly deferential" standard of review for a claim of ineffective assistance of counsel alleged in a habeas corpus petition.  See Premo v. Moore, 562 U.S. 115, 122-23 (2011) (collecting cases).  In assessing a habeas corpus claim, "the question is not whether counsel's actions were reasonable . . . [but it is] whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id. (internal quotation marks and citation omitted).

A petitioner "clearly satisfies the first Strickland prong if his [or her] attorney 'disregards specific instructions from the [petitioner] to file a notice of appeal,' for there could be no objectively reasonable grounds for failing to comply with such a request." Dumas v. Kelly, 105 F. Supp. 2d 66, 72 (E.D.N.Y. 2000), aff'd, 418 F.3d 164 (2d Cir. 2005) (quoting Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000)). Conversely, "if the [the petitioner] directs his [or her] counsel not to file the notice, counsel does not perform deficiently by following those directions." Id. If the petitioner "has not stated his [or her] view one way or the other, then courts are to ask an 'antecedent' question: whether counsel 'consulted' with the [petitioner] about appealing." Id. If counsel consulted with the petitioner, the court then asks whether counsel followed his or her client's "express instructions with respect to an appeal." Id. (quotation marks omitted). If counsel failed to consult with his or her client concerning an appeal, that "absence of consultation . . . will constitute objectively unreasonable performance where 'there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing.'" Id. Counsel's failure to consult is more likely to constitute objectively unreasonable performance if his client was convicted after trial, as opposed to after a guilty plea. Id. at 73.

As to the prejudice prong of the Strickland test, "[w]hen evaluating claims of ineffective assistance of counsel related to a failure to pursue an appeal, the court must determine whether or not the petitioner would have appealed but for his counsel's errors." Hargrove v. United States, No. 01-CR-6112T, 2004 WL 2123497, at *3 (W.D.N.Y. Aug.

10, 2004) (citing Roe v. Flores-Ortega, 528 U.S. at 476-77 (2000)). Both Strickland prongs are satisfied "if counsel knew definitively of the defendant's desire to appeal but failed to file the required notice." Dumas, 105 F. Supp. 2d at 73.

> In Hargrove, the Western District of New York held that the petitioner could not

>> demonstrate that his counsel's failure to file a direct appeal, after allegedly being requested to do so by Hargrove, was unreasonable because Hargrove waived his right to appeal, and therefore could not have taken a direct appeal of his sentence absent an allegation of some underlying error, which Hargrove ha[d] not in this proceeding alleged.

Hargrove, 2004 WL 2123497, at *3. The court found that where a petitioner "knowingly and voluntarily waived his right to appeal in a plea agreement and did so competently, he cannot then show that his defense counsel's failure to file a direct appeal prevented him from undertaking an appeal that he would have pursued." Id. Additionally, the court noted that an attorney could not be found ineffective if he failed to file a notice of appeal where one could not be pursued due to the terms of the plea agreement. See id. (citing Rosa v. United States, 170 F. Supp. 2d 388, 408 (2d Cir. 2001)). Therefore, because the petitioner "knowingly and voluntarily pled guilty; was not coerced into doing so; received a sentence that was contemplated in the plea agreement; and expressly waived his right to appeal in the plea agreement," the Western District concluded that counsel was "justified in not filing an appeal due to the fact that the right to appeal was waived under the valid plea agreement." Id.

Similarly, in Mercedes v. Superintendent, the petitioner claimed that his trial counsel was ineffective because he failed to file a notice of appeal. See Mercedes v. Superintendent, No. 9:12-CV-0687 DNH, 2014 WL 2711803, at *3 (N.D.N.Y. June 16,

2014).  The petitioner voluntarily pleaded guilty and stated that he was satisfied with the services of his attorney.  See id. at 4.  At sentencing, the petitioner signed a Notice of Right to Appeal form, and checked a box indicating that he did not wish to appeal his sentence. See id.  Several months later, the petitioner filed a motion for leave to file a late notice of appeal, alleging that his counsel failed to follow his instruction to file a notice of appeal and did not properly advise him how to file a pro se notice.  See id.  The petitioner's trial counsel submitted a letter "strenuously den[ying]" his allegations, and stated that the petitioner voluntarily entered into a guilty plea and knew the sentence he would receive as a result of that plea.  Id.

This Court found that the "[p]etitioner's sworn statements on the record at sentencing, the Notice of Right to Appeal form, and counsel's sworn statement all support the conclusion that petitioner did not instruct counsel to file a notice of appeal."  Mercedes, 2014 WL 2711803, at *4.  As such, this Court concluded that the "[p]etitioner's current conclusory allegations to the contrary are insufficient to establish that counsel was ineffective for failing to file a notice of appeal."  Id.

The undersigned notes that the underlying case is similar to Hargrove and Mercedes.  The court transcripts clearly demonstrate that, like the petitioners in Hargrove and Mercedes, petitioner was aware that she had waived her right to appeal during both the plea and sentencing proceedings, signed a waiver of her right to appeal, and signed a confirmation of that waiver.  See Hargrove, 2004 WL 2123497, at *3; Mercedes, 2014 WL 2711803, at *3; Tr. 6-7, 16, 60.  As respondent notes, petitioner made at least one statement under oath that she waived her right to appeal.  Id. at 16; Dkt. No. 17-1 at 20.

Similar to Hargrove, petitioner knowingly and voluntarily pleaded guilty; was not coerced into doing so by Mr. Edwards, and, in fact, indicated that no one had "threatened, coerced or forced" her into pleading guilty, that her guilty plea was a "free and voluntary choice," and that she was "entirely satisfied" with his services, Tr. 12, 14; received a sentence contemplated in the plea agreement; and expressly waived her right to appeal in that plea agreement. See Hargrove, 2004 WL 2123497, at *3. Moreover, in letters to both petitioner and the Appellate Division, Mr. Edwards "strenuously den[ied]" that petitioner instructed him to file a notice of appeal; noted that petitioner "verbally confirmed on the record that she did not" want to appeal; and indicated that petitioner had been sentenced in accordance with the plea agreement, and, pursuant to that plea agreement, had waived her right to appeal. Tr. 105; Pet., Ex. G at 33-34; see Mercedes, 2014 WL 2711803, at *3. Thus, the undersigned concludes that Mr. Edwards was "justified in not filing an appeal due to the fact that the right to appeal was waived under the valid plea agreement," as well as petitioner's affirmations that she did not wish to file an appeal. Hargrove, 2004 WL 2123497, at *3.

The undersigned acknowledges that petitioner argues that she attempted to contact her counsel regarding the filing of an appeal, and provided what she alleges are phone records demonstrating calls to Mr. Edwards' office, as well as emails from a family member to Mr. Edwards. See Tr. 93-97. Mr. Edwards disputes that petitioner or her family members attempted to communicate with him. See Pet., Ex. G at 33-34. The undersigned first notes that, with respect to the emails, petitioner's family member requested information regarding whether petitioner would be able to appeal her sentence as they felt it was in

24

excess of her plea agreement; there is no express instruction to file a notice of appeal on petitioner's behalf.  See id. at 95, 96, 97.  Second, assuming that the undersigned determined that Mr. Edwards committed objectively unreasonable conduct by failing to communicate with petitioner and not filing a notice of appeal, petitioner still must establish that she "could have prevailed on the appeal of which [s]he was deprived by the failure of counsel to honor [her] request to file a notice of appeal."  Peoples v. Rivera, No. 06-CV-3070 (ERK), 2008 U.S. Dist. LEXIS 124805, at *2 (E.D.N.Y. July 31, 2008); cf. Bruno v. Superintendent, Five Points Corr. Fac., 639 F. App'x 683, 685 (2d Cir. 2016) (summary order) ("To satisfy the prejudice requirement of Strickland, Bruno must show, at a minimum, that he could have prevailed on a properly pursued suppression motion.").

The undersigned finds that petitioner has not demonstrated that she would have prevailed on appeal.  Petitioner fails to set forth her proposed appellate claim, and she does not argue that her guilty plea was not knowing or voluntary.  Nevertheless, the record seems to suggest that petitioner felt as though the state court failed to honor her plea agreement by sentencing her to six to twelve years imprisonment, or, alternatively, that the state court failed to take into account her cooperation with the prosecution.  See Tr. at 6, 95-97.  Petitioner argues that "the cooperation agreement . . . was fulfilled and information was provided even beyond the actual cooperation agreement."  Pet. at 6.  However, the sentencing transcript indicates that the District Attorney's Office provided petitioner with "multiple opportunities to provide [ ] information, and she did not avail herself" of those opportunities.  Tr. at 53.  The prosecutor noted that petitioner provided information that was already known to detectives and was "very hesitant to provide information regarding more

cases than [the District Attorney's Office] actually knew about." Id.  Petitioner did not dispute the prosecutor's statement during the sentencing proceeding.

Moreover, to the extent that petitioner contends that she would have succeeded on appeal because the state court sentenced her in excess of her plea agreement by imposing the maximum sentence, the undersigned finds that this argument lacks merit. The state court explained on multiple occasions throughout the plea and sentencing proceedings that petitioner's sentence range from one-and-a-half to three years minimum and six to twelve years maximum.  See Tr. at 5, 11, 14, 15, 59.  Petitioner indicated that she understood her sentencing range.  See id.  The state court also affirmed that although petitioner's cooperation was in her best interest, the court and the court alone would determine her sentence and would not be bound by that cooperation, but would take such information into consideration in her sentencing.  See id. at 17-18, 31.  The state court ultimately sentenced petitioner to the maximum sentence imposed because of her "desire to systematically take advantage of elderly people."  Id. at 58, 59.  The court noted that this was petitioner's third conviction for crimes against the elderly, and that she had taken little responsibility for her crimes.  Id. at 58.

Accordingly, the undersigned concludes that petitioner would not have succeeded had she filed a timely notice of appeal.

For the sake of completeness, as to petitioner's unexhausted claim that Mr. Edwards "disparaged" her to the Appellate Division by stating that the state court honored her plea agreement "when it was clearly not adhered to per plea colloquy and allocution," Pet. at 6, the undersigned notes that this argument also fails on the merits.  As stated, the

transcript is clear that the state court was not bound to impose the minimum sentence even if petitioner had cooperated with the prosecutor's office. See Tr. at 17-18. Taking into consideration petitioner's "hesitance" in supplying new information under the cooperation agreement, as well as petitioner's prior convictions for crimes against the elderly, the state court sentenced petitioner to the maximum term allowed for in the plea agreement. See id. at 53, 58-59. Thus, petitioner's argument that Mr. Edwards' "disparaged" her by stating that the plea agreement was honored is contradicted by the record, which demonstrates that Mr. Edwards' statement was accurate as petitioner was sentenced within the terms of her plea agreement. Moreover, there is no indication that petitioner was prejudiced by Mr. Edwards' alleged actions. Accordingly, it is recommended that, in the alternative to dismissal on the grounds of exhaustion, petitioner's claim on this ground be dismissed on the merits.

## III. Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby,

**RECOMMENDED**, that petitioner's petition for a writ of habeas corpus (Dkt. No. 2) be **DENIED**; and it is further

**RECOMMENDED**, that no certificate of appealability should be issued with respect to any of petitioner's claims as petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2). See 28 U.S.C. § 2253(c)(2) ("A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."); see also Lucidore v. New York State Div.

27

of Parole, 209 F.3d 107, 112 (2d Cir. 2000); and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation

and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the

foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO**

**OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE**

**APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y

of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

DATED:       May 13, 2019
             Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

# Peoples v. Rivera

United States District Court for the Eastern District of New York

July 31, 2008, Decided; July 31, 2008, Filed

06-CV-3070 (ERK)

**Reporter**
2008 U.S. Dist. LEXIS 124805 *

LEROY PEOPLES, Petitioner, -against- ISRAEL RIVERA, Respondent,

**Notice:** NOT FOR PUBLICATION

**Prior History:** People v. Peoples, 44 A.D.3d 798, 842 N.Y.S.2d 737, 2007 N.Y. App. Div. LEXIS 10625 (N.Y. App. Div. 2d Dep't, Oct. 9, 2007)

**Counsel:** [*1] Leroy Peoples, Petitioner, Pro se, Rome, NY USA.

For Israel Rivera, Respondent: NEW YORK STATE ATTORNEY GENERALS OFFICE - GENERIC, LEAD ATTORNEY, New York State Attorney Generals Office; Anastasia Spanakos-Orfan, Queens County District Attorney's Office, Kew Gardens, NY USA.

**Judges:** Edward R. Korman, United States District Judge.

**Opinion by:** Edward R. Korman

## Opinion

### MEMORANDUM & ORDER

Korman, J.

I assume familiarity with the underlying facts and the procedural history of this case in which petitioner challenges the judgment of his conviction entered on his plea of guilty. Petitioner raises a number of claims. I address them seriatim.

1. Petitioner's claim that the charge contained in Count One of the indictment is barred by the statute of limitations involves an issue of state law and is not cognizable in petition pursuant to 28 U.S.C. § 2255.

2. Petitioner's claim that he was denied his Sixth Amendment right to a speedy trial is without merit for the reasons stated at pp. 32-38 of the Memorandum of Law filed by the District Attorney.

Moreover, both of foregoing grounds for relief are precluded by petitioner's plea of guilty. Tollett v. Henderson, 411 U.S. 258, 267, 93 S. Ct. 1602, 36 L. Ed. 2d 235 (1973).

3. Petitioner claims that he was denied the effective assistance of counsel based on several alleged deficiencies. None comes [*2] close to meeting Strickland's two pronged test. Specifically, petitioner's claim that petitioner's counsel failed to secure a direct appeal upon the request of petitioner is refuted by the affidavit of petitioner's counsel filed in response to petitioner's coram nobis application. While she did not have a specific recollection of any discussion with petitioner regarding an appeal, she averred that it was always her practice to file a notice of appeal when asked by a defendant. This alone was sufficient to dispense with a hearing on this record. See Campusano v. United States, 442 F.3d 770, 776 (2d Cir. 2006), citing inter alia, Chang v. United States, 250 F.3d 79, 85-86 (2d Cir. 2001), which held that a barebones assertion by a defendant that defense counsel deprived him of his right to testify could be rejected without a hearing if contradicted by an affidavit of counsel.

This consideration aside in this case, petitioner knowingly and voluntarily waived his right to appeal. The Supreme Court has never held that such a defendant may obtain relief without a showing a likelihood that he could have prevailed on the appeal of which he was deprived by the failure of counsel to honor his request to file a notice of appeal. While Campusano held that such a showing was unnecessary, it did not involve a proceeding [*3] pursuant to 28 U.S.C. § 2254 and it relied principally on Second Circuit precedent. Id. at 774-76. Consequently, it did not address the issue in the context of a case in which AEDPA deference was due to a contrary determination by a state court.

Roe v. Flores-Ortega, 528 U.S. 470, 484, 120 S. Ct. 1029, 145 L. Ed. 2d 985 (2000) does not compel a

2008 U.S. Dist. LEXIS 124805, *3

contrary result. Although the petitioner there pled guilty, he had not waived his right to appeal, as Justice Souter acknowledged in his opinion (concurring in part and dissenting in part) in <u>Flores-Ortega. Id</u>. at 488 n.1. Because cases such as <u>Flores-Ortega</u> ultimately rest on the premise that the conduct of counsel has deprived the defendant of his right to appeal from a judgment of conviction, <u>Rodriguez v. United States</u>, 395 U.S. 327, 329, 89 S. Ct. 1715, 23 L. Ed. 2d 340 (1969), they do not apply to a case in which the defendant's own waiver has deprived him of that right. Indeed, notwithstanding the plain language of Fed. R. Crim P. 32(j)(1)(B), which requires a district judge to advise a defendant of any right to appeal from the sentence, the Second Circuit has suggested that, "[w]here a waiver of appeal is of the type we have ruled generally enforceable, district judges sentencing after a plea of guilty should not give unqualified advice concerning a right to appeal." <u>United States v. Tang</u>, 214 F.3d 365, 370 (2d Cir. 2000) (Newman, J.). Only if defense counsel suggests a basis for appeal not precluded by the plea agreement should **[\*4]** the judge inform the defendant that "if, despite the waiver, he wishes to attempt to appeal some issue that is claimed to survive the waiver, he must file a notice of appeal within ten days." <u>Id</u>. at 370.

In sum, where a defendant knowingly and voluntarily waives his right to appeal, filing of a notice of appeal is essentially a useless gesture, unless he can show that, notwithstanding the waiver, he was somehow prejudiced. Petitioner here cannot show that he was so prejudiced. The issues that petitioner would have raised on appeal, the two discussed above, as well as the remaining ineffective assistance of counsel claims, are plainly without merit. The latter two for the reasons set out at pp. 41-46 of the Memorandum of Law filed by the District Attorney. Under these circumstances, it cannot be said that the Appellate Division unreasonably rejected petition for a writ of error <u>coram nobis</u> based on the failure of counsel to file a notice of appeal. Moreover, with respect to the ineffective assistance of counsel claims that go to the sentence, rather than the validity of the judgment of conviction on Count One, any success the petitioner would have would not affect the length of his sentence, **[\*5]** because the sentence on Count One, as corrected to reflect the fact that the underline offense was committed while he was a juvenile, is less than concurrent the sentence imposed on Count Two.

**Conclusion**

The petition is denied.

**SO ORDERED**:

Brooklyn, New York

July 31, 2008

/s/ Edward R. Korman

Edward R. Korman

United States District Judge

---

**End of Document**

639 Fed.Appx. 683
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE
32.1 AND THIS COURT'S LOCAL RULE 32.1.1.
WHEN CITING A SUMMARY ORDER IN A
DOCUMENT FILED WITH THIS COURT, A PARTY
MUST CITE EITHER THE FEDERAL APPENDIX
OR AN ELECTRONIC DATABASE (WITH THE
NOTATION "SUMMARY ORDER"). A PARTY CITING
A SUMMARY ORDER MUST SERVE A COPY OF IT
ON ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals,
Second Circuit.

James BRUNO, Petitioner–Appellant,
v.
SUPERINTENDENT, FIVE POINTS
CORRECTIONAL FACILITY, Respondent–Appellee.

No. 15–96.
|
Feb. 5, 2016.

**Synopsis**
**Background:** State prisoner filed petition for writ of
habeas corpus, based on claim that trial counsel was
ineffective for failure to file motion to suppress evidence
found during warrantless search of motel room that he
had been staying in. The United States District Court
for the Northern District of New York, Singleton, J.,
denied petition, and then issued certificate of appealability
(COA), and prisoner appealed.

**Holdings:** The Court of Appeals held that:

prisoner's claim of ineffective assistance of counsel was not
procedurally defaulted on collateral review, under New
York law, and thus, federal habeas review was not barred,
if claim involved evidence not on record on direct appeal,
and

manager of motel had apparent authority to consent to
warrantless search of prisoner's room after his tenancy
was terminated due to nonpayment of rent and manager
padlocked room.

Affirmed.

**\*684** Appeal from a judgment of the United States
District Court for the Northern District of New York
(Singleton, J.).
**UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED AND DECREED** that the
judgment of the district court be **AFFIRMED.**

**Attorneys and Law Firms**

Jonathan I. Edelstein, Edelstein & Grossman, New York,
NY, for Appellant.

Thomas B. Litsky, Assistant Attorney General (Barbara
D. Underwood, Solicitor General, and Nikki Kowalski,
Deputy Solicitor General on the brief), for Eric T.
Schneiderman, Attorney General of the State of New
York, for Appellee.

PRESENT: DENNIS JACOBS, RICHARD C.
WESLEY, DEBRA ANN LIVINGSTON, Circuit
Judges.

*SUMMARY ORDER*

James Bruno appeals from the judgment of the United
States District Court for the Northern District of New
York (Singleton, J.), denying and dismissing his petition
for habeas corpus pursuant to 28 U.S.C. § 2254. The
court granted a certificate of appealability as to one
issue: whether petitioner's trial counsel was ineffective for
failing to file a motion to suppress evidence found in the
search of a motel where Bruno had been staying. We
assume the parties' familiarity with the underlying facts,
the procedural history, and the issues presented for review.

1. A threshold issue is whether Bruno's claims
are procedurally defaulted. Bruno first raised his
ineffectiveness claim by collateral attack in a motion to
vacate his conviction pursuant to N.Y. C.P.L. § 440.10.
The state trial court rejected the claim on the merits, and
the Appellate Division rejected the claim as procedurally

barred because Bruno could have raised them on direct appeal. The district court agreed that the claim was procedurally defaulted before addressing the merits, in the alternative.

"We review *de novo* a district court's denial of a petition for a writ of habeas corpus." *Parker v. Ercole,* 666 F.3d 830, 834 (2d Cir.2012) (per curiam). Federal habeas review is barred if the constitutional claim was denied by a state court on a state procedural ground that "is both 'independent' of the merits of the federal claim and an 'adequate' basis for the court's decision." *Harris v. Reed,* 489 U.S. 255, 260, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). To determine whether a state procedural bar is "adequate to support the judgment," *Coleman v. Thompson,* 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), a federal habeas court looks to **\*685** whether the state rule at issue is "firmly established and regularly followed," *Ford v. Georgia,* 498 U.S. 411, 423–24, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991); *Bierenbaum v. Graham,* 607 F.3d 36, 47 (2d Cir.2010), and appropriately applied "in the specific circumstances presented in the case," *Cotto v. Herbert,* 331 F.3d 217, 239–240 (2d Cir.2003) ("[T]he principles of comity that drive the doctrine counsel that a federal court that deems a state procedural rule inadequate should not reach that conclusion lightly or without clear support in state law." (quoting *Garcia v. Lewis,* 188 F.3d 71, 77 (2d Cir.1999))).

Bruno contends that his ineffective assistance claim is a "mixed" claim that involves both record and non-record evidence and that he thinks should have been permitted to raise it in a collateral § 440.10 proceeding. *See People v. Brown,* 45 N.Y.2d 852, 853–54, 410 N.Y.S.2d 287, 382 N.E.2d 1149 (1978) ("[I]n the typical case it would be better, and in some cases essential, that an appellate attack on the effectiveness of counsel be bottomed on an evidentiary exploration by collateral or post-conviction proceeding brought under CPL 440.10...." (citation omitted)); *Contant v. Sabol,* 987 F.Supp.2d 323, 351–52 (S.D.N.Y.2013) (collecting cases where federal habeas review was not barred by procedural default for "mixed claims" of ineffective assistance of counsel that relied on matters both in and outside the record). The parties dispute whether petitioner has relied upon documents outside the record—*i.e.,* the search warrant and motel rules—as well as whether certain affidavits (which were relied upon) were outside the record. We will assume

without deciding that the claim is mixed and therefore not procedurally defaulted. [1]

2. Bruno's ineffective assistance of counsel claim fails on the merits. To succeed on a claim of ineffective assistance of counsel, a petitioner must show "that (1) the performance of his counsel was objectively unreasonable and (2) there is a reasonable probability that, but for [the] deficient performance, the result of the proceeding would have been different." *Parker,* 666 F.3d at 834; *see Strickland v. Washington,* 466 U.S. 668, 687–88, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To satisfy the prejudice requirement of *Strickland,* Bruno must show, at a minimum, that he could have prevailed on a properly pursued suppression motion. *See Kimmelman v. Morrison,* 477 U.S. 365, 375, 382, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) ("[A] meritorious Fourth Amendment issue is necessary to the success of a Sixth Amendment claim...."); *United States v. Matos,* 905 F.2d 30, 32 (2d Cir.1990). Bruno's suppression motion would not have been successful.

At the time of Bruno's arrest, he had been staying at a motel owned by BROC, a Vermont community action agency that houses homeless families. As a condition **\*686** of his placement there by the Rutland (Vermont) County Housing Coalition, he was required to pay three days' rent twice per month. Although Bruno now claims that he was current on his rent payments, the record is to the contrary: Donna Stearns, the manager of the motel, testified that Bruno was in arrears, and Jacqueline LaFoe, who was staying in the motel with Bruno, acknowledged the delinquent rent payment to investigators at the time she and Bruno were arrested. *See* App'x at 35 ("[LaFoe] expected that they might be locked out because they had not paid the rent...."). Because Bruno was in arrears, Donna Stearns padlocked the door and later inventoried its contents pursuant to hotel policy. At the manager's invitation, an investigator was present during the creation of the inventory and took pictures. Bruno claims that this constituted a search in violation of the Fourth Amendment.

Although it is disputed whether Bruno had a reasonable expectation of privacy in the motel room, or whether Bruno was actually in arrears, the officers were entitled to rely upon Stearns's representation that she was the motel manager and that Bruno's tenancy had terminated for non-payment of rent. *See United States v. Elliott,* 50

F.3d 180, 186 (2d Cir.1995) ("[E]ven if the third party did not have the requisite relationship to the premises, and therefore lacked the authority to give a valid consent, official reliance on his consent may validate the search if it was reasonable for the officers to believe he had the requisite relationship."). Stearns, as the manager of the property, had apparent authority to consent to the search of unoccupied units in the motel, and the officers reasonably relied upon these representations. *See id.* at 185 ("Consent may validly be granted by the individual whose property is to be searched, or by a third party who possesses common authority over the premises." (citations omitted)). To the extent there was a mistake of fact regarding consent or whether Bruno was still a tenant at the time of the inventory, it was reasonable, and Bruno's suppression motion would have failed. Accordingly, the habeas petition must be denied and dismissed.

For the foregoing reasons, and finding no merit in Bruno's other arguments, we hereby AFFIRM the judgment of the district court.

**All Citations**

639 Fed.Appx. 683

---

Footnotes

1    Whether Bruno should have brought this ineffectiveness claim on direct appeal is complicated. Prior appellate counsel raised numerous ineffective assistance of counsel claims that appear to have been at least partially based on matters outside the record, including a claim that trial counsel should have moved the court to suppress evidence seized from Bruno's car when he was stopped without probable cause. Bruno does not claim that appellate counsel was ineffective, and has offered no explanation for why appellate counsel could successfully raise numerous ineffective assistance of counsel claims, including one suppression claim, but could not have raised on direct appeal a second suppression claim. *See Sweet v. Bennett,* 353 F.3d 135, 140 (2d Cir.2003)("[Petitioner] chose to bring his other ineffective assistance of counsel claims on direct appeal, so he cannot claim that he was consolidating all of his Sixth Amendment claims for one collateral attack with the benefit of a new evidentiary record for those other claims.").

---

End of Document                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.    3

2014 WL 2711803
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Felipe MERCEDES, Petitioner,
v.
SUPERINTENDENT, Respondent.

No. 9:12–CV–0687 (DNH).
|
Signed June 16, 2014.

**Attorneys and Law Firms**

Felipe Mercedes, Bronx, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney General, Thomas B. Litsky, Ass't Attorney General, of Counsel, New York, NY.

**DECISION and ORDER**

DAVID N. HURD, Senior District Judge.

**I. INTRODUCTION**

 **\*1** Currently pending is petitioner's petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. Dkt. No. 1 ("Pet."). Petitioner argues in his petition that he received ineffective assistance of counsel because (1) counsel failed to file a notice of appeal; (2) counsel failed to pursue a defense that the county court lacked jurisdiction; and (3) counsel failed to advise petitioner of the immigration consequences of his guilty plea. Pet.'s Mem. of L. at 11–20, Dkt. No. 1–1. Respondent opposes the petition. Resp.'s Mem. of Law in Opp'n to the Pet. for a Writ of Habeas Corpus, Dkt. No. 16. For the reasons below, the petition will be denied and dismissed.

**II. Effect of Petitioner's Release from Custody**

According to publicly available records maintained by the New York State Department of Corrections and Community Supervision ("DOCCS"), and in petitioner's letter updating his address, petitioner was released from state custody on this conviction on February 28, 2014. See Dkt. No. 23; http://nysdoccslookup.doccs.ny.gov. Petitioner's post-release supervision is set to expire on or about February 28, 2019.

See http://nysdoccslookup.doccs.ny.gov. Regardless of a petitioner's subsequent release, it is within the jurisdiction of a federal court to issue a writ of habeas corpus if the petitioner was "in custody" when his petition was filed. Carafas v. LaVallee, 391 U.S. 234, 237–38 (1968). Since petitioner was in custody when he filed his petition, the court retains jurisdiction over the petition.

Subject matter jurisdiction, however, is limited by Article III, Section 2 of the United States Constitution to cases that present a "case or controversy." Spencer v. Kemna, 523 U.S. 1, 7 (1998); Baur v. Veneman, 352 F.3d 625, 631–32 (2d Cir.2003). Habeas petitioners no longer in custody must demonstrate the existence of a "concrete and continuing injury" or some " 'collateral consequence' of the conviction" in order for a petition to be granted. Spencer, 523 U.S. at 7.

The Supreme Court has stated that a challenge to an underlying conviction itself carries the presumption that a collateral, adverse consequences exists. Spencer, 523 U.S. at 12 ("[I]t is an 'obvious fact of life that most criminal convictions do in fact entail adverse collateral legal consequences.' ") (quoting Sibron v. New York, 392 U.S. 40, 55 (1968)); see Evitts v. Lucey, 469 U.S. 387, 391 n. 4 (1985). Accordingly, this petition does not appear to have been rendered moot by petitioner's release from prison, and thus it will be addressed. Cobos v. Unger, 534 F.Supp.2d 400, 403 (W.D.N.Y. Feb. 14, 2008) (citing Sibron, 392 U .S. at 54–56).

**III. RELEVANT BACKGROUND**

In a 112 count sealed indictment naming twenty-one individuals, petitioner was charged with one count of conspiracy in the second degree (Count 1); two counts of criminal sale of a controlled substance in the first degree (Counts 72 and 104); two counts of criminal possession of a controlled substance in the first degree (Counts 70 and 102); and two counts of criminal possession of a controlled substance in the third degree (Counts 71 and 103). See County Court Decision Denying Pet.'s § 440.10 Motion at 1, Dkt. No 1–2. The indictment was the result of a lengthy investigation by the New York Statewide Organized Crime Task Force, with the assistance of several law enforcement agencies, and alleged that petitioner, along with other defendants, conspired to possess and sell large amounts of cocaine in several counties throughout New York State. Id. On August 5, 2010, petitioner was convicted, upon a negotiated guilty

plea, of an amended count of criminal possession of a controlled substance in the second degree (Count 102) in full satisfaction of the charges naming him in the indictment. *Id; see also* August 5, 2010 Plea Tr., Dkt. No. 17–9. On November 17, 2010, he was sentenced to a determinate term of imprisonment of six years and five years of post-release supervision. *Id; see also* November 17, 2010 Sent. Tr., Dkt. No. 17–9. As a condition of the plea, petitioner waived his right to appeal. *Id.* After the expiration of his time to file a Notice of Appeal, petitioner sought permission from the Appellate Division, Fourth Department to file a late notice of appeal. *Id.* That motion, and his subsequent motion to reconsider, were denied. *Id.*

**\*2** Petitioner filed a motion to vacate the judgment of conviction pursuant to N.Y. C.P.L. § 440.10 ("440.10 Motion"), which alleged that the Cayuga County Court lacked jurisdiction and that petitioner received ineffective assistance of counsel. *See* Pet.'s 440.10 Motion, Dkt. No. 17–8; County Court Decision Denying Pet.'s 440.10 Motion, Dkt. No. 17–10. On November 4, 2011, the motion was denied. The Appellate Division denied petitioner's motion for leave to appeal the denial of petitioner's 440.10 Motion on March 7, 2012. App. Div. Decision Denying Pet.'s Motion for Leave to Appeal, Dkt. No. 17–14. This action followed.

## IV. DISCUSSION

### A. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state court only if, based upon the record before the state court, the state court's decision: (1) was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. §§ 2254(d)(1), (2); *Cullen v. Pinholster,* ––– U.S. ––––, 131 S.Ct. 1388, 1398, 1400 (2011); *Premo v. Moore,* ––– U.S. ––––, 131 S.Ct. 733, 739 (2011); *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007). This standard is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt." *Felkner v. Jackson,* ––– U.S. ––––, 131 S.Ct. 1305, 1307 (2011) (per curiam) (quoting *Renico v. Lett,* 559 U.S. 766, 773 (2010) (internal quotation marks omitted)).

The Supreme Court has repeatedly explained that "a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with th[e Supreme] Court's precedents.' " *Nevada v. Jackson,* ––– U.S. ––––, 133 S.Ct. 1990, 1992 (2013) (per curiam) (quoting *Harrington v. Richter,* ––– U.S. ––––, 131 S.Ct. 770, 786 (2011)); *see Metrish v. Lancaster,* ––– U.S. ––––, 133 S.Ct. 1781, 1787 (2013) (explaining that success in a habeas case premised on § 2254(d)(1) requires the petitioner to "show that the challenged state-court ruling rested on 'an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.' ") (quoting *Richter,* 131 S.Ct. at 786–87)).

Additionally, the AEDPA foreclosed " 'using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.' " *Parker v. Matthews,* ––– U.S. ––––, 132 S.Ct. 2148, 2149 (2012) (per curiam) (quoting *Renico,* 559 U.S. at 779). A state court's findings are not unreasonable under § 2254(d) (2) simply because a federal habeas court reviewing the claim in the first instance would have reached a different conclusion. *Wood v. Allen,* 558 U.S. 290, 301 (2010). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable-a substantially higher threshold." *Schriro,* 550 U.S. at 473. Finally, federal habeas courts must presume that the state courts' factual findings are correct unless a petitioner rebuts that presumption with " 'clear and convincing evidence.' " *Schriro,* 550 U.S. at 473–74 (quoting § 2254(e)(1)).

### B. Ineffective Assistance of Counsel

**\*3** To demonstrate constitutionally ineffective assistance of counsel, a petitioner must show that counsel's performance fell below an objective standard of professional reasonableness, and but for counsel's alleged errors, the result of the proceedings would have been different, and as a result, petitioner suffered prejudice. *Premo,* 131 S.Ct. at 739; *Strickland v. Washington,* 466 U.S. 668, 694 (1984). A petitioner must overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ... [and] that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland,* 466 U.S. at 689 (quoting *Michel v. Louisiana,* 350 U.S. 91,

101 (1955)). Even if petitioner can establish that counsel was deficient, he still must show that he suffered prejudice. *Id.* at 693–94.

Meeting this burden is "never an easy task ... [and] establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult." *Premo,* 131 S.Ct. at 739–40 (citations and internal quotation marks omitted). When reviewing a state court's decision under § 2254, "[t]he question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable-a substantially higher threshold." *Knowles v. Mirzayance,* 556 U.S. 111, 123 (2009) (internal quotation marks and citation omitted). Federal habeas courts "must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)" because "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable." *Harrington v. Richter,* —— U.S. ——, 131 S.Ct. 770, 788 (2011). Instead, "the question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

### 1. Failure to File a Notice of Appeal

Plaintiff first claims that trial counsel was ineffective for failing to file a notice of appeal. Pet. at 4. Specifically, he alleges that he "explicitly instructed counsel Brenner to file a notice of appeal. He did so as of the time of the sentencing proceeding, immediately following the court's pronouncement of judgment." Pet.'s Mem. of L. at 12, Dkt. No. 1–1. The Appellate Division's rejection of this claim was not contrary to or an unreasonable application of clearly established Supreme Court precedent. An attorney who fails to file a notice of appeal after being instructed to do so is per se ineffective. *Roe v. Flores–Ortega,* 528 U.S. 470, 478 (2000). However, absent instruction, it is not unreasonable for counsel to forego such filing. *Id.* ("Counsel performs in a professionally unreasonable manner only by failing to follow the defendant's express instructions with respect to an appeal."); *see also Campusano v. United States,* 442 F.3d 770 (2d Cir.2006). Moreover, an attorney is required to consult with his client regarding an appeal only if: (1) a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) the particular defendant reasonably demonstrated to counsel that he was interested in appealing and there is a reasonable probability that, but for counsel's deficient

failure to consult with him about an appeal, defendant would have timely appealed. *Galviz Zapata v. U.S.,* 431 F.3d 395, 397 (2d Cir.2005) (citations omitted).

**\*4** When petitioner entered his plea on August 5, 2010, the court discussed with him the implications of pleading guilty. Plea Tr. at 10, Dkt. No. 17–9. Petitioner stated that he was in possession of more than four ounces of cocaine on the date in question, and petitioner stated that he was pleading guilty voluntarily and upon his own free will. *Id.* Petitioner also stated that he was satisfied with the services of his attorney. *Id.*

At sentencing on November 17, 2010, plaintiff and his attorney completed a Notice of Right to Appeal form, and each signed his name beneath a checked box that reads, "I do not want to appeal." [1] *See* Dkt. No. 17–3 at 8. This form indicated that petitioner had a right to appeal his conviction and that a notice of appeal would need to be filed within thirty days of the sentence. *Id.* At sentencing, the trial court informed petitioner that even though he waived his right to appeal, petitioner still had a right to appeal by filing a notice of appeal within thirty days. Sent. Tr. at 9, Dkt. No. 17–12.

Several months later, petitioner filed a motion for leave to file a late notice of appeal on April 14, 2011. Dkt. No. 17–1. Petitioner alleged that counsel failed to follow his instruction to file a notice of appeal, and did not properly advise him regarding the procedure to file a notice pro se. *Id.* The People's response to petitioner's application to file a late notice of appeal included an affidavit from trial counsel. Dkt. No. 17–2. Trial counsel "strenuously den[ied]" petitioner's allegations that he had instructed trial counsel to file a notice of appeal, and affirmed that petitioner "entered a guilty plea knowingly [sic], intelligently, and voluntarily, and was aware of the sentence he would receive as a result of that plea." *Id.* at 3–4.

Petitioner's sworn statements on the record at sentencing, the Notice of Right to Appeal form, and counsel's sworn statement all support the conclusion that petitioner did not instruct counsel to file a notice of appeal. Petitioner's current conclusory allegations to the contrary are insufficient to establish that counsel was ineffective for failing to file a notice of appeal. Additionally, the Appellate Division denial of application was not contrary

to or an unreasonable application of Supreme Court precedent.

Petitioner's claim based on counsel's failure to file a notice of appeal will be dismissed.

### 2. Failure to Pursue a Jurisdictional Defense

Petitioner next claims that trial counsel was ineffective for failing to "contest the Cayuga County Court's jurisdiction" because if trial counsel had "advanced such claim prior to the plea proceeding, the matter would have had to be dismissed." Pet.'s Mem. of L. at 16–17, Dkt. No. 1–1.

Petitioner raised this claim in his 440.10 Motion. *See* Dkt. No. 17–8 at 3–7. The County Court denied petitioner's 440.10 Motion, finding that his contentions were contained on the record, and holding that because petitioner had failed to perfect a timely appeal, his claims were procedurally barred by N.Y. C.P.L. § 440.10(2)(c). [2] *See* Dkt. No. 17–10 at 4. The state court's rejection of Petitioner's claims pursuant to C.P.L. § 440.10(2)(c) rests upon an independent and adequate state ground and federal review of the claim is thus barred. *Clark v. Perez,* 510 F.3d 382, 393 (2d Cir.2008); *Sweet v. Bennett,* 353 F.3d 135, 140 (2d Cir.2003); *Aparicio v. Artuz,* 269 F.3d 78, 92–93 (2d Cir.2001). That is true even though the state court also rejected the claims on other grounds in the alternative. *See Harris v. Reed,* 489 U.S. 255, 264 n. 10 (1989) ("[A] state court need not fear reaching the merits of a federal claim in an alternative holding" so long as it explicitly invokes a state procedural rule as a separate basis for its decision).

**\*5** Petitioner's claim is procedurally defaulted absent a showing of cause for the default and actual resulting prejudice, or that the denial of habeas relief would result in a fundamental miscarriage of justice. *House v. Bell,* 547 U.S. 518, 536–39 (2006); *Schlup v.. Delo,* 513 U.S. 298, 327 (1995). To establish cause, petitioner must show that some objective external factor impeded his ability to comply with the relevant procedural rule. *Maples v. Thomas,* — U.S. — —, 132 S.Ct. 912, 922 (2012); *Coleman v. Thompson,* 501 U.S. 722, 753 (1991) (citing *Murray v. Carrier,* 477 U.S. 478, 488 (1986)).

Petitioner has failed to allege or establish cause for his failure to raise this claim on direct appeal. Since

petitioner has not established cause for his procedural default, it need not be decided whether he suffered actual prejudice. *Murray,* 477 U.S. at 488 (referring to "cause-and-prejudice standard"); *Stepney,* 760 F.2d at 45. Petitioner has also not presented any new evidence that he is "actually innocent" of the crimes for which he was convicted. *See Schlup,* 513 U.S. at 327. The procedural default bars federal review of petitioner's claim.

Based on the foregoing, petitioner's claim based on the alleged failure to raise a jurisdictional defense is procedurally defaulted and therefore will be dismissed.

### 3. Failure to Advise Petitioner of Immigration Consequences

Petitioner's final claim is that trial counsel was ineffective because he failed to properly advise petitioner of the potential immigration consequences of his guilty plea. Pet.'s Mem. of L. at 14–17, Dkt. No. 1–1. Specifically, petitioner claims that counsel affirmatively misrepresented "the immigration consequences" of his plea because counsel informed him that he would not be deported as a result of the plea. Traverse at 6, Dkt. No. 19,. These arguments are unexhausted and without merit.

Petitioner raised this claim for the first time in his application for leave to appeal the denial of his 440.10 Motion, in which he argued that counsel was ineffective for failing to correctly advise him, or to advise him at all, "regarding the specific immigration consequences of his guilty plea." Dkt. No. 17–11 at 4–5. Under New York law, consideration before the Appellate Division of leave applications related to the denial of 440.10 motions is discretionary. N.Y. C.P.L. § 450.15(1) (stating that a "certificate granting leave" is required to appeal an order denying a 440.10 motion). Unfortunately for petitioner, "[r]aising a federal claim for the first time in an application for discretionary review" is insufficient to exhaust the claim unless discretionary review is granted and the claim is addressed on the merits. *St. Helen v. Senkowski,* 374 F.3d 181, 183 (2d Cir.2004) (citing *Castille v. Peoples,* 489 U.S. 346, 351 (1989)); *Lurie v. Wittner,* 228 F.3d 113, 124 (2d Cir.2000). Here, the Appellate Division denied petitioner's leave application, finding that "there is no question of law or fact which ought to be reviewed by this Court[.]" Dkt. No. 17–14. Therefore, this claim remains unexhausted.

**\*6** Petitioner could still exhaust his claim by filing a successive 440.10 motion. There is no time limit within which an individual must bring a § 440.10 motion, and the statute does not prohibit successive applications. *See* N.Y. C.P.L. § 440.10(1) (stating that a motion to vacate may be made "[a]t any time after the entry of a judgment."). District courts, however, have the discretion to dismiss unexhausted claims on the merits if the claims are "plainly meritless," *Rhines v. Weber,* 544 U.S. 269, 277 (2005), or "patently frivolous," *McFadden v. Senkowski,* 421 F.Supp.2d 619, 621 (W.D.N.Y.2006). *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Here, petitioner's claim does not warrant habeas relief under either standard.

To establish ineffective assistance of counsel in the context of a guilty plea, a petitioner must show that counsel's performance was deficient and that there is a reasonable probability that, but for counsel's deficient performance, the petitioner would not have pleaded guilty and would instead have gone to trial. *Lafler v. Cooper,* — U.S. ——, 132 S.Ct. 1376, 1384 (2012); *Missouri v. Frye,* — U.S. ——, 132 S.Ct. 1399, 1409 (2012); *Hill v. Lockhart,* 474 U.S. 52, 59 (1985). When a guilty plea implicates immigration consequences, counsel must so advise the defendant. *Padilla v. Kentucky,* 559 U.S. 356, 369 (2010). If the potential "deportation consequences of a particular plea are unclear or uncertain, ... a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences." *Id.* Even if a petitioner can establish that counsel was deficient, he must convince the court that a decision to reject a plea offer would have been rational under the circumstances. *Padilla,* 559 U.S. at 372; *see Francis v. United States,* No. 1:12–CV–1362, 2013 WL 673868, at \*4 (S.D.N.Y. Feb. 25, 2013) ("In the immigration context, a petitioner must affirmatively prove prejudice by putting forth credible evidence that he would actually have insisted on going to trial had he known of the precise immigration consequences of his conviction."), *appeal dismissed* — F. App'x ——, 2014 WL 1258360 (2d Cir. Mar. 28, 2014).

Here, petitioner presented no evidence in support of his claim either that counsel failed to advise him, or incorrectly advised him, of the specific immigration consequences of his plea. His conclusory allegations,

without more, are insufficient. Pet. at 18.[3] In any event, even assuming counsel's performance was deficient, petitioner has not shown that rejecting the plea agreement in this case would have been rational. *Padilla,* 559 U.S. at 372. Nor has he offered any "objective evidence that going to trial would not have resulted in deportation." *Contant v. Sabol,* No. 1:10–CV–3434, 2013 WL 6425006, at \*9 (S.D.N.Y. Dec. 6, 2013)

**\*7** Petitioner admitted that on August 14, 2009, he possessed greater than four ounces of cocaine and that the cocaine was in a vehicle he turned over to a co-conspirator. Plea Tr. at 6–7, Dkt. No. 17–9. Although petitioner claims that his role in the conspiracy was minimal, and his culpability was less than others charged in the indictment, he does not argue that he lied under oath, and his statements during the plea colloquy are properly considered as evidence of his guilt. *See Blackledge v. Allison,* 431 U.S. 63, 74 (1977) ("Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible."); *Doe v. Menefee,* 391 F.3d 147, 168 (2d Cir.2004) ("[T]he district court's discounting of Doe's admission of guilt at his plea allocution was clearly erroneous" where there was no evidence that Doe lied under oath). Petitioner's argument that there is a "reasonable probability" he would have been acquitted because Cayuga County Court lacked jurisdiction is without merit for the reasons discussed in this decision. Finally, petitioner understood that by pleading guilty, he avoided a possible fourteen year sentence if convicted after a trial. Plea Tr. at 8, Dkt. No. 17–9. The sentence imposed in exchange for his plea was six years in prison followed by five years post-release supervision-less than half of the sentence he faced. Petitioner has "offered no evidence demonstrating why he would have foregone the substantial benefit resulting from his plea and risked a harsher sentence at trial." *Contant,* 2013 WL 6425006, at \*7 (S.D.N.Y. Dec. 6, 2013) (quoting *Francis,* 2013 WL 673868, at \*5) (internal quotation marks omitted).

In sum, petitioner has failed to "affirmatively prove prejudice." *Strickland,* 466 U.S. at 693; *see Contant,* 2013 WL 6425006, at \*9 ("[G]iven the strength of the evidence against [the petitioner], and given his failure even now to assert his innocence or to identify any way in which he could have succeeded at trial, Petitioner

'cannot demonstrate that the case against him could have resulted in anything but eventual deportation, regardless of his decision to plead guilty or to proceed to trial.' ") (quoting *Francis,* 2013 WL 673868, at *4). This portion of petitioner's ineffective assistance of counsel claim will therefore be denied and dismissed.


## V. CONCLUSION

Therefore, it is

ORDERED that

1. The petition, Dkt. No. 1, is **DISMISSED;**

2. No certificate of appealability ("COA") shall issue in this case because petitioner has failed to make a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2);[4] and

3. The Clerk serve copies of this Decision and Order upon the parties in accordance with the Local Rules.

IT IS SO ORDERED.


**All Citations**

Not Reported in F.Supp.3d, 2014 WL 2711803


Footnotes

1    The form also states that petitioner had a right to appeal his conviction and that if he wanted to appeal, a Notice of Appeal must be filed within thirty days of the date of sentence. Dkt. No. 17–3 at 8.

2    The County Court also held in the alternative that petitioner's claims "lack merit. Cayuga County is a proper venue by reason of the conspiracy exception provided in CPL § 20.40(2)(d). Inasmuch as [petitioner's] jurisdictional claims are without merit, his claim of ineffective assistance of counsel based on that ground is moot." Dkt. No. 17–10 at 4. This holding is not contrary to *Strickland,* 466 U.S. 668.

3    It is worth noting that at sentencing, counsel explained to the court petitioner's education in the Dominican Republic, and petitioner's intention to continue his education while in prison. Sent. Tr. at 5–6, Dkt. No. 17–12. Counsel stated that doing so would be important "if he's able to stay in this country, and I believe that he might be able to [.]" *Id.* at 6; *see Padilla,* 559 U.S. at 372.

4    *See Miller–El v. Cockrell,* 537 U.S. 322, 336 (2003) ( "[Section] 2253 permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right' "); *Richardson v. Greene,* 497 F.3d 212, 217 (2d Cir.2007) (holding that, if the court denies a habeas petition on procedural grounds, "the certificate of appealability must show that jurists of reason would find debatable two issues: (1) that the district court was correct in its procedural ruling, and (2) that the applicant has established a valid constitutional violation") (citation omitted)).

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2004 WL 2123497
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Tarik HARGROVE, Petitioner,

v.

UNITED STATES OF AMERICA, Respondent.

No. 03–CV–6634T, 02–CR–6064T, 01–CR–6112T.
|
Aug. 10, 2004.

**Attorneys and Law Firms**

Tarik Hargrove, White Deer, PA, pro se.

Gary Bitetti, Esq., Rochester, NY, for Defendant.

DECISION and ORDER

TELESCA, J.

*INTRODUCTION*

**\*1** Petitioner, Tarik Hargrove, ("Hargrove"),
proceeding *pro se,* petitions this Court for a writ of habeas
corpus pursuant to 28 U.S.C. § 2255, to vacate, set aside,
or correct his sentence. On June 21, 2002, Hargrove pled
guilty to violations of 18 U.S.C. § 924(c)(1), (possessing
a firearm in furtherance of a drug trafficking crime), and
21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), (possession of
cocaine base with intent to distribute). He was sentenced
to consecutive terms of imprisonment of 57 months on the
drug conviction, and 60 months on the gun conviction, for
a total of 117 months imprisonment.

In his petition, Hargrove claims that his attorney was
ineffective because he failed to file a direct appeal after
being directed to do so by Hargrove. The government
opposes Hargrove's position, and contends that: (1)
Hargrove's petition is barred by his plea agreement, in
which he agreed to waive his right to appeal or collaterally
attack his sentence; (2) his claims are barred by procedural
default for failure to raise them on direct appeal; and (3)
his claims are without merit.

*BACKGROUND*

On October 23, 2001, Petitioner Tarik Hargrove while
driving in the City of Rochester was pulled over by a
City of Rochester, New York Police Officer for failing to
signal before turning. Officers then learned that Hargrove
had a suspended license, and placed him under arrest.
In response to questioning from the arresting officers,
Hargrove admitted that he had a gun, but denied having
any drugs. Subsequently, the officers observed what
appeared to be an "eightball" of cocaine on the drivers
seat of the car. Hargrove then admitted to having drugs in
his underwear. The officers found 7 "eightballs" of crack
cocaine and two bags of marijuana under Hargrove's
clothing.

On November 15, 2001, a federal grand jury returned a
four count indictment against Hargrove. The first count
charged him with possessing and carrying a firearm in
furtherance of a drug trafficking crime in violation of
18 U.S.C. § 924(c)(1). Count two charged him with
possession with intent to distribute five grams or more of
cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and
841(b)(1)(B). Count three charged him with possession
with intent to distribute cocaine base in violation of 21
U.S.C. §§ 841(a)(1) and 841(b)(1)(C). Count four charged
him with possession of marijuana in violation of 21 U.S.C.
§ 844(a).

The defendant entered into a plea agreement with the
government in which he agreed to plead guilty to a
violation of 18 U.S.C. § 924(c)(1) (possessing a firearm
in furtherance of a drug trafficking crime) and 21 U.S.C.
§§ 841(a)(1) and 841(b)(1)(C) (possession of cocaine base
with intent to distribute). The plea agreement indicated
that the defendant had possessed 27.327 grams of cocaine
base which, under the Federal Sentencing Guidelines,
resulted in an offense level of 28. The agreement
contemplated a three level reduction of the offense level
to 25 for acceptance of responsibility. The agreement
further provided that the defendant had a criminal history
category of I, which, when combined with the adjusted
offense level, resulted in a sentence of 57 to 71 months
for the drug charge. The parties agreed on a 57 month
term for the drug charge and a minimum 60 month term
for the gun charge, to be served consecutively with the
drug charge. In addition, the plea agreement also expressly
indicated that petitioner could not appeal or collaterally

2004 WL 2123497

attack his sentence if he was sentenced in accordance with the terms set forth in the plea agreement, or if he received a more favorable sentence. On June 21, 2002, Hargrove executed the plea agreement and entered a plea of guilty to two counts of the Indictment. On September 20, 2002, this Court sentenced Petitioner to 117 months incarceration in accordance with the terms of the plea agreement.

**\*2** On December 15, 2003, Hargrove filed the instant petition claiming ineffective assistance of his trial counsel for failing to file a direct appeal. Pursuant to *Wims v. United States,* 225 F.3d 186, 188–91 (2d Cir.2000) (recognizing that the one-year statute of limitations period for filing a petition for habeas corpus relief to be tolled under certain circumstances) the court, without passing on the timeliness of Hargrove's petition, accepted Hargrove's petition for filing.

### DISCUSSION

I. Petitioner's claims are barred by the valid waiver of his right to appeal or collaterally attack his sentence.

The waiver of a right to appeal or collaterally attack a sentence contained in a plea agreement is generally enforceable, as long as the sentence received is equal to or more favorable than the sentence agreed upon in the plea agreement. *United States v. Djelevic,* 161 F.3d 104, 106–07 (2d Cir.1998) (per curiam) (citations omitted). However, a waiver is not enforceable if a defendant can show that the ineffective assistance of his counsel in negotiating his plea agreement caused him to unknowingly or involuntarily agree to the plea. *United States v. Hernandez,* 242 F.3d 110, 113–14 (2d Cir.2001) (per curiam).

If the constitutionality of the process by which the plea agreement was consummated is found to be sufficient to show that the plea was entered into knowingly and voluntarily, then the plea agreement waiver bars the filing of an appeal with respect to any issues that fall within the scope of that waiver. *Id.* at 114. Accordingly, pursuant to Rule 11(b) of the Federal Rules of Criminal Procedure, when accepting the plea of a criminal defendant, the court must question the defendant to ensure that the defendant has entered the plea agreement knowingly and voluntarily, and without coercion. Further, the court must ensure that the defendant knows the elements of the crime, the evidence in support of the charges against him, and the consequences of accepting the plea agreement. Fed.R.Crim.P. 11(b). If the court has followed the procedure outlined in Rule 11(b) then the defendant is bound by his statements made during the plea colloquy. *Warner v. United States,* 975 F.2d 1207, 1212 (6th Cir.1992) (citations omitted), *cert. denied,* 507 U.S. 932, 113 S.Ct. 1314, 122 L.Ed.2d 702 (1993).

The petitioner bears the burden of showing that the waiver of his right to appeal or collaterally attack his sentence was not knowing or voluntary. *United States v. Wildes,* 910 F.2d 1484, 1486 (7th Cir.1990). In the instant case, however, Hargrove has failed to argue that he entered into his plea unknowingly or involuntary because of the ineffective assistance of his counsel. Instead, Hargrove's argument is that his attorney was ineffective because his attorney failed to file an appeal after Hargrove indicated though correspondence that he wanted to appeal. Moreover, the facts show that Hargrove was well aware that he waived his right to appeal the sentence. The transcripts of the plea colloquy establish that Hargrove knowingly and voluntarily accepted the plea agreement; that he understood the elements of the charges against him; that he agreed to the evidence supporting the charges against him, and that he was aware of and accepted the potential results and consequences of pleading guilty. *See* June 21, 2002 Transcript of Proceedings. Specifically, Hargrove acknowledged that by pleading guilty he would waive his right to appeal and/or collaterally attack the sentence imposed if that sentence was equal to or more favorable than the sentence contemplated in the plea agreement. Since the court properly satisfied the requirements of Rule 11(b) at the plea colloquy, and because Petitioner's sentence did not exceed the proposed 117 months, as set forth in the plea agreement, the waiver contained in the plea agreement is valid and binding. Therefore, Hargrove is barred from bringing his claims of ineffective assistance of counsel under a habeas corpus motion.

II. Petitioner's claims of ineffective assistance of counsel are without merit.

**\*3** Even if petitioner's claims of ineffective assistance of counsel were not barred because he waived those rights, Hargrove's claims are without merit. In order to prove ineffective assistance of counsel, a petitioner must satisfy a two part test. First, the petitioner must demonstrate that "counsel's representation fell below 'an objective standard of reasonableness' under '[p]revailing norms of practice." ' *Rosa,* 170 F.Supp.2d at 397 (citing

*Strickland v. Washington,* 446 U.S. 668, 688, 693–94 (1984)). Second, the petitioner must establish that he was prejudiced such that there is a "reasonable probability that 'but for the counsel's unprofessional errors, the result of the proceeding would have been different." ' *Id.* There is a "strong presumption" that counsel's conduct was within the broad spectrum of reasonable professional assistance because it is "too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence ..." *Strickland,* 446 U.S. at 689.

### A. *Hargrove cannot prove that counsel provided ineffective assistance by not filing an appeal.*

When evaluating claims of ineffective assistance of counsel related to a failure to pursue an appeal, the court must determine whether or not the petitioner would have appealed but for his counsel's errors. *Roe v. Flores–Ortega,* 528 U.S. 470, 476–77, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000). In this case, Hargrove cannot demonstrate that his counsel's failure to file a direct appeal, after allegedly being requested to do so by Hargrove, was unreasonable because Hargrove waived his right to appeal, and therefore could not have taken a direct appeal of his sentence absent an allegation of some underlying error, which Hargrove has not in this proceeding alleged. Where a defendant knowingly and voluntarily waived his right to appeal in a plea agreement and did so competently, he cannot then show that his defense counsel's failure to file a direct appeal prevented him from undertaking an appeal that he would have pursued. *Jolaoso v. United States,* 142 F.Supp.2d 306, 309 (E.D.N.Y.2001). In addition, an attorney is not ineffective in failing to file a notice of appeal where no appeal could be pursued in the first place due to the terms of the plea agreement. *Rosa,* 170 F.Supp.2d at 408. Therefore, an attorney cannot be faulted for failure to pursue an appeal that was legally barred. *Jackson v. United States,* 2002 WL 1968328, at *1 (S.D.N.Y. Aug.26, 2002). Here, Hargrove knowingly and voluntarily pled guilty; was not coerced into doing so; received a sentence that was contemplated in the plea agreement; and expressly waived his right to appeal in the plea agreement. He has not alleged any error with respect to his representation during the plea negotiations, but merely that his attorney failed to file an appeal. Therefore, his attorney was justified in not filing an appeal due to the fact that the right to appeal was waived under the valid plea agreement.

### B. *Hargrove cannot prove that he was improperly sentenced by the District Court.*

**\*4** Hargrove claims that he was improperly sentenced by this Court under § 841(b)(1)(C), for indeterminate amounts of controlled substances. Specifically, he argues that under *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), his sentencing range was improperly increased from 0 to 20 years, to 5 to 40 years imprisonment.

The Supreme Court in *Apprendi* held that, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi,* 530 U.S. at 490. However, the 2nd Circuit has held that "*Apprendi* does not apply where the sentence imposed is not greater then the prescribed statutory maximum for the offense of conviction." *Thomas v. United States,* 274 F.3d 655, 664 (2d Cir.2001) (en banc) (emphasis added).

The indictment against Hargrove initially contained a count of possession with intent to distribute 5 grams of cocaine or more pursuant to 21 U.S.C. § 841(a)(1) and (b)(1)(B), which subjected him to a sentence between 5 and 40 years imprisonment. However, the agreement he entered into with the government allowed him to plead guilty to possession with intent to distribute cocaine base pursuant to 21 U.S.C. § 841(a)(1) and (b)(1)(C), which *reduced* his sentencing range to 0 to 20 years imprisonment. Therefore, even though the plea agreement stated that he possessed 27.372 grams of crack cocaine, (which he admitted to possessing during the plea colloquy), the charge he plead to decreased—not increased—the minimum and maximum amount of years to which he could have been sentenced. In addition, the sentence that Hargrove actually received is less than the mandatory minimum sentence he could have received had he proceeded to trial with his case and been found guilty.

Since the maximum sentence that Hargrove could have received under 21 U.S.C. § 841(b)(1)(B) was 20 years and because he was sentenced to less then 20 years imprisonment, Petitioner's arguments under *Apprendi* are without merit.

*CONCLUSION*

2004 WL 2123497

Petitioner's habeas corpus claims of ineffective assistance of counsel are barred by the waiver of his right to appeal or collaterally attack his sentence expressed in his plea agreement. The plea agreement and waiver are valid and enforceable because they were entered into knowingly and voluntarily, and the sentence imposed was within the sentence contemplated in the plea agreement. In addition, Hargrove's claims of ineffective assistance of counsel, based on his attorney's failure to appeal his sentence as requested, and failure to argue that the court applied an erroneous sentence, are without merit. Accordingly, the Petitioner's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 is denied.

For the reasons set forth above, a certificate of appealability is denied. Petitioner has failed to make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253. Also, for the reasons set forth above, I hereby certify that appeal of this order would not be taken in good faith pursuant to 28 U.S.C. § 1915(a) and leave to appeal to the Court of Appeals as a poor person is hereby denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

**\*5** ALL OF THE ABOVE IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 2123497

---

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

509 Fed.Appx. 51
This case was not selected for
publication in the Federal Reporter.
United States Court of Appeals,
Second Circuit.

Phillip A. TAYLOR, Petitioner–Appellant,

v.

Frank RIVERA, Respondent–Appellee.

No. 11–4724–cv.
|
Jan. 30, 2013.

**Synopsis**

**Background:** After conviction by jury of attempted robbery in the first and second degrees and criminal possession of a weapon in the fourth degree was affirmed on appeal, 29 A.D.3d 450, 815 N.Y.S.2d 90, state prisoner filed petition for federal habeas corpus relief. The United States District Court for the Southern District of New York, P. Kevin Castel, J., 2011 WL 4472146, adopted report and recommendation of Debra C. Freeman, United States Magistrate Judge, and denied petition. Prisoner appealed.

**Holdings:** The Court of Appeals, Second Circuit held that:

decision that evidence was sufficient to convict defendant was not arbitrary application of New York law or federal constitution, and

it was not objectively unreasonable for New York trial court to reject defendant's sufficiency challenge.

Affirmed.

**\*52** Appeal from a judgment of the United States District Court for the Southern District of New York (P. Kevin Castel, Judge; Debra C. Freeman, Magistrate Judge ). UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment entered on September 29, 2011, is AFFIRMED.

**Attorneys and Law Firms**

Sally Wasserman, Esq., New York, NY, for Appellant.

Megan R. Roberts (Joseph N. Ferdenzi, on the brief), Assistant District Attorneys, for Robert T. Johnson, District Attorney, Bronx County, Bronx, NY, for Appellee.

PRESENT: RENNA RAGGI, PETER W. HALL and CHRISTOPHER F. DRONEY, Circuit Judges.

**SUMMARY ORDER**

**\*\*1** Petitioner Phillip A. Taylor appeals from the denial of his petition for habeas relief from his New York State conviction, following a jury trial, for attempted robbery in the first and second degrees, see N.Y. Penal Law §§ 110.00, 160.10[1], 160.15[4], and criminal possession of a weapon in the fourth degree, see id. § 265.01[1]. This court granted a certificate of appealability on Taylor's sufficiency challenge to the "display" element of first-degree attempted robbery. We review de novo a district court's denial of a writ of habeas corpus. See Cornell v. Kirkpatrick, 665 F.3d 369, 374 (2d Cir.2011). We assume the parties' familiarity with the facts and record of prior proceedings, which we reference only as necessary to explain our decision to affirm.

Taylor contends that, under New York law, the display element demands that the victim directly perceive action by defendant that manifests the presence of a gun. He maintains that a victim's observation of another person's reaction to a defendant's actions, without more, is insufficient to satisfy the display element. In any event, Taylor asserts that victim Anthony Asson's particular observations of customer Pedro Martinez's reaction were insufficient to permit Asson to perceive that Taylor had displayed a gun. We are not persuaded.

Taylor's first argument effectively charges New York courts with failing to understand their own law regarding the display element of first-degree attempted **\*53** robbery, a matter not within the scope of our habeas review. "Our federal constitution does not dictate to the state courts precisely how to interpret their own criminal statutes," Ponnapula v. Spitzer, 297 F.3d 172, 182 (2d Cir.2002), and " '[a] federal court may not issue the

writ on the basis of a perceived error of state law,' " *Santone v. Fischer,* 689 F.3d 138, 148 (2d Cir.2012) (quoting *Pulley v. Harris,* 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984)). Here, although the First Department summarily rejected Taylor's sufficiency challenge, *see People v. Taylor,* 29 A.D.3d 450, 451, 815 N.Y.S.2d 90 (1st Dep't 2006), insofar as that decision was grounded in a determination that a victim need not himself see the defendant display a firearm to conclude that there had been the requisite display, that decision "was in no sense an arbitrary application of New York law"[1] and "nothing in federal constitutional law ... prevented the Appellate Division" from reaching that conclusion. *Santone v. Fischer,* 689 F.3d at 149.

 Insofar as Taylor challenges the sufficiency of the inferential evidence in this case to prove display, he confronts a "twice-deferential" standard of review. *See Parker v. Matthews,* ─── U.S. ───, 132 S.Ct. 2148, 2152, 183 L.Ed.2d 32 (2012) (stating that (1) state court, on direct review, must uphold guilty verdict if evidence viewed in light most favorable to prosecution would permit *any* rational trier of fact to find essential elements of crime proved beyond a reasonable doubt and (2) habeas court may not upset state court rejection of sufficiency challenge unless objectively unreasonable); *accord Santone v. Fischer,* 689 F.3d at 148.

 **\*\*2** Here, Asson testified that, when he observed Martinez raise his arms after Taylor entered the store, he interpreted the action to mean that "something was wrong," "maybe a robbery," prompting him to lock himself in a bullet-proof cashier's booth and to call 911. J.A. 22. A rational jury could have concluded, from what Asson saw and did in response to what he saw Martinez do, that Asson thought Taylor had displayed a firearm. The reasonableness of such an inference was reinforced in this case by (1) Martinez's own testimony that *he* observed Taylor with a firearm; (2) police recovery of an operable shotgun from Taylor's vehicle 90 minutes after the robbery; and (3) the plea allocution of Michelle Clark, Taylor's accomplice, in which she stated that Taylor had a gun during the robbery. *See People v. Turner,* 96 A.D.3d 1392, 1393, 946 N.Y.S.2d 347 (4th Dep't 2012); *People v. Slater,* 13 A.D.3d 732, 733–34, 786 N.Y.S.2d 62 (3d Dep't 2004) (noting that, although victim was unavailable to testify at trial, "there was other proof from which **\*54** the jury could reasonably infer that [victim] perceived that defendant was armed with a gun during the commission of the robbery"). On this record, Taylor cannot show that it was objectively unreasonable for the First Department to reject his sufficiency challenge to the display element of first-degree attempted robbery under New York law. *See Santone v. Fischer,* 689 F.3d at 148.

 We have considered Taylor's remaining arguments and conclude that they are without merit. The judgment of the district court is AFFIRMED.

### All Citations

509 Fed.Appx. 51, 2013 WL 335970

---

Footnotes

[1]    The New York Court of Appeals has "broadly" construed the display requirement "to cover a wide range of actions which might reasonably create the impression in the mind of the victim that the robber is armed with a firearm," *People v. Lopez,* 73 N.Y.2d 214, 220–21, 538 N.Y.S.2d 788, 535 N.E.2d 1328 (1989), noting that "an object can be 'displayed' without actually being seen by the victim even in outline," *id.* at 222, 538 N.Y.S.2d 788, 535 N.E.2d 1328. More recently, the Fourth Department has stated that N.Y. Penal Law § 160.15 "does not specify who must view the display." *People v. Turner,* 96 A.D.3d 1392, 1393, 946 N.Y.S.2d 347 (4th Dep't 2012). In light of this precedent, Taylor's citation to cases in which defendant took no action consciously manifesting the presence of a weapon to the testifying victim, *see, e.g., People v. Ray,* 184 A.D.2d 596, 584 N.Y.S.2d 620 (2d Dep't 1992); *People v. York,* 134 A.D.2d 637, 521 N.Y.S.2d 531 (2d Dep't 1987); *People v. Carrington,* 127 A.D.2d 677, 511 N.Y.S.2d 673 (2d Dep't 1987), or in which the victim did not perceive the presence of a weapon, *see, e.g., In re Tafari S.,* 83 A.D.3d 1084, 922 N.Y.S.2d 448 (2d Dep't 2011), is not enough to demonstrate an arbitrary application of New York law.

---

**End of Document**                                                          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 4472146
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Phillip A. TAYLOR, Petitioner,
v.
Frank RIVERA, Superintendent, Respondent.

No. 07 Civ. 8668(PKC)(DF).
|
Sept. 27, 2011.

*ORDER ADOPTING REPORT
AND RECOMMENDATION*

P. KEVIN CASTEL, District Judge.

**\*1** The petition for a writ of habeas corpus was referred to Magistrate Judge Debra Freeman for a report and recommendation. On April 18, 2011, Magistrate Judge Freeman issued a Report and Recommendation ("R & R") recommending that the petition be denied.

The R & R advised the parties that they had fourteen days from service of the R & R to file any objections, and warned that failure to timely file such objections would result in waiver of any right to object. The R & R expressly called petitioner's attention to Rule 72(b), Fed.R.Civ.P., and 28 U.S.C. § 636(b)(1).

Petitioner was granted an extension until June 5, 2011 to file his objections. He faxed the objections bearing the date of June 5 to the undersigned's Chambers on June 6. Although they were submitted a day late, the Court will nevertheless consider the objections and review the petition *de novo* insofar as there is an objection to the R & R.

Magistrate Judge Freeman conveniently assigned ten numerical references to the grounds asserted for habeas relief. (R & R at 11–12 .) All but one of the grounds —No. 8, the Confrontation Clause claim (which will be discussed separately)—was insubstantial. The R & R correctly concludes that grounds No. 3, 4 and 10 were procedurally defaulted. No recognized ground for excusing or disregarding the procedural bar exists on this record. There were no procedural defaults as to grounds

Nos. 1, 2, 5, 6, 7 and 9 and the R & R reaches the merits as to each of them. As to each, the R & R concludes that they do not satisfy the standards for grant of relief under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214(1996). 28 U.S.C. § 2254(d). Upon *de novo* review, this Court agrees.

One ground asserted—No. 8, the Confrontation Clause claim—warrants further discussion. The plea allocution of an accomplice, Michelle Clark, was received into evidence at trial. Clark had asserted her Fifth Amendment right not to testify out of the presence of the jury. The Court afforded the defendant's counsel the opportunity to object to the admission of the plea allocution. Counsel initially objected on the ground that the allocution did not mention the defendant by name. (Tr. 221.) The Court pointed out that had the defendant been identified by name, the express reference to defendant would likely have been redacted. (Tr. 222.) Defense counsel raised the issue of whether the introduction of the plea allocution would allow the defendant to introduce a videotaped confession by Clark on rebuttal. (Tr. 223.) As the discussion ensued— and without resolution of the issue of the admissibility of the videotape, defense counsel announced to the Court as follows: "I was withdrawing my objection to that coming in. Let that allocution come in. I have no objection, your Honor, none whatsoever." (Tr, 224.) In his objections to the R & R, petitioner does not dispute that the objection to the admission of the plea allocution was withdrawn. (Pet.Obj.6.)

**\*2** The colloquy withdrawing the objection to the admission of the plea allocution took place on October 15, 2002. The Supreme Court's decision in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) did not occur until March 8, 2004. The admissibility of the allocution was raised by appellate counsel on direct appeal, by which time *Crawford* had been decided, but the state appellate court ruled that any error was not preserved for review.

The R & R correctly concludes that the failure to object— or the withdrawal of the objection—was an independent and adequate ground for the state court's decision. (R & R 18–19.) The R & R further correctly concludes that the petitioner had established neither cause nor prejudice for the procedural default. (*Id.* 19–23.) With regard to the prejudice prong, the R & R notes that the statements in

2011 WL 4472146

Clark's plea allocution were corroborated by other trial evidence. (*Id.* 21–22.) The R & R further concludes that the failure to review the defaulted Confrontation Clause claim would not result in a fundamental miscarriage of justice. (R & R 22.) Based upon my *de novo* review, this Court agrees.

The R & R is adopted in its entirety and the petition is DENIED. The Clerk shall enter judgment for the respondent.

Petitioner has not made a substantial showing of the denial of a constitutional right and, accordingly, a certificate of appealability will not issue. 28 U.S.C. § 2253. An appeal from this Order or the resulting judgment may not be taken *in forma pauperis* because this Court certifies that any appeal would not be taken in good faith. 28 U.S.C. § 1915(a)(3).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 4472146

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 4471919
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Phillip A. TAYLOR, Petitioner,

v.

Frank RIVERA, Superintendent, Respondent.

No. 07 Civ. 8668(PKC)(DF).
|
April 18, 2011.

**REPORT AND RECOMMENDATION**

DEBRA FREEMAN, United States Magistrate Judge.

**\*1 TO THE HONORABLE P. KEVIN CASTEL,
U.S.D.J.:**

*Pro se* Petitioner Phillip A. Taylor ("Petitioner") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, following his state conviction, upon a jury verdict, of Attempted Robbery in the First Degree, in violation of N.Y. Penal Law §§ 110, 160.15[4], Attempted Robbery in the Second Degree, in violation of N.Y. Penal Law §§ 110, 160.10[1], and Criminal Possession of a Weapon in the Fourth Degree, in violation of N.Y. Penal Law § 265.01[1]. At the time he filed his habeas petition, he was incarcerated at the Wallkill Correctional Facility.[1] On November 18, 2002, Petitioner was sentenced to concurrent terms of imprisonment of seven years on the first-degree attempted robbery count, three years on the second-degree attempted robbery count, and one year on the weapon possession count.

Petitioner raises 10 separate claims in his habeas petition. (*See* Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody, dated Sept. 19, 2007 ("Petition" or "Pet.") (Dkt.1).) The Superintendent of the Wallkill Correctional Facility ("Respondent") argues that the Petition should be dismissed in its entirety, on the grounds that the claims are procedurally barred and/or without merit. (*See* Affidavit in Opposition to Petition for Writ of Habeas Corpus, dated Mar. 4, 2008 (Dkt.10), Memorandum of Law in Opposition to Petition ("Resp.Mem.").)[2]

For the reasons discussed below, I recommend that the Petition be dismissed.

*FACTUAL BACKGROUND*

Based on the evidence presented by the prosecution at trial, on December 19, 2000, at approximately 1:30 a.m., Petitioner and codefendant Michelle Clark ("Clark") arrived at an Exxon gas station at 1419 Bruckner Boulevard in the Bronx in a Ford Explorer. (Trial Transcript, dated Oct. 15–24, 2002 (Dkt.6) ( "Trial Tr."), at 5–8.) Petitioner and Clark entered the store. (*Id.*) Martinez, a customer in the store, testified that Petitioner and Clark told everyone to stop what they were doing and put their hands up. (*Id.* at 199.) Martinez held the cans of oil he was holding in the air, and then Clark told him to give her whatever money he had. (*Id.*)

Petitioner approached the enclosed cashier booth, where Anthony Assan ("Assan") was working. (*See id.* at 10.) According to Martinez, Petitioner, who was holding a gun in his right hand pointed down, knocked on the cashier booth window and stated, "Give me the money, this is a holdup." (*Id.* at 193–94, 196, 206.) Assan noticed that Petitioner spoke twice, but "paid him no mind," as Assan could not hear the words through the bulletproof glass of the cashier booth. (*Id.* at 8–9.) Assan had a clear view of Petitioner's face, as the lights in the store were bright and Petitioner was standing approximately two feet away. (*Id.* at 10–12.) Assan did not see that Petitioner was holding a gun. (*Id.* at 16, 48–49.)

**\*2** Assan, however, realized that something was happening when he noticed Martinez raise both his hands in the air multiple times, so Assan closed the door to the enclosed cashier booth and called 911. (*Id.* at 8–11, 17.) Petitioner and Clark then walked out of the station and drove away. (*Id.* at 13–14, 200.) Assan noted that Petitioner and Clark drove away in what he believed to be a green Ford Explorer, with license plate number CG400J. (*See id.* at 14, 46, 258.) Police Officer Craig Horn arrived on the scene at approximately 1:38 a.m., and Assan and Martinez provided a description of the assailants and the Ford Explorer. (*Id.* at 18–19, 201, 257–61.) Officer Horn then sent out a radio transmission, including the license plate number of the Ford Explorer. (*Id.* at 59–60, 262.)

Police Officer Orlando Rivera heard the radio transmission and conducted a search of the license plate number on the New York Department of Motor Vehicles database, which identified the owner of the vehicle as living in the vicinity of the 47th Precinct in the Bronx. (*Id.* at 59–61.) Officer Rivera canvassed that precinct and, at or around 2:50 a.m., saw a black Ford Explorer with the reported license plate number. (*Id.* at 61–63.) Officer Rivera stopped the truck and saw Petitioner in the driver seat and Clark in the front passenger seat. (*Id.* at 66.) Officer Rivera also saw a 12–gauge shotgun with a pistol handle and a shotgun shell in plain view on the rear seat. (*Id.* at 66–67.) Officer Rivera arrested Petitioner and Clark. (*Id.* at 57–58.) At a lineup later that morning, Asson identified Petitioner. (*Id.* at 23–26.) On October 10, 2002, Clark pleaded guilty to Attempted Robbery in the Third Degree and was sentenced to a term of probation. (*Id.* at 229–30.)

### PROCEDURAL HISTORY

#### A. *Indictment and Pretrial Proceedings*
On January 5, 2001, Petitioner was indicted by a grand jury for Attempted Robbery in the First Degree, in violation of N.Y. Penal Law §§ 110, 160.15[4], Attempted Robbery in the Second Degree, in violation of N.Y. Penal Law §§ 110, 160.10[1], Attempted Robbery in the Third Degree, in violation of N.Y. Penal Law §§ 110, 160.05, and Criminal Possession of a Weapon in the Fourth Degree, in violation of N.Y. Penal Law § 265.01[1]. On January 17, 2001, Petitioner filed a motion to dismiss the indictment, arguing that he was denied his right to testify before the grand jury. [3] (Ex. 1.) The state court denied the motion in a written Order dated April 5, 2001, finding the motion to be without merit. (Ex. 3.)

According to Petitioner, at a proceeding that same day, at which Petitioner was not present, the court denied his *pro se* motion for a *Mapp* hearing, [4] but granted Petitioner two weeks to file additional supporting factual allegations to warrant a hearing. [5] (Pet., at Point B.) The court did hold a *Wade* hearing [6] (Pretrial Transcript, dated June 5, 2001 (Dkt.7) ("6/5/01 Tr.")), after which the court denied Petitioner's motion to suppress his identification at the lineup (Ex. 7).

#### B. *Petitioner's Trial and Conviction*
**\*3** Petitioner was tried before a jury in New York Supreme Court, Bronx County. As set out above, the prosecution called Assan, Martinez, Officer Horn, and Officer Ramirez. Clark, though, had invoked her right not to incriminate herself, and the prosecution read Clark's plea allocution into the record. (*See* Trial Tr., at 229–36.) Petitioner did not testify on his own behalf or call any witnesses.

At the close of the evidence, Petitioner moved to dismiss based on the purported insufficiency of the evidence against him, and the court denied that motion. (*Id.* at 266–67.) On the prosecution's motion, the court dismissed the charge of attempted robbery in the third degree. (*Id.*) The remaining charges were submitted to the jury and, on October 24, 2002, Petitioner was convicted of attempted robbery in the first degree, attempted robbery in the second degree, and criminal possession of a weapon in the third degree. (*Id.* at 337–38.) On November 18, 2002, Petitioner was sentenced, as noted above, to concurrent terms of imprisonment of seven years on the count of attempted robbery in the first degree, three years on the count of attempted robbery in the second degree, and one year on the count of criminal possession of a weapon in the third degree. (*See* Ex. 10.)

#### C. *Petitioner's First Motion To Vacate the Judgment Pursuant to N.Y.C.P.L. § 440.10*
On November 7, 2002, prior to sentencing, Petitioner filed a *pro se* motion in the trial court pursuant to Section 440.10 of the New York Criminal Procedure Law, seeking to vacate the judgment on the grounds that: (a) his placement in a lineup without an attorney present violated his right to due process; (b) his search, seizure, and arrest were illegal; (c) the destruction of a 911 tape was a violation of the state *Rosario* rule; [7] (d) Petitioner's trial counsel was ineffective because he attempted to have Petitioner plead guilty, failed to inform Petitioner of pretrial motions filed on his behalf, failed to conduct any investigation, and failed to move for a bail reduction; (e) the prosecutor engaged in misconduct; and (f) Petitioner's right to a speedy trail was violated. (*See* Ex. 8.)

The court denied Petitioner's motion in its entirety on April 2, 2003. (Ex. 10.) First, the court held that the motion should be summarily denied as "all of the facts alleged by the [Petitioner] relate to matters on the record

Case 9:16-cv-01458-DNH-CFH Document 31 Filed 05/13/19 Page 50 of 134
Taylor v. Rivera, Not Reported in F.Supp.2d (2011)
2011 WL 4471919

which could have been raised on direct appeal." (*Id.*) The court stated that Petitioner's motion was "also denied" on the ground that his ineffective assistance of trial counsel claim was meritless:

> [Petitioner] has failed to demonstrate that trial counsel was deficient or that [Petitioner] was deprived fo a fair trial by less than meaningful representation. This Court presided over [Petitioner's] case and was in a position to evaluate counsel's performance at each stage of the proceedings. There was and is nothing to suggest that trial counsel provided [Petitioner] with anything other than skilled and effective representation. Trial counsel conducted an effective voir dire, made an appropriate opening statement, conducted effective cross-examination of the witnesses and delivered an effective summation.

**\*4** (*Id.* at 4, 213 N.Y.S.2d 448, 173 N.E.2d 881.)

Petitioner sought leave to appeal to the Appellate Division, which was denied on July 31, 2004. (Ex. 11.)

**D. *Direct Appeal***

On direct appeal to New York Supreme Court, Appellate Division, Petitioner's assigned counsel raised two claims on behalf of Petitioner, specifically (1) that the trial court's admission of Clark's plea allocution violated the Confrontation Clause under *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and (2) that the trial court's admonishment of the jury, without Petitioner's presence, violated his right to be present at trial. (*See* Ex. 12 .) Petitioner filed a *pro se* application requesting copies of grand jury minutes and pretrial and trial transcripts, and seeking leave to file a *pro se* supplemental brief in support of his direct appeal, raising numerous claims, including a challenge to the trial court's denial of his Section 440.10 motion. (*See* Ex. 13.) The Appellate Division granted Petitioner's application in part

and denied it in part, permitting him to raise claims other than for ineffective assistance of trial counsel, [8] directing the Clerk provide Petitioner with a copy of transcripts relating to Petitioner's appeal, and denying his request to the extent it sought to enlarge the record to include grand jury minutes. (Ex. 15.)

In January 2006, Petitioner filed a *pro se* supplemental brief, asserting that: (a) the police illegally searched his vehicle and arrested him without probable cause; (b) he was deprived of his right to effective assistance of counsel at a critical stage of trial when he was forced to participate in a pretrial lineup without an attorney; (c) the admission of the identification of Petitioner in the lineup violated the rule in *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972); (d) the trial court's decision to give an adverse inference charge as a result of the destruction of a 911 tape was not a proper sanction; (e) the proof that Petitioner committed attempted robbery in the first degree was legally insufficient; (f) Petitioner's right to be present was violated when he was excluded from a proceeding pertaining to his omnibus motion; and (g) his right to a speedy trial was violated. (*See* Ex. 16.)

The Appellate Division unanimously affirmed Petitioner's conviction on May 23, 2006. (Ex. 18.) In pertinent part, the Appellate Division found that Petitioner's *Crawford* claim was unpreserved but, in any event, harmless "even under the standard for constitutional error," and that Petitioner was not prejudiced by the trial court's standard instructions to the jury outside of his presence, as they were "wholly unrelated to the substantive legal or factual issues of the trial." (*Id.*) The Appellate Division also stated that it had "considered and rejected" the claims raised in Petitioner's *pro se* supplemental brief. (*Id.*)

On June 12, 2006, Petitioner filed a *pro se* motion with the Appellate Division, seeking to reargue or, in the alternative, for leave to appeal to the New York Court of Appeals from the Appellate Division's denial of his substantive claims, as well as from the Appellate Division's earlier ruling that had restricted the scope of Petitioner's *pro se* submissions and denied his request to enlarge the record. (*See* Ex. 19A, at 4.) On June 15, 2006, however, Petitioner's counsel submitted a letter to the Court of Appeals, seeking leave to appeal to that court based on all of the claims raised both in the appellate brief that had been submitted by counsel and in Petitioner's *pro se* supplemental brief. (*See* Ex. 23.) At that point,

Petitioner apparently attempted to withdraw his request to the Appellate Division for leave to appeal (Ex. 19B), although Petitioner refiled his motion for reargument (Ex. 20).

 **\*5** On August 17, 2006, the Court of Appeals denied Petitioner leave to appeal. *People v. Taylor,* 7 N.Y.3d 818, 822 N.Y.S.2d 493, 855 N.E.2d 809 (2006). Then, on October 17, 2006, the Appellate Division denied Petitioner's motion for reargument. (Ex. 22.) Further, even though Petitioner had seemingly tried to withdraw the motion for leave to appeal that he had directed to the Appellate Division (prior to his counsel's directing another such application to the Court of Appeals), the Appellate Division rejected that motion by Petitioner as well. (*See id.*)

On November 14, 2006, Petitioner filed a *pro se* petition for writ of certiorari to the United States Supreme Court. *Taylor v. New York,* No. 06–7907 (Dkt.1). That petition was denied on March 19, 2007. (Ex. 24.)

### E. *Petitioner's Second Motion To Vacate the Judgment Pursuant to N.Y.C.P.L. § 440.10*

On December 4, 2006, Petitioner filed a second motion to vacate his judgment pursuant to New York Criminal Procedure Law Section 440 .10. (Ex. 25.) In that motion, Petitioner claimed that he was deprived of effective assistance of trial counsel, as his counsel had allegedly failed to consult with him during critical stages of the pretrial proceedings, failed to prepare adequately for trial, failed to raise a claim that Petitioner was illegally detained, failed to move to dismiss the indictment for violation of Petitioner's right to speedy trial, failed to preserve constitutional errors, and intentionally rendered assistance to the prosecution. (*See id.*)

The trial court issued a decision on May 4, 2007, denying Petitioner's motion. (Ex. 27.) The court initially observed that certain of Petitioner's arguments were duplicative of those raised and rejected in his first Section 440.10 motion, although it is unclear whether the court opted to deny any of Petitioner's claims on that ground, as the court went on to reject Petitioner's claims as unsupported by the record and meritless. (*See id.*) In particular, the court noted that Petitioner's argument concerning his trial attorney's withdrawal of his objection to the admission of Clark's plea allocution was mooted by the Appellate Division's finding that any error in the admission of the allocution

was harmless, and that Petitioner had not demonstrated that he had a viable speedy trial claim. (*See id.*) The court also stated that, in general, Petitioner's moving papers did "not allege any ground constituting legal basis for the motion." (*Id.* at 5.)

Petitioner sought leave to appeal the trial court's decision to the Appellate Division, and that application was denied on July 5, 2007. (Ex. 28.)

### F. *Petitioner's Motion for a Writ of Error Coram Nobis*

Petitioner filed a *pro se* motion with the Appellate Division for a writ of error *coram nobis* on January 17, 2007. (Ex. 29.) Petitioner argued that his appellate attorney was ineffective because, on direct appeal, he failed to assert a number of claims of ineffective assistance of trial counsel. Specifically, Petitioner argued that his appellate counsel should have challenged trial counsel's purported failures to submit a timely affirmation in support of a *Mapp* hearing; to prepare for trial or to withdraw as counsel; to maintain his objection to the admission of Clark's plea allocution; to avoid the conflict of interest that, according to Petitioner, arose from entering into a stipulation with the prosecutor; to advise Petitioner that he could testify at trial; to request a specific identification charge; to object to certain jury instructions; to object to hearsay testimony by Officer Horn; to seek any remedy when the prosecution did not turn over Officer Horn's memo book and handwritten statements; to move for a mistrial or to reopen the *Wade* hearing; and to reargue to dismiss the indictment. (*See id.*)

 **\*6** On June 19, 2007, the Appellate Division denied Petitioner's motion (Ex. 31), and, on September 7, 2007, the New York Court of Appeals denied Petitioner's application for leave to appeal (Ex. 32).

### G. *Petitioner's Federal Habeas Petition*

Petitioner filed his federal habeas Petition on September 19, 2007.[9] In this Court, Petitioner asserts 10 claims, alleging that:

> 1. Petitioner's due process and equal protection rights were violated by limitations imposed by the Appellate Division in granting Petitioner leave to file a *pro se* supplemental brief in support of his direct appeal, and

by the court's denial of Petitioner's request to enlarge the record;

2. Petitioner was denied the right to be present at all critical stages of the proceedings;

3. Petitioner's due process rights were violated as the indictment was defective;

4. Petitioner was denied the effective assistance of trial counsel on numerous grounds;

5. Petitioner was denied the effective assistance of appellate counsel by his attorney's failure to raise an ineffective assistance of trial counsel claim on direct appeal;

6. the evidence was not legally sufficient to support Petitioner's conviction of attempted robbery in the first degree;

7. Petitioner's due process rights were violated by the trial court's sanction for the prosecution's destruction of a tape recording of a 911 call;

8. Petitioner's right to confront any witness testifying against him was violated by the introduction of a plea allocution by a codefendant;

9. Petitioner was denied his right to counsel at a pretrial lineup; and

10. Petitioner's right to present a complete defense was violated by the exclusion of a videotaped statement by a codefendant.

(*See generally* Pet.) [10] On December 30, 2008, Respondent opposed the Petition by filing an Affidavit in Opposition to Petition for Writ of Habeas Corpus (Dkt.7), together with a memorandum of law, exhibits, and the transcripts of Petitioner's pretrial proceedings and trial.

### *DISCUSSION*

### I. *APPLICABLE LEGAL STANDARDS*

#### A. *Statute of Limitations*
Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a habeas petition must be filed within a one-year limitations period beginning on the latest of four dates, usually "the date on which the judgment became

final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A) (2000); *see also Williams v. Artuz,* 237 F.3d 147, 150–51 (2d Cir.2001) (citations omitted) (judgment becomes "final" for purposes of Section 2244 upon "the completion of direct appellate review in the state court system and either the completion of certiorari proceedings in the United States Supreme Court, or—if the prisoner elects not to file a petition for certiorari—[the expiration of] the time to seek direct review via certiorari"). [11]

In this case, even exclusive of any tolling of the statute of limitations that may have resulted from Petitioner's state-court motions for post-conviction or other collateral review, *see* 28 U .S.C. § 2244(d)(2), Petitioner's claims are timely because his Petition was filed within one year of the denial by the Supreme Court of the petition for a writ of certiorari in Petitioner's direct appeal, which is the date Petitioner's conviction became final for purposes of habeas review, *see id.* at § 2244(d)(1) (A).

#### B. *Exhaustion*
**\*7** A federal court may not consider a petition for a writ of habeas corpus unless the petitioner has exhausted all state judicial remedies. 28 U.S.C. § 2254(b)(1)(A); *see also Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Doresy v. Kelly,* 112 F.3d 50, 52 (2d Cir.1997). To satisfy the exhaustion requirement, a habeas petitioner must have "fairly presented" his claims to the state courts, thereby affording those courts the " 'opportunity to pass upon and correct alleged violations of ... prisoners' federal rights." *Picard,* 404 U.S. at 275 (citing *Wilwording v. Swenson,* 404 U.S. 249, 250, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971)). There are several ways by which a petitioner can fairly present a federal claim to the state appellate court, including by citing the relevant provisions of the federal Constitution in his appellate brief. *See Davis v. Strack,* 270 F.3d 111 (2d Cir.2001).

Once the state courts are appraised of the constitutional nature of a petitioner's claims, the exhaustion requirement is fulfilled when those claims have been presented to "the highest court of the pertinent state." *Bossett v. Walker,* 41 F.3d 825, 828 (2d Cir.1994) (citation omitted). A petitioner will be found to have satisfied this requirement where, with his letter seeking leave to appeal, he submits a copy of his brief to the lower appellate court, and the "fair import" of the total application suggests a request

for review of the constitutional claims raised in that brief. *Galdamez v. Keane,* 294 F.3d 68 (2d Cir.2005).

### C. *Standard of Review*

Where a federal constitutional claim has been adjudicated on the merits by the state court, this Court must accord substantial deference to the state court's decision under the standard of review dictated by AEDPA. *See* 28 U.S.C. § 2254(d); *see also Sellan v. Kuhlman,* 261 F.3d 303, 311 (2d Cir.2001) (noting that "adjudicated on the merits" means "a decision finally resolving the parties' claims, with *res judicata* effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground"). The relevant section of AEDPA provides that:

[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). In addition, under AEDPA, where not manifestly unreasonable, a state court's factual findings are presumed correct, and can only be overcome by "clear and convincing evidence." 28 U.S.C. § 2254(e) (1).

**\*8** Under AEDPA, a state court decision is "contrary to" clearly established federal law where the state court either applies a rule that "contradicts the governing law" set forth in Supreme Court precedent or "confronts a set of facts that are materially indistinguishable from

a [Supreme Court] decision" and arrives at a different result. *Williams,* 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). [12] An "unreasonable application" of clearly established federal law occurs when the state court identifies the correct governing legal principle, but unreasonably applies that principle to "a set of facts different from those of the case in which the principle was announced." *Lockyer v. Andrade,* 538 U.S. 63, 73–76, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). The state court's decision, however, "must have been more than incorrect or erroneous"—rather, "[t]he state court's application must have been 'objectively unreasonable.' " *Wiggins v. Smith,* 539 U.S. 510, 520–21, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (quoting *Williams,* 529 U.S. at 409). In other words, the state court's ruling must have been "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter,* ––– U.S. ––––, –––– – ––––, 131 S.Ct. 770, 786–87, 178 L.Ed.2d 624 (2011).

Where the state court has not reached the merits of a petitioner's claim, then this Court will consider the claim under a *de novo* standard of review.

## II. *PETITIONER'S CLAIMS*

### A. *Claims That Are Procedurally Barred From Review by This Court*

This Court "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson,* 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (citing *Fox Film Corp. v. Muller,* 296 U.S. 207, 210, 56 S.Ct. 183, 80 L.Ed. 158 (1935)). "This rule applies whether the state law ground is substantive or procedural." *Id.*

To determine whether the state law ground on which the state court rested was "truly an *independent* basis for [the] decision or merely a passing reference, such reliance on state law must be clear from the face of the opinion." *Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 809 (2d Cir.2000) (emphasis added) (internal quotation marks and citation omitted); *see also Jones v. Vacco,* 126 F.3d 408, 415 (2d Cir.1997) (explaining that, "in order to preclude federal review, the last state court to render judgment must clearly and expressly state that its judgment rested

on a state procedural bar") (internal quotation marks
and citation omitted). To be deemed *adequate,* the state
procedural rule on which the court's decision was based
must be a rule that is "firmly established and regularly
followed" by the state in question, *Ford v. Georgia,* 498
U.S. 411, 423–24, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991),
and that has not been "misapplied in [the petitioner's]
case in particular." *Cotto v. Herbert,* 331 F.3d 217, 240
(2d Cir.2003) (internal quotation marks and citations
omitted); *see also Garvey v. Duncan,* 485 F.3d 709, 714 (2d
Cir.2007) (the relevant inquiry is whether "the state rule
at issue ... is firmly established and regularly followed");
*Monroe v. Kuhlman,* 433 F.3d 236, 241 (2d Cir.2006)
(holding that a state procedural bar is "adequate" if it "is
firmly established and regularly followed by the state in
question" in the specific type of circumstances presented)
(citation omitted).

 **\*9** A claim may also be procedurally barred from
federal habeas review if it is unexhausted, but "deemed"
exhausted because, under the state's procedural rules, the
petitioner no longer has recourse to the state courts. *See*
*Castille v. Peoples,* 489 U.S. 346, 351, 109 S.Ct. 1056, 103
L.Ed.2d 380 (1989); *Grey v. Hoke,* 933 F.2d 117, 120–21
(2d Cir.1991). When a claim is deemed exhausted because
of such a procedural bar, "the procedural bar that gives
rise to exhaustion provides an independent and adequate
state-law ground for the conviction and sentence, and thus
prevents federal habeas corpus review of the defaulted
claim." *Gray v. Netherland,* 518 U.S. 152, 162, 116 S.Ct.
2074, 135 L.Ed.2d 457 (1996) (citations omitted).

Here, four of Petitioner's claims have been procedurally
defaulted: his Confrontation Clause claim (Petitioner's
eighth-pleaded claim), which was decided by the state
court on an independent and adequate state-law ground,
and three claims—that his due process rights were violated
as a result of an allegedly defective indictment (Petitioner's
third-pleaded claim); that his right to effective assistance
of trial counsel was violated by his counsel's failure
to secure the trial court's admission of a videotaped
statement by Clark (a portion of Petitioner's fourth-
pleaded claim); and that his right to a complete defense
was violated by the trial court's exclusion of that
videotaped statement (the claim referred to herein as
Petitioner's 10th claim)—which are unexhausted, but
should be deemed exhausted at this juncture.

**1. *Petitioner's Unpreserved Confrontation Clause Claim
(Petitioner's Eighth Claim)***

Petitioner claims that his right to confront any witnesses
against him under the Sixth Amendment was violated
by the prosecution's introduction into evidence of Clark's
plea allocution. (*See* Pet., at 72.) This claim, which was
raised by appellate counsel on behalf of Petitioner in
his direct appeal, was rejected by the Appellate Division
as unpreserved. (Ex. 18.) As the Appellate Division
explained, "defendant never objected, on constitutional
grounds, to the admission of a nontestifying codefendant's
plea allocution, and since, in any event, he withdrew his
objection completely, his Confrontation Clause claim is
unpreserved and we decline to review it in the interest of
justice." (*Id.*)

**a. *The State Court Rejected the Claim on an
Independent and Adequate State Law Ground***

By expressly holding that Petitioner had failed to preserve
his Confrontation Clause claim, the Appellate Division
made clear, from the face of its decision, that it was relying
on the state-law preservation requirement as a ground
for rejecting this claim. Thus, the Appellate Division's
rejection of this claim rested on an "independent" state
ground. *See Fama,* 235 F.3d at 809.[13] Moreover, the
state procedural rule at issue is firmly established in
New York state law and regularly followed, and hence
provided an "adequate" basis for the court's decision.
The federal courts have repeatedly held that the denial of
an appeal for failure to raise the issue at trial represents
the application of a "firmly established and regularly
followed" state law. *See, e.g ., Salcedo v. Artuz,* 107
F.Supp.2d 405, 413 (S.D.N.Y.2000) (failure to object
to jury instructions was an independent and adequate
state ground for the appellate court's rejection of the
claim); *see also generally Velasquez,* 898 F.2d at 9 (New
York's "contemporaneous objection" rule was adequate
and independent state ground); *Wainwright v. Sykes,* 433
U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (federal
habeas claim is not cognizable where the petitioner waived
it procedurally in the state court).[14] Further, Petitioner
has not shown that the state procedural rule in question
was misapplied in his case in particular. *See Cotto,* 331
F.3d at 240.

 **\*10** Accordingly, the state-law ground on which the
appellate court decided Petitioner's Confrontation Clause

Case 9:16-cv-01458-DNH-CFH    Document 31    Filed 05/13/19    Page 55 of 134
Taylor v. Rivera, Not Reported in F.Supp.2d (2011)
2011 WL 4471919

claim was both independent and adequate to support the court's decision, precluding federal habeas review.

### b. *Petitioner Cannot Overcome the Procedural Bar*

Petitioner can overcome the procedural bar to this Court's review of his challenge to the introduction of Clark's plea allocution only if Petitioner can demonstrate "cause and prejudice for the default," *Gray,* 518 U.S. at 162 (citations omitted), or that "failure to consider the [defaulted] claim will result in a fundamental miscarriage of justice," *Coleman,* 501 U.S. at 750 (internal quotations omitted). Petitioner has not satisfied either standard.

### i. *Lack of "Cause" and "Prejudice"*

Generally, "cause" for a procedural default is established when "some objective factor external to the defense" impeded the petitioner's efforts to comply with the state's procedural rule. *Murray v. Carrier,* 477 U.S. 478, 488 (1986). More specifically, cause for a default exists where a petitioner can show that (1) "the factual or legal basis for a claim was not reasonably available to counsel," (2) " 'some interference by state officials' made compliance [with the procedural rule] impracticable," or (3) "the procedural default is the result of ineffective assistance of counsel." *Bossett v. Walker,* 41 F.3d 825, 829 (2d Cir.1994) (internal citation omitted). "Prejudice" requires Petitioner to demonstrate that the alleged constitutional error worked to Petitioner's *"actual* and substantial disadvantage." *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982) (emphasis in original).

Here, Petitioner has shown neither "cause" nor "prejudice" for his procedural default. With respect to cause, Petitioner asserts that he could not have raised his *Crawford*-based Confrontation Clause claim at trial, as *Crawford* had not yet been decided at that time. (*See* Pet., at 73.) This argument fails, as nothing precluded Petitioner from raising the same type of constitutional objection as was raised in *Crawford.* *See Gonzalez v. Lape,* No. 09 Civ. 4021(RJD), 2011 WL 208407, at *4 (E.D.N.Y. Jan.21, 2011) (holding that the fact that petitioner's trial occurred prior to *Crawford* did not excuse petitioner from making proper constitutional objection at trial). Petitioner also asserts that, to the extent his claim was not adequately preserved, the lack of preservation can be attributed to ineffective assistance of counsel. (*See* Pet., at 73.) This argument for "cause" also fails, however,

as, even if Petitioner's Confrontation Clause claim would have been meritorious, and even if his trial counsel should have raised a constitutional objection to the admission of the Clark plea allocution, Petitioner cannot now show a "reasonable probability" that, but for counsel's failure to raise the claim at trial, the outcome of Petitioner's trial would have been different. *See Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). As set out below, Petitioner's ineffective assistance of counsel claim therefore lacks merit (*see infra* at 43–44), and Petitioner cannot rely on it as a basis to excuse his procedural default, *see Aparicio v. Artuz,* 269 F.3d 78, 91 (2d Cir.2001) (noting that defense counsel's failure to preserve a claim for review "can suffice to establish cause for a procedural default only when the counsel's ineptitude rises to the level of a violation of a defendant's Sixth Amendment right to counsel").

**\*11** For similar reasons, Petitioner cannot show the requisite "prejudice" to excuse his default. Clark's plea allocution was admitted as evidence that Petitioner was "aided by another person present," N.Y. Penal Law § 160.10 [1], as required to support Petitioner's conviction for attempted robbery in the second degree, in violation of N.Y. Penal Law §§ 110, 160.10[1]. In particular, the trial court instructed the jury that Clark's plea allocution was not admitted "for the truth or for the falsity, but rather for the purposes of determining whether she acted in concert with another person, in connection with any of the crime charged here." (Trial Tr., at 311–12.) The prosecution's case as to attempted robbery in the second degree (and, more specifically, as to Petitioner being aided by another person present) was independently strong, however, and, in this regard, Clark's plea allocution was well-corroborated by other evidence. As set forth in more detail above (*see* at 2–3), Assan testified to an attempted robbery by two individuals, and he identified Petitioner as one of the assailants at both a lineup and at trial. (Trial Tr., at 23–26.) Martinez further corroborated Assan's testimony regarding the involvement of two individuals, as well as the sequence of events. (*See id.* at 193–96.) In addition, according to the testimony at trial, Petitioner was apprehended with Clark, in a vehicle of the make and model and bearing the license plate number that Assan provided to the police. (*See id.* at 55–67.)

Taking the record as a whole, this Court cannot conclude that any constitutional error committed by the trial court in admitting Clark's plea allocution would have worked to

Petitioner's "actual and substantial disadvantage" at trial. *Frady,* 456 U.S. at 170 . [15]

#### ii. *No "Fundamental Miscarriage of Justice"*

Nor has Petitioner demonstrated a sufficient probability that this Court's failure to review his defaulted Confrontation Clause claim would result in a "fundamental miscarriage of justice." *Edwards v. Carpenter,* 529 U.S. 446, 451, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000) (citing *Coleman,* 501 U.S. at 750). This exception to the procedural bar is quite narrow; it is "concerned with actual as compared to legal innocence." *Sawyer v. Whitley,* 505 U.S. 333, 339, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). To meet this standard, a petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Carrier,* 477 U.S. at 496. "To be credible, [a claim of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo,* 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). "Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." *Id.* at 316. "The petitioner thus is required to make a stronger showing than that needed to establish prejudice." *Id.* at 327 (citations omitted). It is extremely rare that a petitioner will be able to satisfy the actual innocence standard. *See id.* at 324 ("in virtually every case, the allegation of actual innocence has been summarily rejected." (citation omitted)). Here, Petitioner has not submitted any new evidence showing that he is actually innocent. [16]

**\*12** For all of these reasons, I recommend that Petitioner's Confrontation Clause claim be dismissed as procedurally barred.

#### 2. *Unexhausted Claims*

In his habeas Petition, Petitioner pleads three claims that he failed to exhaust in the state courts. As none of these claims can now be raised before the state courts because of state procedural rules, all should be deemed exhausted and procedurally defaulted. Further, as Petitioner cannot

show an adequate basis to overcome the procedural bar to this Court's consideration of any of these three claims, each should be dismissed as defaulted.

#### a. *Due Process Claim Challenging Allegedly Defective Indictment* (Petitioner's Third Claim)

Petitioner's first unexhausted claim (his third habeas claim) appears to challenge the sufficiency of the indictment returned by the grand jury and the alleged denial of his right to testify before the grand jury. Specifically, Petitioner claims that his due process rights were violated because of the "two-stage" process by which he was indicted: the grand jury voted a true bill on December 28, 2000, and then voted a true bill as to additional charges on January 2, 2001. (*See* Ex. 2.) According to Petitioner, the result of this process was that he was denied to opportunity to testify before the grand jury with respect to the second set of charges. (Pet., at Point C.) As Petitioner did not raise this challenge to the indictment before the trial court or on direct appeal, [17] this claim is unexhausted.

No current avenues are available for Petitioner to exhaust his claim. He could have raised this claim on direct appeal, but he did not do so, and he is not now entitled to a second direct appeal. *See Jimenez v. Walker,* 458 F.3d 130, 149 (2d Cir.2006) (finding that remedies in New York State courts were no longer available where "[petitioner] has already taken his one direct appeal, and [his] claim is procedurally barred from consideration in a collateral attack on his conviction"), *cert. denied,* 549 U.S. 1133, 127 S.Ct. 976, 166 L.Ed.2d 740 (2007). Petitioner is also foreclosed from raising the claims collaterally in a Section 440.10 motion. *See* N.Y.Crim. Proc. L. § 440.10(2)(c) (barring collateral review of claims that could have been raised on direct appeal). Nor can he seek state review of this claim pursuant to either a writ of error *coram nobis, see People v. Gordon,* 183 A.D.2d 915, 584 N.Y.S.2d 318 (2d Dep't 1992) (*coram nobis* relief only available for claims of ineffective assistance of appellate counsel) (citation omitted), or a state writ of habeas corpus, *see People ex rel. Allah v. Leonardo,* 170 A.D.2d 730, 565 N.Y.S.2d 331 (3d Dep't 1991) (state writ of habeas corpus unavailable where claim could have been raised on direct appeal) (citations omitted). As Petitioner thus has no procedural recourse to New York's courts to advance this unexhausted claim, the claim should be deemed exhausted.

In order to overcome the resulting procedural bar, Petitioner would have to show either "cause" for his procedural default and "prejudice" resulting therefrom, *Gray,* 518 U.S. at 162 (citations omitted); *accord Carmona v. United States Bureau of Prisons,* 243 F.3d 629, 633 (2d Cir.2001) (citations omitted), or that this Court's failure to consider the claim would result in a "fundamental miscarriage of justice," *Coleman,* 501 U.S. at 750 (internal quotation marks and citations omitted). In this instance, Petitioner has shown no basis for overcoming the procedural bar. He has advanced no explanation as to why he failed to exhaust this claim, and he cannot show prejudice, as this claim could not be successful on its merits.

**\*13** A claim for denial of the right to testify before the grand jury is not, itself, cognizable in a federal habeas proceeding. *Davis v. Mantello,* 42 Fed. App'x 488, 490 (2d Cir.2002). Rather, the "sufficiency of an indictment cannot form the basis for a writ of habeas corpus unless the indictment falls below basic constitutional standards." *Carroll v. Hoke,* 695 F.Supp. 1435, 1438 (E.D.N.Y.1988), *aff'd,* 880 F.2d 1318 (2d Cir.1989). An indictment is constitutionally sufficient when "it contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend," and "it enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Resendiz–Ponce,* 549 U.S. 102, 108, 127 S.Ct. 782, 166 L.Ed.2d 591 (2007). Thus, claims based on a defective indictment are only reviewable "if the indictment fails to satisfy the basic due process requirements: notice of the time, place, and essential elements of the crime." *Id.* (citing *Carroll,* 695 F.Supp. at 1435). As Plaintiff does not argue that the indictment failed to provide him with notice of the time, place and essential elements of the criminal charges, his claim would not even be cognizable on federal habeas review.

Finally, as discussed above, Petitioner has made no showing of actual innocence, so as to justify this Court's consideration of his procedurally defaulted claim. Accordingly, I recommend that this claim be dismissed.

**b.** *Ineffective Assistance of Trial Counsel for Failing To Secure Admission of Clark's Videotaped Statement* **(Included as Part of Petitioner's Fourth Claim)**
Petitioner's second unexhausted claim (included as part of Petitioner's fourth habeas claim, which alleges ineffective

assistance of trial counsel on numerous grounds) challenges the adequacy of Petitioner's counsel in failing to make sufficient efforts to introduce, at trial, a videotaped statement of Petitioner's codefendant, Clark. (*See* Pet., at 40.) According to trial counsel, in that statement, Clark informed the police that the person who was with her when she attempted to rob the gas station had stayed behind, inside the car. (Trial Tr., at 223.) Petitioner argues that the statement was exculpatory and that his trial counsel should have secured its admission. (*See* Pet., at 40.)

In Petitioner's two Section 440.10 motions, Petitioner raised a host of claims challenging the conduct of his trial counsel, and he sought to raise certain of those claims again on his direct appeal. It does not appear, however, that he ever raised, or attempted to raise, this *particular* ineffective assistance claim before any state court, at any time; thus the claim remains unexhausted. As the extent of counsel's efforts to introduce Clark's statement into evidence would have been apparent from the face of the trial record, the claim would have been appropriate for direct review. Yet, as Petitioner no longer has an opportunity to seek direct review of the claim, this unexhausted claim should be deemed exhausted. *See* N .Y.Crim. Proc. § 440.10(2); *see also Sweet v. Bennett,* 353 F.3d 135, 140 (2d Cir.2003) (deeming an ineffective assistance claim exhausted where the petitioner failed to raise the claim on direct appeal "despite a sufficient record, and, consequently[,] waived the claim under § 440.10(2)(c)"); *Ortiz v. Heath,* No. 10 Civ. 1492(KAM), 2011 WL 1331509, at \*8 (E.D.N.Y. April 6, 2011) ("[B]ecause petitioner's ... ineffective assistance of counsel claims [based on trial counsel's on-the-record conduct] would now be denied by New York courts pursuant to Section 440.10(2)(c), and because such a denial would constitute an independent and adequate state procedural bar, petitioner's on-the-record ineffective assistance claims are deemed exhausted").

**\*14** The resulting procedural bar may not be excused, as Petitioner has not shown cause for his failure even to attempt to raise this claim on direct appeal, and has also not demonstrated that he would suffer prejudice if his procedural default were not excused. Indeed, Petitioner has not shown that this claim has any merit whatsoever, given that his counsel *did* attempt to introduce Clark's statement at trial. (*See* Trial Tr., at 222–24.) In light of those efforts, counsel's conduct could not be said to meet the stringent test for ineffective assistance articulated by

*Strickland*, as Petitioner would not be able to show that his attorney's conduct "fell below an objective standard of reasonableness," *id.* at 686; *see also infra* at 38–39. Moreover, the trial court's determination that the evidence was appropriately excluded appears to have been correct, as Petitioner sought to introduce Clark's out-of-court statement for the truth of the matter asserted. (*See* Trial Tr., at 222.) Contrary to Petitioner's argument at trial, Clark's alleged statement that the person who was with her did not leave the car was not, in itself, a statement against Clark's own interest, *see People v. Settles,* 46 N.Y.2d 154, 167, 412 N.Y.S.2d 874, 385 N.E.2d 612 (1978) ("To qualify for admission into evidence as a declaration against the maker's penal interest ... when the statement was made[,] the declarant must [have been] aware that it was adverse to his penal interest"), nor a business record, *see Matter of Leon RR,* 48 N.Y.2d 117, 122–23, 421 N.Y.S.2d 863, 397 N.E.2d 374 (1979) (for statements by an informant recorded by the police to qualify as a business record, "the informant must be under a contemporaneous business duty to report the occurrence"). Finally, even if the statement had been admitted into evidence, it would have been contradicted by the testimony of Assan, who placed Petitioner in the gas station and described him as having been an active participant in the attempted robbery. Consequently, Petitioner cannot demonstrate that a different ruling on the hearsay issue would likely have altered the outcome of his trial.

Finally, Petitioner has again failed to show that, unless the procedural bar is excused, Petitioner would suffer a fundamental miscarriage of justice. For all these reasons, this claim should also be dismissed as procedurally barred.

### c. *Alleged Denial of the Right To Present a Complete Defense* (Petitioner's 10th Claim)

Finally, Petitioner's third unexhausted claim (which he does not separately list in his Petition, but which—affording the Petition a liberal construction—should be found to be contained therein, and which the Court has thus identified as Petitioner's 10th claim) asserts that he was deprived of his right to present a complete defense by the trial court's exclusion of Clark's videotaped statement. (*See* Pet., at 40.)

Petitioner failed to raise this claim on his direct appeal, and cannot raise it now in the state courts. *See* N.Y.Crim. Proc. § 440.10(2)(c). He also cannot overcome the resulting procedural bar because he has not shown any

cause for failing to raise the claim and because, for substantially the same reasons discussed above, the claim would have had little chance of success. *See Rock v. Arkansas,* 483 U.S. 44, 56, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) (state rules excluding evidence from criminal trials "do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve."); *Taylor v. Curry,* 708 F.2d 886, 890–91 (2d Cir.1983) ("Erroneous [state court] evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus. Rather, the writ would issue only where petitioner can show that the error deprived her of a *fundamentally* fair trial." (emphasis in original) (citing *Chambers v. Mississippi,* 410 U.S. 284, 302–02, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973))), *cert. denied,* 464 U.S. 1000 (1983). In the absence of any showing of actual innocence, this claim, too, should be dismissed.

### B. *Claims Subject To Review by This Court*

**\*15** The remainder of Petitioner's claims do not appear to have been procedurally defaulted, and this Court will therefore review them on their merits.

### 1. *Alleged Due Process/Equal Protection Violations by the Appellate Division, in Denying Petitioner's Motion To Raise Certain Claims Pro Se and To Enlarge the Record* (Petitioner's First Claim)

Petitioner claims that the Appellate Division denied his rights to due process and equal protection by denying his application for leave to raise particular ineffective assistance claims in his *pro se* supplemental brief on his direct appeal, and for denying his request to enlarge the appellate record with certain grand jury minutes. (*See* Pet., at Point A.) After the Appellate Division made its ruling in this regard, Petitioner challenged that ruling on federal constitutional grounds, setting out both due process and equal protection arguments in a motion for reargument or, alternatively, leave to appeal. (Ex. 19A, at 4.) Although it appears that Petitioner attempted to withdraw that application (Ex. 19B), and to proceed solely on a motion for reargument (Ex. 20), the Appellate Division nonetheless denied Petitioner leave to appeal (Ex. 21 ["Now, upon reading and filing the papers with respect to the motion, and due deliberation having been had thereon, [i]t is ordered that the motion is denied."]). Seemingly, then, this claim has been exhausted, and Respondent does not argue otherwise. Although the

unusual procedural posture of this claim makes it unclear whether the AEDPA standard of review should apply, the question of the appropriate standard of review is ultimately of no consequence, as the claim would fail equally under AEDPA or on *de novo* review.

As a threshold matter, there is no "constitutional right to self-representation on direct appeal from a criminal conviction," *Martinez v. Court of Appeal of Cal., 528 U.S. 152, 163, 120 S.Ct. 684, 145 L.Ed.2d 597 (2000)*, and, especially as Petitioner's appellate counsel filed an appellate brief on Petitioner's behalf, it was within the Appellate Division's discretion to deny Petitioner leave to raise certain claims in a *pro se* supplemental brief. In any event, those same claims had already been addressed by the trial court on Petitioner's first Section 440.10 motion, and then raised before the Appellate Division on Petitioner's application for leave to appeal from the denial of that motion, and thus Petitioner was not deprived of an opportunity to place those claims before the state courts. (*See* Ex. 10 (finding that, while procedurally barred, the ineffective assistance of counsel claim was also without merit; Ex. 11 (denying leave to appeal).)

Furthermore, with respect to Petitioner's request that the Appellate Division enlarge the record to include grand jury minutes, Petitioner does not provide any explanation as to what he believed he would have discovered from a review of the grand jury minutes. (*See* Pet., at Point B.) As there is no reason to believe that he would have discovered any new exculpatory evidence, review of the grand jury minutes would, at most, have revealed defects in the process by which Petitioner was indicted. Yet challenges concerning a state grand jury proceeding "are *a fortiori* foreclosed in a collateral attack brought in federal court," where, as here, the petitioner was convicted by a jury. *Lopez v. Riley, 865 F.2d 30, 32 (2d Cir.1989)*. Consequently, Petitioner's claim based on the Appellate Division's denial of his request to enlarge the record does not implicate a federal constitutional right, and is not cognizable on federal habeas review. *See Jansen v. Monroe County, 430 F.Supp.2d 127, 129–30 (W.D.N.Y.2006)* (dismissing claim that Appellate Division violated petitioner's due process rights by denying request for access to grand jury minutes as not cognizable where petitioner had been convicted by a jury); *Clarke v. Mazzuca, No. 00 Civ. 2871(WHP), 2002 WL 1837367, at *6 (S.D.N.Y. Aug.6, 2002)* (dismissing claim based on state court's failure to

turn over grand jury minutes because, *inter alia,* there is no federal constitutional right to discovery in a criminal case).

**\*16** Under the circumstances, Petitioner has not shown that the Appellate Division committed any constitutional error, much less that its rejection of Petitioner's due process and equal protection claims was contrary to, or an unreasonable application of federal law. I therefore recommend that this claim be dismissed. *See 28 U.S.C. § 2254(d)*.

### 2. *Alleged Denial of the Right to Be Present at All Critical Stages of the Proceedings* (Petitioner's Second Claim)

Petitioner asserts that he was denied the right to be present at all critical stages of the proceedings against him. Specifically, he complains that he was not present (1) when the court gave admonitions to the jury when the trial was adjourned due to illness of Petitioner's attorney (*see* Pet., at 69–71); and (2) at a pretrial proceeding when a motion was discussed by the court, the prosecutor, and his trial attorney (*see id.* at Point B).

Petitioner raised both aspects of this claim on direct appeal —the first in the brief submitted by his appellate counsel on his behalf (*see* Ex. 12), and the second in Petitioner's *pro se* supplemental brief (*see* Ex. 16, at 5)—and the Appellate Division rejected both portions of the claim on the merits. As to the first part of Petitioner's claim, the Appellate Division explained that the announcement of an adjournment and giving of admonitions by the trial judge to the jury outside the presence of Petitioner did not violate his right to be present. (Ex. 18.) As to the second, the Appellate Division stated that it had "considered and rejected the claims contained in defendant's pro se supplemental brief" (*id.*), which is considered a "merits" determination for purposes of federal habeas review, *see Francolino v. Kuhlman, 365 F.3d 137, 141 (2d Cir.2004)* (holding that where "the Appellate Division concluded its opinion by stating that it had 'considered and rejected defendants' remaining claims,'" such a rejection is on the merits and AEDPA deference applies). Petitioner then fully exhausted both parts of his claim by seeking leave to appeal to the Court of Appeals on all of the claims he had raised to the Appellate Division, whether in the brief filed by his appellate counsel or in his supplemental brief. (Ex. 23.) Thus, the claim is now subject to review under AEDPA. *See 28 U.S.C. § 2254(d)*. Under the relevant

AEDPA standard, however, Petitioner cannot prevail on this claim.

A criminal defendant is entitled "to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings." *Faretta v. California,* 422 U.S. 806, 819–20 n. 15, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *see also Rushen v. Spain,* 464 U.S. 114, 117–18, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) (right to personal presence at all critical stages of the trial is a "fundamental right[ ] of each criminal defendant"). This right is "scarcely less important to the accused than the right of trial itself," *Diaz v. United States,* 223 U.S. 442, 455, 32 S.Ct. 250, 56 L.Ed. 500 (1912), and is rooted in both the Sixth Amendment Confrontation Clause and the Due Process Clause, *United States v. Gagnon,* 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985); *see also Illinois v. Allen,* 397 U.S. 337, 338, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) ("One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial.") (citing *Lewis* ); *Snyder v. Massachusetts,* 291 U.S. 97, 107–08, 54 S.Ct. 330, 78 L.Ed. 674 (1934) ("[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence."), *overruled in part on other grounds by Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

**\*17** Nevertheless, the right to be present is not absolute; it is triggered only when the defendant's "presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." *Snyder,* 291 U.S. at 105–06. In defining a criminal defendant's right to be present, the Supreme Court has emphasized that the right "is guaranteed ... if [the defendant's] presence would contribute to the fairness of the procedure," but that the right "is not guaranteed 'when presence would be useless, or the benefit but a shadow.' " *Kentucky v. Stincer,* 482 U.S. 730, 745, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987) (quoting *Snyder,* 291 U.S. at 106–07). A defendant's exclusion from any aspect of the trial "should be considered in light of the whole record." *Gagnon,* 470 U.S. at 526–27 (citing *Snyder,* 291 U.S. at 115). Where nothing in the record indicates that the defendant's absence compromised the fundamental fairness of the trial proceedings, no violation of the right to be present has occurred. *See Stincer,* 482 U.S. at 36–47 (rejecting challenge to defendant's exclusion, over objection, from witness competency hearing); *Gagnon,* 470

U.S. at 527 (rejecting challenge to defendant's exclusion, without objection, from *in camera* discussion between trial judge and juror); *Snyder,* 291 U.S. at 106–22 (rejecting challenge to defendant's exclusion, over objection, from jury inspection of crime scene).

In this case, the absence of Petitioner during the admonitions to the jury following an adjournment of trial and at a pretrial hearing were not errors of constitutional magnitude, such that the fundamental fairness of Petitioner's trial was compromised.

### a. *Admonitions to Jury Following Adjournment During Trial*

On October 16, 2002, the trial judge, outside the presence of defense counsel, the prosecutor, and the jury, informed Petitioner that his attorney had notified the court that he was ill and would not be able to come to court that day. (Trial Tr., at 76–77.) The trial judge informed Petitioner that the case would be adjourned until October 18, and that the jury would be informed about the medical emergency and adjournment outside the presence of any of the attorneys or Petitioner. (*Id.*) The trial judge, outside the presence of any of the attorneys or Petitioner, informed the jury that "[o]ne of the parties had a medical emergency this morning, and they telephoned early this morning. We were trying to determine how long it was going to take in terms of doctors, etcetera and it's gonna take most of today." (*Id.* at 78–79.) The trial judge explained that trial would be adjourned, but that jurors would get "credit" for that day, and delivered the following admonishments:

> Do not visit the scene of the incident. Do not discuss the case among yourselves [or] with any friends or relatives. If you happen to see the parties, the defendant, etcetera, no conversations with them. Don't read anything in the paper, listen to anything about it on the radio.

**\*18** (*Id.* at 79–80.)

The Supreme Court noted in *Gagnon* that

the mere occurrence of an *ex parte* conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right. The defense has no constitutional right to be present at every interaction between a judge and a juror, nor is there a constitutional right to have a court reporter transcribe every such communication.

*Gagnon,* 470 U.S. at 526 (internal quotations omitted). In this instance, as in *Gagnon,* "[t]he encounter ... was a short interlude in a complex trial," and Petitioner "could have done nothing" had he been present during this ministerial proceeding, "nor would [he] have gained anything by attending." *Id.* at 527 (citing *Snyder,* 291 U.S. at 108). Petitioner does not make any argument that the admonitions differed from those given to the jury, in his presence, each time the trial was adjourned for the day. (*See* Trial Tr., at 45–46, 74, 158, 201, 218, 237, 331.) Petitioner argues that he was prejudiced because the jury "was left to wonder if [P]etitioner was the cause of their inconvenience." (Pet., at 71.) By announcing the adjournment and giving admonitions outside the presence of counsel and Petitioner, however, the trial court actually prevented any prejudice that could have arisen had the jury been aware that the delay was caused by Petitioner's counsel. Overall, based on the full trial record, Petitioner's absence did not compromise the fundamental fairness of his trial.

### b. Pretrial Hearing Addressing *Pro Se* Motion

Petitioner also claims that his right to be present at all material stages was violated when the state court, outside his presence, denied his *pro se* request for a *Mapp* hearing based on a lack of factual allegations, but granted him leave to file additional supporting factual allegations within two weeks. (Pet., at Point B.) Petitioner claims that he did not learn of the court's decision until several months later, by which time he had missed the deadline to make an additional submission. (*Id.*)

As a threshold matter, though, a criminal defendant has no constitutionally protected right to be present at a hearing involving scheduling matters and/or legal issues. *See Russo v. Zon,* No. 05 Civ. 0298T, 2009 WL 3614527, at *9 (W.D.N.Y. Oct.26, 2009). Moreover, Petitioner has not come forward with any evidence to suggest that, had he made the additional submissions invited by the court, the court would have been likely to grant a *Mapp* hearing and ultimately to find that evidence was obtained in violation of Petitioner's right to be free from unreasonable search and seizure. Indeed, as explained below (*see infra* at 39–40), Officer Rivera had probable cause to arrest Petitioner, and, apart from questioning the legality of his arrest (*see* Pet., at Point B; *see also id.* at 55–61), Petitioner has offered no other basis for the suppression of any evidence under *Mapp.*[18]

**\*19** For these reasons, the Appellate Division's denial of Petitioner's claim that he was denied the right to be present at all critical stages of the litigation was neither contrary to, nor an unreasonable application of, established federal law. *See* 28 U.S.C. § 2254(d). Accordingly, I recommend that this claim be dismissed.

### 3. *Alleged Ineffective Assistance of Trial Counsel* (Petitioner's Fourth Claim)

For his fourth habeas claim, Petitioner asserts that he was denied the effective assistance of trial counsel in a number of ways. Apart from the one (unexhausted) portion of this claim that is addressed above (*see supra* at 26–28), Petitioner complains that his trial counsel:

(1) failed to provide meaningful representation during pretrial proceedings;

(2) failed to move to secure a speedy trial;

(3) failed to preserve an objection to the introduction of Clark's plea allocution;

(4) created a conflict of interest by stipulating to the accuracy of a transcript of Clark's plea allocution; and

(5) was not prepared for trial.

(*See* Pet., at 18–42.)

The first ground was raised in both of Petitioner's Section 440.10 motions; the remainder were raised in Petitioner's

2011 WL 4471919

second Section 440.10 motion. As set out above, the trial court denied the first of Petitioner's motions on both procedural grounds and the merits (*see supra* at 6–7), and it is not immediately clear whether there was also a procedural basis for the court's second decision, in addition to its evident merits analysis (*see supra* at 9–10). Respondent, though, does not argue that any part of Petitioner's ineffective assistance of trial counsel claim should be considered barred on independent and adequate state procedural law grounds, and thus the Court considers that argument to have been waived. *See Trest v. Cain,* 522 U.S. 87, 89, 118 S.Ct. 478, 139 L.Ed.2d 444 (1997) (noting that the existence of an independent and adequate state procedural bar is "a defense that the State is obligated to raise and preserve if it is not to lose the right to assert the defense thereafter"). In any event, Petitioner's ineffective assistance claim (including each of its sub-parts) is subject to dismissal on the merits.

The right to counsel in criminal prosecutions is grounded in the Sixth Amendment. Because the Constitution "envisions counsel playing a role that is critical to the ability of the adversarial system to produce just results [,] ... 'the right to counsel is the right to the effective assistance of counsel.' " *Strickland,* 466 U.S. at 685–86 (1984) (quoting *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)). Counsel can deprive a criminal defendant of this right "simply by failing to render 'adequate legal assistance.' " *Id.* at 686 (citation omitted).

In order for counsel to be deemed constitutionally "ineffective," however, counsel's conduct must have "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* Thus, to prevail on an ineffective assistance claim under *Strickland,* a criminal defendant must show that: (1) his counsel's performance "fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. A court may reject an ineffective assistance of counsel claim for failure to satisfy either prong of the *Strickland* standard, without reaching the other. *See id.* at 697. ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

**\*20** For purposes of habeas review under AEDPA, *Strickland* sets out the relevant "clearly established federal law." *Aparicio v. Artuz,* 269 F.3d 78, 95 and n. 8 (2d Cir.2001) ("It is beyond cavil that the *Strickland* standard qualifies as 'clearly established Federal law.' ") (citation omitted). Yet, as "the standards created by Strickland and § 2254(d) are both highly deferential, ... when the two apply in tandem, review is doubly so." *Harrington,* 131 S.Ct. at 788 (internal quotations omitted). Thus, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland* 's deferential standard." *Id.*

a. *Failure To Provide Meaningful Representation During Pretrial Proceedings*

Petitioner asserts that his counsel did not provide meaningful representation during pretrial proceedings because his counsel (1) failed to seek relief based on a claim that Officer Rivera lacked probable cause to arrest Petitioner, (2) failed to raise an adequate challenge to the suggestiveness of the lineup; and (3) failed to conduct sufficient investigations or spend adequate time meeting with Petitioner. (*See* Pet., at 19.) Petitioner, however, cannot establish that any such failures actually prejudiced his defense.

First, based on the record before the Court, there was probable cause for Petitioner's arrest and, consequently, any motion based on a lack of probable cause would have been unsuccessful. Petitioner concedes that Officer Rivera learned, through a radio bulletin, of a robbery in progress involving two black men in a green Ford Explorer with license plate number CT–400J. (*Id.* at 26.) Officer Rivera pulled over Petitioner and Clark (a black woman) in a black Ford Explorer bearing that same license plate number. (*Id.*) Further, Officer Rivera testified that a gun was in plain view on the rear seat. (Trial Tr., at 66–67.)

Although Petitioner contends that Officer Rivera lacked probable cause because he did not personally receive the information, the reliability of information conveyed by a radio bulletin may be assumed by a police officer in the field. *See People v. Dodt,* 61 N.Y.2d 408, 416, 474 N.Y.S.2d 441, 462 N.E.2d 1159 (1984). Moreover, although, as Petitioner notes, there were discrepancies between the information reported in the bulletin and the facts discovered by Officer Rivera (*i.e.,* the gender of the occupants and the color of the vehicle), the similarities,

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.   15

coupled with the gun being in plain view, were more than sufficient to support a finding of probable case for Petitioner's arrest. *See People v. Fleming,* 65 A.D.3d 702, 884 N.Y.S.2d 477 (2d Dep't 2009) (finding that police had probable cause to arrest defendant once they observed a gun in plain view in back seat of a vehicle, after stopping the vehicle based on a license plate number provided by a witness who saw the vehicle drive away after a robbery). As Petitioner cannot show any prejudice arising from his trial counsel's failure to pursue this theory, this Court has no reason to disturb the rejection of Petitioner's ineffective assistance claim. *See Mosby v. Senkowski,* 470 F.3d 515, 524–25 (2d Cir.2006) (rejecting claim that counsel was ineffective for failing to move for suppression, where the petitioner could not demonstrate a likelihood of success on such a motion); *United States v. Nersesian,* 824 F.2d 1294, 1322 (2d Cir.1987) ("Counsel certainly is not required to engage in the filing of futile or frivolous motions.").

**\*21** Second, with respect to the lineup, Petitioner's trial counsel actually sought to suppress the lineup identification, arguing, *inter alia,* that the lineup was unduly suggestive as Petitioner was the oldest and tallest participant. (*See* 6/5/01 Tr., at 33–37.) Petitioner argues, however, that trial counsel should have raised other differences among the participants, including hairstyle and facial hair, which Petitioner contends were accentuated by the fact that all of the participants wore red baseball caps. (*See* Pet., at 31.) The decision by counsel to focus on certain characteristics in arguing that the lineup was unduly suggestive may, however, be considered sound trial strategy, and thus cannot be viewed as constitutionally deficient. *See McKee v. United States,* 167 F.3d 103, 106 (2d Cir.1999) ("[A]ctions or omissions that might be regarded as sound trial strategy do not amount to ineffective assistance."); *United States v. Berkovich,* 168 F.3d 64, 67 (2d Cir.1999) (same).

Third, Petitioner's conclusory allegations are insufficient to establish that his counsel in fact failed to investigate or to spend sufficient time meeting with Petitioner, or that any such failure actually prejudiced his defense. *See, e.g., Brinkley v. Lefevre,* 621 F.2d 45, 46 (2d Cir.1980) ("Infrequency of visitation is not alone enough to demonstrate ineffectiveness of counsel.") (citation omitted); *United States ex rel. Testamark v. Vincent,* 496 F.2d 641 (2d Cir.1974) (rejecting claim of ineffective assistance based on infrequent visitation by counsel);

*Bingham v. Duncan,* No. 01 Civ. 1371(LTS), 2003 WL 21360084, at *4 (S.D.N.Y. June 12, 2003) ("[P]etitioner's conclusory allegations regarding trial counsel's failure to do investigative work and to contact potential witnesses do not establish that the result of the proceedings would have been different if not for counsel's error—or even that his behavior was erroneous at all."); *Polanco v. United States,* Nos. 99 Civ. 5739, 94 Cr. 453(CSH), 2000 WL 1072303, at *10 (S.D.N.Y. Aug. 3, 2000) ("[W]holesale and vague accusations are patently insufficient to meet the *Strickland* standard.").

**b.** *Failure To Move To Dismiss on Speedy Trial Grounds*

Petitioner's argument that his counsel was ineffective for failing to move to dismiss on speedy trial grounds is similarly unavailing, as Petitioner has failed to demonstrate that such a motion would likely have succeeded. The right of an accused to a speedy trial is guaranteed by the Sixth Amendment and is imposed upon the states by the Due Process Clause of the 14th Amendment. *See Klopfer v. North Carolina,* 386 U.S. 213, 223, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967). Specifically, the Sixth Amendment provides, in relevant part, that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. Amend. VI. The speedy trial provision "has no application until the putative defendant in some way becomes an 'accused,' " *i.e.,* when a putative defendant has been indicted or actually detained. *United States v. Marion,* 404 U.S. 307, 313, 320, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). In determining whether a "particular defendant has been deprived of his right" to a speedy trial, the Court must balance four factors: (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) the prejudice to the defendant. *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Further, "[t]he length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Id.* at 530.

**\*22** In this case, Petitioner was arrested on December 2000, and his trial commenced in November 2002. While a delay of nearly two years may be viewed as presumptively prejudicial, the other *Barker* factors weigh against dismissal. *See United States v. Vassell,* 970 F.2d 1162, 1164 (2d Cir.1992) (suggesting that any delay over eight months is presumptively prejudicial, but rejecting

speedy trial claim where government sought delay to encourage codefendant to testify against defendant, case was complex, and delay did not alter defense). Petitioner concedes that much of the delay was attributable to locating Officer Horn, who had apparently retired and moved to Florida, and securing his appearance for trial (*see* Pet., at 32–33), and Petitioner has offered nothing to support his contention that this was merely a "delay tactic" by the prosecution, *see Barker,* 407 U.S. at 531 ("[A] valid reason, such as a missing witness, should serve to justify appropriate delay ."). Nor has Petitioner identified any prejudice caused by the delay. Petitioner suggests that Assan had significant lapses of memory (*see* Pet., at 32–33), but there is nothing to suggest that the slight discrepancies between Assan's testimony and the testimony of the other witnesses were due to memory loss.

Likewise, Petitioner has failed to demonstrate that his trial counsel was ineffective for failing to raise any state-law speedy trial claim, as any such claim would also have been flawed. Under New York law, a motion to dismiss must be granted if the State is not ready for trial within six months of the commencement of a criminal action. N.Y.Crim. Proc. § 30.30(1)(a). The limitation period is tolled under certain circumstance, such as where a continuance is granted at the request of the prosecution "because of the unavailability of evidence material to the people's case, when the district attorney has exercised due diligence to obtain such evidence and there are reasonable grounds to believe that such evidence will become available in a reasonable period." N.Y.Crim. Proc. § 30.30(4)(g). Here, Petitioner has failed to demonstrate that any delay beyond six months was not excludable under relevant tolling provisions.

Based on the foregoing, Petitioner has not demonstrated that a speedy trial motion was likely to have been successful. Indeed, on direct appeal, the Appellate Division denied Petitioner's claim (raised in his *pro se* supplemental brief) that he was denied his right to a speedy trial. (Ex. 18.) Thus, it cannot be said that Petitioner's counsel's conduct, in failing to make such a motion, fell below acceptable standards. *See Boyd v. Hawk,* 965 F.Supp. 443, 450 (S.D.N.Y.1997) ("If a speedy trial motion likely would have been unsuccessful, trial counsel's failure to make the motion does not constitute ineffective assistance.").

#### c. *Failure To Preserve Objection to the Admission of Clark's Plea Allocution*

Petitioner argues that his counsel was ineffective for withdrawing his objection to the admission of Clark's plea allocution and failing to raise an objection to its admission on federal constitutional grounds. (*See* Pet., at 35–41.) As the Appellate Division found (Ex. 18), and as further noted above (*see* n. 15 *supra* ), even if Clark's plea allocution was admitted in error, the error was harmless. Further, to the extent Petitioner suggests that trial counsel should have moved to redact the plea allocution to remove any reference to an accomplice, Petitioner cannot overcome the presumption that, under the circumstances, this decision might be considered sound trial strategy. By allowing the full plea allocution to be admitted, trial counsel was able to argue in summation that Clark "never names anybody and she certainly doesn't name [Petitioner] at all." (Trial Tr., at 284; *see Jennings v. United States,* No. 04 Civ. 9741(SHS), 2005 WL 1387987, at *8 n. 6 (S.D.N.Y. June 6, 2005) (denying ineffective assistance of trial counsel claim based on counsel's consent to the admission of codefendant's plea allocution in part because it was based on a strategic decision).

#### d. *Stipulation as to Accuracy of Clark's Plea Allocution*

**\*23** Petitioner claims that his counsel "created a conflict of interest" by stipulating as to the accuracy of the written transcription of Clark's plea allocution without Petitioner's consent.[19] (Pet., at 42.) Petitioner cannot establish that his trial counsel was objectively unreasonable to enter into this stipulation. Petitioner's lawyer objected to the accuracy of a date in the transcript of the allocution (Trial Tr., at 238–39), and there is nothing to suggest that the transcript was in any other way inaccurate. Moreover, "[e]ntering into a stipulation is a strategic decision that defense counsel may make on the defendant's behalf.' " *Horan v. Conway,* No. 9:03–CV–0486 (LEK)(DEP), 2007 WL 1087492, at *10 (N.D.N.Y. Apr. 9, 2007) (quoting *Goicochea–Melchor v. United States,* No. 99 CIV. 729(JGK), 1999 WL 804146, at *5 (S.D.N.Y. Oct.7, 1999)) (noting that entering into a stipulation without first obtaining a defendant's consent "does not amount to *per se* ineffective assistance of counsel").

#### e. *Failure To Prepare for Trial*

Petitioner claims that his trial counsel failed to prepare for trial. (*See* Pet., at 34.) As background, Petitioner notes that, prior to *voir dire*, his attorney moved to withdraw because his mother was ill and he would need to travel to Florida to admit her into a nursing home. (Transcript, dated Oct. 8, 2002 (Dkt.8), at 15–17.) Counsel stated:

> I cannot proceed with a clear mind and concentrate on this case. I will not be able to proceed with a clear mind and concentrate on this case. I will not be able to proceed with a clear mind. I will not be able to do the best defense and I have to put that on the record for this Court.

(*Id.* at 17.) The trial court denied the motion, but stated that it would "work with" counsel in terms of scheduling. (*Id.* at 43–44.)

This Court has reviewed the trial proceedings and agrees with the general finding of the trial court (made upon the denial of both of Petitioner's Section 440.10 motions), that "[t]here was and is nothing to suggest that trial counsel provided the defendant with anything other than skilled and effective representation." (Ex. 27; *see also* Ex. 10 (same).) Not only does each of Petitioner's specific arguments regarding counsel's conduct fail on its merits, but, "[c]onsidering the totality of the circumstances, at the time, and assessing trial counsel's representation as a whole, it cannot be said that trial counsel's representation of the petitioner was objectively unreasonable such that the petitioner was denied the effective assistance of counsel." *Cotto v. Lord,* No. 99 Civ. 4874(JGK), 2001 WL 21246, at *17–18 (S.D.N.Y. Jan.9, 2001) (noting need to view trial counsel's representation "as a whole").

For all of the above reasons, the denial of Petitioner's claim that he received ineffective assistance of trial counsel was neither contrary to, nor an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d). I therefore recommend that this claim—with the exception of Petitioner's unexhausted argument that counsel was ineffective in seeking the admission of Clark's video tape confession (*see supra* at 26–28)—be dismissed as without merit.

### 4. *Alleged Ineffective Assistance of Appellate Counsel (Petitioner's Fifth Claim)*

**\*24** Petitioner contends that his appellate counsel was ineffective for failing to argue that Petitioner's trial counsel was ineffective. (Pet., at 48.) Petitioner fully exhausted this claim by raising it in a state *coram nobis* proceeding, and by then seeking leave to appeal the denial of his claim to the Court of Appeals. As the Appellate Division rejected the claim on the merits, this Court now reviews the claim under AEDPA. (*See* Ex. 31; *Francolino,* 365 F.3d at 141.)

Under the *Strickland* test (which applies to appellate counsel, as well as trial counsel, *see Claudio v. Scully,* 982 F.2d 798, 803 (2d Cir.1992)), appellate counsel does not have a duty to advance every available nonfrivolous argument on appeal, *see Jones v. Barnes,* 463 U.S. 745, 754, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). A petitioner, however, may demonstrate that appellate counsel was constitutionally ineffective "if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.1994). A federal or a state-law claim that was improperly omitted from an appeal may form the basis for an ineffective assistance of appellate counsel claim, "so long as the failure to raise the ... claim fell outside the wide range of professionally competent assistance." *Id.* (quotations omitted). Deference is accorded to an appellate counsel's strategic decision to focus an appeal on select issues, instead of raising every potentially "colorable" claim. *Jones,* 463 U.S. at 753–54. This is because "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most a few key issues." *Id.* at 751–52. A brief that raises every colorable claim "runs the risk of burying good arguments ... in a verbal mound made up of strong and weak contentions." *Id.* at 753 (citations omitted).

Here, Petitioner's appellate counsel raised two claims on behalf of Petitioner in the direct appeal: Counsel argued that (1) the admission of Clark's plea allocution violated Petitioner's Confrontation Clause rights; and (2) Petitioner's right to be present was violated when the trial court admonished the jury outside of Petitioner's presence. (*See* Ex. 12.) Appellate counsel was not ineffective for failing to raise a claim based on ineffective assistance of trial counsel. As explained above (*see supra* at 37–46),

such a claim was not likely to have succeeded. Appellate counsel cannot be found ineffective for omitting a claim which had no likelihood of success on appeal, and a petitioner cannot be prejudiced as a result of appellate counsel's failure to raise meritless claims. *See Mayo, 13 F.3d at 534* ("To establish prejudice in the appellate context, a petitioner must demonstrate that there was a reasonable probability that [his] claim would have been successful.") (internal quotation omitted).

**\*25** As the Appellate Division's rejection of Petitioner's ineffective assistance of appellate counsel claim was neither contrary to, nor an unreasonable application of, clearly established federal law, I recommend that this claim be dismissed. *See 28 U.S.C. § 2254(d).*

### 5. *Sufficiency of the Evidence of Attempted Robbery in the First Degree* (Petitioner's Sixth Claim)

Petitioner claims that there was insufficient evidence to prove the elements of attempted robbery in the first degree beyond a reasonable doubt. (*See* Pet., at 62.) Petitioner raised this claim in the *pro se* supplemental brief he filed on his direct appeal. (*See* Ex. 16, at 37–29.) The Appellate Division rejected the claim on the merits, and Petitioner exhausted the claim by seeking leave to appeal to the Court of Appeals. (*See supra* at 32.) Accordingly, the Court reviews this claim under the standard of review set forth in AEDPA. *See 28 U.S.C. § 2254(d).* Under that deferential standard, the claim should be dismissed, even though, if this Court were considering the claim *de novo,* the Court would recommend a different result.

Under established Supreme Court law, "the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia, 443 U.S. 307, 318, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).* Such an inquiry "does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' " *Id.* at 318–19 (emphasis in original) (citations omitted). Rather, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original); *see also United States v. Carson, 702 F.2d 351, 361 (2d Cir.1983)* (a court must determine

"whether the jury, drawing reasonable inferences from the evidence, may fairly and logically have concluded that the defendant was guilty beyond a reasonable doubt ... view[ing] the evidence in the light most favorable to the government, and constru[ing] all permissible inferences in its favor") (internal citations omitted), *cert. denied sub nom. Mont v. United States, 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983).*

In making this determination, "pieces of evidence must be viewed in conjunction, not in isolation." *United States v. Podlog, 35 F.3d 699, 705 (2d Cir.1994)* (citation omitted). *cert. denied sub nom. Romano v. United States, 513 U.S. 1135, 115 S.Ct. 954, 130 L.Ed.2d 897 (1995).* It is also not enough for a petitioner to show that the evidence had inconsistencies. *See, e.g., United States v. Vasquez, 267 F.3d 79, 91 (2d Cir.2001).* "[A] reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.' " *McDaniel v. Brown, — U.S. —, —, 130 S.Ct. 665, 673, 175 L.Ed.2d 582 (2010)* (quoting *Williams,* 529 U.S. at 326). In fact, "[t]he testimony of a single uncorroborated witness is sufficient to achieve a showing of guilt beyond a reasonable doubt even if that witness's testimony is less than entirely consistent." *Means v. Barkley,* No. 98 Civ. 7603(DLC), 2000 WL 5020, at *4 (S.D.N.Y. Jan.4, 2000)* (internal citations omitted).

**\*26** In this case, Petitioner argues, in particular, that the evidence adduced at his trial was insufficient to permit a rational jury to conclude that he had "displayed a firearm," an element of attempted robbery in the first degree, under *Section 160.15[4] of the New York Penal Law. See People v. York, 134 A.D.2d 637, 638, 521 N.Y.S.2d 531 (2d Dep't 1987).* As the New York Court of Appeals has explained, "[t]he defendant must consciously display something that could reasonably be perceived as a firearm, with the intent of compelling an owner of property to deliver it up or for the purpose of preventing or overcoming resistance to the taking," and "the display must actually be witnessed in some manner by the victim, *i.e.,* it must appear to the victim by sight, touch or sound that he is threatened by a firearm." *People v. Baskerville, 60 N.Y.2d 374, 381, 469 N.Y.S.2d 646, 457 N.E.2d 752 (1983)* (citations omitted); *see also People v. Lopez, 73 N.Y.2d 214, 222, 538 N.Y.S.2d 788, 535 N.E.2d 1328 (1989)* ("All that is required is that the defendant, by his

actions, consciously manifest the presence of an object to the victim in such a way that the victim reasonably perceives that the defendant has a gun."). The Court of Appeals has reasoned that, unlike other aggravating factors in the robbery statute that address the danger of actual harm to the crime victim (*e.g.,* the "deadly weapon" and "dangerous instrument" provisions), the "displayed what appeared to be a firearm" provision is premised on the "effect upon the victim [of being] put in fear of his or her life by the display." *Baskerville,* 60 N.Y.2d at 756, 469 N.Y.S.2d 667, 457 N.E.2d 773.[20]

Petitioner argues that, here, there was no evidence that Assan, the victim of the charged crime, reasonably perceived what appeared to be a firearm.[21] (*See* Pet., at 62.) As Petitioner notes, and as Respondent concedes (Resp. Mem., at 52), on both direct and cross-examination, Assan testified that he never saw a gun:

> Q. Did you ever see the defendant have a gun that night.
>
> A. No, I never saw the gun.

(*Id.* at 16, 469 N.Y.S.2d 667, 457 N.E.2d 773.)

> Q. And you said, on the district attorney's direct examination, you never saw a gun either?
>
> A. No, I never saw the gun.

(*Id.* at 48, 469 N.Y.S.2d 667, 457 N.E.2d 773.)

> Q. And so he never pointed a gun; just said he needed something, and it was a man without a mustache and a goatee in a green Ford Explorer?
>
> A. Yes.

(*Id.*)

> Q. And the other one, just to reiterate—sorry to beat a dead horse—but just so the jury understands—the one you saw was a goatee, no mustache, green Explorer and no shotgun, no firearm. You never saw a firearm?
>
> A. No, sir.

(*Id.* at 49, 469 N.Y.S.2d 667, 457 N.E.2d 773.)

There is also no evidence in the trial record that Assan saw Petitioner put his hand inside a shirt, jacket, or pocket, giving the suggestion that a firearm was hidden underneath. *See, e.g., Lopez,* 73 N.Y.2d at 221–22, 538 N.Y.S.2d 788, 535 N.E.2d 1328 (finding that the fact that robbery victim only saw defendant move his hand inside his jacket, but did not see a gun, was sufficient to find that defendant displayed what appeared to be a firearm); *People v. Broadhead,* 179 A.D.2d 766, 579 N.Y.S.2d 135, 136 (2d Dep't 1992) ("[D]espite the absence of any language specifically announcing the possession of a firearm, the defendant consciously displayed the object in his pocket when he reached into his bulky pocket, under such circumstances that the victims reasonably perceived that he had a handgun."). Nor is there evidence in the record that Assan felt a gun pressed to his body or heard a gunshot. *See York,* 521 N.Y.S.2d at 638–39 (1987) (reversing conviction for first degree robbery where the victim testified that "she had not observed a gun in the defendant's possession and had not heard anything"); *see also People v. Slater,* 13 A.D.3d 732, 786 N.Y.S.2d 602 (3d Dep't 2004) (finding sufficient evidence to support conviction for first degree robbery where, although the victim did not testify at trial, there was other proof from which jury could reasonably infer that victim perceived the defendant was armed with a gun, including testimony of two codefendants that they saw defendant enter store with a gun, put his hand around victim's neck, point the gun to his head, and fire shot past victim's head). Not only did Assan offer no testimony to the effect that he felt or heard a gun, but the record suggests, to the contrary, that he was closeted in a space that physically separated him from Petitioner and that made it difficult for him to hear anything that was transpiring. (*See* Trial Tr., at 8–13.)

**\*27** There is no question that the trial record did contain testimony that Petitioner was holding a gun, which was seen by at least one other person during the robbery. (*Id.* at 206, 786 N.Y.S.2d 602.) Yet, as there was *no* basis for the jury to conclude that the *victim* of the crime—Assan —saw, heard, or was touched by the firearm or anything he believed to be a firearm, there is a serious question in this case as to whether a rational juror could conclude that the prosecution satisfied its burden of proving the element of "display" beyond a reasonable doubt. Indeed, based on existing New York precedent on this point, it is this Court's view that the Appellate Division—which did not explain its reasoning on this claim—committed constitutional error by allowing Petitioner's conviction for first-degree attempted robbery to stand.

The Supreme Court has emphasized, however, that, under AEDPA, even "clear error" by a state court is not sufficient to warrant habeas relief. *Lockyer v. Andrade,* 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."). Rather, as noted above, "[a] state court's determination that a claim lacks merit precludes federal habeas review so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington,* 131 S.Ct. at 786 (quoting *Yarborough v. Alvarado,* 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004)); *see also Williams,* 529 U.S. at 410 ("[A]n unreasonable application of federal law is different from an incorrect application of federal law."). While this can make this Court's task a difficult one, "AEDPA's standard was meant to be difficult," as the Second Circuit has recently observed. *Byrd v. Evans,* No. 09–5309–pr, 2011 WL 941615, at *2 (2d Cir. Mar.21, 2011) (citing *Harrington* ).

In this case, Assan testified that, while he did not directly see a gun, he *did* see Martinez raise his hands in the air, at which point he realized that a robbery might be in progress, so he closed the door to his enclosed cashier booth, and he called 911. (Trial Tr., at 17.) The New York courts have never squarely addressed whether, from testimony that the victim saw a bystander raise both hands in the air (and, as a result, called 911), a rational juror could infer that the victim had perceived that the defendant had displayed a firearm. Based on existing state precedent, as discussed above, it appears to this Court that the lack of the victim's perception of the firearm by seeing, hearing, or feeling it (or by seeing, hearing, or feeling something reasonably believed to be a firearm) would be fatal to the prosecution's case. Nonetheless, a fairminded jurist could disagree, and could conclude that all that is necessary under New York law to satisfy the element of "display" of a firearm is the victim's "reasonable perception" that the defendant had a gun, *see Lopez,* 73 N.Y.2d at 222, 538 N.Y.S.2d 788, 535 N.E.2d 1328, a perception which, in this case, plausibly could have been inferred by the jury from what Assan did witness, *cf. Ball v. State,* 347 Md. 156, 191–192, 699 A.2d 1170 (1997) ("The eyewitness said he saw the attendant's hands in the air, from which a jury could infer that the men holding up the station were using a deadly weapon.").

***28** As this Court has not found any prior New York Court of Appeals decision confronting an analogous set of facts, and as fairminded jurists could differ as to how New York law should be applied on these facts, this Court cannot conclude that, in rejecting Petitioner's claim, the Appellate Division committed an error "well understood and comprehended in existing law." *Harrington,* 131 S.Ct. at 785. Accordingly, under that deferential AEDPA standard, this Court is constrained to recommend that Petitioner's claim be dismissed, even though this Court would independently conclude, were the claim before it on *de novo* review, that the Appellate Division erred in this instance.

### 6. *Claimed Due Process Violation Based on Allegedly Inadequate Sanction for Destruction of Evidence* (Petitioner's Seventh Claim)

Petitioner claims that his right to due process was violated when the trial court sanctioned the prosecutor for the destruction of the tape recording of the 911 call by precluding the prosecution from introducing a written record of the call (10/8/02 Tr., at 47), and by giving the jury an adverse inference charge (Trial Tr., at 311), rather than by dismissing the case altogether. (*See* Pet., at 65 .) Petitioner raised this claim in his *pro se* supplemental brief on his direct appeal. (*See* Ex. 16.) As explained above, all of the claims raised in Petitioner's *pro se* supplemental brief were exhausted, and should be considered to have been denied on the merits by the Appellate Division. (*See supra* at 32.) Thus, the Court reviews this claim under AEDPA. *See* 28 U.S.C § 2254(d).

Under Supreme Court law, to establish a due process violation where evidence has been lost, a defendant generally must show that the State acted in "bad faith" in failing to preserve the evidence. *See Arizona v. Youngblood,* 488 U.S. 51, 57–58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988) ("[U]nless a criminal defendant can show bad faith ..., failure to preserve potentially useful evidence does not constitute a denial of due process."); *accord Colon v. Kuhlmann,* 865 F.2d 29, 30 (2d Cir.1988); *Brock v. Artuz,* No. 99 Civ.1903(AJP), 2000 WL 1611010, at *8 (S.D.N.Y. Oct.27, 2000). [22] In this case, Petitioner argues that the fact that the 911 tape was destroyed before the prosecutor requested a copy of the tape shows that Respondent or its agents acted in bad faith. (*See* Pet., at 67.) Petitioner's speculation, however, is not sufficient to show bad faith, and this is fatal to his claim. *See United*

*States v. Rastelli,* 870 F.2d 822, 833 (2d Cir.1989) (holding that a "missing evidence claim must fail" where the record was "barren of proof that the government lost the evidence in bad faith"); *Brock,* 2000 WL 1611010, at *8 (destruction of evidence claim dismissed where petitioner failed to establish both that missing evidence was "exculpatory" and that there was any "bad faith on the part of the police or prosecution" in the destruction). Accordingly, Petitioner has not shown that the state court's rejection of his claim was contrary to, or an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d).

**\*29** To the extent Petitioner intends to raise a claim that the 911 tape should have been produced under New York state law (*see* Pet ., at 68 (citing New York state law)), that claim cannot be reviewed by this Court. If the prosecution fails to disclose so-called *Rosario* material, the defendant may be entitled to a reversal of the conviction or some other sanction, depending on the circumstances of the failure to disclose and the content of the material. *See People v. Martinez,* 71 N.Y.2d 937, 940, 528 N.Y.S.2d 813, 524 N.E.2d 134 (1988); *see also* N.Y.Crim. Proc. § 240.70. A claim based on *Rosario,* however, would be grounded in state case law and statute; as such, it would not be cognizable on federal habeas review. *See Estelle v. McGuire,* 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.") (citations omitted); *Landy v. Costello,* 141 F.3d 1151 (Table), No. 97–2433, 1998 WL 105768, at *1 (2d Cir. Mar.9, 1998) ("To the extent that [Petitioner's] claim is based on a *Rosario* violation, it must fail, because a habeas petition can only be granted to remedy some violation of *federal* law; the obligation to turn over *Rosario* material arises under *state* law." (emphasis in original)); *see also Padro v. Strack,* No. 99 Civ. 4961(AKH), 2001 WL 394852, at *2 (S.D.N.Y. Apr.18, 2001) ("[P]etitioner's claim that the prosecution's failure to provide defense counsel with the surveillance tapes was a violation of *Rosario* rights is not cognizable under federal review.").

For these reasons, I recommend that this claim be dismissed.

### 7. *Alleged Denial of Right to Counsel at Lineup* (Petitioner's Ninth Claim)

Plaintiff claims that his Sixth Amendment right to counsel was violated when a lineup was conducted without

his having the assistance of counsel. (*See* Pet., at 77.) The Court also reviews under ADEPA the Appellate Division's rejection of this claim, which was raised in Petitioner's *pro se* supplemental brief and exhausted on direct appeal. (*See supra* at 32.)

Under clearly established federal law, a defendant may not be placed in a lineup without the presence of his attorney once the Sixth Amendment right to counsel has attached. *Wade,* 388 U.S. at 236–38. The right to counsel, however, "does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information or arraignment." *McNeil v. Wisconsin,* 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (internal quotations omitted). In determining whether adversarial proceedings have commenced, federal courts look to state law, *see Meadows v. Kuhlmann,* 812 F.2d 72, 76 (2d Cir.1987), and, under New York law, a criminal action is commenced by the filing of an accusatory instrument, *see* N.Y.Crim. Proc. § 100.05.

**\*30** Here, Petitioner asserts that he was brought to court at 9:00 a.m. on December 19, 2000 at which time an accusatory instrument was filed; that he requested counsel; and that, at 12:25 p.m., he was placed in a court-ordered lineup, without counsel. (*See* Pet., at 77–78.) Yet Petitioner has not submitted anything to support his version of the events of December 19. To the contrary, based on the records before this Court (including those that were attached to Petitioner's *pro se* supplement brief in his direct appeal (*see* Ex. 16)), it appears that the accusatory instrument was not filed until after the lineup. After being arrested at approximately 2:50 a.m. on December 19 (Trial Tr., at 89), Petitioner was placed in a lineup at approximately 4:20 or 4:40 p.m. on that same day (6/5/01 Tr., at 4, 8, 24–26). According to records from the New York City Police Department, the accusatory instrument was not sworn out until 7:00 p.m., and thus presumably could not have been filed prior to the lineup earlier that afternoon. (*See* Exs. 33–35.) Indeed, those records indicate a "docketed" time of 3:00 a.m. on December 20. (*Id.*) Petitioner was then arraigned around 11:00 a.m. on December 20. (*Id.*) Officer Rivera's memo book entries confirm this sequence of events, with slight, but immaterial, discrepancies as to the precise times. (*See* Ex. 36.)

Taylor v. Rivera, Not Reported in F.Supp.2d (2011)
Case 9:16-cv-01458-DNH-CFH   Document 31   Filed 05/13/19   Page 70 of 134
2011 WL 4471919

Given this documentary evidence, this Court cannot find that the Appellate Division's rejection of Petitioner's claim was contrary to, or an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d). I therefore recommend that Petitioner's right to counsel claim be dismissed.

### CONCLUSION

For the foregoing reasons, I recommend that the Petition be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable P. Kevin Castel,

United States Courthouse, 500 Pearl Street, Room 630, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 525, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Castel. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL–CIO Pension Fund v. Hermann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983).

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 4471919

Footnotes

1    According to the New York State Department of Correctional Services, Petitioner is currently incarcerated at Riverview Correctional Facility in Ogdensburg, New York. *See* New York State Department Of Correctional Services, Inmate Population Information Search, http://ny sdocslookup.docs.state.ny.us/GCA00P00/WIQ3/WINQ130 (Search Last Name "Taylor"; First Name "Phillip"; DIN "02–R–6212"). It appears from this source that Petitioner had been released on parole, but was brought back into custody in October 2010, due to a violation of the terms of his release.

2    Exhibits attached to the Affidavit in Opposition to Petition for Writ of Habeas Corpus are referred to by exhibit number.

3    This motion was initially filed *pro se,* but was subsequently adopted by Petitioner's appointed attorney. (*See* Ex. 3.)

4    The purpose of a hearing held pursuant *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), is to determine whether evidence was obtained in violation of a criminal defendant's Fourth Amendment right to be free from unreasonable search and seizure.

5    Respondent does not dispute that the court made this ruling in a proceeding at which Petitioner was not present. (Resp. Mem., at 10.) It appears, however, that the Court's decision was memorialized in a written Order dated April 4, 2001. (*See* Ex. 6 .)

6    This hearing was held pursuant to *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), to determine whether Petitioner's pretrial identification was the result of impermissibly suggestive procedures.

7    In *People v. Rosario,* 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881 (1961), the New York Court of Appeals held that a criminal defendant is entitled to examine any prior statement of a witness called by the prosecution, where the prior statement relates to the subject matter of the witness' testimony. 9 N.Y.2d at 289–91, 213 N.Y.S.2d 448, 173 N.E.2d 881. That rule was later codified in N.Y.C.P.L. § 240.45(1)(a).

8    Petitioner had identified certain ineffective assistance claims that he sought to raise on direct appeal; these appear to have been the same claims that he asserted in his first Section 440.10 motion. (*See* Ex. 13.)

9    Although the Court's docket reflects a filing date of October 9, 2007, a *pro se* prisoner's papers are deemed filed when they are handed over to prison officials for forwarding to the court, *see Houston v. Lack,* 487 U.S. 266, 270, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988), and this Court will therefore deem the Petition to have been filed on September 19, 2007, the date when Petitioner declared under penalty of perjury that he delivered the Petition to prison authorities to be mailed to the Court, *see, e.g., Rhodes v. Senkowski,* 82 F.Supp.2d 160, 165 (S.D.N.Y.2000).

10    The Court has numbered the claims for ease of reference. Although the Petitioner has used various numbering schemes, this is, for the most part, the order in which he has presented his claims in his Petition. The only exceptions are that one

aspect of what this Court has referred to as Petitioner's second claim is addressed somewhat later in the Petition than the remainder of that claim (*see* Pet., at 69; *see also id.* at Point B), and the claim referred to herein as Petitioner's 10th claim is mentioned by Petitioner in the middle of his discussion of his ineffective assistance of trial counsel claim (*see id.* at 40)).

11 The limitations period may alternatively begin to run on the following dates: (1) where the petitioner was prevented from filing an application by state action, the date on which the impediment is removed; (2) where the right asserted is a newly recognized one made retroactively applicable, the date on which the constitutional right asserted was initially recognized by the Supreme Court; and (3) the date on which the factual predicate of the claim presented could have been discovered through the exercise of due diligence. *See* 28 U.S.C.

12 The Supreme Court has emphasized that "clearly established [f]ederal law" refers only to the " 'holdings, as opposed to the dicta, [of the Supreme Court's] decisions as of the time of the relevant state-court decision.' " *Carey v. Musladin,* 549 U.S. 70, 74, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006) (quoting *Williams,* 529 U.S. at 412); *see also Rodriguez v. Miller,* 537 F.3d 102, 107 (2d Cir.2007) (*"Musladin* admonishes courts to read the Supreme Court's holdings narrowly and to disregard as dicta for habeas purposes."). Thus, a principle of constitutional law "grounded solely in the holdings of the various courts of appeals or even in the dicta of the Supreme Court" cannot provide the basis for habeas relief. *Rodriguez,* 537 F.3d at 106–07 (citing *Musladin* ).

13 The mere fact that the Appellate Division also held that, were it to review this aspect of Petitioner's claim, it would find it to be without merit (Ex. 18), does not alter the fact that the claim is procedurally barred, *see Harris v. Reed,* 489 U.S. 255, 264 n. 10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *Velasquez v. Leonardo,* 898 F.2d 7, 9 (2d Cir.1990) (where a state court expressly relies on a procedural default in rejecting the claim, but also notes that it would reject the claim on the merits as well, federal habeas review remains procedurally barred).

14 Under New York law, a defendant must make a timely objection before the trial court in order to preserve that objection for appellate review. *See* N.Y.Crim. Proc. § 470.05(2) ("For purposes of appeal, a question of law with respect to a ruling or instruction of a criminal court during a trial or proceeding is presented when a protest thereto was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same."); *see also People v. Balls,* 69 N.Y.2d 641, 642, 511 N.Y.S.2d 586, 503 N.E.2d 1017 (1986); *People v. Newton,* 228 A.D.2d 321, 644 N.Y.S.2d 708, 709 (1st Dep't 1996).

15 For essentially the same reasons, if this Court were to reach the merits of Petitioner's Confrontation Clause claim, the Court would conclude that, even if the trial court's admission of Clark's plea allocution constituted constitutional error, such error was harmless. *See United States v. McClain,* 377 F.3d 219, 222 (2d Cir.2004) (noting that Confrontation Clause violations are subject to harmless error analysis (citing *Coy v. Iowa,* 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988)); *Fry v. Pliler,* 551 U.S. 112, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007) (holding that, in § 2254 habeas proceedings, a court must assess the prejudicial impact of constitutional error under the "substantial and injurious effect" harmless-error standard set forth in *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)). Similarly, if the Court were to apply AEDPA's deferential standard to the Appellate Division's conclusion that any constitutional violation here would have been harmless, the Court again would have no basis to disturb the Appellate Division's finding. (*See* Ex. 18; *see also Perkins v. Herbert,* 596 F.3d 161, 175–76 (2d Cir.2010).)

16 Although Petitioner asserts a claim in this habeas proceeding that the evidence was legally insufficient to support his conviction of attempted first-degree robbery, this claim, even if meritorious, would not be sufficient to support a finding of "actual innocence." *See Sweet v. Bennett,* 353 F.3d 135, 142 (2d Cir.2003); *Dunham v. Travis,* 313 F.3d 724, 730 (2d Cir.2002); *Garbutt v. Conway,* 05 Civ. 9898(SHS), 2009 WL 2474099, at *3 (S.D.N.Y. Aug. 12, 2009); *Edwards v. Fischer,* 414 F.Supp.2d 342, 352–53 (S.D.N.Y.2006); *but see Dixon v. Miller,* 293 F.3d 74, 81 (2d Cir.2002) (acknowledging that actual innocence " 'means factual innocence, not mere legal insufficiency,' " but still finding that the determination of actual innocence "depends on the evidence at trial and its sufficiency"). Moreover, actual innocence means "entire" innocence, not just innocence of the particular charge on which the petitioner was convicted. *See Garbutt,* 2009 WL 2474099, at *3 ("As the Supreme Court has explained, the fundamental miscarriage of justice exception is 'tied ... to a petitioner's innocence" and exists to protect those who are *"entirely* innocent." (quoting *Schlup,* 513 U.S. at 321, 325 (emphasis added))); *but see Fernandez v. Smith,* 558 F.Supp.2d 480, 494 (S.D.N.Y.2008) (reviewing unpreserved insufficiency of the evidence claim because refusing to review that claim would result in a "fundamental miscarriage of justice" even though petitioner was "surely ... guilty of manslaughter").

17 In the trial court, Petitioner filed a *pro se* motion to dismiss the indictment, but that challenge was based on an alleged deprivation of the right to testify before the grand jury under New York Criminal Procedural Law § 190.50, prior to his initial indictment on December 28, 2000. (Ex. 2.) In any event, even if that motion could be read to raise the same claim

2011 WL 4471919

as Petitioner seeks to raise here, it would not be fully exhausted, as, on his direct appeal, Petitioner failed to challenge the trial court's denial of that motion.

18   To the extent Petitioner's trial counsel failed to inform him regarding decisions and deadlines in his case, an ineffective assistance claim on that basis would be unexhausted and, in any event, fail on the merits, as Petitioner cannot show sufficient prejudice. (*See infra* at 38–39.)

19   Although Petitioner argues that this stipulation was somehow the "functional equivalent" of a guilty plea (Pet., at 50), it is clear from the trial transcript that the stipulation was limited to the accuracy of the transcript (*see* Trial Tr., at 228 ("It is hereby stipulated by and between the parties that People's 16 in Evidence is a true and accurate transcription of the plea allocution of Michelle Clark.")).

20   The prosecution appears to have sought to elevate the attempted robbery charge to the first degree based only on the "displayed what appeared to be a firearm" aggravating factor, N.Y. Penal Law § 160.15 [4] (*e.g.,* the prosecution did not rely on the "deadly weapon" or "dangerous instrument" provisions under N.Y. Penal Law § 160.15[2], [3] ). (*See, e.g.,* Ex. 6 (pretrial court denying Petitioner's motion to dismiss the indictment and noting that Petitioner was indicted and charged with, *inter alia,* attempted robbery in the first degree under N.Y. Penal Law § 110, 160.15[4] ); Trial Tr., at 320 (jury charge that, to find Petitioner guilty of attempted robbery in the first degree, the prosecution had to prove beyond a reasonable doubt that, *inter alia,* "the defendant or another person or participant in the crime displayed what appeared to be a shotgun").)

21   Petitioner does not appear to have been charged with attempted robbery, or any other crime, against Martinez. (*See* Trial Tr., at 320–22; Ex. 5.)

22   Petitioner does not claim that the 911 tape contained exculpatory *Brady* material. *See Youngblood,* 488 U.S. at 57 (differentiating the standard for failure to preserve *Brady* material).

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Perez v. Lee, Not Reported in Fed. Supp. (2017)

2017 WL 480619

2017 WL 480619
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Reynaldo PEREZ, Petitioner,
v.
William LEE, Respondent.

14-CV-05763 (JPO) (BCM)
|
Signed January 6, 2017

**Attorneys and Law Firms**

Howard R. Birnbach, Great Neck, NY, for Petitioner.

Noah Jeffrey Chamoy, The Bronx District Attorney's Office, Bronx, NY, for Respondent.

**REPORT AND RECOMMENDATION TO THE HON. J. PAUL OETKEN**

BARBARA MOSES, United States Magistrate Judge

**\*1** Petitioner Reynaldo Perez seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He has been incarcerated since 1996, when he was convicted of one count of second degree murder in violation of N.Y. Penal L. § 125.25(2) and one count of first degree manslaughter in violation of N.Y. Penal L. § 125.20(1). He is currently held at Green Haven Correctional Facility in Stormville, New York. Petitioner alleges that he was denied effective assistance of appellate counsel on direct appeal of his criminal conviction. For the reasons set forth below, I respectfully recommend that the petition be DENIED.

**BACKGROUND**

**I. 1996 Conviction and Notice of Appeal**
On July 10, 1996, following a jury trial in New York Supreme Court, Bronx County, petitioner was convicted of second degree murder and first degree manslaughter. Sent. Tr., dated July 24, 1996 (Dkt. No. 13-2), at 2-3. [1] Two weeks later, he was sentenced to a term of 8-1/3 to 25 years for the manslaughter count, and 25 years to life imprisonment for the murder count, to be served consecutively, for a combined indeterminate sentence of 33-1/3 years to life imprisonment. Id. at 24. At the end of the sentencing hearing, the clerk instructed petitioner's trial counsel, Joseph Miano, Esq., to inform petitioner of his right to appeal. Id. at 25. Attorney Miano then stated on the record, "I advised him of his right to appeal and if he wishes I will file forth the request." Id. The record also contains a check-the-box notation (Dkt. No. 13-16, at ECF page 3) indicating that petitioner was "given written notice of his right to appeal."

On August 1, 1996, Miano timely filed a notice of appeal, on petitioner's behalf, to the Appellate Division, First Department. (Dkt. No. 13-3.) No further action was taken on the direct appeal until 2012, when petitioner's current counsel, Howard Birnbach, Esq., filed a motion to enlarge the time to perfect the appeal, along with a proposed brief. (Dkt. Nos. 13-10, 13-11.) The reasons for the lengthy delay are discussed below.

**II. 1997 Retention of Appellate Counsel**
On or about January 2, 1997, petitioner retained attorney Steven R. Kartagener, Esq. as appellate counsel. See Birnbach Aff., dated Nov. 30, 2012 (Dkt. No. 13-13), ¶ 4. On that date, in a letter addressed to Anna Mendez (Dkt. No. 13-14), Kartagener acknowledged receipt of $30,000 for "legal services relating to the appeal by your son, Reynaldo Perez, to the Appellate Division, First Department, from the recent judgment of conviction against him."

**III. 2003 Disciplinary Action Against Appellate Counsel**
**\*2** Kartagener never perfected petitioner's direct appeal. Nor did he ever request an enlargement of time in which to do so. [2] On May 1, 2003—more than six years after Kartagener took the case—the Departmental Disciplinary Committee of the Appellate Division, First Department informed Mendez by letter (Dkt. No. 13-15) that it had formally admonished Kartagener for neglecting petitioner's appeal. According to the Committee, Kartagener violated the Lawyer's Code of Professional Responsibility by performing "no work ... for long periods of time" on petitioner's appeal after Mendez paid him $30,000, which constituted "neglect of [her] son's case" in violation of Disciplinary Rule 6-101(A)(3) Id.

**IV. 2008 Motion to Vacate Conviction**

2017 WL 480619

Another five years passed, during which no effort was made to perfect petitioner's direct appeal. On September 12, 2008—eleven years after attorney Kartagener took the case and five years after he was admonished by the Committee—the same attorney filed a motion to vacate petitioner's conviction pursuant to N.Y. Crim. Proc. L. § 440.10(1)(h). The § 440.10 motion challenged petitioner's Second Degree Murder conviction on the ground that his trial attorney failed to argue the insufficiency of the evidence to support a "depraved indifference" charge, thus depriving petitioner of his "state and federal constitutional rights to the effective assistance of counsel" at trial. Kartagener Aff., dated Sept. 12, 2008 (Dkt. No. 13-4), ¶ 11.

On December 1, 2009, the New York Supreme Court, Bronx County, denied the § 440.10 motion, both on the merits and "upon procedural grounds," pursuant to N.Y. Crim. Proc. L. § 440.10(2)(c), ruling that trial counsel's conduct "was a matter of record and any alleged omission could have been raised as an issue on direct appeal (had defendant filed and perfected such an appeal)." (Dkt. No. 13-6.) On February 5, 2010, petitioner, through attorney Kartagener, sought leave to appeal the Supreme Court's denial of his § 440.10 motion to the Appellate Division. (Dkt. No. 13-7.) On April 8, 2010, the Appellate Division denied leave to appeal. (Dkt. No. 13-9.)

Attorney Kartagener appears to have taken no further action on the case.

## V. 2012 Cross-Motions to Enlarge Time to Perfect, and to Dismiss, the Direct Appeal

On August 22, 2012, petitioner retained his current counsel. Birnbach Aff., dated Oct. 29 2012 (Dkt, No. 13-10), ¶ 3. On November 12, 2012—more than sixteen years after petitioner filed his notice of appeal—attorney Birnbach filed a motion pursuant to 22 NY.C.R.R. § 600.8 for enlargement of the time to perfect that appeal. In support of the motion, Birnbach submitted a two-page attorney affirmation arguing that enlargement was warranted because petitioner "may be facing lifetime imprisonment without any judicial review of his judgment of conviction." Id. ¶ 5. In addition, counsel argued, "the appeal raises some very serious appellate issues which could well merit a reversal or modification of the sentence to time served." Id. ¶ 11. [3] The affirmation did not mention attorney Kartagener or provide any explanation

for the lengthy failure to perfect the appeal other than that "[t]he trial attorney is not an appellate practitioner and was never retained to prosecute the appeal." Id. ¶ 6.

**\*3** On November 30, 2012, the state opposed the motion to enlarge time and filed a cross-motion, pursuant to 22 N.Y.C.R.R. § 600.12 and N.Y. Crim. Proc. L. § 470.60(1), to dismiss the appeal for lack of prosecution. (Dkt. No. 13-12.) [4] That same day, attorney Birnbach filed another two-page attorney affirmation, in opposition to the motion to dismiss, in which he stated that on January 7, 1997, [5] Perez retained Kartagener and "paid him a substantial fee"; that Kartagener "neither perfected the appeal nor returned the retainer"; that Kartagener was admonished in 2003 for neglecting the appeal; and that Perez "was without funds to retain another attorney." Birnbach Aff., dated Nov. 30, 2012, ¶¶ 4, 6-8. Birnbach concluded that petitioner "has remained imprisoned since July 24, 1996 because he did not know he was entitled to an attorney as an indigent." Id. ¶ 9. Although Birnbach attached copies of the January 2, 1997 letter from Kartagener and the May 1, 2003 letter from the Disciplinary Committee, he did not attach a sworn statement from Perez or from anyone else with personal knowledge of petitioner's asserted inability to retain other appellate counsel or his ignorance of his entitlement to appointed counsel on appeal. [6] Birnbach did note that Kartagener continued to represent petitioner on a post-conviction motion "as late as April 8, 2010," id. ¶ 10, but offered no information concerning whose decision it was to pursue the § 440.10 motion rather than attempt to perfect the direct appeal or the basis on which that decision was made.

On February 5, 2013, without opinion, the Appellate Division denied petitioner's motion, granted the state's cross-motion, and dismissed petitioner's direct appeal for failure to timely prosecute. People v. Perez, 2013 N.Y. Slip Op. 63657(U) (App. Div., 1st Dep't Feb. 5, 2013).

## VI. 2013 Appeal of Dismissal Order

On May 9, 2013, the Appellate Division granted leave to appeal the dismissal order. People v. Perez, 21 N.Y.3d 946, 968 N.Y.S.2d 8 (App. Div. 2013). On June 6, 2013, petitioner appealed to the New York Court of Appeals that he had "a constitutional right to appeal his life sentence." Br. for App.-Def., dated June 6, 2013 (Dkt. No. 13-17), at 5. Petitioner further asserted that where, as here, a

Perez v. Lee, Not Reported in Fed. Supp. (2017)

2017 WL 480619

would-be appellant was "victimized by his own attorney," the "strict enforcement of court rules must give way to the constitutional right to at least one appeal before an intermediate appellate court." Br. for App.-Def. at 5-6 (citing *People v. Ventura*, 17 N.Y.3d 675, 934 N.Y.S.2d 756 (2011)). The state filed its response on September 10, 2013 (Dkt. No. 13-18), and petitioner filed a reply brief on September 26, 2013, once again arguing, based on state law precedents, that he "has an absolute right to at least one appeal of his conviction." Reply Br. for App.-Def., dated Sept. 26, 2013 (Dkt. No. 13-19), at 5. Petitioner went on to argue this time citing both state and federal case law—that he was victimized by the ineffective assistance of his prior appellate counsel. *Id.* at 5-7, 11-12 ("[a] more compelling case of ineffective assistance of appellate counsel cannot be found").

## VII. 2014 Court of Appeals Decision

**\*4** On April 3, 2014, in a decision disposing of four separate cases raising similar issues (one of which, coincidentally, was the appeal underlying *Calaff*). the New York Court of Appeals affirmed the 2013 decision of the Appellate Division. *People v. Perez*, 23 N.Y.3d 89, 989 N.Y.S.2d 418 (2014). The Court of Appeals credited petitioner with "making two arguments: that [his] constitutional rights to a fair appellate process were violated, and that, even if there was no constitutional violation, the Appellate Division abused its discretion in dismissing [his] appeal[ ]." 23 N.Y.3d at 99. With respect to the constitutional argument, the Court of Appeals found that petitioner's first appellate lawyer "was undoubtedly ineffective in failing to perfect the appeal that he was hired to pursue." which ordinarily would deprive petitioner of his "constitutional right to the effective assistance of counsel." *Id.* at 100. However, "the long delay in Perez's appeal—from the notice of appeal in 1996 to the motion for an extension of time in 2012—cannot be attributed solely to [Kartagener's] ineffectiveness," since petitioner knew about his attorney's neglect "at least by 2003," could have obtained a new lawyer "[a]t any time in the following nine years, if not sooner," and "offered no explanation of why he failed to seek assigned counsel" during that period. *Id.* The Court of Appeals concluded that "[t]he dismissal of Perez's appeal after his own lengthy neglect of it did not deprive him of any constitutional right." *Id.* [7]

## VIII. Habeas Corpus Petition

On July 25, 2014, Perez filed the instant § 2254 petition. (Dkt. No. 2.) Although it is signed by Birnbach, as counsel, the petition does not clearly state the grounds on which habeas relief is sought. On October 6, 2014, the Hon. J. Paul Oetken, United States District Judge, referred the case to the Hon. Frank Maas, United States Magistrate Judge, for report and recommendation. (Dkt. No. 3.) On November 12, 2014, attorney Birnbach filed a letter inquiring about the status of the case (Dkt. No. 4), and the following day Judge Maas ordered a response to the petition, noting that he could not say, "based on a review of the barebones petition," that petitioner's ineffective assistance of counsel claim "is not viable." (Dkt. No. 5.)

Respondent filed opposition papers on April 1, 2015, arguing that the decision of the Court of Appeals "was not contrary to, nor did it constitute an unreasonable application of any Supreme Court precedent," particularly in light of "the wholly inadequate evidence presented before the Appellate Division." Resp. Mem. of Law (Dkt. No. 14), at 5.

On April 29, 2016, in his only memorandum of law submitted to this Court, petitioner phrases the "Question Presented" by his § 2254 petition as: "Whether the Petitioner, who is exposed to a potential life term of imprisonment, is entitled to at least one appellate review of his conviction?" Br. for Pet. (Dkt. No. 16), at 3. Similarly, his single-point argument section is headed: "The Failure to Permit the Petitioner at Least One Direct Appeal of his Life Sentence is Unconstitutional." *Id.* at 13. The argument following this headline, however, focuses on the issue of ineffective assistance of appellate counsel. *Id.* at 15-16. Nowhere in the petition, or in his brief to this Court, does petitioner assert that he was unable to obtain successor appellate counsel due to either indigency or ignorance. On January 13, 2016, the case was reassigned to me for report and recommendation.

## DISCUSSION

### I. Governing Legal Standards

Under 28 U.S.C. §§ 2244 and 2254, as amended by the Antiterrorism and Effective Death Penalty Act (AEDPA), before the Court can address the merits of petitioner's constitutional claim, it must determine whether he has complied with AEDPA's procedural requirements.

Perez v. Lee, Not Reported in Fed. Supp. (2017)

Case 9:16-cv-01458-DNH-CFH    Document 31    Filed 05/13/19    Page 76 of 134

2017 WL 480619

If there has been procedural compliance, the Court must analyze the claim under the appropriate standard of review, in accordance with § 2254(d). AEDPA's procedural requirements and standards of review are summarized below.

### A. Statute of Limitations

**\*5** The AEDPA imposes a one-year statute of limitations on habeas corpus petitions. As relevant here, a state prisoner has one year to file his petition after "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). Time that elapses while a properly-filed application is pending for state post-conviction or other collateral review with respect to the pertinent judgment or claim is not counted toward the one-year limitation period. Id. § 2244(d)(2).

### B. Exhaustion

A federal court may not consider a petition for a writ of habeas corpus, even if timely filed, unless the petitioner has exhausted the remedies available in the state courts. 28 U.S.C. § 2254(b)(1). To satisfy the exhaustion requirement, the petitioner must "fairly present" each federal claim in "each appropriate state court (including a state supreme court with powers of discretionary review)" in a manner that "alert[s] that court to the federal nature of the claim." Baldwin v. Reese, 541 U.S. 27, 29 (2004) (internal quotations and citations omitted). The purpose of this requirement is to "giv[e] the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." Id. (internal quotations and citations omitted); accord Rose v. Lundy, 455 U.S. 509, 518 (1982) (exhaustion doctrine "protect[s] the state courts' role in the enforcement of federal law and prevent[s] disruption of state judicial proceedings").

Section 2254(b)(3) states that "[a]n applicant shall not be deemed to have exhausted the remedies available in the courts of the State ... if he has the right under the law of the State to raise, by any available procedure, the question presented." However, the "Supreme Court has warned against interpreting this provision too narrowly, holding that it requires 'only that state prisoners give state courts a *fair* opportunity to act on their claims.' " Galdamez v. Keane, 394 F.3d 68, 72 (2d Cir. 2005) (quoting O'Sullivan v. Boerckel, 526 U.S. 838, 844 (1999)) (emphasis in original). "The petitioner need not have

invoked every possible avenue of state court review," but must have given the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." Galdamez, 394 F.3d at 73 (citing Wilwording v. Swenson, 404 U.S. 249, 249-50 (1971) (per curiam), and O'Sullivan, 526 U.S. at 845). A "complete round" requires presentation of the claim to "the highest court of the state." Galdamez, 394 F.3d at 73 (citing Morgan v. Bennett, 204 F.3d 360, 369 (2d Cir. 2000)); see also Grey v. Hoke, 933 F.2d 117, 119 (2d. Cir. 1991) ("a petitioner must present his federal constitutional claims to the highest court of the state before a federal court may consider the merits of the petition").

The exhaustion requirement is satisfied when the federal claim has been "fairly presented to the state courts." Picard v. Connor, 404 U.S. 270, 275 (1971). A petitioner may "fairly present" his claims in several ways, including by citing to the applicable provisions of the federal Constitution in his state-court appellate brief, see Davis v. Strack, 270 F.3d 111, 122-23 (2d Cir. 2001), or by citing "pertinent federal cases employing constitutional analysis." Rustici v. Phillips, 308 Fed.Appx. 467, 469 (2d Cir. 2009) (internal quotation marks and citation omitted). A claim is not "fairly presented" to a state court "if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." Baldwin, 541 U.S. at 32. [8] The federal claim must be presented with some specificity: "a general appeal to a constitutional guarantee as broad as due process" is insufficient "to present the 'substance' of such a claim to a state court." Gray v. Netherland, 518 U.S. 152, 163 (1996) (citing Anderson v. Harless, 459 U.S. 4, 7 (1982)).

**\*6** "As a general matter, unexhausted claims must be dismissed without prejudice to afford the petitioner an opportunity to exhaust the claim in state court." Rodriguez v. Sheahan, 2016 WL 3522278, at \*3 (S.D.N.Y. June 21, 2016) (citing Carvajal v. Artus, 633 F.3d 95, 104 (2d Cir. 2011)). However, "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2). In other words, a court "may deny but not grant" unexhausted claims on the merits. See Caswell v. Racetti, 2012 WL 1029457, at \*4 (W.D.N.Y. Mar. 26,

Perez v. Lee, Not Reported in Fed. Supp. (2017)

2017 WL 480619

Case 9:16-cv-01458-DNH-CFH    Document 31    Filed 05/13/19    Page 77 of 134

2012) (citing *Turner v. Artuz*, 262 F.3d 118, 122 (2d Cir. 2001)).

When a petition contains both exhausted and unexhausted claims a "mixed" petition—the court may stay the petition and hold it in abeyance while the petitioner returns to state court to exhaust. *Rhines v. Weber*, 544 U.S. 269, 277 (2005). However, abeyance is only appropriate where good cause exists for the failure to exhaust, where the unexhausted claims are not "plainly meritless," and where petitioner has not engaged in intentionally dilatory litigation tactics. *Id.* at 277-78. "[I]t is the petitioner who has the burden of demonstrating 'good cause' for his failure to exhaust previously any unexhausted claims." *Porter v. Keyser*, 2016 WL 1417847, at *2 (S.D.N.Y. Apr. 8, 2016) (citing *Perkins v. LaValley*, 2012 WL 1948773, at *1 (S.D.N.Y. May 30, 2012)).

### C. Procedural Default and Independent and Adequate State Grounds

When a petitioner has failed to exhaust his claims in state court, but no longer has a procedural mechanism to do so—for example, because he failed to take the next step in state court before the applicable time limit expired —his claims are deemed exhausted but "procedurally defaulted," barring federal habeas review. *Coleman v. Thompson*, 501 U.S. 722, 732 (1991); *see also Thomas v. Greiner*, 111 F. Supp. 2d 271, 277-78 (S.D.N.Y. 2000) (if this were not the rule, "the theory would be that state remedies are never exhausted because a petitioner can always request relief from the state court, even if it is virtually certain the state court would not grant it"); *Rodriguez v. Conway*, 2010 WL 92911, at *9 (E.D.N.Y. Jan. 6, 2010) (collecting cases).

Federal habeas review is also barred when a petitioner has properly exhausted his claims in state court, but the state court has decided the claims based on "a state law ground that is independent of the federal question and adequate to support the judgment," rather than on the merits of the federal claim. *Walker v. Martin*, 562 U.S. 307, 315 (2011) (quoting *Beard v. Kindler*, 558 U.S. 53, 55 (2009)); *accord Harris v. Reed*, 489 U.S. 255, 263 (1989) (independent and adequate state ground exists if "the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar").

In either situation, the petition must be denied unless the petitioner can demonstrate "cause and prejudice," that is,

"cause" for the procedural failure, coupled with prejudice as a result of the alleged constitutional violation, or, in the alternative, a fundamental miscarriage of justice, that is, that petitioner is actually innocent of the crime for which he was convicted. *See Beard*, 558 U.S. at 55, *Coleman*, 501 U.S. at 729-31; *Castille v. Peoples*, 489 U.S. 346, 350 (1989).

### D. Standard of Review

If the petitioner properly exhausted all of his federal claims in state court and if the last reasoned state court ruling decided his federal claims on the merits, those claims are reviewable in federal district court under AEDPA's deferential standard of review. That standard permits a district court to grant habeas relief only when the state court's opinion:

> **\*7** (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented by the State court proceedings.

28 U.S.C. § 2254(d).

"Clearly established" federal law means "the holdings, as opposed to the dicta," of the decisions of the United States Supreme Court "as of the time of the relevant state-court decision," and does not include opinions of lower federal appellate courts. *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). A decision is "contrary to" clearly established federal law if the state court "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. A decision involves an "unreasonable application" of clearly established federal law if the state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.*

This standard is intentionally difficult to meet. It preserves for federal courts "authority to issue the writ in cases where there is no possibility fairminded jurists could

Perez v. Lee, Not Reported in Fed. Supp. (2017)

Case 9:16-cv-01458-DNH-CFH   Document 31   Filed 05/13/19   Page 78 of 134

2017 WL 480619

disagree that the state court's decision conflicts with [the Supreme Court's] precedents," but "goes no further." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). A federal court cannot grant habeas relief "simply because the court concludes in its independent judgment that the relevant state-court decisions applied clearly established federal law erroneously or incorrectly. Rather, that application must be unreasonable." *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411). Similarly, an adjudication of a claim is not based on an unreasonable determination of facts "merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010) (citation omitted).

## II. Timeliness of Petition

Respondent does not challenge the timeliness of the petition. However, "[d]istrict courts are permitted ... to consider, *sua sponte*, the timeliness of a state prisoner's habeas petition." *Day v. McDonough*, 547 U.S. 198, 209 (2006). Having considered the issue *sua sponte*, I conclude that the petition in this action was timely filed.

Petitioner was sentenced on July 24, 1996. He had thirty days from imposition of his sentence to file a notice of appeal, and 120 days from the end of that period to perfect the appeal. *See* N.Y. Crim. Proc. L. § 460.10; 22 N.Y.C.R.R. § 600.8(b). However, as the procedural history of this action makes clear, the Appellate Division does not automatically dismiss an appeal if it is not perfected within that period. *See West v. Breslin*, 2008 WL 110947, at *2 (S.D.N.Y. Jan. 2, 2008), *aff'd*, 410 Fed.Appx. 393 (2d Cir. 2011). Instead, the Appellate Division may dismiss a pending appeal for failure to timely prosecute or perfect, among other things, "[a]t any time after an appeal has been taken and before determination thereof." N.Y. Crim. Proc. L. § 470.60(1).

**\*8** Petitioner's direct appeal remained pending, and potentially viable, until the Appellate Division dismissed it on February 5, 2013. Leave to appeal that decision was granted on May 9, 2013, and petitioner filed a timely appeal to the Court of Appeals on June 6, 2013. The Court of Appeals affirmed the dismissal on April 3, 2014. Petitioner had 90 days from that date, until July 2, 2014, to petition the United States Supreme Court for *certiorari*. *See* Sup. Ct. R. 13(1). July 2, 2014 is therefore the date on which the one-year limitations period under the AEDPA, § 2244(d), began to run. Since Perez filed his petition

for habeas corpus 22 days later, on July 24, 2014, the petition was timely. *See Cedeno v. Conway*, 724 F. Supp. 2d 373, 378 (W.D.N.Y. 2010) (the one-year AEDPA limitations period began to run 90 days after the state court's non-appealable dismissal of petitioner's appeal, because during that 90 days petitioner could have filed a *certiorari* petition) (citing *Clay v. United States*, 537 U.S. 522, 525 (2003)); *see also McCray v. Superintendent*, 2006 WL 721548, at *2 (N.D.N.Y. Mar. 10, 2006) (where petitioner's direct appeal to the Appellate Division had not yet been dismissed, "the one year statute of limitations to file a habeas petition would not appear to have begun to run"); *Lue v. Marshall*, 2014 WL 787327, at *9 (S.D.N.Y. Feb. 24, 2014) ("Petitioner's conviction became final at the expiration of time to seek a writ of *certiorari* from the Supreme Court" to challenge the order dismissing his appeal, giving him "one year from that date ..., barring any tolling, to file his federal habeas petition.").

## III. Exhaustion

It is petitioner's burden to show that he has fully exhausted his federal constitutional claims. *See Santana v. Brown*, 2013 WL 2641460, at *5 (S.D.N.Y. June 12, 2013). While it is possible for a respondent to waive the exhaustion requirement, such a waiver must be "expressly" made. *See* 28 U.S.C. § 2254(b)(3); *Cornell v. Kirkpatrick* 665 F.3d 369, 376 (2d Cir. 2011). Respondent here neither argues the exhaustion issue nor expressly waives it. I am therefore required to consider whether plaintiff has exhausted his claims. This analysis, in turn, requires that I identify all federal constitutional claims on which the petition is based.

### A. Identification of Claim

As noted above, petitioner phrases the "Question Presented" in this Court as whether he is "entitled to at least one appellate review of his conviction." Br. for Pet. at 3. *See also id.* at 13 ("The Failure to Permit the Petitioner at Least One Direct Appeal of his Life Sentence is Unconstitutional."). But this cannot be the basis of his federal habeas petition, because it is state law, not federal law, that grants him the right to a direct appeal of his criminal conviction. *See* N.Y. Crim. Proc. L. § 450.10; *People v. Yavru-Sakuk*, 98 N.Y.2d 56, 59, 745 N.Y.S.2d 787 (2002) (in New York "a defendant has a fundamental right to appellate review of a criminal conviction") (citing *People v. Harrison*, 85 N.Y.2d 794, 796, 628 N.Y.S.2d 939 (1995), and *People v. Montgomery*,

**Perez v. Lee, Not Reported in Fed. Supp. (2017)**

Case 9:16-cv-01458-DNH-CFH    Document 31    Filed 05/13/19    Page 79 of 134

2017 WL 480619

24 N.Y.2d 130, 132, 299 N.Y.S.2d 156 (1969)); *accord People v. Perez*, 23 N.Y.3d at 103 (Rivera, J., dissenting). There is no corresponding federal constitutional right. *Halbert v. Michigan*, 545 U.S. 605, 610 (2005) (the United States Constitution "imposes on the States no obligation to provide appellate review of criminal convictions") (citing *McKane v. Durston*, 153 U.S. 684, 687 (1894)). [9]

**\*9** This does not mean, however, that the Constitution has no role to play in the conduct of a state court appeal. If a state—like New York—provides appellate review as part of its "system for finally adjudicating the guilt or innocence of a defendant," its appellate procedures "must comport with the demands of the Due Process and Equal Protection Clauses of the Constitution." *Evitts v. Lucey*, 469 U.S. 387, 393 (1985) (quoting *Griffin v. Illinois*, 351 U.S. 12, 18 (1956)). Moreover, "[a] first appeal as of right ... is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney." *Evitts*, 469 U.S. at 396. Thus, "the Due Process Clause, guaranteeing a [criminal] defendant effective assistance of counsel on his first appeal as of right, d[oes] not permit the dismissal of an appeal where the failure to comply with appellate procedure was the result of ineffective assistance of counsel." *Goeke v. Branch*, 514 U.S. 115, 119-20 (1995) (citing *Evitts*, 469 U.S. at 398-99).

Although petitioner does not cite a single decision of the United States Supreme Court in his habeas brief, he does argue that an attorney who "breaks a promise to pursue an appeal" violates his client's federal constitutional rights. Br. for Pet. at 15. In addition, he cites *People v. Syville*, 15 N.Y.3d 391, 397-98, 912 N.Y.S.2d 477 (2010), which in turn cites *Evitts* and discusses the federal constitutional right to effective assistance of counsel on a direct appeal as of right from a criminal conviction. *Id.* at 15-16. I therefore conclude that the petition asserts a federal constitutional claim, under the Due Process Clause, for ineffective assistance of counsel on petitioner's first appeal as of right.

### B. Fair Presentation of Claim to State Court

It is "well settled" that a petitioner must, for purposes of the exhaustion requirement, present his federal claims to "the highest court of the pertinent state," *Larocco v. Senkowski*, 65 Fed.Appx. 740, 742 (2d Cir. 2003) (citing *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994)), thereby

giving the state court the "first opportunity to hear the claim." *Picard*, 404 U.S. at 275-76.

In New York, a claim of ineffective assistance of appellate counsel is ordinarily raised in an application to the Appellate Division for a common law writ of error *coram nobis*. *See Cisneros v. Ford*, 2011 WL 3586064, at \*9 (N.D.N.Y. Aug. 16, 2011) ("[A]n ineffective assistance of appellate counsel claim is raised by a common law writ of error *coram nobis* in the appellate tribunal in which the allegedly deficient appeal was brought."). [10] Since the *coram nobis* writ is the only procedure in New York specifically targeted at ineffective assistance of appellate counsel, it is sometimes characterized as a mandatory prerequisite to a federal habeas petition based on such a claim. *See, e.g., Garcia v. Scully*, 907 F. Supp. 700, 706-07 (S.D.N.Y. 1995) ("The issue of whether appellate counsel was ineffective ... must be presented to the Appellate Division. The only procedure in New York for doing so is an application for a writ of error *coram nobis* to the Appellate Division department that confirmed the conviction."). If the *coram nobis* application is denied, the petitioner must then seek leave to appeal the denial to the Court of Appeals. *Shields v. Stallone*, 2016 WL 5930262. at \*4 (S.D.N.Y. Oct. 12, 2016); *Cobb v. Unger*, 2013 WL 821179. at \*3 (W.D.N.Y. Mar. 5, 2013); *Shomo v. Maher*, 2005 WL 743156, at \*3 (S.D.N.Y. Mar. 31, 2005) (citing N.Y. Crim. Proc. L. §§ 450.90(1), 460.10(5)(a)).

**\*10** There is "no time limit for moving for a writ of error *coram nobis*" alleging ineffective assistance of appellate counsel." *Pena v. Fischer*, 2003 WL 1990331, at \*12 (S.D.N.Y. Apr. 30, 2003). *See also Rodriguez v. People*, 2000 WL 962748, at \*2 (S.D.N.Y. July 11, 2000) (dismissing habeas petition without prejudice because petitioner "never raised his ineffective assistance of [appellate] counsel claim through a writ of error *coram nobis* to the First Department," and therefore "his claim ... is unexhausted in state court" and "is still available as a state remedy").

In this case, petitioner never filed a *coram nobis* application. [11] To the extent he presented his claim for ineffective assistance of appellate counsel to the state courts, he did so only in the context of (1) his opposition to the motion to dismiss his direct appeal, filed in the Appellate Division, and (2) his appeal of that dismissal, filed in the Court of Appeals. Even in those filings, petitioner failed to clearly articulate his ineffective-

Perez v. Lee, Not Reported in Fed. Supp. (2017)

2017 WL 480619

assistance claim or to identify it as arising under the Due Process Clause. Ordinarily, that would make the claim unexhausted.

However, despite petitioner's unorthodox procedural approach and imprecise briefing, the Court of Appeals credited him with raising his federal constitutional right to effective assistance of counsel on appeal, *see Perez, 23 N.Y.3d at 99-100* (interpreting petitioner's appeal as arguing, among other things, that his "constitutional right[ ] to a fair appellate process w[as] violated" by the ineffectiveness of his appellate counsel), and adjudicated that issue on the merits. Citing one of its own prior opinions—which in turn interpreted United States Supreme Court precedent—the Court of Appeals recognized that petitioner has a federal constitutional right to "a fair appellate procedure," including the right to "receive the careful advocacy needed 'to ensure that rights are not forgone and that substantial legal and factual arguments are not inadvertently passed over,' " that is, "a right to counsel." *Id.* at 99 (citing *People v. West, 100 N.Y.2d 23, 28, 759 N.Y.S.2d 437 (2003)*, which in turn cited *Penson v. Ohio, 488 U.S. 75, 85 (1988)*). The state high court then held that while Kartagener was "undoubtedly ineffective," *id.* at 100, "it is not unconstitutional to require a defendant to take some minimal initiative to assure himself adequate representation on appeal," *Id.* Since petitioner made no effort to obtain another lawyer for nine years after Kartagener was admonished for neglecting his appeal, the dismissal of that appeal "after his own lengthy neglect of it did not deprive him of any constitutional right." *Id.*

Since the New York Court of Appeals was "apprised of the constitutional nature" of petitioner's federal claim, *Chappero v. West, 2009 WL 2058534, at *14 (S.D.N.Y. July 15, 2009)*, and elected to decide the claim on the merits, I conclude that petitioner has given the state courts the necessary "one full opportunity" to resolve that claim, *Galdamez, 394 F.3d at 73*, and thereby exhausted it, despite his theoretical ability to raise the same issue again, before a lower state court, in a *coram nobis* application. I therefore proceed to review the state court's decision under AEDPA's deferential standard of review.

### IV. Review of the State Court Decision

**\*11** Habeas relief may only be granted under AEDPA if the decision of the New York Court of Appeals "was contrary to, or involved an unreasonable application of,

clearly established Federal law" as determined by the Supreme Court at the time of the decision, or "was based on an unreasonable determination of the facts in light of the evidence presented by the State court proceedings." *28 U.S.C. § 2254(d)*. The state court held that petitioner's counsel "was undoubtedly ineffective in failing to perfect the appeal that he was hired to pursue," *Perez, 23 N.Y.3d at 100*, but that the "long delay in Perez's appeal ... cannot be attributed solely to [Kartagener's] ineffectiveness," and therefore that "the dismissal of [his] appeal after his own lengthy neglect of it did not deprive him of any constitutional right" *Id.* I address each issue in turn.

### A. Clearly Established Federal Law

Ineffective assistance of appellate counsel claims are analyzed under the standard set forth in *Strickland v. Washington, 466 U.S. 668, 694 (1984). Smith v. Robbins, 528 U.S. 259, 285 (2000); Aparicio, 269 F.3d at 95.* Under *Strickland, 466 U.S. at 688*, a petitioner is entitled to relief only if (1) appellate counsel's representation "fell below an objective standard of reasonableness," and (2) the petitioner was prejudiced by the deficient representation. *See Roe v. Flores-Ortega, 528 U.S. 470, 476-77 (2000)* (applying *Strickland* standard to a § 2255 habeas petition based on counsel's failure to file any notice of appeal following federal criminal conviction); *Smith, 528 U.S. at 285* (applying *Strickland* standard to a § 2254 petition based on counsel's filing of a *Wende* brief under California law).[12]

"The standards created by *Strickland* and *§ 2254(d)* are both highly deferential, and when the two apply in tandem, review is doubly so." *Harrington, 562 U.S. at 105* (internal quotation marks and citations omitted). Thus, the question on habeas review "is not whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*; *accord Bell v. Cone, 535 U.S. 685, 698-99 (2002)* (federal habeas courts must judge not whether counsel was ineffective, but whether the state court "applied *Strickland* to the facts of [the] case in an objectively unreasonable manner").

With regard to the first *Strickland* prong, courts must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct," and "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland, 466*

Perez v. Lee, Not Reported in Fed. Supp. (2017)

Case 9:16-cv-01458-DNH-CFH    Document 31    Filed 05/13/19    Page 81 of 134

2017 WL 480619

U.S. at 689-690. However, "counsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." *Flores-Ortega*, 528 U.S. at 480. The Supreme Court has "long held that a lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable." *Id.* at 477 (citing *Rodriguez v. United States*, 395 U.S. 327 (1969)). [13]

**\*12** The second *Strickland* prong normally requires a showing that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Flores-Ortega*, 528 U.S. at 482. However, where "counsel's alleged deficient performance arguably led not to a judicial proceeding of disputed reliability, but rather to the forfeiture of a proceeding itself," a "presumption of prejudice" is warranted, and no showing that the direct appeal had merit is required. *Id.* at 483-84. *Accord Rodriguez*, 395 U.S. at 329-30; *Peguero v. United States*, 526 U.S. 23, 28-29 (1999); *Campusano v. United States*, 442 F.3d 770, 773 (2d Cir. 2006). The defendant must still "demonstrate that, but for counsel's deficient performance, he would have appealed," since in the absence of that fact "counsel's deficient performance has not deprived him of anything, and he is not entitled to relief." *Flores-Ortega*, 528 U.S. at 484.

The Due Process clause entitles a criminal defendant: to effective counsel on his first direct appeal as of right. *Evitts*, 469 U.S. at 393. However, the Supreme Court has never held that a would-be appellant who has been deprived of the effective assistance of appellate counsel is thereafter permanently immunized from otherwise reasonable procedural rules, including "timely filing schedules." *Calaff*, 2016 WL 6094110, at \*8 (quoting *Taveras*, 463 F.3d at 149). As the Supreme Court explained in *Goeke*, 514 U.S. at 119-20, *Evitts* does not permit "the dismissal of an appeal where the failure to comply with appellate procedure was *the result of* ineffective assistance of counsel." (Emphasis added.) *See also Flores-Ortega*, 528 U.S. at 484 ("counsel's deficient performance must actually *cause* the forfeiture of the defendant's appeal"); *People v. Syville*, 15 N.Y.3d at 398 ("The Due Process Clause prohibits a defendant from being denied the right to appeal *as a consequence of the* violation of ... the right to the effective assistance of counsel on direct appeal") (emphases added). However, if the appeal was dismissed as a result of lengthy delays attributable to petitioner's inaction rather than counsel's ineffectiveness, the Constitution does not require its reinstatement *See Calaff*, 2016 WL 6094110, at \*8 (denying habeas relief where petitioner's failure to perfect his appeal between 1993 and 2004 was attributable to the First Department's constitutionally inadequate Rights Notice, "but his failure to prosecute his appeal between 2004 and 2012," after he learned how to request appointed counsel, "was a valid ground for dismissal by the New York Court of Appeals").

### B. Application to Court of Appeals Decision

Respondent argues that petitioner has not met the first prong of the *Strickland* test for ineffectiveness because he "never actually alleged in the State courts that his lawyer 'disregarded specific instructions from [him] to file' the appeal." Resp. Mem. of Law at 13 (quoting *Flores-Ortega*, 528 U.S. at 477). I disagree, and therefore I do not accept respondent's invitation to disregard the Court of Appeals' determination that Kartagener was "undoubtedly ineffective in failing to perfect the appeal that he was hired to pursue." *Perez*, 23 N.Y.3d at 100.

Although the evidentiary record compiled in the state courts is very thin, it does contain the 1997 letter from Kartagener showing that he accepted $30,000 to pursue "the appeal by ... Reynaldo Perez, to the Appellate Division, First Department" (Dkt. No. 13-14) and the 2003 letter from the Departmental Disciplinary Committee reporting that it had formally admonished Kartagener for neglecting petitioner's appeal and thanking his mother for bringing the matter to the Committee's attention. (Dkt. No. 13-15). Having retained counsel for the express purpose of perfecting an appeal (the notice having already been filed), petitioner need not also show that he gave counsel further "specific instructions" to do that which he had already been hired (and paid) to do. Similarly, the fact that petitioner's family complained to the Departmental Disciplinary Committee about counsel's failure to perfect the appeal adequately rebuts any speculation that petitioner simply changed his mind and decided to forgo that appeal—at least for the period leading up to the complaint. [14]

Perez v. Lee, Not Reported in Fed. Supp. (2017)

2017 WL 480619

**\*13** Respondent is correct, however, that there is no competent evidence in the record explaining petitioner's failure to pursue his direct appeal—or seek the appointment of new counsel to assist him in doing so—from May 2003, when he learned that the Departmental Disciplinary Committee had admonished Kartagener for neglecting his appeal, to November 2012, when he moved, through newly-retained counsel, to enlarge the time to perfect his appeal. The only quasi-evidentiary filing that even touches on this issue is the two-page attorney affirmation filed in opposition to the State's motion to dismiss petitioner's appeal, in which petitioner's current counsel states that he is "familiar" with various asserted facts, including that Perez "was without funds to retain another attorney" and "did not know he was entitled to an attorney as an indigent." Birnbach Aff., dated Nov. 30, 2012, ¶¶ 1, 7, 8. The affirmation does not provide any support for these conclusory assertions, nor does it address questions such as whether petitioner ever asked Kartagener to pursue the direct appeal *after* receiving the Departmental Disciplinary Committee letter; whose decision it was to have Kartagener file a § 440.10 motion on petitioner's behalf in 2008; why that decision was made; or how Perez secured new counsel in 2012. Under both subsections of 28 U.S.C. § 2254(d), moreover, this Court is restricted to the record that was before the state court. *See Cullen v. Pinholster*, 563 U.S. 170, 185 (2011) ("If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court"); 28 U.S.C. § 2254(d)(2) (petitioner must show that the state court decision was based on an unreasonable determination of the facts "in light of the evidence presented in the State court proceeding").

Thus, although petitioner's failure to perfect his appeal from 1997 to 2003 can plausibly be described as "the result of" ineffective assistance of counsel, *Goeke*, 514 U.S. at 119, neither the Court of Appeals nor this Court is obligated to make that assumption with respect to his continuing inaction from 2003 to 2012. As the Court of Appeals explained, "[A]n unfortunate choice of lawyer does not entitle Perez., as a matter of law, to perfect his appeal 16 years after it was taken, when nine of those years elapsed after the lawyer's failure had been made the subject of a formal sanction, and where no reasonable excuse for that nine-year delay was offered." *Perez*, 23 N.Y.3d at 101. Nothing in *Evitts*, or other decisions of the United States Supreme Court, compels a different result.

I therefore conclude, applying the deferential standard mandated by 28 U.S.C. § 2254(d), that the Court of Appeals did not "arrive at a conclusion opposite to that reached by [the Supreme Court] on a question of law," decide the case differently than the Supreme Court has "on a set of materially indistinguishable facts," or "identif[y] the correct governing legal principles from [the Supreme Court's] decisions but unreasonably appl[y] that principle to the facts of [petitioner's] case." *Williams*, 529 U.S. at 413. Nor was its decision based on "an unreasonable determination of the facts in light of the evidence presented by the State court proceedings." 28 U.S.C. § 2254(d)(2).

## CONCLUSION

For the foregoing reasons, I respectfully recommend that the District Judge DENY the petition. [15]

## NOTICE OF PROCEDURE FOR FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from this date to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). *See also* Fed. R. Civ. P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the Hon. J. Paul Oetken at 40 Foley Square, New York, New York 10007, and to the chambers of the undersigned magistrate judge. Any request for an extension of time to file objections must be directed to Judge Oetken. Failure to file timely objections will preclude appellate review. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Wagner & Wagner*, *LLP v. Atkinson*, *Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 480619

Case 9:16-cv-01458-DNH-CFH Document 31 Filed 05/13/19 Page 83 of 134

Perez v. Lee, Not Reported in Fed. Supp. (2017)

2017 WL 480619

## Footnotes

1      Respondent attached the record of the state court proceedings to the Declaration of Assistant District Attorney Noah J. Chamoy, dated April 1, 2015 (Dkt. No. 13), in the form of 19 separate exhibits. In this Report and Recommendation, when referring to portions of the state court record, I cite directly to the relevant exhibit. Page citations are to each document's original page numbers, rather than ECF page numbers, unless otherwise noted.

2      In the Appellate Division, First Department, a criminal appeal must be "perfected." meaning that the record, appendix, or agreed statement must be filed, along with the appellant's brief, "within 120 days after the last day in which a notice of appeal was required to be filed, unless the time to perfect the appeal is enlarged by the court or a justice thereof." 22 N.Y.C.R.R § 600.8(b). Applications for enlargement of the time to perfect an appeal are governed by 22 N.Y.C.R.R. § 600.8(c), which requires, among other things, an affidavit "satisfactorily explaining the delay."

3      Birnbach elaborated on those issues in petitioner's proposed appellate brief (Dkt. No. 13-11), which he submitted along with his motion papers. The brief argued: (1) a state law claim that the evidence at trial was insufficient to support conviction for second degree murder; (2) a state law claim that the trial court's failure to instruct the jury on an alibi defense warranted a new trial, despite trial counsel's failure to request such an instruction; (3) federal and state constitutional claims that the prosecution's failure to disclose *Brady* material until the seventh day of trial (specifically, information about the government's grant of immunity to a key witness who had been a suspect in the case and who, according to some witnesses, actually committed the crimes) violated petitioner's rights to a fair trial and due process; (4) federal and state constitutional claims that petitioner was denied due process and a fair trial by the trial court's evidentiary rulings on various witness statements and police reports; and (5) a request that the court reduce petitioner's sentence under state law. The pending § 2254 habeas petition does not request relief on any of these grounds.

4      Section 600.12(b) states, in pertinent part, that "[i]n the event the appellant or moving party fails to prosecute the appeal or cause within the time prescribed by this Part, or fails to restore an appeal or cause to the calendar within 60 days after it has been marked off the calendar, any other party to the appeal may move to dismiss the appeal for lack of prosecution on eight days' notice." Section 470.60(1) states that "[a]t any time after an appeal has been taken and before determination thereof the appellate court in which such appeal is pending may, upon motion of the respondent or upon its own motion, dismiss such appeal upon the ground of mootness, lack of jurisdiction to determine it, failure of timely prosecution or perfection thereof, or other substantial defect, irregularity or failure of action by the appellant with respect to the prosecution or perfection of such appeal."

5      The date provided—January 7 rather than January 2, 1997—may have been a typographical error.

6      In states where criminal defendants have the right to a direct appeal of their convictions, the Constitution requires that indigent appellants be provided with appointed counsel for that purpose. *Douglas v. California*, 372 U.S. 353, 358 (1963); *see also Taveras v. Smith*, 463 F.3d 141, 147 (2d Cir. 2006) (because New York provides a first appeal as of right, *Douglas* applies to defendants in New York). In the First Appellate Department, defendants are handed a Notice of Right to Appeal (Rights Notice) at sentencing, which explains that the notice of appeal must be filed in 30 days and continues, "If you are without funds, after the notice of appeal has been filed, you must write to the Appellate Division requesting that counsel be assigned to you for the purpose of the appeal." *Calaff v. Capra*, 2016 WL 6094110, at *2 (S.D.N.Y. Oct. 18, 2016); *see also People v. West*, 100 N.Y.2d 23, 27 (2003) (describing Rights Notice). *Calaff* found that the Rights Notice was "confusing and deficient in describing what [Calaff] needed to do to obtain appellate counsel," *id.* at *4, and therefore that the First Department's procedure was unconstitutional, *id.* at *6, but denied Calaff's habeas petition, because the record showed that he was adequately informed of his rights by 2004 but "made no effort to pursue his appeal until 2012." *Id.* at *7. In this case, although the record contains a notation that petitioner was given written notice of his right to appeal (Dkt. No. 13-16, at ECF page 3), there is no copy of the actual notice in the record.

7      Two judges of the Court of Appeals dissented from the majority opinion. In their view, petitioner's "right to pursue a timely appeal was effectively thwarted by appellate counsel's violations of the professional duties and obligations he owed [petitioner]," and therefore petitioner was deprived of the "fundamental right[ ] to appeal" his conviction guaranteed by New York law. 23 N.Y.2d at 103. The dissenting judges, relying exclusively on state law precedents, would have held that the Appellate Division abused its discretion in dismissing the appeal. *Id.* at 104.

8      In *Baldwin*, as here, the petitioner's federal habeas claim was that "his *appellate,* counsel did not effectively represent him during one of his direct state-court appeals." 541 U.S. at 30 (emphasis in original). The Court held that petitioner failed to exhaust that claim where his ultimate state-court petition—seeking discretionary review by the Oregon Supreme Court of a lower court decision denying him collateral relief from his conviction complained generally of "ineffective assistance

Perez v. Lee, Not Reported in Fed. Supp. (2017)

Case 9:16-cv-01458-DNH-CFH   Document 31   Filed 05/13/19   Page 84 of 134

2017 WL 480619

of counsel," but did not clearly invoke any relevant provision of the United States Constitution or otherwise specify that his claims were federal in nature. *Id.* at 30-33.

9   Even if there were a federal constitutional right to "at least one appellate review" of his conviction, such a claim would be unexhausted. Although plaintiff argued to the New York Court of Appeals that he had a "constitutional right to at least one appeal before an intermediate appellate court," Br. for App-Def. at 6, he did not rely on any federal cases for that proposition nor otherwise suggest, in the state forum, that the right to a direct appeal arose under the *federal* constitution. Although a habeas petitioner need not "cit[e] chapter and verse of the Constitution" to exhaust his claim in state court, *Daye v. Att'y Gen. of the State of N.Y.*, 696 F.2d 186, 194 (2d Cir. 1982), he must at a minimum "alert[ ] that court to the federal nature of the claim." *Baldwin*, 541 U.S. at 29. Petitioner did not do so with regard to his claim that he was deprived of his fundamental right to a direct appeal.

10   "*Coram nobis,* an ancient common law writ, has been largely superseded by the motion to vacate a judgment ... [and] remains available as remedy only in those situations *not* explicitly covered by [N.Y. Crim. Proc. L.] § 440.10." *Aparicio v. Artuz,* 269 F.3d 78, 87 n.1 (2d Cir. 2001) (emphasis in the original). "Thus far, its use has been sanctioned by the Court of Appeals only in the context of ineffective assistance of appellate counsel." *Id.* (citing *People v. Bachert,* 69 N.Y.2d 593, 599, 516 N.Y.S.2d 623 (1987)); *accord Turner,* 262 F.3d at 123 ("[T]he writ of error *coram nobis* lies in [the state appellate court] only to vacate an order determining an appeal on the ground that the defendant was deprived of the effective assistance of appellate counsel.").

11   In briefs to the Court of Appeals and to this court, petitioner erroneously states that attorney Kartagener filed a *coram nobis* application in 2008. Br. for App.-Def. dated June 6, 2013, at 3; Reply Br. for App.-Def. dated Sept. 26, 2013, at 4, 9; Br. for Pet., at 4, 17. Kartagener actually filed a § 440.10 motion, in which he attempted, unsuccessfully, to assert a claim for ineffective assistance of *trial* counsel.

12   Under *People v. Wende,* 25 Cal. 3d 436, 441-42, 600 P.2d 1071, 1074-75 (1979), appointed appellate counsel, upon concluding that an appeal is frivolous, are required to file a brief that summarizes the history of the case, requests that the court independently examine the record for "arguable issues," and expresses counsel's availability to brief any issues as to which the court desires briefing. In *Smith,* the Supreme Court held that the *Wende* procedure "affords adequate and effective appellate review for criminal indigents" and therefore was not unconstitutional, 528 U.S. at 284, but remanded for further consideration, under the *Strickland* standard, of whether respondent's counsel "was Objectively unreasonable in failing to find arguable issues to appeal" and whether respondent was prejudiced thereby. *Id.* at 285.

13   *Flores-Ortega* and *Rodriguez* both dealt with counsel's failure to file notice of appeal, rather than to perfect an appeal. However, the Second Circuit has held that there is "no basis for ... a distinction" between "a criminal defendant whose attorney does not file a notice of appeal, or files a timely notice and then neglects to perfect the appeal." *Hernandez v. United States,* 202 F.3d 486, 489 (2d Cir. 2000).

14   The record does not indicate when petitioner's family first complained to the Departmental Disciplinary Committee. However, the Court of Appeals stated that the Committee began its investigation in 2001. *See Perez,* 23 N.Y.3d at 96. Respondent suggests that the Court of Appeals "independently determined" this fact through its own research. Resp. Mem. of Law, at 15.

15   As noted above, unexhausted as well as exhausted claims may be denied as meritless. 28 U.S.C. § 2254(b)(2); *Turner,* 262 F.3d at 122. Even if the District Judge concludes that petitioner's ineffective-assistance claim was not exhausted in state court, therefore, I recommend, for the same reasons set forth above, that the petition be denied pursuant to § 2254(b)(2).

---

**End of Document**         © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 2971575
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Antwaine PARKER, Petitioner
v.
Victor HERBERT, Superintendent,
Attica Correctional Facility, Respondent.

No. 02–CV–0373(RJA)(VEB).
|
May 28, 2009.

**Attorneys and Law Firms**

Paul J. Cambria, Jr., Roger W. Wilcox, Jr., Lipsitz Green
Scime Cambria LLP, Buffalo, NY, for Petitioner.

Raymond C. Herman, Buffalo, NY, for Respondent.

**REPORT AND RECOMMENDATION**

VICTOR E. BIANCHINI, United States Magistrate
Judge.

**I. Introduction**

**\*1** Petitioner Antwaine Parker ("Parker" or
"petitioner"), represented by counsel, has filed a petition
for a writ of habeas corpus under 28 U.S.C. § 2254. In
his petition, he challenges the constitutionality of his state
custody pursuant to the October 31, 1997, judgment of
conviction following a jury trial in Erie County Court of
New York State Supreme Court. Petitioner was convicted
of second degree (intentional) murder (New York Penal
Law ("P.L.") § 125.25(1)) and second degree criminal
possession of a weapon (P.L. § 265.03) in connection with
the shooting of Tyrone Brown on June 14, 1997, in the
City of Buffalo.

This matter has been referred to the undersigned pursuant
to 28 U .S.C. § 636(b) for the issuance, *inter alia,* of a report
and recommendation regarding the disposition of Parker's
petition. For the reasons that follow, I recommend that
the petition be **granted in part and denied in part.**

**II. Factual Background and Procedural History**

**A. Overview of the Case**

At about 11 a.m. on Saturday, June 14, 1997, Tyrone
Brown ("Brown") was shot to death on Edison Avenue
in Buffalo's Langfield Projects. William "Boo" Byrd
("Byrd"), Brown's cousin, was with him at the time and
witnessed the shooting. Byrd and Brown were in separate
vehicle. Byrd was driving an $85,000 Mercedes–Benz, and
Brown was following behind him in a rented maroon
Dodge Caravan. According to Byrd's statements to police,
moments before the shooting, petitioner passed by him
in a green Cadillac and turned around in the middle of
Edison Avenue, pulling up behind the maroon minivan.
Byrd heard shots being fired from behind him at his
cousin's van. His reaction to this was to put the Mercedes–
Benz into "park" because, he claimed, he was unfamiliar
with the gearshift. Brown leapt from the van and tried
to flee as the shooter continued to fire. Byrd identified
petitioner, whom he knew from the streets and the clubs
as "Twan", as the man who jumped out of the Cadillac
and began firing at the maroon minivan. Byrd stated when
petitioner was done shooting, he jumped into the driver's-
side of the Cadillac and sped away. Brown collapsed next
to the Mercedes–Benz and died minutes later from his
gunshot injuries. Prior to the arrival of the police, Byrd
asked an unidentified person to take the keys and move the
maroon minivan. The van was broken into at some point
thereafter. Parker was arrested within a half-hour of the
shooting while riding as a passenger in a green Cadillac;
however, this vehicle was not the same green Cadillac as
the one the shooter had been driving.

The prosecutor argued that Parker had gunned down
Brown for a reason which remained unknown, but
speculated that it was possibly because they had a
dispute over an unpaid debt allegedly owed to Parker
by Brown over a dogfight. *See* R.384–93. The defense
theory was that Brown was a major cocaine dealer
in the Buffalo area. Byrd, who was his "right-hand
man," also owed Brown a large amount of money for
cocaine purchases. According to the defense, Byrd had
set up the shooting in order to steal $20,000 in cash
stashed in the maroon minivan that Brown was driving
at the time of the shooting and, ultimately, to take over
control of Brown's cocaine distribution operation. *See*
Petitioner's Reply Memorandum of Law dated January
30, 2009 ("Pet'r 1/30/09 Reply Mem.") at 6–7 (Docket
No. 34). The prosecution's case was based chiefly upon
the testimony of Byrd, along with that offered by six
additional eyewitnesses: Christine Elliott, Dabrien Hill,

Sandra Hollis, Roger Hunt, James Moses, and Dean Taylor. These witnesses described the shooter in some fashion, but only Hill and Hollis (along with Byrd) made an in-court identification of Parker as the shooter. *See* R.1299. Thus, a large part of the defense depended upon heavily attacking Byrd's credibility. Apart from Byrd's identification of Parker as the shooter, the remaining eyewitnesses' testimony with respect to identification was not based on an the witnesses' independent familiarity with Parker, as they claimed to be strangers to him. With respect to all these other witnesses' testimony at trial, there were a number of inconsistencies in their descriptions of the shooter and the shooting itself. *See, e.g.,* Petitioner's Reply Memorandum of Law ("Pet'r 1/30/09 Reply Mem.") at 6–7 (Docket No. 34).

**\*2** From August 1997 through the time of trial in October 1997, Parker's defense counsel made requests in open court, in the prosecutor's presence, for information confirming that the Buffalo Police Department and the DEA had formed a joint task force and were conducting a investigation into a large-scale cocaine distribution ring in the Buffalo area. Brown was considered a major dealer in this ring and Byrd was suspected to be his "right-hand man." Trial counsel submitted repeated requests for the trial judge to sign subpoenas compelling the disclosure of the federal wiretapping warrants for Byrd and Brown. The prosecutor who handled Parker's case vehemently denied knowing anything about a federal investigation of Byrd and Brown for drug dealing or having access to wiretapping warrants or other federal documents. He further denied ever talking to investigators from the joint task force. The prosecutor forcefully opposed trial counsel's attempts to obtain information regarding the joint task force investigation, arguing that there was no proof whatever that Byrd and Brown were drug dealers. Indeed, the prosecutor argued to the jury at Parker's murder trial that Byrd was not a drug-dealer. However, the prosecutor subsequently admitted during the evidentiary hearing held of Parker's post-conviction motion to vacate the judgment pursuant to New York Criminal Procedure Law ("C.P.L.") that, at the time of Parker's trial, he had surmised that Brown and Byrd were both drug dealers. This admission and the prosecutor's conduct during state court proceedings will be the subject of further comment below.

**B. The Trial**

**1. The Defense's *Brady* Demands**

On October 20, 1997, and again prior to jury selection on October 21, 1997), Parker's trial counsel stated to the trial court that "[o]n Monday of last week [he] had discussions with certain people involved in Drug Enforcement Administration ("DEA") investigations and confirmed that there were wiretaps and information surrounding William Byrd, who is the People's main witness in this case." R.32–33. Trial counsel indicated that "Byrd's voice and name is identified in various DEA forms and wiretaps wherein he is having conversation with not only Ty Brown [the victim], but other people in relation to drug dealing, gambling, and hits, or taking people out ...." R.33. Trial counsel argued that the wiretaps and DEA forms were *Brady* material and also constituted *Giglio* material to be used in cross-examining Byrd. *Id.*

Specifically, trial counsel stated that he knew the DEA and the United States Attorney's Office were investigating both Brown and Byrd for drug dealing, gambling, and dog-fighting in Buffalo. According to trial counsel, Brown, the victim, was the largest supplier of drugs in the Buffalo area, and Byrd was involved with him in this enterprise as his "underboss." T.10; R.23–28.[1] Trial counsel noted that the phones of both men had been tapped by the federal government for several months and alleged that the DEA and the U.S. Attorney's Office were being aided in their investigation of Brown and Byrd by the City of Buffalo Police Department. *Id.*[2]

**\*3** When trial counsel sought advice from the U.S. Attorney's Office on the previous Friday on how he would obtain those materials, or at least have them brought to court for review, he "was informed that the motion probably isn't the way to get the material, but that subpoenas signed by the Court would at least get the DEA agent and the U.S. Attorney assigned to that file over [to the County Court] so that they could at least *in camera* disclose ... the information that they do have available." *Id.*

Judge Drury criticized trial counsel's application as being based on "rumor" and chastised him for coming in at the "11th hour plus 59 minutes, and you want this, and you want that, and you could have done it earlier." R.35–36. Judge Drury told trial counsel, "Give me something factual, I'll listen to it." R.36. Trial counsel explained that he had "been asking [A.D.A.] Cooper and everybody else

2009 WL 2971575

all along whether Mr. Brown [sic] is being investigated, and everybody's giving me the dummy lift [sic]." R.36. So, trial counsel, explained, he had, on his own, obtained "DEA forms from the other attorneys who maybe, in fact, aren't supposed to turn them over to me," and these forms have "these people's names on them." R.36.

The trial judge repeated his instruction to give him "something factual." R.36–37. Trial counsel attempted to explain that was why he was requesting the court speak to A.U.S.A. Kennedy and the DEA agent—to get "something factual." R.37. At the time, the trial court apparently found this to be a rather outlandish suggestion. R.37 (Judge Drury: "Oh, I'm going to bring them in here and talk to them, is that it?). Trial counsel stated that these individuals would confirm to the court, if subpoenaed, that there was, in fact, a federal investigation into Byrd's alleged drug-dealing activities. R.37. The trial court directed trial counsel, "You give me a vehicle to do it, I will." *Id.* Trial counsel again explained that he had subpoenas for the court to sign, and Judge Drury told him, "Show me some law where I can bring in federal agents and start questioning them." R.38. That apparently was the end of the subject for the time.

After the prosecution's two witnesses testified regarding the photographic identifications made by two witnesses (Sandra Hollis and Dabrien Hill), trial counsel asked to have the subpoenas for A.U .S.A. Kennedy and DEA Special Agent Dale Kaspryzk ("Agent Kaspryzk") marked as an exhibit. R.58. Over the prosecutor's objection, trial counsel was permitted to explain why he was "doing this at the last minute." R.59 *et seq.* Counsel had represented Adrian Price ("Price") in federal court for the past eight months; Price was "Ty Brown's partner in drug dealing." R.59. Price had been opposed to defense sharing information between his file and Parker's file, but, after accepting a plea deal the week before, now consented to counsel "using certain information in his file for investigatory purposes" in Parker's case. R.59–60. The subpoenas were not signed that day.

**\*4**  The following day, October 21, 1997 (after jury selection (R.83–345) and prior to the start of the prosecution's case), trial counsel "renew[ed][his] request that the Court sign the subpoenas that were handed up yesterday and ask that it [sic] be marked as a Court Exhibit." R.354. Trial counsel argued that he has "not been able to develop a defense because the DEA and the

District Attorney's Office have continuously denied that there was an investigation surrounding Tyrone Brown and William Bird ...." *Id.* The request again was denied.

On October 27, 1997, near the end of trial, trial counsel again argued that the judge "should have signed subpoenas pretrial for the U.S. Attorney's office," which "would have caused the U.S. Attorney's Office to move to quash the subpoenas, which would have allowed [him] to go in front of a Federal Court Judge ordering this Court to interview the U.S. Attorney in camera as to the Grand Jury investigation or any other investigation surrounding William Byrd and Tyrone Brown." R.867. The trial court asked what prevented defense counsel from doing that now, to which counsel replied, "You wouldn't sign the subpoenas." R.867. The trial court chided defense counsel for not explaining the procedure to him earlier, and counsel replied, "I didn't know that that's the procedure, but I did know that the subpoena had to be signed." R.868. The trial court expressed frustration with counsel's "piecemeal" approach, R.869, but said that it would read the case handed up by defense counsel and consider his renewed motion.

On October 28, 1997, the trial judge adopted the prosecutor's argument that trial counsel was on a "fishing expedition" and that the motion to have the subpoenas signed was "untimely." R.937. In taking exception to the ruling, trial counsel stated that he believed he was taking the proper first step by asking the trial judge to sign the subpoenas. R.938–39. The trial judge's response was, "Yeah. Well, you've done this in dribs and drabs. I got the motion the day of jury selection, and it's untimely." R.939. Accordingly, this last attempt by trial counsel to obtain the subpoenas was denied. [3]

### 2. The Prosecution's Direct Case

#### a. William Byrd: The Chief Eyewitness
Byrd testified that he was employed at the Car Corner as a mechanic in June of 1997. R.590. Brown showed up at his house on the morning of June 14th driving a white Mercedes, stating that "[h]is boss loaned it to him." R.591. Brown asked Byrd to ride with him to his girlfriend's house in Williamsville to pick up his rented minivan. R.592.

Byrd testified that they stopped at a diner for breakfast but left early because Brown said it was taking too long to get their orders. R.594. They were going to take the Mercedes

and "put it on Courtland," and they were going to go through the Langfield Projects to get there. R.595. After that, they were going to go to the Juneteenth Festival. R.597.

**\*5** Byrd drove the white Mercedes and Brown followed behind in the maroon minivan. After stopping at the light at Langfield and Edison, Byrd pulled forward "[s]lowly" because they were "[n]ot really" in a hurry to get where they were going. R.597. As he was driving down Edison, he saw "Twan passing [him] in a green Cadillac" that did not have tinted windows. R.597, 599. Byrd had known Parker for a "couple years" from seeing him "[i]n the streets" and "[i]n the clubs." R.598. Parker was driving a #93 or #94 Cadillac Sevile STD which he had seen him driving that car "a lot of times" before. R.599. In his rearview mirror, Byrd saw "Twan trying to make a U-turn but he couldn't complete that U-turn. He stopped. That's when I'm trying to stop the Benz, but I couldn't throw it in park, because you had to go like that [motioning]. I wasn't familiar with it. I look in the rearview mirror, I see Ty jumping out the van—." R.601, 602. Byrd said Parker positioned the Cadillac so no cars could pass by it on Edison. R.602.

Prior to seeing Brown jump out of the van, Byrd heard gunshots fired. Brown was "running towards [Byrd]" saying, " ' Boo, I'm hit. Boo, I'm hit.' " R.603. "Boo" was a nickname Brown called Byrd. R.603. Byrd looked back at where the Cadillac was parked and saw "Twan" with a "gun in his hand." R.604. The gun was in his right hand and was "pointing down." R.604. Brown did not have a gun, and neither did Byrd. R.605. No one returned fire at Parker. R.605.

At that point, Parker "ran in the projects" behind the buildings. R.605. He then ran back out, jumped into the Cadillac on the driver's-side, and drove off up Edison towards Langfield. R.605–06.

Before Byrd could get Brown into the passenger's side of the Mercedes to take him to the hospital, Brown collapsed. R.603. Byrd removed Brown's jacket and threw it into the Mercedes. Byrd sat with Brown and said, "Hold on, man. You going to make it ...." R.606. Byrd did ask someone, whose name he did not know, to "[t]ake the van and put it over there and park it, and lock the doors, give me the keys." R.607. Byrd claimed that earlier in the day, "Brown ... got some money from me to go buy his girl a car, and I knew that money was in that van, and I ain't [sic] want the police to take it from him." R.607. Byrd testified that he had given Brown $3,000 that he had gotten that money by "[s]aving it from work" where he was paid "[a]round $400 a week." [4]

Byrd admitted that he had not told the police about the minivan at first, and originally had claimed that both he and Brown were in the Mercedes. R.610.

The prosecutor asked him if was "aware of the fact that the defendant and Tyrone Brown didn't get along[.]" R.611. Byrd replied affirmatively, stating that their original argument was over "[u]npaid debt" from "[a] dog fight" "[a] couple years" ago. R .611. The R.611–12. According to Byrd, Parker's dog had "beaten" Brown's dog in a fight, so Brown owed petitioner money. R.612. Byrd denied having any personal dispute with petitioner, stating that he had never fought with him about anything. R.612.

**\*6** On cross-examination, trial counsel confronted Byrd with his prior inconsistent testimony about his employment. At the felony hearing, Byrd had testified that he worked in the "construction business," R.620, but he also had told the police he was a mechanic at the Car Corner, making "$500 a month." R.621. At trial, however, Byrd testified that he had been making $400 per week at the Car Corner. R.621. Byrd admitted that he testified at the felony hearing to removing $900 from the victim's jacket and placing it in the Mercedes. R.622. He also told the police, and testified at the felony hearing, that he thought there was between $16,000 and $20,000 in the maroon minivan. R.622. Byrd continued to deny that he was a drug dealer. R.622–23.

Byrd admitted that he led the police to believe that it was his Mercedes, which was worth about $85,000. R.624. Trial counsel confronted Byrd with the incongruity of claiming to be going to a festival and having very large amounts of cash in the vehicles they were driving. R.628. Byrd stated that it took him about two months to save up $3,000, and that he was paid in cash at the Car Corner and did not have a bank account. R.628. Thus, there were no pay stubs to verify his income. R.629.

Byrd claimed that he did not know what his cousin, Brown, did for a living. R.629.

The trial court sustained the prosecutor's objection when trial counsel asked if Byrd knew whether Brown was being investigated by the DEA. R.629. When asked if he was under investigation by the DEA, Byrd replied, "Not that I know of." R.629.

Byrd claimed that he had a pager with a toll-free "800" number so that his mother could call him if she needed him. R.630. Byrd admitted that at the felony hearing, he told the judge that they were taking the Mercedes to Barthel (where Byrd claimed that the victim's mother resided), not Courtland. R.632. He claimed that he "was confused." *Id.*

Trial counsel cross-examined Byrd extensively about occasions on which he was present when drug raids occurred. *See* R.635 *et seq.* Byrd admitted that he was in a house raided in 1984 when "a large amount of crack cocaine was confiscated by the police." R.635. He admitted that he was arrested that day but claimed he did not know where the cocaine was. R.636. Byrd said the case "was throwed [sic] out of court" but he denied making a deal with the prosecution to testify against other defendants in exchange for dismissal of the indictment against him. R.638.

When questioned about an arrest on October 1, 1996, for loitering and criminal possession of one bag of crack cocaine, he denied it. Byrd admitted being in a vehicle on December 10, 1992, when it was pulled over and found to have a large quantity of crack cocaine in it. R.639. Byrd continued to maintain that he was not a drug dealer but rather was a mechanic. R.640.

Trial counsel cross-examined Byrd extensively about the circumstances of his statement to the police, and how his story changed over the course of the interview. R.641. He denied that during a break, the police told him that they "already knew [he] [was] lying and that there was a van with $20,000 in it," and that was what caused him to change his story during the interview. *Id.* He claimed that he lied to the police about owning the Mercedes because he "was just so confused, man." R.642.

 \*7  Byrd said that he knew there was money in the Mercedes and that Brown was going to use it to buy a car, and Byrd was just trying to protect it from being stolen or confiscated by the police. R.643. Trial counsel questioned him as to why the police would not return the money to "innocent people." R.643. Byrd admitted that he never mentioned the dogfighting debt in his statement to the police, during the felony hearing, or at the grand jury proceeding. R.655–56.

Trial counsel also cross-examined Byrd about how his description of Parker's clothing differed from that offered by the other eyewitnesses, in that he said at the felony hearing that Parker had on a "dark shirt and dark pants." R.644.

Trial counsel questioned Byrd about the circuitousness of the route he and Brown took to get to their alleged destination. R.647, 658. Byrd denied that he was in Parker's presence that morning and claimed that no one else knew that he and the victim were going to go through the Langfield Projects that morning. R.649, 659. Byrd admitted that he was in the lead, and it was his decision to take the particular route they took down Edison Avenue, the sidestreet where the shooting occurred. R.659.

With regard to the minivan, trial counsel questioned him about the incongruity of having some unknown person move the vehicle which was supposed to contain $20,000. R.649. Byrd claimed that he did not steal the $20,000; that he did not know that the van was broken into; and that he never got the $20,000 out of the van. R.650. He insisted that he moved to South Carolina because his "[m]other and father wanted [him] to get from up here." R.667. Counsel then asked if he was afraid of anybody, and Byrd said no. R.667.

Byrd denied that he set the victim up for a hit. R.651. Trial counsel pointed out that "when somebody started shooting at [the victim's] van, [Byrd] put [his] car in park, which is front of [the victim's] car[.]" R.652. When questioned at the felony hearing, Byrd had said that he was driving so slowly (10 m.p.h.) down Edison because he "wanted to shine in the Benz and let all the girls" see him. R.652, 659. Trial counsel questioned Byrd about the peculiarity of Brown's reaction to having his van shot at— that is, to stop the van and jump out of it. R.652–54. Byrd admitted that he was "the one in front whose car stopped." R.659–60. However, Byrd maintained that he nothing to do with the shooting.

**b. The Other Eyewitnesses: Sandra Hollis, Christine Elliott, Dabrien Hill, James Moses, Roger Hunt and Dean Taylor**

2009 WL 2971575

### 1.) Sandra Hollis

Sandra Hollis ("Hollis"), who had grown up with Brown, witnessed Brown being shot and was with him when he died at the scene. She made an in-court identification of Parker as the shooter. R.538.

Hollis was sitting on the front steps of her house at 326 Langfield at around 11 a.m. that day with girlfriend when they thought they heard firecrackers. R.531. The next thing she saw was "Jehovah['s] Witness people running back off of Edison onto Langfield." R.531. At that point, she "[t]ook off runing" toward Edison R.531–32. She followed the crowd of people who were running. R.552. When she got to the corner of Langfield and Edison she saw "people running ... and this one guy with this Cadillac, [5] ... and I asked him what was going on, and he says some guy was shooting, and I looked down Langfield, and I see this guy standing there, holding a black gun in his right hand, "shooting someone in the back." R.533, 534. According to Hollis, he was a black, dark-skinned male, about 5#4# to 5#5#-tall, with a muscular build. Hollis stated that the shooter "had black pants, and he had this shirt around his—the arm [sic] where he had the gun in." R.541. Hollis said that the shirt was "[b]eige." R.541. [6]

**\*8** The victim "had his back turned to the shooter ... and had his hand up on the fence, as if he was trying to get over this fence ." R.535, 549–51. Hollis only saw two shots fired but she had heard shots being fired before that. R.533–34. The victim turned around and grabbed his shoulder. Before Hollis could get to him, Brown collapsed next to a "white car" on the passenger's side. R.535–36. When she grabbed his hand, she realized it was Brown, with whom she had grown up about 15 years ago on the same street in Buffalo. R.536. Hollis had seen Brown "in passing" over the years, but it "wasn't too often." R.537.

Hollis testified that after the shooter stopped firing, he ran around the white car and got into the *passenger's* side of a green Cadillac which turned down Langfield toward Eggert; Byrd and Hill, for instance, testified that Parker got into the *driver's* side of the car. R.539.

On cross-examination, Hollis stated that she did not see a green Cadillac parked up against a utility pole in front of Elliott's house on Edison; she said the green Cadillac arrived just after the shooting. R.555–56. She could not tell how man people were in the green Cadillac because

it had tinted windows. R.540. It was a newer-model Cadillac.

However, in contrast to her trial testimony that a man was next to the victim as she approached them, Hollis had told the police at the time of the shooting that a "guy came out of nowhere" as she was trying to assist the victim. R.566. She described him to the police as small, light-skinned, "fade [sic] cut, curly hair." R.565. She said that this person who "came out of nowhere" "could be" Byrd. *See* R.565. However, according to Hollis, this person was not anywhere near the white car when she approached the victim. R.219.

Hollis admitted that she did say at one point she thought the man who "came out of nowhere" was "Ty Brown's uncle." She conceded that thee man who "came out of nowhere" was not sitting with the victim when she approached him (the victim). R.219.

### 2.) Dabrien Hill

Dabrien Hill ("Hill") [7] was the third witness, in addition to Byrd and Hollis, to make an in-court identification of Byrd.

Hill was living up the street at 226 Edison Avenue with Glenda Johnson, his girlfriend and the mother of his two children. At about 11 a.m., while Hill was sitting on his living room sofa with his back to the window, he heard gunshots that sounded like firecrackers. R.941–42, 965. Hill looked out the window and saw "just a car parked ... pointing towards [his] house, the front end." R.942–43. The car was a green Cadillac. R.943. He did not see the shooter at that time. Nor was he able to see the Mercedes when he looked out the window.

On cross-examination, Hill testified that his "immediate reaction [to the gunshots] was to go to the floor with the children." R.968. Hill admitted that at 10:30 a.m. he was drinking St. Ives malt liquor out of a coffee mug. R.961. Hill stated that he had only "one glass of beer" at "[b]efore, about 10:30." R.961. Hill admitted that one of the officers who came to his house that morning "confronted" him about his drinking" but he said he did not know why, claiming, "I don't get up every day and drink." R.963. He later admitted that his breath smelled like alcohol. R.965. Hill volunteered that he "broke [his] leg real bad" so he "drunk the beer to take away the pain."

2009 WL 2971575

**\*9** After Hill "ducked to the floor," he went to "take [his] kids into the kitchen," and then "[c]rawl[ed] back up towards the front ... [t]o the front door," which had a screen door on it. R.943–44. Hill said that when he opened up the front door and looked out, he saw "[a] guy shooting a gun" that was chrome on top and black on the bottom. R.945, 947.

According to Hill, the shooter was "wearing a white T-shirt, blue jeans," and "white sneakers." R.945, 946. Hill said Parker was "[p]robably about 50 feet" away from the screen door of Hill's house. At first, Hill only saw "a gun pointing, that's all" and did not see the shooter himself until he ran and looked out the front door. R.968.

After the shooter stopped, Hill saw him immediately "[j]ump in his car and leave." R.948, 969. Hill said that the shooter got into the car on the *driver's* side, and then drove off toward Langfield. R.949.

Hill proceeded outside where he saw "the guy [Brown] laying [sic] on the ground and another guy holding him." R.950. Hill did not know who the other guy was; he later learned it was Byrd. Hill said that the victim was lying between the chainlink fence and a "cream or gold" Mercedes, and there was a maroon minivan parked behind the Mercedes. R.951, 952. Byrd was "taking off his jacket to see where [the victim] was shot at [sic]." R.953. Over objection, Hill testified that Byrd was "screaming 'Call the ambulance.' " R.954.

According to Hill, Byrd was in his sight the entire time, and Byrd did not run behind any buildings or attempt to throw a gun anywhere. R.956, 973, 973 Hill admitted that he had "no idea" what Byrd was doing while the shots were going off. R.970.

Hill testified that a person from the neighborhood known as "Sife" moved the maroon van at some point prior to the arrival of the police. R.956. According to Hill, Sife was coming from the corner store when Hill first saw him in the vicinity of the victim lying on the ground. R.954–55. After Sife moved the van, he brought the keys back to Byrd. R.955. Hill did not know what happened to Sife after that. R.955, 972.

On cross-examination, Hill claimed that he had been employed at McDonald's in June of 1997, but he admitted that he did not give any pay stubs to the prosecutor to prove that. R.963. When questioned regarding an unrelated uncharged instance of trespassing, Hill said he "just happened to be standing at the bus stop that day" when the store was broken into ...." R.978. Hill also had a history of violence against his girlfriends, including Johnson. *See* R.976 *et seq.* Hill admitted that he was arrested on October 17, 1997, because he "strangle[d] her." R.976. He denied saying that "if she isn't put in jail, you're going to have someone kill her[.]" R.976. Hill denied that, on November 14, 1993, he remained inside a premises unlawfully and yelled to the police, " 'Fuck you. Get the fuck out of my face.' " R.977. Hill admitted that in November 1995, he had a different girlfriend whom he "slapped ... around a little bit ...." R.978. Hill denied telling this woman " 'I know people. I'll make your life a living hell if you try to leave me.' " R.978. However, Hill admitted that he was arrested as a result for that incident. R.979. Defense counsel asked, "Who are these people that you know, and who is it that you're going to have kill these girls, if you didn't know William Byrd?" R.979. Hill responded, "I have no idea." R.979.

### 3.) James Moses

**\*10** James Moses ("Moses") witnessed the shooting but could not identify the shooter. He was driving his blue, 1991 Cadillac Sedan de Ville down Edison on his way to the Juneteenth Festival, he had just crossed Langfield when a "green Cadillac pull[ed] in front of [him] and cut [him] off, so [he] stopped." R.503, 505. The Cadillac was from 1991 or 1992, "somewhere in there." R.505. The car stopped right in front of a big tree (in front of Elliott's house). R.514–15. Moses said that the shooter "jump[ed] out [sic] the car, walk[ed] about three steps up, and he start[ed] shooting." R.506. The man was holding a "handgun, pistol" in his right hand and fired a "bunch" of gunshots, "about seven to eight." R.506. Moses could not identify the shooter. He described him as wearing a "dark pair of black pants, it looked like black pants, and a light-colored shirt," R.506–07, and was about 5#9# or 5#102d and about 175 to 180 pounds, R.507. Unlike Hollis, however, Moses did not see the victim attempt to jump the chainlink fence. R.521.

As he watched the shooting, Moses started backing up his car down Edison. After the man "got through shooting ... [h]e was going back to his car, and then he went and took off and went between two buildings." R.507. Moses lost sight of him for a few moments while he was behind the

2009 WL 2971575

buildings. he ran back to his car and got in and "that's when the shooter got in his car, and he went right by" Moses. R.510. Moses recalled that the shooter got in on the *driver's* side of the green Cadillac, and drove away. R.511. The green Cadillac carrying the shooter made a right turn onto Langfield, heading toward Eggert. R.512. Moses testified that he did not see anyone else in the car. R.511.

At some point, Moses got out of his car, and ran up the street where he told an unidentified "heavyset lady" and an unidentified bus driver that there had been a shooting and to call the police. R .510. (These witnesses were not produced at trial.)

At about the same time Moses was backing up his car, he saw a "young lady ... come running up the street, "hollering and screaming" " 'I hope it's not so and so.' " R.509, 510. Moses did not know the name she called out. R.509. That was "when [the shooter] came out" from behind the buildings. R.521. Moses later learned that this woman was Hollis. R.509.

Moses was the only witness who denied seeing a maroon minivan (i.e., the car which Brown was driving just before the shooting) parked in front of the green Cadillac that had cut him off. R.521. He said that if it was there, he did not see it. *Id.*

#### 4.) Christine Elliott

Christine Elliott ("Elliott") witnessed the shooting from her house on Edison Avenue out of which she ran a daycare business. R.469. Elliott admitted that she "didn't get a clear view of [the shooter's] face," R.484, and was unable to identify him in court. Elliott described the shooter as a black male, "heavyset, short," with a bald haircut [sic]." R.476. He wore a "white t-shirt and some blue jeans cut below the knee," R.477. Elliott appeared to be "around in his twenties, about his mid-twenties." R.484.

**\*11** At about 11 a.m., the phone rang; Elliott happened to look out her windows at the same time and saw a green car of unknown make and model "stop suddenly" with a "screeching sound like ... there's been an accident." R.469. She then heard two gunshots. R .486. The green car was parked in front of the pole in front of her house, "at an angle like it was trying to make a U-turn and it couldn't proceed." R.473. There was a "burgundy van" about 50 feet in front of the tree in front of her house, closer to the

service road than the green car. R.475. "All of a sudden," Elliott saw a "guy running" with a "silver" handgun in his hands. R.476.

After the shooting, the man "ran and got into the car," on the "front of the *driver's* side." R.478 (emphasis supplied). Elliott testified that the green car pulled off, did a U-turn, and went down Edison toward Langfield, "KC6" was part of the license-plate number of the getaway car. R.478–79.[8]

Elliott went outside and looked at the maroon minivan, but did not see anybody around. She looked down the street, and then "came back in the house and ... called the cops and told them somebody's been shot ...." R.479. Elliott returned outside and walked over to where the victim was lying next to a white Mercedes, on the passenger's side. R.482–83. Elliott stated that there was a black male talking to the victim telling him he was going to be okay. R.482. Just as she approached, she heard the person with Brown (i .e., Byrd) say, "Move the van." R.491. Elliott did not know to whom he was speaking. Sometime before the police arrived she noticed that somebody had moved the burgundy minivan over to the service road. R.483–84. Elliott observed that the van appeared to have two gunshots in the back of it. R.484. R.490, 492. *Id.,* Elliott did not know who moved the van.

Unlike Hollis, Elliott (like Moses) did not recall seeing a man trying to jump over the chainlink fence during the shooting. R.489. However, Elliott also said that she did not see an elderly black man (i.e., Moses) pull his gray or blue car over to the side of the street, park it, and get out and run up the street. R.489. Elliott stated that she did not know either Moses or Hollis.

#### 5.) Roger Hunt

Roger Hunt ("Hunt"), who observed the shooting from the back of his house on 312 Weston; their backyard fence ran along Eggert Street, the service road, near where the shooting occurred. R.670–71. Hunt was unable to identify the shooter because he "just couldn't see what the guy looked like." R.679.

Shortly after 11 a.m., Hunt "heard a couple of shots and started towards the door" to go outside to get his niece. R.671. He looked out a side window and saw "a guy" whose clothing he could not remember. R.687. Hunt then

heard "two or three more shots and a guy just slumped and hit—hit the ground," falling about five feet from the chainlink fence. R.672.

Hunt looked down momentarily to check on his niece and when he looked up again, he saw that "a little guy had come out and started shaking the guy saying hey, uh, no, Ty, something or other, you know, get up, you know, don't go, or whatever, something like that." R.672, 674. Hunt said that he did not see the "little man" immediately after the victim fell. R.689. Hunt did not know "where he came from," explaining that he (Hunt) was "still busy" with his three-year-old niece. R.693.

 **\*12**  Hunt then saw black male "run from a building." R.673. This person, who did not have a gun, R.695, 697, "looked back and jumped in the car" that was parked perpendicular to a pole in the middle of the street. R.674, 686. The car was "blue or green, something like that," but Hunt did not know what model it was at the time. [9]

The blue or green car drove off out of sight. R.674. While Hunt's aunt was speaking with 911, Hunt got on the phone to tell them that the victim was dead. R.675. Hunt went outside a minute or two later and there were people around and walking up to the man lying on the ground. R.675.

Hunt admitted that when he first spoke to the police, he told them that he did not know what kind of car the shooter got into, stating that it was "blue" or "bluish green." R.679, 81, 687. He admitted that he did not describe the car as a green Cadillac. R.684. Hunt testified on direct examination that the shooter got into the car on the passenger's side, but, on cross-examination, he insisted that he had said the driver's side. R.686, 697. Hunt could not see which car (the minivan or the white Mercedes) stopped first. R.693.

### 6.) Dean Taylor

Dean Taylor ("Taylor"), who lived on Edison, near Langfield, witnessed portions of the shooting but could not make an identification of the shooter.

At about 11 a.m. on June 14, 1997, he was inside his house when heard "[a]bout five to six" shots. R.765–66. By the time he looked out the door, he saw people running. He went outside and made his way to where the victim

was lying on the ground; this took "about three to four minutes." R.766. (Taylor was disabled as a result of being born with a club foot.) Taylor testified that when he reached the victim, there was a "light-skinned" black male, with a thin build, about 5# 8#-tall, next to the victim. R.767. This person, whom Taylor eventually learned was Byrd, "was just standing there," although he "tried to pick [the victim] up when [Taylor] got there." R.767. Taylor told Byrd to "[l]eave him laying there" so that the victim's injuries would not worsen. R.768.

About 30 seconds later, Taylor said, two black women came up. R.768. One woman "grabbed [the victim's] hand and start[ed] trying to check for his pulse, and the other one was just holding his hand." R.768.

Taylor saw one vehicle out in the street near the victim at the time he arrived—the white Mercedes. R.768–69. The victim was lying on the passenger's side of the Mercedes, next to the chainlink fence. R.769. Taylor waited until the ambulance and police arrived about 10 minutes later and then returned home. R.778.

On cross-examination, Taylor stated that when he arrived, he did not see a maroon van in the street. He had passed the maroon van on the service road on his way from his house to where the victim was. R.776. Thus, the maroon van had already been moved before he got to the scene of the shooting. R.776. Taylor did not know who moved the van. R.778.

### c. Petitioner's Arrest
 **\*13**  Officer John McGrath of the Buffalo Police Department was working with his partner when they received a broadcast of a shooting on Edison; several minutes later, at around 11:20 a.m. the possible name of the suspect was given as "Twan Parker." R.400–01, 419. The suspect was described as a "black male, stocky, bald, wearing a white T-shirt, last seen driving away in a green Cadillac," and possibly was in the Sycamore–Woltz area. R.401. At about 11:35 a.m., the officers pulled over a green Cadillac heading north on Sycamore with three black males in it. R.408, 420. Deshawn McClaren ("McClaren") was driving; Parker was in the backseat behind the driver; and Eddie Fields ("Fields") was in the front passenger's-side seat. R.402.

Officer McGrath testified that Parker was bald and was wearing a white V-neck t-shirt, "nylon blue sweat pants or

2009 WL 2971575

running pants, and some sneakers." R.403. Based on his review of a photograph taken of Parker at his arrest, the pant's leg on one side was "pulled up." R.403, 405.

Detective John Bohen interviewed Parker upon his arrest. Parker refused to sign the card from which Bohen read the *Miranda* warnings and requested to speak with his attorney. Parker asked, "What am I charged with?" Detective Bohen told him that he was identified as the shooter. Parker asked, "How am I the shooter? How was I identified?" R.860–62.

### d. The Crime Scene Evidence
Officer Antonio Roman and partner, Reginald Hokes; they were the first unit there to respond.[10] R.780, 784. When he arrived on the scene, the first he thing he saw was a white late-model Mercedes Benz parked along the curb; a black male (Brown) lying on the sidewalk; and "another black male [i.e., Byrd] sort of comforting him ...." R.781. Officer Roman asked Byrd whether he saw who did the shooting, and Byrd replied that "Twan" did. R.784. Byrd described "Twan" as a "black male, bald. He didn't really give a clothing description, but he said [Twan] was a black male, bald." R.785, 798–99. Byrd described the shooter's car as a "late model Cadillac STS, dark green, with gold rims." R.785.

On cross-examination, Officer Roman admitted that he later learned that Byrd said he lived at 48 Barthel, not Courtland. R.807. Byrd lied to him about what he was doing at the time of the shooting—at the scene, Byrd had told the police that he was "[l]aying back in the front seat listening to music." R.803. Byrd claimed that somebody pulled up from behind in a green car and started shooting at him and his friend. R.805. Byrd did not say anything about a maroon Dodge minivan being driven by the victim. Byrd did not tell Officer Roman whether or not he told somebody earlier that he and the victim would be driving down Edison. R.804. It was only when Byrd was taken to police headquarters and questioned that he disclosed the existence of the maroon Dodge van. R.804.

McClaren and Fields were questioned and released. No weapon was found in the green Cadillac in which Parker was riding at the time he was arrested. That Cadillac was a rented late model Coupe de Ville, not a Seville STS, R.858–59, R.432–33. It had apparently been rented by an individual named Nigel Bostick from National Rent–

a–Car in Rochester. R.910. R.406–07. Among Parker's personal effects was a receipt for services performed on a 1993 Cadillac STS Seville, namely, the installation of a car radio for $1,728 by D & R Automotive. R.427–28. There was also a work order for some custom-detailing work to be done on the same vehicle. R.428. There was a third receipt for some type of installation of a car radio or soundsystem; the name on the top of the receipt was Talia Salter, petitioner's girlfriend. R.429. The third receipt was made out for a "1994 Cadillac." R.431. Detective Lyons admitted that the car in which Parker was arrested was a Coupe de Ville, not a Seville.

**\*14** Detective Michael Lyons admitted that when he went to the garage to examine the white Mercedes–Benz and the maroon Dodge Caravan mini-van, there were three agents present from the DEA who were also there to look at the Mercedes–Benz and the Dodge Caravan, but they were not investigating the Brown homicide. R.434–36. According to Detective Lyons, no drugs, drug paraphernalia or hidden compartments were found in either car. Nor did he "find any receipts saying that people owed [money] for drug transactions in either of those vehicles[.]" R.444. He did not find $20,000 in cash in the Dodge Caravan, and denied that he or the DEA agents took anything from the Mercedes–Benz or the Dodge Caravan required to be vouchered or inventoried. R.441–42, 445.

The maroon minivan showed extensive damage to the windows, and there were some projectile holes inside the van. R.446–47. A side window was smashed, but Detective Lyons admitted that the back window was not smashed. R.448. Despite being shown a photograph of the minivan, Detective Lyons would not agree that there were bullet holes in the back door of the van. R.448.

The police collected five five (5) expended shell casings, fired from an .45 automatic pistol from the crime scene. R.725 *et seq.; see also* R.919. Testing indicated that they shared similar characteristics and could have been fired from the same gun. R.729–30, 741. There was no way of determining that any gun involved in this case was both silver and black.[11] R.734. There also was a lead bullet was recovered from the van; a copper bullet was recovered from the victim's body; and copper bullet fragments were collected from the inside of the minivan's rear cargo door. R.748. Three bullet holes were found in the back of the maroon minivan, indicating that there were two shots

fired that apparently did not hit the van. R.919, 921. Of the two shots that did not hit the van, one bullet was recovered during the autopsy, and one bullet was not found at all. R.922. He admitted that he could not say that there were not two guns fired in the crime scene area. R.922–23.

The holes in the minivan were made by .45–caliber bullets were found on the driver's side rear tailgate portion and the inner part of the van on the right rear, between the back seat and the tailgate, and on the tailgate of the passenger's side. R.892–93. One bullet passed all the way through the rear tailgate and entered the van. A lead bullet was removed from behind the passenger seat, a copper-jacketed bullet towards the back of the vehicle, strongly indicating that somebody was standing behind the van when the shots were fired into it. R.918. R.893, 921.

The passenger side window was broken, and a paper bag with a rock in it was found in the van. R.902. The evidence technician did not know what was in the minivan before it was broken into. R.909, 915.

No weapon was found at the crime scene or in the vicinity, and gun in question was never located. R.895–96. The police recovered a jacket from the front seat of the Mercedes and $910 in cash stuck in the pocket of the passenger's-side door. R.897.

### e. The Medical Evidence

**\*15** Dr. Justin Michael Uku ("Dr.Uku"), Erie County's chief medical examiner, testified that the first bullet entry wound he observed on Brown was on the outer part of the right upper arm towards the back, with the exit wound on the inner side of the right upper arm. R.752. The absence of gunpowder marks around the wound indicated that the bullet was not fired from close range (i.e., three to five feet). R .753, 762. The next bullet entry wound testified to was on the right side of the victim's chest, just below the armpit; this was the same bullet that had passed through the right arm. R.753–54. It then traveled through the victim's right lung and heart and exited the fourth and fifth left ribs, fracturing the fourth rib. R .755. Brown would have lived "[a] few minutes" after receiving the above-described gunshot wounds. R.756.

The entry wounds were 55 inches above the victim's right heel. The bullets traveled on a path Brown's right to his left, going forwards and downwards. This indicated to the medical examiner that Brown was "shot ... from towards

the back," R.756, 761, not that the victim was shot in the back, R.756. To the contrary, the medical examiner agreed with defense counsel that the victim's bullet wound was inconsistent with a claim that the victim was shot in the back while climbing over a fence. R.760. Furthermore, there was no indication that the person who shot Brown was standing directly behind him and shot him while he was running away. R.763.

### 2. The Defense Case

The defense called one witness—petitioner. Twenty-four-year-old Parker testified that he had been kicked out of high school after tenth grade for "being absent a lot, skipping class." R.984. He admitted, "I haven't been doing nothing" since then. He did not have a job, R.987, and for money, he would "[m]ooch off" his grandmother and his girlfriend (with whom he had a son and a daughter). R.985. He also "might sell a little pot every now and then, keep [him]self up." R.985, 989. He had no permanent address but rather "stayed" variously at his grandmother's, his aunt's and his girlfriend's residences; he did not contribute rent to any of them. R.987.

Parker testified that he considered himself a "pothead" since he smoked marijuana on a daily basis. R.990. He admitted to selling a "little" bit of crack cocaine, to support his marijuana habit. R.990. He knew Ty Brown "from the area on Barthel Street." R.991. He knew Boo Byrd, "the flunkie" who was "always with Ty Brown." R.991. Parker explained, "He's [Brown's] mut. He deals for him. He do [sic] anything he tell him to do." R.991.

With regard to Byrd's accusation that he (Parker) shot Brown over a dog-fight debt, Parker stated, "I heard my brother [Javon] and they [Brown and Byrd] were involved in dog fighting, but I never condoned any dog fights." R.993–94.

Parker admitted that he had been arrested in the past year, for "[r]eckless endangerment, speeding." R.994. He had been driving while high on pot, with his younger brother with him in the car. The police tried to pull him over but, because he did not want his younger brother to get arrested, he just kept driving until they got to their destination. R.995. He was arrested on another occasion for the same thing, but that time he had two bags of marijuana on him. In both cases he pled guilty to reckless driving. He was driving a green Buick Century that belonged to a friend of his at the time.

**\*16** Parker testified that the green Cadillac Seville belonged to his brother, Javon Parker ("Javon") but was registered in Parker's girlfriend's name because Javon did not have a driver's license. R.997. In return, Javon allowed Parker and his girlfriend, Talia Salter ("Salter") to drive the Seville, but Parker claimed that he "couldn't barely [sic] drive" the Seville because his brother was "always riding it, or some of his friends driving the car." R.998–99. The Seville was kept at 48 Domedion, Parker's girlfriend's house.

On the day before the incident, the green Seville was not at 48 Domedion, and Parker did not know who was using it. *See* R.1003–05. On the day of the shooting, the Seville had not been returned.

That day, Parker got up at about 9:30 a.m. and went to the barbershop. After that, he drove to Brinkman Street to see his cousin Eddie Fields ("Fields"). R.1013–14. At the time, Parker was driving a grey station wagon owned by his aunt, Barbara Fields, which he had borrowed the day before.

He found Fields and McClaren in front of the house, "conversating [sic] about something, standing in front of a green Cadillac ...." R.1014. That Cadillac was not his brother's Seville, but rather was a rented car that McClaren was driving. R.1014. Parker said he had never been in the rental Cadillac before. R.1015.

Parker asked if they were going to the Juneteenth Festival and they said yes, so he had them follow him over to his aunt's house to drop off the grey station wagon. R.1015. Then Parker got into the backseat of the green Cadillac. Parker said he and Fields were smoking pot; McClaren was driving. R.1015–16. They were planning to go to the Juneteenth, but Parker did not know exactly where McClaren was headed. R.1015. At about Rother and Walden, Parker "started hearing sirens everywhere" and in about another block, the police pulled them over. R.1016. Parker was told to stay in the car while the officers talked to Fields and McClaren. R.1016. As soon as Parker told the officers his name, they "slapped the cuffs right on [him]." R.1017. Parker asked, " 'What did I do, officer,' " and he said, "Somebody said that you shot someone.' " R.1017.

Once at the police station, Parker was told that "Mr. Brown died this morning." R.1020. Parker asked what did that have to do with him, and the officer replied, "the guy saying [sic] that I did it." R.1020. Parker asked several times what that meant, but he was not given an answer. Parker said another officer came in and was pointing in his face and threatening that he was going to "do 40 years." Parker said that this officer had a gun. R.1020. At that point, Parker asked for his lawyer. R.1021.

Parker denied knowing who had the green Cadillac on the day of the shooting, and denied being on Edison at any time that day. R.1021. He was not sure if his brother or any of his brother's friends were using the Cadillac that day.

### 3. The Prosecution's Rebuttal Witness: Glenda Johnson

**\*17** After the conclusion of Parker's testimony, there was a conference with counsel and the trial court regarding Glenda Johnson ("Johnson"), Dabrien Hill's girlfriend. R.1023 *et seq.* The prosecutor announced his intention to call her as a rebuttal witness to "testify to the fact that ... an individual by the name of Goobie came and paid her $2,000 to give a statement to [defense counsel] indicating that Dabrien Hill did not see what—what he saw, and that on October 22nd of 1997 that [sic] the defendant went to 226 Edison with this Goobie and paid Dabrien Hill $5,000 not to testify at the trial of this matter, telling him that he is not to appear in court for the next five days." R.1062.

Trial counsel objected, arguing Johnson should not be allowed to testify, because her testimony was not in rebuttal to anything petitioner had said. Defense counsel explained that Johnson had contacted *him* the previous week say that "she had something to tell [him], because her boyfriend beat her up the night before." R .1063. She then came in and gave a statement explaining that Hill had been too drunk have been able to make it to the front door to witness the shooting, as he had testified. Subsequently, however, Johnson refused that day to respond to a material witness order issued at defense counsel's request. R.1063.

Defense counsel argued that the prosecutor had access to Johnson all week, and when she was finally brought in that day, she was improperly kept for "an hour and 20 minutes in the Homicide office talking to [Officer] Reggie Minor" before trial counsel was allowed to speak with her. When she finally spoke with trial counsel before testifying she allegedly said, " 'I'm not gonna do what you asked

2009 WL 2971575

me to.' " R.1064. When asked why, Johnson responded to trial counsel, " 'I'm scared[,]' " but would not say of whom. R.1064. Counsel alleged that Johnson responded affirmatively when asked if someone had threatened her to give a statement on Parker's behalf. She denied knowing who they were or their names, but also denied that Parker ever came to her house. In addition, she told defense counsel that she had not been given any money by these unknown individuals. R.1064.

The trial court determined that her testimony would be proper rebuttal as a matter of New York law, citing to N.Y. CRIM. PROC. LAW § 260.30. R.1066.

Twenty-three-year-old Johnson was then called to the witness stand and testified on direct examination that she had two children with Dabrien Hill, and was employed as a home healthcare worker. R.1069. On October 19, 1997, Johnson testified that "Goobie," a black male, had come to her house and offered her $2,000 "[t]o keep Dabrien [Hill] out of court." R.1070. Hill was in jail over the weekend of October 18 to October 19. The following day, Monday, October 20, 1997, Johnson was picked up at her house by "Goobie and Tee" (neither of whom were further identified) and driven to defense counsel's office. There she signed a statement (People's Trial Exhibit 62) explaining that Hill had been drunk on the day of the incident. She now claimed, however, that she merely had said Hill was "drinking." R.1072–73.

 **\*18**  On October 22, 1997, two days after she signed the statement at defense counsel's office, Johnson testified that Goobie and Parker came over to her house. By this time, Hill had been released from jail. While in her presence, Johnson testified, Goobie and Parker offered Hill $5,000 "to stay away until the trial was over with." R.1071–72.

On cross-examination, defense counsel pointed out that Johnson was "forgetting part of what happened" at his office, and that another lawyer, Scott Schwartz ("Schwartz") "sat in the room while all of this was done," and "watched [her] read through everything in this statement, initial [her] name after each paragraph," and witnessed her signature. R.1074. She agreed that in front of Schwartz, the other attorney, she told defense counsel what had happened, and he wrote it down. She agreed that she had initialed where it said it was her choice to talk to defense counsel. She was evasive, however, about recalling

signing the part of the statement saying that no one forced her to come, paid her to come, or threatened her. R.1080.

Johnson admitted that on Friday, October 17, 1997, Hill had beat her up and she had him arrested. Hill had been in jail, when, on October 20, 1997, Johnson had visited defense counsel's office and signed the statement. R.1081.

Johnson agreed that in the statement she signed, she said that at the time of the shooting, Hill "ran towards the door, but couldn't get to see who was shooting, the lock [wa]s broken, and [he] was drunk." R.1085. She agreed that she did relate to defense counsel everything that was contained in the statement she signed. R.1086.

Johnson remembered saying that Hill had a drinking problem but denied telling defense counsel that Hill abused her, stating, "I don't recall saying that" Hill "slap[ed][her] around when he's drunk." R.1087. She agreed, however, that she had talked to defense counsel about her "boyfriend problems." R.1090.

Johnson agreed that defense counsel was nice to her and did not threaten her. R.1087. She denied that she was telling the jury that defense counsel was putting words in her mouth. R.1088. She admitted that in the week since she signed the statement, she did not contact the police or the district attorney's office to tell them "people were threatening [her] or paying [her] to talk to [defense counsel]." R.1089, 1091. Defense counsel also elicited that when she was brought in on the material witness order, she was brought immediately to the homicide bureau and not allowed to talk to defense counsel. R.1091.

On re-direct, Johnson agree d that she was "afraid" at the time she went to defense counsel's office, and when she was signing the statement. R.1093. She claimed that since the shooting, various individuals had come by her house to talk about it on five occasions. When asked if she received threats, she responded, ambiguously, "Not at the time, but in certain ways." R.1093. Johnson admitted that the police officers did not threaten her, and were going to provide protection for her and Hill, and that when she left the court that day, she did not know where she was going to live. R.1094.

### 4. Summations

#### a. The Defense Argument

2009 WL 2971575

**\*19** Defense counsel argued that the shooting of Ty Brown was "not a happenstance killing" but was "a gangland hit." R.1182. Defense counsel admitted that he did not know who shot Brown, and that he was not claiming that Byrd was shooting at Brown—nevertheless, he argued it was a planned attack on Brown, and Parker was set up as the "fall guy": "Somebody knew they were driving down that street at that time. There were people there planted to ditch guns. That van was robbed in accordance with a plan. The car, the green Cadillac, was there for a purpose, because there's a fall guy intended, and to tell you anything else is nonsense. To try and tell you or sell to you that Tyrone Brown is a nice upstanding citizen and not a drug dealer is nonsense. To try and sell William "Boo" Byrd as some friendly little cousin, crying over his cousin's death, is nonsense. This isn't luck. This is the attack of a kingpin. It's usurping of power." R.1183; *see also* R.1208. Defense counsel argued that Byrd was like a "Brutus" or a "Judas", who "sold his cousin out for the $20,000 that was in the maroon van." R.1184.

Defense counsel asserted that Brown was a drug dealer and asked the jury to reject Byrd's testimony that he was a mechanic, stating "[h]e's a drug dealer." R.1190. Defense counsel pointed to the incongruity of a mechanic driving a Mercedes that cost $85,000, and also reminded the jury about the Hyatt Hotel receipt and $910 in cash found in the car. R.1199. In the felony hearing, counsel noted, Byrd was only making $400 a month, but at trial, he said he was making $400 a week. R.1203. Defense counsel reminded the jury that Byrd had the van moved immediately after the shooting, and he lied to the police at first—and only started telling a different story after "he's Mirandized down at the Police Headquarters[,]" because "they're onto the fact that the guy's in on this." R.1204. When asked to describe what Parker was wearing, Byrd responded with the vague and inaccurate description of "[d]ark clothing." R .1204. However, when Parker was arrested twenty minutes after the shooting on the opposite side of town, he was in a white T-shirt. R .1204.

Defense counsel called Byrd's story about going to have having breakfast that morning implausible, and discussed the inconsistencies and incongruities of the route they supposedly took that morning, using the street map to show they had no reason to drive down Edison Avenue, where the shooting occurred. R.1187, 1199. Defense counsel talked about the suspicious set-up of the three vehicles—how Byrd, after supposedly seeing Parker, with whom Brown supposedly had an argument over a dogfight debt, drive by in his green Cadillac, put the white Mercedes into park, leaving Brown, in the maroon van behind him, nowhere to go. The green Cadillac pulled around and cornered the maroon van carrying Brown. Hunt, Taylor, and Elliott testified that Byrd got out of his car and was over on the sidewalk; defense counsel argued that this was because Byrd knew that shots were going to be fired, and that there was $20,000 in the van. R.1188.

**\*20** Defense counsel pointed out that the car in which the shooter was driving was "accessible to a bunch of other kids who are running around selling drugs and gang banging." R.1185. Defense counsel stressed that the only three witnesses who could positively identify Parker had credibility issues: Byrd; Hollis, who was Brown's friend from 15 years ago; and "some drunk" (i.e., Hill). R.1185.

Defense counsel called Hollis biased because she had known Brown for 15 years, and attacked the believability of her story that Brown was running away and trying to scale a fence, when compared to the medical evidence, which showed that Brown was not shot "in the back" but rather was "shot in the side from a backward angle," "[p]robably standing next to the Mercedes Benz confused as to why his buddy's standing there letting him get killed." R.1199–1200. Counsel argued that "[n]obody was running up the street like Mr. Hill, Ms. Hollis, and Mr. Byrd tried to tell you." R.1200. Counsel also pointed out that Hollis' demeanor became extremely defensive when he questioned her. R.1205. Hollis did not accurately describe Parker's clothing, saying that the shooter did not have a shirt on, and was wearing jean shorts. R.1206.

As to Hill and his girlfriend, Johnson, defense counsel pointed out Johnson came into his office to give a statement while her boyfriend was in jail for beating her up. R.1200–02. She only "went south," and recanted her statement and refused to testify for the defense, after her abusive boyfriend got out of jail. R.1201–02. Defense counsel questioned why Hill did not tell the jury or the prosecutor about the alleged bribes when he appeared to testify. He pointed out the inconsistencies between Hill and Johnson testifying at trial that Hill looked out the window, and Johnson telling defense counsel in her statement that she always kept the blinds at her house closed. R.1201. Counsel also pointed out that only Hill stated that the shooter was holding the gun in his left hand;

all of the other witnesses said the gun was in the shooter's right hand. R.1205.

Counsel noted that none of the four other eyewitnesses (Elliott, Hunt, Taylor, and Moses) were able to identify Parker as the shooter. Three of these individuals (Elliott, Hunt, and Taylor) all testified regarding someone running behind the buildings after the shooting. Hunt, for instance, said that he saw the shooter run behind the building, and when he returned, he had no gun. However, Byrd, Hollis, and Hill—all of whom claimed to be able to identify Parker—said no gunman ran between the buildings in the Langfield Projects.

Defense counsel questioned why the prosecutor did not introduce the audiotape of the 911 call or call McClaren and Fields as witnesses. Counsel pointed out that at the time of the arrest, Fields and McClaren were driving a different green Cadillac than the one used in the shooting and asked why, if Parker "just blew somebody away in a green Cadillac, would [he] jump into another one [ .]" R.1195. Defense counsel also pointed out that after Fields and McClaren were interviewed, the police confiscated Parker's aunt's grey station wagon. Counsel asked, "What did Eddie [Fields] and Deshawn [McClaren] tell them that caused them to get the silver station wagon," and urged the jury to question why they were not called by the prosecution. R.1197–98.

*21  Trial counsel pointed out that Parker did not hesitate in his testimony and "basically told [the jury] he's a bum." R.1207. Defense counsel argued that if Parker was going to lie, "why wouldn't he lie about everything?" R.1207. Counsel allowed that perhaps Parker might know who shot Brown, but "unless this guy is a total moron, and just happened to be driving down the street, there's a reasonable doubt that [petitioner] did this. R.1208.

### b. The Prosecution Argument

The prosecutor told the jury that there was no proof that anybody, including Brown or Byrd, was a "liar, a drug dealer, [or] a gangland hitman ...." R.1214. As to Byrd, the prosecutor also argued that he had nothing to gain by testifying. The prosecutor argued that it was "absolutely absurd" to think that this was "some gangland hit over drug territory" because the shooting occurred in the middle of broad daylight, in the housing projects, in front of a "daycare center." [12]  R.1214, 1215.

The prosecutor argued that if it were over drugs, "why did William Byrd have to leave town and go to South Carolina? Is he running a Buffalo drug operation from his home in South Carolina? It's absurd ." R.1213. [13] According to the prosecutor, the only evidence defense counsel had to show Byrd was a drug dealer was "prior arrests, no convictions ...." R.1231. The prosecutor argued that it is improper to assume that a person is guilty just because they were arrested, and urged the jury to apply the presumption of innocence to Byrd.

To support Byrd's identification of Parker, the prosecutor pointed out that Parker had admitted that Byrd also knew his brother, Javon Parker, who owned the green Cadillac driven by the shooter, but could tell the two of them apart. R.1218. The prosecutor stressed the difference between "description and recognition," and argued that Byrd was "recognizing someone that he knows" and therefore it made sense that he was unable to provide a description of what the shooter was wearing. R.1219–20, 1221, 1232–33.

With regard to the green 1993 Cadillac STS driven by the shooter, and allegedly belonging to Parker's brother, the prosecutor questioned "[h]ow many people have a $1,728 stereo system in a car that they never use[.]" R.1223. The prosecutor pointed out that the owner of the car shop identified Parker as the person who had a power sunroof and a leather interior costing $2,000 in the Cadillac STS. R.1223–24.

The prosecutor argued that Hollis' observations of Brown's movements during the shooting were consistent with the medical evidence of where his gunshot wounds were located. Hollis had testified that Brown looked as if he were reaching his arms up, trying to scale the chainlink fence; he was shot through his arm, through the armpit, through the right lung, and through the heart. Thus, the prosecutor argued, her testimony was not inconsistent with the medical proof. R.1228. In addition, the prosecutor argued, Hollis' testimony was consistent with the physical evidence of how many shots were fired, and where the shell casings were found. R.1229.

*22  The prosecutor attempted to build a motive for the shooting upon Byrd's testimony that Parker and Brown had a "beef" over an unpaid dogfighting debt. The prosecutor argued that it was a "crime of emotion": Parker was driving down the street and saw Byrd, "Brown's flunkie, driving this brand new Mercedes," and

Parker v. Herbert, Not Reported in F.Supp.2d (2009)
2009 WL 2971575
Case 9:16-cv-01458-DNH-CFH    Document 31    Filed 05/13/19    Page 100 of 134

saw Brown, who owed him money. "[P]issed off that they're driving around with this new Mercedes and this van," Parker decided to gun down Brown. R.1230.

The prosecutor concluded his argument by highlighting the rebuttal testimony given by Johnson concerning the alleged bribery incident, and arguing that Parker, who was out on bail for most of the trial, had the opportunity to visit Johnson and Hill at their house. The prosecutor argued, without having any adduced proof at trial, that an unidentified young man present in the spectator section was in fact this so-called "Goobie" about whom Johnson testified. The prosecutor also made an extremely improper comment suggesting that at least one of the witnesses (Hollis) had made a pre-trial identification of Parker in the presence of the police. These instances of misconduct were raised by defense counsel immediately after summations concluded and addressed by the trial court, as discussed further in Ground Five, below.

### 5. Jury Deliberations, the Verdict, and Sentencing

During deliberations, the jury made a number of requests for extensive read-backs of testimony from all of the eyewitnesses. The jury ultimately returned a verdict convicting Parker as charged in the indictment.

At the sentencing hearing on December 10, 1997, the trial judge commented extensively on the evidence at trial. *See* R.1330–34. In the trial judge's opinion, "this jury would have to be made idiots if they didn't realize—and, as you [defense counsel] said in your opening, that it was a gangland slaying. It was drug related." R.1330. The judge also commented, "I think the odd thing about this, besides the business of the cars, and what was implicit was [sic] the drug dealing, is that you might not have been convicted but for the last witness who testified that you, uh, bribed." R.1331. According to the trial judge, "that might have contributed in a major way to your conviction on murder," and "[y]ou don't show much—much respect for the Court in bribing at least one of the witnesses[,] [a]nd, of course, I think that, as I said, it's probably your undoing." R.1332–33. Stating that he saw "no reason to sentence [Parker] to anything less" than the maximum, Judge Drury imposed a sentence of 25 years to life on the murder conviction and a concurrent term of 5 to 15 years of the weapons possession conviction. R.1334.

### C. The Direct Appeal

Represented by new appellate counsel, Parker appealed his conviction to the Appellate Division, Fourth Department, of New York State Supreme Court. As grounds for reversal, appellate counsel argued that (1) the prosecution improperly refused to investigate whether their obligations under *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *People v. Vilardi,* 76 N.Y.2d 67, 73, 556 N.Y.S.2d 518, 555 N.E.2d 915 (N.Y.1990), were implicated by information that the victim and chief eyewitness were subjects of federal wiretapping warrants and a DEA drug-distribution investigation; (2) the prosecutor's misconduct during summation denied petitioner a fair trial; (3) petitioner was denied a fair trial when the prosecutor improperly bolstered identification testimony; (4) petitioner's convictions were against the weight of the evidence; and (5) the sentence was harsh and excessive.

**\*23** The Appellate Division unanimously affirmed the conviction, *see People v. Parker,* 283 A.D.2d 973, 725 N.Y.S.2d 250 (App.Div. 4th Dept.2001). The court rejected the contention "that the People had a duty to investigate whether their *Brady* obligations were implicated by information that the victim and the principal prosecution witness were subjects of a drug enforcement administration (DEA) task force investigation" because "[d]efendant [did] not allege that there was a joint investigation between the local police and the DEA" and "[t]hus, it cannot be said that the prosecutor had control or constructive possession of any alleged *Brady* material in the possession of the DEA, nor did the prosecutor have a duty to inquire about any such material[.]" *Id.* (citing *People v. Santorelli,* 95 N.Y.2d 412, 421, 718 N.Y.S.2d 696, 741 N.E.2d 493 (N.Y.2000)).

With regard to the claim that the "prosecutor's improper reference to a person in the courtroom" the Appellate Division disagreed that it required reversal, since the trial court "issued a curative instruction, and the improper reference was not so egregious as to deny defendant a fair trial[.]" *Id.* (citation omitted). The Appellate Division found that "[t]he [trial] court did not abuse its discretion in denying defendant's motion for a mistrial based on the prosecutor's bolstering of the identification testimony of an eyewitness [.]" *Id.* (citation omitted). The Appellate Division noted that trial counsel "declined the court's offer to issue a curative instruction" and held that "in view of the strong evidence of identity, reversal is not required [.]" *Id.* (citations omitted).

The Appellate Division summarily found that the verdict was not against the weight of the evidence, but did not engage in any analysis of the proof at trial. *Id.* at 974, 725 N.Y.S.2d 250 (citation omitted). Finally, the sentence was found to be neither unduly harsh or severe. *Id.*

Leave to appeal to the New York Court of Appeals was denied. *People v. Parker,* 96 N.Y.2d 905 (N.Y.2001).

**D. Byrd's Arrest on Federal Drug Trafficking Charges**
Byrd was arrested in June of 1998, about eight months after he had testified against petitioner in connection with the Brown homicide. The United States Attorney's Office for the Western District of New York charged Byrd, in a multi-defendant indictment, with conspiracy to distribute, and criminal distribution of, cocaine and cocaine base. The indictment was based on drug-related activities occurring between September 1994, and June 1997, involving Byrd, Brown, and numerous other individuals. *Id.* at 54, 55. In particular, Byrd was charged in connection with a controlled sale of cocaine base on April 11, 1997, to a confidential informant working for the DEA. *Id.* at 41–42.

**E. The C.P.L. § 440.10 Motion**

**1. Overview**
Following Parker's sentencing and the perfecting of his direct appeal, and after Byrd had been indicted in federal court, Parker's appellate attorneys obtained copies of the federal wiretap orders substantiating trial counsel's allegations that Brown and Byrd were major cocaine dealers in the Buffalo area and were under investigation by the DEA. Parker's appellate counsel brought a motion to vacate the judgment pursuant to C.P.L. § 440.10 arguing that the prosecutor had violated his obligations under *Brady* to disclose this favorable evidence to the defense. Specifically, appellate counsel argued the prosecutor falsely professed ignorance of the federal drug-trafficking investigation regarding the People's chief witness, Byrd, and his involvement in the victim's large-scale cocaine distribution organization. Submitted in support of the C.P.L. § 440.10 motion were "applications and orders for eavesdropping warrants, [which] indicate[d] that Mr. Brown and Mr. Byrd were engaged in drug dealing on a major scale in late 1995 and in 1996 and into 1997 and that both were being wiretapped by the federal authorities

in late 1996 and into 1997." Order Dated January 26, 2001 Denying C.P.L. § 440.10 Order ("the C.P.L. § 440.10 Order") at 8–9. The exhibits submitted by Parker included an affidavit by Special Agent Dale Kasprzyk from the DEA that Brown, Byrd, and an individual named Darwin McNeill were the targets of a wiretap application dated November 22, 1996. 1/19/00 Tr. at 10–11. In addition, an affidavit dated December 31, 1996, from Task Force Agent John Ferby indicated that Brown and Byrd were involved in the sale of multiple kilos of cocaine on a weekly basis; reliable informant stated that Byrd was given responsibility for administering Brown's drug distribution network after Brown's death; and Byrd, while using a cloned cell phone, had spoken to an alleged cocaine supply-source in New York City. *Id.* at 35–36. A "DEA seven" form showed that a controlled purchase of half a kilo of cocaine was made by the DEA from Byrd on April 11, 1997.

**2. The C.P.L. § 440.10 Hearing**
*\*24* Judge Drury held an evidentiary hearing on January 19, 2000, and July 6, 2000, at which Assistant United States Attorney Joseph Guerra, the Chief of the Narcotics/ Violent Crime Division, ("AUSA Guerra") testified for the prosecution. Detective Daniel Rinaldo, a Buffalo Police Department officer acting as a Task Force Agent deputized by the DEA, testified for the defense. The trial judge agreed that it was necessary to call A.D.A. Cooper, since it appeared that he had made inconsistent factual allegations on the record with regard to his contact with the U.S. Attorney's Office and/or the DEA. On the one hand, he had represented to Judge Drury at Parker's trial that he did not talk to DEA Agent Kasprzyk or A.U.S.A. James Kennedy. However, before a different state court judge, in the context of a forfeiture proceeding regarding the Mercedes Benz, A.D.A. Cooper made a comment to the effect that he *had* spoken to the DEA. *See* Transcript of Erie County Court C.P.L. § 440.10 Hearing dated June 1, 2000 ("the 6/1/00 C.P.L. § 440.10 Tr."). After Cooper testified, the assistant district attorney representing the People, conceded that it was unnecessary to call Parker's trial counsel to testify.

**a. AUSA Joseph Guerra**
A.U.S.A. Guerra did not know when exactly he became aware that Byrd and Brown were involved in cocaine distribution in Buffalo, only that it was "some time in 1997[,]" *Id.* at 12. Based upon A.U.S.A. Guerra admitted

2009 WL 2971575

that he was at least aware by that time that Byrd was a substantial distributor of crack cocaine in the Buffalo area. *Id.* at 14. However, he stated, AUSA James Kennedy most likely dealt with the eavesdropping applications for Byrd. AUSA Guerra indicated in October of 1997, at the time of Parker's trial, that the investigation was "on hold meaning that the agents were in the process of reviewing all the intercepted wire tap communications ... basically organizing it to be presented to the Grand Jury later." *Id.* at 44. However, "there was really no other active ... gathering [of] more evidence ... going on .... " *Id.* AUSA Guerra stated that all of the wiretap applications and supporting documents were still under seal at that time. *Id.* at 45. The required public notice "was delayed until some time following the indictments [of Byrd] in June of #98." *Id.* In other words, all of the wiretap materials were still under seal as of October 1997, when Parker's trial took place. *Id.* at 45.

The trial court and questioned AUSA Guerra about how trial counsel could have gotten the information regarding the wiretaps, that. AUSA Guerra said that he could "guess several different places ... he could have talked with anybody involved in the case who might have mentioned to him or he might have pieced it together. I don't know." *Id.* at 51. Parker's trial counsel was involved in plea negotiations with AUSA Guerra concerning another client, Adrian Price ("Price"), who was involved in Brown's drug ring. *Id.* at 47–48. AUSA Guerra denied telling Parker's about the wiretaps, but he did mention several drug transactions in which Price was involved, and he was "more than 50% sure" that he mentioned Byrd's involvement as "Brown's right hand man." *Id.* at 48, 50. However, that information came from a confidential source; it was not something picked up over a wiretap of Byrd or Brown. *Id.*

**\*25** AUSA Guerra asserted that public disclosure of the fact that the DEA was wiretapping Brown and Byrd would have affected the Government's investigation because it had the potential of compromising their ability to execute search warrants, if the individuals came to know they were wiretapping targets. *Id.* at 52. However, AUSA Guerra confirmed, there was nothing wrong with DEA agents and Task Force officers sharing that information with Buffalo Homicide detectives. *Id.* at 54–55.

**b. Joint Task Force Member Detective Rinaldo**

Detective Daniel Rinaldo ("Detective Rinaldo") of the Buffalo Police Department's Narcotics Squad, who started an assignment as a Task Force Officer with the DEA in 1993, testified for the defense at the C.P.L. § 440.10 hearing. *Id.* at 60.

Detective Rinaldo confirmed that he and other Task Force officers were aware of the eavesdropping applications with regard to Byrd and Brown. In fact, Detective Rinaldo had authored such an application in November 1996. *Id.* at 66. This application indicated that Rinaldo had received information from a confidential source that Brown and Byrd were involved in the distribution of about ten kilograms per week of cocaine in the Buffalo area. *Id.* at 67. Detective Rinaldo characterized Byrd as a "[c]lose associate" of Brown's. *Id.* at 78. Detective Rinaldo was aware that in April 1997, Byrd sold $12,000–worth of cocaine (half a kilo) in a controlled purchase monitored by the DEA. *Id.* at 79. Therefore, Byrd "[a]bsolutely" was not a mere street-corner dealer. To say that he was a "$400 a month mechanic who was not involved with cocaine distribution" "would not be true." *Id.* at 80.

Detective Rinaldo testified that there were "[n]o restrictions" on his sharing information with anyone at the Buffalo Police Department. *Id.* at 61. In fact, he discussed the DEA's investigation into Brown and Byrd with Detective Lawrence Sadlocha on the Narcotics Squad. *Id.* at 61–62. In addition, Detective Rinaldo was informed by Detective Sadlocha when Brown was murdered. *Id.* at 63–64. As a result of this conversation, a group of individuals from the DEA went to the Buffalo Police Department on June 14, 1996. *Id.* at 65–66.

A teletype memorializing a meeting regarding Brown and others that occurred between the DEA and the BPD on June 14, 1997. *Id.* at 25 (citing Defendant's Hearing Exhibit A). The teletype indicated that Brown had been murdered. *Id.* Detectives Phillip Torre, John Ferby, and Daniel Rinaldo were Buffalo police officers acting as Task Force Agents associated with the DEA and very involved with the Brown/Byrd investigation. *Id.* at 27–28, 34. In the teletype, there was a "reference that some agents believe that William Bird [sic] after Tyrone Brown's death was going to take control of Brown's organization." *Id.* at 31. The teletype also indicated that the DEA was going to continue to monitor the activities of Brown's associates. *Id.* at 32.

2009 WL 2971575

**\*26** While at the Buffalo Police Department on the day of the murder, Detective Rinaldo discussed Brown's drug dealing and Byrd's knowledge of the shooting with Detective Giardina. *Id.* at 68. Detective Rinaldo told Detective Giardina that Byrd "was one of the people under investigation by DEA" for cocaine distribution. *Id.* at 69. Detective Rinaldo confirmed the he was "[a]bsolutely" willing to share any information with Sadlocha about Brown and Byrd. *Id.* at 70. Detective Rinaldo repeated that he would have readily shared information about their investigation into Brown and Byrd with the BPD and the District Attorney's Office, had they asked. *Id.* at 75–76.

Sometime after that, Detective Rinaldo and several other Task Force officers "observed" the search of the Mercedes Benz conducted by the Buffalo Police Department. *Id.* at 70. Homicide Detective Michael Lyons and Evidence Collection Detective Andrew Streicher (who both testified at Parker's trial) were there. *Id.* at 71. Special Agent Dale Kasprzyk prepared a teletype summarizing the search and indicating that the DEA was "currently working with Buffalo Police Department Homicide Detectives to provide them with intelligence information concerning Brown's drug distribution organization ...." *Id.* at 73. The teletype also mentioned that "agents believed that William Bird [sic] would now take control of Brown's organization and carry on further the sale and distribution of crack cocaine in the Buffalo area ...." *Id.* at 73.

### c. Former A.D.A. Michael Cooper—The Trial Prosecutor

On July 1, 2000, former A.D.A. Cooper [14] appeared to give testimony in connection with the C.P.L. § 440.10 hearing. At the unrelated state-court forfeiture hearing in July 1997 before Judge Michalek regarding the white Mercedes Benz, Cooper admitted that he made the statement, "When I talked with the Drug Enforcement Administration they indicated to me that the deceased Tyrone Brown went into the dealership, picked out the car, picked out the color, ... and then all of a sudden ... a loan comes out of the bank out of Birmingham, Alabama, and now it is supposedly owned by some company." 7/1/00 Tr. at 16. Cooper also admitted that he told Judge Michalek, "And it's the federal government's position when I spoke to the ...." *Id.* at 21. However, at Parker's trial, in October 1997, when defense counsel

started making allegations about Byrd and Brown's drug dealing, Cooper "indicated to the [Judge Drury] that [he] had *not* talked with anyone from the Drug Enforcement Administration ...." *Id.* at 17 (emphasis supplied). Cooper claimed that he did not recall with whom he spoke at the DEA in July 1997, and that there would not be anything in the District Attorney's file on Parker because that conversation "had to do with ... getting the car back. It had nothing to do with [him] proving the murder." *Id.* at 18, 20–21. Cooper maintained that he had "no recollection" of whom he spoke to from the Government in July 1997. *Id.* at 21, 22, 23.

**\*27** Cooper claimed not to remember that Byrd had testified at Parker's felony hearing or at Parker's trial that he was not a drug dealer, and that he needed to see the transcript. *Id.* at 25–26. Cooper admitted that he did learn, via a memo from evidence tech Streicher, that DEA special agents and task force agents had been present during the search and inventory of the Mercedes Benz. *Id.* at 32–33. Cooper claimed that he did not know what the federal agents' role was in relating to the search of the car, but admitted that he knew they were "interested" in the car. *Id.* at 33–34. Cooper admitted that defense counsel was informing the court, in Cooper's presence, in October 1997 that "the federal authorities, DEA, Task Force agents, are investigating" and that he had specific information about Byrd being involved with drug distribution. Cooper testified that, notwithstanding these factors, it "wasn't [his] concern" because he was trying to get his case ready for trial. *Id.* at 35.

First, Cooper testified that he decided not to contact the people from the DEA he had talked to in July 1997 about the car in regards to the forfeiture proceeding in response to defense counsel's allegations because he "didn't feel it was relevant," "it" being Byrd's alleged drug dealing. *Id.* at 38–39. Cooper then asked why "couldn't [defense counsel] subpoena the federal government for those records if he was aware of them ...." *Id.* at 39. When Parker's motion counsel reminded Cooper that he had "objected to [such a course of action], calling it a fishing expedition, asking the Judge not to issue the subpoenas," *id.* at 39, 41–42, Cooper claimed to have "no specific recollection, but it sound[ed] like something [he] might have done." *Id.*

Cooper testified that he opposed the request was because it was his "understanding that to impeach a witness's credibility you had to have convictions, and if it was an

active ongoing federal investigation, I don't see how it would have been admissible in a state trial if there was no convictions." *Id.* at 42. When pressed on this, Cooper changed his testimony again stating that his objection at trial was based on his belief that the federal government was not "going to reveal an ongoing investigation ...." *Id.* at 44.

Cooper admitted that trial counsel had been making allegations about Brown's drug dealing as early as April 1997, earlier. *Id.* at 45–46, 56–57. Cooper testified at the hearing that it was defense counsel's obligation to investigate this information, but was forced to admit that he objected each time defense counsel brought it up at trial, and that he urged the trial judge not to sign the subpoenas. *Id.* at 48–49, 50–51.

Cooper admitted that he was aware of the procedure for a federal entity to move to quash a subpoena issued by a state court. *Id.* at 52. However, he kept insisting that defense counsel's request was inappropriate and "was late." *Id.* at 51, 53–54. Judge Drury noted that, at trial, Cooper had objected on relevance grounds. *Id.* at 54–55. Cooper then admitted that he understood that defense counsel wanted this information about Byrd and Brown because he "wanted to portray [them] as low lives [sic]. To attack their credibility." *Id.* at 56. However, Cooper maintained that it was not relevant because it was "an ID case," "murder with three eyewitnesses." *Id.* at 56. (Of course, one of the main eyewitnesses' was Byrd, so Cooper could not plausibly argue that his credibility was not relevant.) Cooper later admitted during the hearing that an identification-based case involves credibility. *Id.* at 76.)

 **\*28** Cooper admitted that he was "not aware of any law" that would preclude the trial judge from issuing the subpoena, and acknowledged that defense counsel did not even request a continuance of the trial. *Id.* at 62–63. After re-reading parts of the trial transcript, Cooper admitted that defense counsel had said that he had learned certain information from AUSA Guerra, but was not able to obtain specifics without a subpoena. Cooper admitted that he did not doubt that defense counsel had in fact talked with AUSA Guerra. *Id.* at 69. [15]

Cooper testified that he never attempted to contact anyone in the federal government about defense counsel's allegations regarding Byrd and Brown. *Id.* at 66–67.

He never contacted anyone from the Buffalo Police Department's homicide squad or narcotics squad to determine if they had any relevant information about that. *Id.* He did not ever attempt to ascertain what the wiretaps would have shown. *Id.* at 77–78.

Cooper then tried to explain his failure to contact the U.S. Attorney's office by claiming that "during that time the District Attorney's office and the U.S. Attorney's office was [sic] not getting along." *Id.* Defense counsel asked Cooper if he would be surprised to learn that had Cooper called, both AUSA Guerra and Task Force Agent Rinaldo would have been happy to give him all the information they had about Byrd. *Id.* at 43. Cooper said that he "couldn't answer that" because he never spoke to either of them and that it was his decision not to speak with them. *Id.*

Although he conducted over 600 trials (100 of which were felonies) for the Erie County District Attorney's Office, Cooper testified that he had never read the Supreme Court decision in *Kyles v. Whitley* explaining the prosecution's obligations under *Brady.*

On re-direct, Cooper admitted to subpoenaing and talking with Eddie Fields, who had been with petitioner in the car at the time petitioner was arrested. Motion counsel coincidentally had represented Fields and had been present for the interview. 7/1/00 C .P.L. § 440.10 Tr. at 72. Cooper claimed to have "no recollection" of making a statement to Fields about "[Cooper's] understanding about ... Brown's involvement with drugs." *Id.* at 73. Cooper admitted that it could have happened, however. *Id.* Cooper testified, "Well, it was common sense if you're driving an $85,000 car and you have $20,000 in cash— I mean I'm sure the jury could make the same surmises that I made." *Id.* Cooper agreed that if a person is driving an $85,000 car and did not "have a decent job to pay for the car, certainly" one could "surmise he is a drug dealer." *Id.* at 74. Cooper was reminded that, at the time of the incident, Byrd was only earning $100 a week as a mechanic. *Id.* Based on those circumstances, Cooper admitted, one could "[c]ertainly" surmise that "William Bird [sic] was a drug dealer." *Id.* at 75, 76.

### 3. The Order Denying C.P.L. § 440.10 Relief

 **\*29** Following the evidentiary hearing, the trial court denied relief in a Memorandum Decision and Order dated January 26, 2001 ("the C.P .L. § 440.10 Order"), attached

as an exhibit to Parker's habeas petition (Docket No. 1).
Judge Drury made a number of specific factual findings
and conclusions of law, including the following:

1. The defense motion to vacate pursuant C.P.L. §
440.10 was proper, given that the *Brady* material (i.e.,
the wiretap documents) would not have been part of
the record on appeal.

2. As a matter of both State and Federal law, the People
were not relieved of their obligations to disclose
*Brady* material by the prosecutor's failure to discover
that the police are in possession of exculpatory
information.

3. Despite his belief that Byrd was a drug dealer,
the prosecutor nevertheless argued to the jury that
neither Byrd nor Brown were drug dealers.

4. The prosecutor was not aware of his obligation under
*Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131
L.Ed.2d 490 (1995), to learn about and disclose any
favorable evidence known to the police acting on the
prosecutor's behalf.

5. The prosecutor "turned a blind eye" to defense
counsel's on-the-record assertions that there was a
federal investigation into Byrd and Brown's alleged
drug-trafficking.

6. The prosecutor argued in opposition to the
subpoenas *duces tecum* requested by defense counsel
regarding the DEA investigation, because, among
other things, he did not want his chief eyewitness
impeached on the stand as a major drug dealer.

7. Since a number of Buffalo police officers fully
participated in the DEA Task Force investigation
into Byrd and Brown, and shared information
developed during the investigation with Buffalo
police personnel not part of the Task Force, the
Buffalo Police Department was in constructive
possession of the wiretap information and related
material.

8. Although a different verdict would have been
"possible" had the wiretap documents been disclosed,
it was not "reasonably possible".

9. It was not proper to issue subpoenas for additional
potential *Brady* material requested by defense
counsel during the C.P.L. § 440.10 proceeding

because trial counsel had not made a specific request
for that material.

*See* Order Denying C.P.L. § 440.10 Motion, attached to
Petition (Docket No. 1).

Parker sought leave to appeal to the Appellate Division,
arguing that the trial court erred in denying the C.P.L.
§ 440.10 motion without first ordering a full review
of all information in the prosecution's possession to
determine the existence of *Brady* material; and (2) the trial
court erred in concluding that there was no reasonable
possibility that the *Brady* material uncovered by the
defense subsequent to trial would have resulted in a
different verdict, had the material not been suppressed
by the prosecution. Leave to appeal was denied by the
Appellate Division. Parker then sought permission to
appeal to the New York Court of Appeals, arguing the
two grounds set forth in the preceding paragraph, as well
as claims that (1) C.P.L. §§ 450.10 and 460.15, on their
face and as applied to his case, violated his federal due
process rights in violation of the Fifth and Fourteenth
Amendments of the United States Constitution and
Article I, § 6 of the New York State Constitution; and (2)
C.P.L. §§ 450.10 and 460.15 improperly infringe upon the
Appellate Division's jurisdiction violation of Article VI, §
4(k) of the New York State Constitution. The New York
Court of Appeals dismissed the application.

### F. The Federal Habeas Petition

**\*30** Following the completion of appellate proceedings
with regard to the C.P.L. § 440.10 motion, Parker
filed this federal habeas petition, raising these grounds
for relief: (1) petitioner's rights as guaranteed by the
Fifth and Fourteenth Amendments to the United States
Constitution and *Brady v. Maryland* were violated at
trial (Docket No. 1, Exhibit A); (2) the trial court
violated petitioner's rights as guaranteed by the Fifth
and Fourteenth Amendments and *Brady* when it refused
petitioner's request during the course of the C.P.L.
§ 440.10 proceedings to issue an order, prior to its
decision, directing the state to conduct an inquiry into
the existence of additional *Brady* material (Docket No.
1, Ex. B); (3) *Brady* and *Kyles* required the prosecution
to at least investigate whether his disclosure obligations
were implicated by specific information provided by
defense counsel that the victim and the chief eyewitness
were subjects of a federal law enforcement investigation
involving Buffalo police officers (Docket No. 1, Ex. C);

(4) petitioner's due process rights were violated when the Appellate Division denied leave to appeal the decision of the trial court denying the C.P.L. § 440.10 motion (Docket No. 1, Ex. D); and (5) the prosecutor's misconduct during summation deprived petitioner of his due process right to a fair trial (Docket No. 1, Ex. E).

**G. Byrd's Guilty Plea in Federal Court and the New Item of *Brady* Evidence**

On July 5, 2000 (which happened to be the day before the second day of the C.P.L. § 440.10 hearing), Byrd entered a guilty with regard to the 1998 indictment before Chief District Judge Richard J. Arcara in the District Court for the Western District of New York. He admitted conspiring with numerous individuals, including Brown, to obtain over 150 kilograms of cocaine and 496 grams of cocaine base in the form of crack cocaine from New York City and to bring it back to Buffalo for sale and distribution. Under the federal Sentencing Guidelines, Byrd's sentencing range was calculated to be 135 to 168 months. As part of the plea agreement, the Government indicated that it would move pursuant to U.S.S.G. § 5K1.1 for a four-level downward departure based upon Byrd's "substantial assistance" to the Government in regards to several other investigations being conducted into cocaine-dealing in the Buffalo area; had this been granted, Byrd's sentencing guidelines range would have been reduced 87 to 108 months.

About a year and a half later, on April 17, 2002, the Government filed a motion to be relieved of its obligations under the plea agreement, citing information it had received implicating Byrd in two homicides: the July 31, 1997 homicide of Jerond "Fruit" Reed at Trinidad Park, and the December 12, 1997 homicide of William R. "Goob" Brown. Transcript of Byrd's Sentencing Hearing in United States District Court, dated October 9, 2002 ("10/9/02 Dist. Ct. Tr .") at 4–7. The Government also requested that the District Court apply several sentencing enhancements based upon these allegations, and stated that did not intend to file a "substantial assistance" motion under § 5K1.1, as it had originally planned to do.

**\*31** A five-day hearing was held on October and November 2002, before Chief District Judge Richard J. Arcara in order to resolve the Government's motion. At the hearing, the Government called the following witnesses: Supervisory Special Agent Dale Kasprzyk ("Agent Kasprzyk") of the Drug

Enforcement Administration ("DEA"); Detective Mark Stambach ("Detective Stambach") of the Buffalo Police Department; Detective James Giardina ("Detective Giardina") of the Buffalo Police Department. The Government also called Shawn Jones; Leonard Harrison; and Daawood Naseer, all of whom claimed that Byrd's had admitted, in their presence, to committing one or both of the murders. Naseer also happened to be one of the co-conspirators indicted with Byrd. Byrd did not call any witnesses.

In addition to Byrd's alleged participation in the murders of Fruit Reed and Goob Brown, the witnesses' testimony covered Byrd's involvement in Brown's drug-dealing ring and Brown's homicide. Agent Kasprzyk testified that "Byrd was probably Tyrone Brown's closest confidant," and was "his right-hand man" who "lived on the same street as Brown, and probably spent the most time with Brown, working with [him] ... in the day-to-day management of this ... distribution network." 10/9/02 Tr. at 29–30 *et seq.* [16] Also of particular relevance to Parker's *Brady* claim Agent Kasprzyk's testimony concerning the search of Brown's Mercedes Benz conducted jointly by the Buffalo Police Department and the DEA. According to Agent Kasprzyk, he "actually got a copy of a note" from "Buffalo police detectives" "that was found on the body of Tyrone Brown at the time of his death." *Id.* (The existence of this note was never disclosed at trial or at the C.P.L. § 440.10 hearing.) Agent Kasprzyk explained that the note "had a listing of people that [sic] owed [Brown] money, and it had the various drug customers listed on the note." *Id.* at 36–37 (citing Government Exhibit 51). *Id.* at 37. On the left-hand side of the note was a "variety of initials" which "represent[ed] the identity of various people," and "[t]o the right of each initial [wa]s a number." *Id.* The numbers on the note "represent[ed] money owed to Mr. Brown for cocaine previously provided ... by Mr. Brown[.]" *Id.* at 38. The name "Byrd" was written on the bottom of the note, and Agent Kasprzyzk testified that "[w]ould be William Byrd, otherwise known as Boo Byrd." *Id.* at 40. The amount next to Byrd's name "look[ed] like twenty-five thousand dollars." *Id.* [17]

Parker's habeas counsel, after learning of the note found on Brown's body, brought it to the Court's attention, arguing that it is further crucial exculpatory and impeachment evidence regarding Byrd that was suppressed by the Erie County District Attorney's Office. Respondent has conceded that it is *Brady* material,

stating that "[t]he only evidence that could arguably be considered suppressed—if defense counsel did not have it—is the piece of paper reflecting amounts of money next to various names or initial's including Byrd's." Respondent's Second Supplemental Memorandum of Law dated November 30, 2004 at p. 14. Respondent argues, without elaboration, that "[e]valuated in light of the entire trial record, that paper by itself or when considered with the other evidence brought forth at the state court [C.P.L. § 440.10] hearing does not undermine confidence in the verdict." *Id.* Thus, respondent contends that *Brady* was not violated by the note's non-disclosure because it was not "material" to the verdict.

**\*32** Parker's habeas counsel subsequently obtained an affidavit from Andrew C. LoTempio, Esq., Parker's trial counsel. Attorney LoTempio averred that the note about which Agent Kasprzyk testified at Byrd's hearing "was never disclosed to the defense." Affidavit of Andrew C. LoTempio, Esq. ("LoTempio Aff."), at p. 3, ¶ 17 (attached to Petitioner's Reply Memorandum of Law dated July 27, 2007 ("Pet'r 7/27/07 Reply Mem.") (Docket No. 25). Attorney LoTempio asserts that the note would have had a "huge impact" on the defense case, since the "existence of the note would have given the defense specific information concerning individuals who may have had a motive to kill Brown or to contract for his death." *Id.,* at p. 4, ¶ 19 (Docket No. 25). In addition, counsel states that the suppression of the note "unfairly enhanced the People's case insofar as ADA Cooper was able to argue without restraint that Byrd was not a drug dealer and had no reason to set up a hit on Brown." *Id.,* at p. 4, ¶ 22 (Docket No. 25). Respondent has not submitted any papers in response to the affidavit from Parker's trial counsel.

Based on this Court's review of all the parties' submissions, there does not appear to be any real dispute that the Brown note constitutes *Brady* material. Respondent has stated that the note could "arguably" be considered suppressed if trial counsel did not have it. Trial counsel has affirmed that he did not have the note. Indeed, the Court has reviewed the trial transcript, and it appears to this Court quite plain that trial counsel did not have access to the note. Given trial counsel's arguments to the trial court in his attempts to obtain the other *Brady* material, and his cross-examinations of the prosecution's witnesses, it seems that trial counsel would have made use of the note had he been in possession of it.

That brings the Court to the question of how the note relates to the *Brady* claim that Parker asserted in his original habeas petition. As noted above, the County Court found that the wiretaps and related documents concerning Byrd were "suppressed" within the meaning of *Brady.* Respondent maintains, however, that trial counsel was aware, through his own investigation and off-the-record conversations with individuals working for the federal government, of Byrd's involvement in drug-dealing with Brown. Respondent also argues that even if there was non-disclosure, it had no appreciable effect on the verdict against Parker. The County Court did not have the Brown note before it, because its existence was not revealed during the C.P.L. § 440.10 hearing. As detailed above, the note did not surface until October 2002, during Byrd's sentencing hearing in District Court. Thus, at the time Parker filed his habeas petition in 2002, the existence of the note had not yet come to light. And, of course, the note was not before the County Court when it reviewed Parker's *Brady* claim in 2001 in connection with the post-conviction C.P.L. § 440.10 motion. Consequently, it appears to this Court that Parker has set forth facts regarding, at the least, a new *Brady* violation. Because the note had not been disclosed at the time of the hearing, the County Court was not able to factor the note into its analysis under *Brady* and *Kyles v. Whitley.* As noted above, the County Court found that Parker was "seriously prejudiced" just by the original *Brady* violation (i.e., the wiretaps and related documents as to Byrd's drug dealing). This Court therefore requested in a previous order that the parties to provide "additional briefing regarding how the note affects the *Brady* claim presented to the state courts in the C.P.L. § 440.10 hearing, and asserted in Parker's original habeas petition" and "request[ed] that the parties make certain to address any relevant procedural issues presented by the note."

### III. Exhaustion of State Court Remedies

**\*33** This brings the Court to the well-established requirement that "[b]efore a state prisoner may obtain a writ of habeas corpus from a federal court, the prisoner must exhaust his remedies in state court." *Jimenez v. Walker,* 458 F.3d 130, 148 (2d Cir.2006) (citing 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel,* 526 U.S. 838, 842, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). "The exhaustion requirement 'is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings,' " *id.* (quoting

*Rose v. Lundy,* 455 U.S. 509, 518, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982)). Generally, it " 'is not satisfied unless the federal claim has been "fairly presented" to the state courts,' " *id.* (quoting *Daye v. Attorney Gen'l of N.Y.,* 696 F.2d 186, 191 (2d Cir.1982) (*en banc* )). Section 2254(b)(1) provides that

> (b) (1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court *shall not be granted* unless it appears that—

> (A) the applicant has exhausted the remedies available in the courts of the State;

> or

> (B) (I) there is an absence of available State corrective process; or

> (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1) (emphasis supplied).

Parker filed his habeas application after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 ("AEDPA"). Therefore, AEDPA's revisions to the federal habeas statute, *see* 28 U.S.C. § 2241 *et seq.,* govern this Court's review of his claims. Now AEDPA provides that the "State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." 28 U.S.C. § 2254(b)(3). In a pre-AEDPA case, a habeas court would have easily relied upon respondent's litigation conduct—i.e., its failure to affirmatively raise the failure to exhaust, to find that it had tacitly, but effectively, waived the defense of non-exhaustion. *See, e.g.,* *Granberry v. Greer,* 481 U.S. 129, 107 S.Ct. 1671, 95 L.Ed.2d 119 (1987). "AEDPA does not explain how a state 'expressly waives' the exhaustion requirement, but says only that the state cannot be deemed to have waived the requirement unless it expressly waived the requirement." *D'Ambrosio v. Bagley,* 517 F.3d 489, 495 (6th Cir.2008). Traditionally, "waiver" has been defined as an " 'intentional relinquishment or abandonment of a known right.' " *United States v. Olano,* 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508, (1993) (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)); *accord, e.g., D'Ambrosio,* 517 F.3d at 495.

Respondent has not asserted the defense of non-exhaustion with regard to Parker's *Brady* claim (Ground One) to the extent that it is based on the information concerning the federal drug-trafficking investigation into Byrd and Brown. Nor does respondent contend that Parker's remaining four grounds for relief in the petition are unexhausted. In light of AEDPA's requirement of "express[ ] waive[r]," and the issue of which review standard to apply, the Court made a previous request for additional briefing regarding the *Brady* claim concerning the note, as discussed in the previous section. *See* Order (Docket No. 29); *see also* Docket Nos. 32, 33 & 34 (the parties' responses).

**\*34** In response to this Court's Order to provide additional briefing, respondent for the first time argued that petitioner has failed to exhaust state remedies with regard to any *Brady* claim premised on the note found on the victim's body during the joint DEA–Buffalo Police search of the Mercedes, because he has never presented it in a state-court application for post-conviction relief. *See* Respondent's Memorandum of Law dated January 14, 2009 ("Resp't 1/14/09 Mem.") (Docket No.33). Respondent now contends that Parker's claim regarding the Brown note should not be reviewed unless the state courts have an opportunity to review the *Brady* claim after looking at all of the *Brady* evidence. This Court finds it extremely significant that respondent did not raise the exhaustion defense until after this Court requested additional briefing as to whether Parker's *Brady* argument concerning the note (which was raised in a supplemental memorandum of law) amounted to a new claim.

Petitioner has cited to *Monroe v. Angelone,* 323 F.3d 286(4th Cir.2003), which held that "[w]here a state court has not considered a properly preserved claim on its merits, a federal court must assess the claim de novo." *Id.* at 297 (citing *Daniels v. Lee,* 316 F.3d 477, 487 (4th Cir.2003); *Cargle v. Mullin,* 317 F.3d 1196, 1206 (10th Cir.2003) ("[AEDPA applies only when there is an antecedent state court decision on the same matter.") (cited in Petitioner's January 30, 2009 Memorandum of Law at 3–4 ("Pet'r 1/30/09 Mem.") (Docket No. 34)). These cases do not directly address the exhaustion issue; rather, they deal with question of which standard of review applies, another important issue on which they are directly on point with the present case, as discussed below. In *Monroe,* respondent apparently asserted a procedural

bar to the new *Brady* claim because the petitioner there could not return to state court and exhaust it; in *Daniels,* on the other hand, the state had expressly waived the exhaustion requirement. Thus, in *Monroe,* there was an issue of procedural default.

Here, on the other hand, Parker theoretically could return to County Court and file another C.P.L. § 440.10 motion alleging a *Brady* violation based on the newly-discovered note, and it would not be subject to a procedural bar or statute of limitations under New York state law. *See* N.Y. CRIM. PROC. LAW § 440.10(1)(g) ("At any time after the entry of a judgment, the court in which it was entered may, upon motion of the defendant, vacate such judgment upon the ground that: ... (g) [n]ew evidence has been discovered since the entry of a judgment based upon a verdict of guilty after trial, which could not have been produced by the defendant at the trial even with due diligence on his part and which is of such character as to *create a probability* that had such evidence been received at the trial the verdict would have been more favorable to the defendant; provided that a motion based upon such ground must be made with due diligence after the discovery of such alleged new evidence; or, (h) [t]he judgment was obtained in violation of a right of the defendant under the constitution of this state or of the United States.") (emphasis supplied). Section 440.10(1)(h) would encompass a *Brady* claim, while Section 440.10(1)(g) would include a claim of newly discovered evidence. To succeed on a *Brady* claim, Parker need only demonstrate merely that with the suppressed evidence there is "a 'reasonable probability' of a different result." *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). The standard for reviewing a newly discovered evidence claim under C.P.L. § 440.10(1)(g) includes six requirements: "1. It must be such as will probably change the result if a new trial is granted; 2. It must have been discovered since the trial; 3. It must be such as could have not been discovered before the trial by the exercise of due diligence; 4. It must be material to the issue; 5. It must not be cumulative to the former issue; and, 6. It must not be merely impeaching or contradicting the former evidence.' " *People v. Salemi,* 309 N.Y. 208, 216, 128 N.E.2d 377 (quoting *People v. Priori,* 164 N.Y. 459, 472, 58 N.E. 668)).

**\*35** Because there is some lack of clarity as to which standard would be employed on a return C.P.L. § 440.10(1) motion at this very belated stage in the proceedings, this Court is skeptical as to whether Parker

has "available State corrective process" by which to exhaust the *Brady* claim involving the note. I also believe that given the extraordinary and singular facts of this case, including that the State is the party responsible for wilfully obstructing Parker's ability to obtain the *Brady* evidence in time to present it to the state courts in his C.P.L. § 440.10 motion or direct appeal—as the trial court expressly found in the C.P.L. § 440.10 Order—that even if there were such "State corrective process," "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1). Therefore, I recommend concluding that Parker has fulfilled the exhaustion requirement pursuant to Section 2254(b)(1).

With regard to the remaining claims, exhaustion does not present an issue. Both the Appellate Division and the C.P.L. § 440.10 court considered and discussed the merits of Parker's *Brady* claim based upon the federal wiretap information concerning Brown and Byrd. As to Parker's other four habeas grounds, there is no dispute among the parties that they have been "adjudicated on the merits."

**IV. The Standard of Review Applicable on Federal Habeas**
Because the filing of this petition postdates the enactment of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), AEDPA's revisions of 28 U.S.C. § 2254 govern this proceeding. *See Williams v. Taylor,* 529 U.S. 362, 402, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Under AEDPA, "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was *adjudicated on the merits* in State court proceedings unless the adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1), (2) (emphasis supplied). Both AEDPA and its predecessor statute recognize that a presumption of correctness shall apply to state court findings of fact, *Whitaker v. Meachum,* 123 F.3d 714, 715 n. 1 (2d Cir.1997), and AEDPA now requires a habeas petitioner to rebut that presumption by "clear

and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also* *LanFranco v. Murray,* 313 F.3d 112, 117 (2d Cir.2002). A state court's findings "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller–El v. Cockrell,* 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003).

**\*36** The phrase in 28 U.S.C. § 2254(d)(1), "clearly established Federal law, as determined by the Supreme Court of the United States," limits the law governing a habeas petitioner's claims to the holdings—not *dicta*—of Supreme Court decisions existing at the time of the relevant state-court decision. *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *accord Sevencan v. Herbert,* 342 F.3d 69, 73–74 (2d Cir.2002), *cert. denied,* 540 U.S. 1197, 124 S.Ct. 1453, 158 L.Ed.2d 111 (2004). The Supreme Court has given separate meaning to the phrases "contrary to" and "unreasonable application of" clearly established federal law. 529 U.S. at 413. A state court decision is "contrary to clearly established federal law ... if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Court] has on a set of materially indistinguishable facts." *Id.; accord Harris v. Kuhlmann,* 346 F.3d 330, 342 (2d Cir.2003). A state court decision involves "an unreasonable application of" Supreme Court case law if it "identifies the correct governing legal principle from [the Court's] decisions but unreasonably applies that principle to the particular facts of [a] prisoner's case." *Williams,* 529 U.S. at 413.

The inquiry for a federal habeas court is not whether the state court's application of the governing law was erroneous or incorrect, but rather whether it was "objectively unreasonable." *Id.* at 408–10, 411; *accord, e.g., Eze v. Senkowski,* 321 F.3d 110, 125 (2d Cir.2003). "[A] federal habeas court is not empowered to grant the writ just because, in its independent judgment, it would have decided the federal law question differently. The state court's application must reflect some additional increment of incorrectness such that it may be said to be unreasonable." *Aparicio v. Artuz,* 269 F.3d 78, 94 (2d Cir.2001). However, "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000) (internal quotation marks omitted).

"[A] 'state court adjudicates a state prisoner's federal claim on the merits when it (1) disposes of the claim on the merits, and (2) reduces its disposition to judgment.' " *Jimenez v. Walker,* 458 F.3d 130, 142 (2d Cir.2006) (quoting *Sellan v. Kuhlman,* 261 F.3d 303, 312 (2d Cir.2001) (quotation and alteration marks omitted)). Where a claim has been "adjudicated on the merits," 28 U.S.C. § 2254(d), "deference [is] mandated under AEDPA," *Sellan, 261 F.3d at 310,* in the federal habeas court's review of petitioner's claim. As petitioner has pointed out, "[c]onversely, where a state court has not considered a properly preserved claim on its merits, a federal court must assess the claim *de novo.*" *Monroe v. Angelone,* 323 F.3d 286, 297 (4th Cir.2003). The only claim for which there has not been an "adjudication on the merits" is the aspect of the *Brady* claim pertaining to the note found on the victim's body during the police-DEA search of the vehicle. This is because the existence of the note was not discovered by Parker sometime after October 2002, years after his direct appeal and C.P.L. § 440.10 motion had been decided, and also after his habeas petition already had been filed.

**\*37** In *Monroe,* a Fourth Circuit case directly on point with Parker's in that "certain items of suppressed, exculpatory material first came to light during Monroe's federal habeas proceedings," 323 F.3d at 297, and "[t]he prosecution's late disclosure of the other eight items of exculpatory material ... precluded the state courts from considering those items when they ruled on Monroe's *Brady* claim," *id.* at 298, the Fourth Circuit held "AEDPA's deference requirement does not apply when a claim made on federal habeas review is premised on *Brady* material that has surfaced for the first time during federal habeas proceedings." 323 F.3d at 297 (citing *Rojem v. Gibson,* 245 F.3d 1130, 1140 (10th Cir.2001) (reviewing *Brady* claim de novo when exculpatory material surfaced for first time in federal habeas proceedings); *Williams v. Coyle,* 260 F.3d 684, 706 (6th Cir.2001), *cert. denied,* 536 U.S. 947, 122 S.Ct. 2635, 153 L.Ed.2d 816 (2002) (same); *Cargle,* 317 F.3d at 1206–07 (holding that AEDPA's standard of review does not apply when new issues are considered on federal habeas review); *Daniels,* 316 F.3d at 487 (suggesting that when "evidence on which [a federal claim] is premised was only discovered [after the conclusion of state court proceedings]" "it does not trigger the deference mandate of AEDPA"); *Killian v. Poole,* 282 F.3d 1204, 1208 (9th Cir.2002) ("AEDPA deference does

not apply to [a] claim [when] [e]vidence of the [claim] was adduced only at the hearing before the [federal] magistrate judge.").

The Second Circuit's decision, *Jimenez v. Walker,* 458 F.3d 130, *supra,* does not compel a different conclusion. In *Jimenez,* the Second Circuit stated that "the effect of these rules is to present federal habeas courts with a binary circumstance: we either apply AEDPA deference to review a state court's disposition of a federal claim or refuse to review the claim because of a procedural bar properly raised," "[a]ssuming that the independent state procedural bar is adequate to support the judgment and not excused by a showing of either cause and prejudice or a fundamental miscarriage of justice." 458 F.3d 130, 146 (citing *Messiah,* 435 F.3d at 197 n. 5); *id.* at n. 18 (citing *Coleman,* 501 U.S. at 730; *Harris,* 489 U.S. at 262; *Cotto,* 331 F.3d at 239, 247). The Second Circuit stated that "[t]he middle ground envisioned by *Shih Wei Su,* 335 F.3d at 126 n. 3, does not exist." The "middle ground" in *Shih Wei Su* was the Circuit's statement that "[its] cases seem to contemplate situations in which, because of uncertainty as to what the state courts have held, no procedural bar exists and yet no AEDPA deference is required. But, to decide the instant case, we need not determine whether that indeed is so." *Jimenez* and *Shih Wei Su* did not involve a situation where, as here, the claims as to which there was a question of AEDPA deference had not been submitted to the state courts. Rather, the claims had been pressed before the state courts and there was an issue as to whether the courts had ruled on them on the merits or had relied upon a procedural bar. Here, in contrast, I have recommended finding that the *Brady* claim involving the Brown note has been exhausted by means of Parker fulfilling the statutory criteria set forth in 28 U.S.C. § 2254(b) (1).

**\*38** Even if the Court were to apply the deferential AEDPA review standard to the Brown note, it would reach the same conclusion regarding the *Brady* claim after that evaluation. Furthermore, as discussed further below, this Court believes that Parker's original *Brady* claim, not including the Brown note, more than sufficiently satisfies the AEDPA standard set forth in 28 U.S.C. § 2254(d) so as to warrant habeas relief.

**V. Standard of Review**

Under § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L.

No. 104–132, § 104, 110 Stat. 1214, 1219, a federal court may set aside a state court conviction upon a showing by the petitioner that the state court's adjudication of the merits of his claim "resulted in a decision that ... involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "Under § 2254(d)(1)'s 'unreasonable application' clause, ... a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor,* 529 U.S. 362, 411, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J., for the Court). "Although '[s]ome increment of incorrectness beyond error is required, ... the increment need not be great; otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.' " *Brown v. Alexander,* 543 F.3d 94, 100 (2d Cir.2008) (quoting *Overton v. Newton,* 295 F.3d 270, 275 (2d Cir.2002) (internal quotation marks and citation omitted in original).

**VI. Analysis of the Petition**

**A. Ground One: Petitioner's rights as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and the rule of *Brady v. Maryland* were violated at trial.**

**1. The Prosecution's Duties Under *Brady v. Maryland*—General Legal Principles**

"As long ago as *Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 342, 79 L.Ed. 791 (1935), th[e] Supreme Court made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.' " *Giglio v. United States,* 405 U.S. 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (citing *Pyle v. Kansas,* 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942) (reaffirming *Mooney* )); *accord, e.g., Drake v. Portuondo,* 553 F.3d 230, 240 (2d Cir.2009). " '[T]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.' " *Giglio,* 405 U.S. at 153 (quoting *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)). The next step in the progression of the Supreme Court's jurisprudence on this subject was "*Brady v. Maryland,* 373 U.S. [83,] 87 [ ( 1963 ) ], [which] held that suppression of material

evidence justifies a new trial 'irrespective of the good faith or bad faith of the prosecution." *Giglio,* 405 U.S. at 153–54 (citing American Bar Association, Project on Standards for Criminal Justice, Prosecution Function and the Defense Function § 3.11(a)).

**\*39** In *Brady v. Maryland,* the Supreme Court ruled that a defendant's due process rights are violated if the government suppresses favorable evidence that is material to guilt or punishment, irrespective of the prosecution's good or bad faith. *Brady v. Maryland,* 373 U.S. at 87; *accord, e.g., Strickler v. Greene,* 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *Kyles v. Whitley,* 14 U.S. 419, 433–34 (1995); *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). The *Brady* duty arises regardless of whether or not the defense has made a specific disclosure request. *United States v. Agurs,* 427 U.S. 97, 108–10, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *accord, e.g., United States v. Payne,* 63 F.3d 1200, 1210 (2d Cir.1995).

Thus, "[t]here are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [prosecution], either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *accord, e.g., Douglas,* 225 F.3d at 245. Both exculpatory and impeaching evidence may satisfy the "favorable to the accused" prong. *E.g., Banks v. Dretke,* 540 U.S. 668, 691, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004); *United States v. Payne,* 63 F.3d 1200, 1210 (2d Cir.1995) ("The evidence whose disclosure is required under *Brady* may consist not only of exculpatory evidence but also of impeachment evidence, *see Bagley,* 473 U.S. at 676, 105 S.Ct. at 3380; *Giglio v. United States,* 405 U.S. [150,] 154–55, 92 S.Ct. 763, 31 L.Ed.2d 104 [ ( 1972) ]; *Tate v. Wood,* 963 F.2d 20, 25 (2d Cir.1992), since '[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence ...,' *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 ... (1959).") (alteration and ellipsis in original)).

"Materiality encompasses the notions that the suppressed evidence is favorable to the accused and that he was prejudiced by its suppression." *United States v. Douglas,* 525 F.3d 225, 244 (2d Cir.2008) (citing *Kyles v. Whitley,* 514 U.S. at 434 (1995) (stating that "the constitutional

duty is triggered by the potential impact of favorable but undisclosed evidence"). With regard to assessing materiality, the Supreme Court stated in *Kyles v. Whitley,* "We evaluate the tendency and force of the undisclosed evidence item by item; there is no other way. We evaluate its cumulative effect for purposes of materiality separately and at the end of the discussion ...." 514 U.S. at 437. Accordingly, a reviewing court analyzes whether each of petitioner's individual grounds for relief satisfy the suppression and exculpatory prongs of *Brady;* the court's inquiry ends if an item fails one or both of these elements. Then, the court conducts a cumulative examination of all the items that satisfy the first two prongs to determine whether, taken as a whole, they meet *Brady* 's materiality requirement.

### 2. Analysis of the items of *Brady* material

#### a. The federal wiretap warrants and other documents related to the drug trafficking investigation

##### 1.) "Favorable to the accused"

**\*40** In support of the C.P.L. § 440.10 motion, the defense submitted "applications and orders for federal eavesdropping warrants, indicat[ing] that Mr. Brown and Mr. Byrd were engaged in drug dealing on a major scale in late 1995 and in 1996 and into 1997[,] and that both were being wiretapped by the federal authorities in late 1996 and into 1997." C.P.L. § 440.10 Order at 7–8. For purposes of the C.P.L. § 440.10 motion, Judge Drury narrowed the focus of what constituted *Brady* material to "only the wiretaps of Mr. Byrd and related documents that would be admissible at trial since the information coming from informants and most of the investigation is hearsay and is irrelevant to Mr. Byrd's credibility ." C.P.L. § 440.10 Order at 22.

Judge Drury found that "none of the *Brady* material that has now been disclosed indicates that there is a clear link to anyone else as the shooter of Mr. Brown[,]" and "[t]herefore, the eavesdropping tapes and documents are only relevant to the credibility of Mr. Byrd and not as to the possible motive of anyone else who might be responsible in regard to Mr. Brown's shooting." *Id.* at 23. As Judge Drury noted, impeachment evidence falls within the *Brady* rule. C.P.L. § 440.10 Order at 14 (citing *Bagley,* 473 U.S. at 676. A major part of the defense was to vigorously attack Byrd's credibility by attempting to show that he was involved in large-scale drug-dealing as Brown's

"gofer" or "underboss." The defense attempted to portray the shooting as a coup deposing Brown as the head of the cocaine ring. Clearly, evidence establishing that Byrd was being targeted in a DEA drug investigation was persuasive impeachment material for cross-examination. Parker thus easily satisfies the "favorable to the accused" prong of *Brady.*

### 2.) Whether the wiretap documents were in the prosecution's "possession" and whether they were "suppressed"

The "suppression" prong of *Brady* can be demonstrated in several ways. The Supreme Court in *Kyles v. Whitley* explained that *Brady* material is suppressed where the prosecution (1) introduces testimony that it knows, or should know, is perjury; (2) does not honor a defense request for specific exculpatory evidence; or (3) fails to volunteer exculpatory evidence not requested by the defense, or requested only generally. *Kyles,* 514 U.S. at 433. As Judge Drury correctly noted, suppression of evidence may occur where the state prosecutor has actual possession or knowledge of the evidence and fails to disclose it to the defense. *E.g., United States v. Pena,* 227 F.3d 23, 27 n. 3 (2d Cir.2000) (stating that the obligation to disclose *Brady* material in a pre-sentence report stems from the government's possession of the report). Respondent argues that neither he (nor the real party in interest, the State) should not be charged with having "suppressed" the wiretap documents because he was not in the actual or constructive possession or control of the district attorney's office. Further, respondent claims, the prosecutor did not have actual knowledge of the DEA investigation into Brown and Byrd, and knowledge of the Brown–Byrd drug investigation should not be imputed because the prosecutor, an employee of a state agency, did not possess the documents in question, which were generated by federal agencies (the DEA and U.S. Attorney's Office).

**\*41** However, as Judge Drury pointed out, the Supreme Court has held that the "mandate of *Brady* extends beyond any particular prosecutor's actual knowledge," and, furthermore, even assuming for purposes of this argument that Cooper did not have actual knowledge, which this Court emphatically does not concede, "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." *Kyles,* 514 U.S. at 437; *accord, e.g., Youngblood v. West Virginia,* 547

U.S. 867, 869, 126 S.Ct. 2188, 165 L.Ed.2d 269 (2006) (*per curiam* ). Thus, it is well-settled that suppression of evidence may also occur if the prosecutor has only "constructive knowledge" of the *Brady* material's existence. *United States v. Coppa,* 267 F.3d 132, 140 (2d Cir.2001) ("[A] prosecutor can 'suppress' evidence even if he has acted in good faith and even if the evidence is 'known only to police investigators and not to the prosecutor.' ") (quoting *Kyles v. Whitley,* 514 U.S. at 438)); *see also United States v. Payne,* 63 F.3d at1208 ("The individual prosecutor is presumed to have knowledge of all information gathered in connection with the government's investigation.").

Judge Drury found that AUSA Guerra and Task Force Officer Rinaldo, a "Buffalo police officer detailed to the investigation" of Byrd and Brown, "knew at the time from the investigation, which included the wire taps, that Mr. Brown and Mr. Byrd were involved in the multi-kilo distribution of crack cocaine in the Buffalo area in 1995, 1996 and 1997." *Id.* at 8–9. Furthermore, Judge Drury found, both A.U.S.A. Guerra and Detective Rinaldo "were aware that Mr. Byrd was a close associate or right-hand man of Mr. Brown in his drug dealing activities," and "also knew that on or about April 11, 1997[,] the DEA made a controlled buy of one-half kilo of cocaine from Mr. Byrd." *Id.* at 9. AUSA Guerra had conversations with Parker's trial counsel about another client, Adrian Price, in which "it was more than likely that he [AUSA Guerra] mentioned William Byrd's name to [trial counsel] during that conversation." *Id.* at 11. [18]

"[T]he hearing testimony established that Buffalo Police Detectives Phillip Torre and John Ferby were ... assigned to the federal task force conducting the investigation" into Brown and Byrd. C.P.L. § 440.10 Order at 11. Joint Task Force Officer Rinaldo "shared information from the investigation relating to the activities of Tyrone Brown, William Byrd and others with Buffalo Police Narcotics Detective Lawrence Sadlocha," who, as a result of this, "called ... [Detective] Rinaldo on June 14, 1997 to tell him that Mr. Brown had just been murdered." *Id.* At that time, Detective Rinaldo went to Buffalo Police Headquarters "with other members of the DEA Task Force and talked to Detective James Giardina of the Buffalo Police Homicide Squad with respect to Mr. Brown's role as a large scale cocaine distributor." *Id.* However, according to Detective Rinaldo's testimony, "Detective Giardina already knew of Mr. Brown's drug activities." C.P.L. §

440.10 Order at 9–10. Detective Rinaldo testified "that he became aware [on June 14, 1997] that William Byrd was being interviewed by the Buffalo Police Homicide Squad relative to Mr. Brown's shooting." *Id.* at 10. Although Detective Rinaldo "did not go into specifics with Detective Giardina about the DEA investigation, ... he was willing to share information with him[,]" but "Detective Giardina never contacted him to obtain the information." *Id.* Based upon the testimony offered at the hearing, Judge Drury found that at the time defense counsel began to press for issuance of the subpoenas *duces tecum* in October 1997, Detective Rinaldo "would have shared information about the investigation with members of the Buffalo Police Department or the District Attorney's Office if requested." *Id.* Given the foregoing circumstances in Parker's case, Judge Drury imputed knowledge of the joint state-federal drug investigation to the state prosecutor. [19]

**\*42** Judge Drury found as a fact that former A.D.A. Cooper "was not aware of his obligation under *Kyles v. Whitley* ... to learn about and disclose any favorable evidence known to the police acting for the prosecutor in the investigation." *Id.* at 17–18. Under *Kyles,* "[t]he People ... were not relieved of their obligation to turn over *Brady* material by the prosecutor's failure to discover that the police were in possession of exculpatory information[.]" C.P.L. § 440.10 Order at 14 (citing *People v. Simmons,* 36 N.Y.2d 126, 132, 365 N.Y.S.2d 812, 325 N.E.2d 139; *People v. Wright,* 86 N.Y.2d 591, 598, 635 N.Y.S.2d 136, 658 N.E.2d 1009). Thus, even though Judge Drury found prosecutorial ignorance, Cooper's convenient and very questionable claim of ignorance of the law as set forth in *Kyles* certainly did not relieve his office of constructive knowledge of the obligations set forth in *Kyles,* and it certainly did not relieve Cooper himself of his duty to investigate the existence of and disclose any *Brady* material.

Judge Drury gleaned from the hearing testimony that former A.D.A. Cooper "believed that Mr. Brown [sic] [20] was a drug dealer because he was driving a $85,000.00 Mercedes automobile at the time of his [sic] shooting and did not have a decent enough job to pay for such a car." C.P.L. § 440.10 at 17. Judge Drury further found that "[d]espite this fact, Mr. Cooper still argued to the jury on summation that Mr. Brown [sic] was not a drug dealer." *Id.* As noted above, Judge Drury "determine[d] that when confronted with evidence of the Brown–Byrd drug investigation [the prosecutor] turned a blind eye to

these allegations and never asked either the Buffalo Police or the federal authorities about these claims in attempt to verify them." *Id.*

Judge Drury determined that the prosecutor's "inaction would not be an issue as long as there was no Buffalo Police involvement in the Brown–Byrd drug investigation." *Id.* (citing *People v. Rodriguez,* (to be deemed *Brady/Rosario* material, the material must be within the possession, custody or control of the People, and when it is not, the rule of *Brady* is not violated). Thus, Judge Drury stated, "[u]nless the federal authorities were part of the state 'law enforcement chain' or unless there was close cooperation between the state and federal prosecutors in their investigation such as to warrant a finding of control or agency, knowledge of the federal investigators will not be imputed to the members of the state agency[.]" C.P.L. § 440.10 Order at 19 (citing *People v. Kronberg,* 243 A.D.2d 132, 152, 672 N.Y.S.2d 63 (declining to apply a theory of constructive possession to witnesses' statements in possession of other City or State agencies not directly in control of the prosecutor or the police).

District courts in this Circuit have observed that " 'the exact point at which government agents can fairly be categorized as acting on behalf of the prosecution, thus requiring the prosecutor to seek out any exculpatory or impeachment evidence in their possession, is uncertain.' " *United States v. Bin Laden,* 397 F.Supp.2d 465, 481 (S.D.N.Y.2005) (quoting *Chandras v. McGinnis,* No. 01 Civ. 2519(LBS), 2002 WL 31946711, at \*7 (E.D.N.Y. Nov.13, 2002) and citing *United States v. Zagari,* 111 F.3d 307, 320 n. 13 (2d Cir.1997) ("The extent to which knowledge may be imputed from one federal investigative agency to another for *Brady* purposes is as yet unclear.")). "[C]ourts, including the Supreme Court, have imputed knowledge of *Brady* material to prosecutors when the evidence is known only to prosecutorial personnel (including fellow prosecutors in the same office) or government agents investigating the particular case." *Chandras,* 2002 WL 31946711, at \*7 (citing *Kyles,* 514 U.S. at 438 (police investigator); *Giglio,* 405 U.S. at 154 (fellow prosecutor); *United States v. Thornton,* 1 F.3d 149, (3d Cir.1993) (Drug Enforcement Administration agents); *Morell,* 524 F.2d at 554–55 (Federal Bureau of Investigation agent supervising confidential informant); *Pennsylvania v. Ritchie,* 480 U.S. 39, 57, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) (assuming, *sub silentio,*

2009 WL 2971575

that a state prosecutor had constructive knowledge of information in state child services division's investigative files; assuming without discussion that state prosecutor's office had imputed knowledge of information available to state child services division's investigative officers, even though prosecutor had no actual knowledge of information). In addition, a number of courts have found that prosecutors "suppressed" evidence "by failing to search for background information, such as a witness's criminal history, that is readily available through routine investigation of the prosecution's files or the files of other government agencies." *Chandras,* 2002 WL 31946711, at *7 (citing *Crivins v. Roth,* 172 F.3d 991, 997–98 (7th Cir.1999); *Hollman v. Wilson,* 158 F.3d 177, 181 (3d Cir.1998); *United States v. Brooks,* 966 F.2d 1500, 1502 (D.C.Cir.1992); *United States v. Auten,* 632 F.2d 478, 481 (5th Cir.1980); *United States v. Coppa,* 267 F.3d at 140 (interpreting *Kyles* to require the Government actively to seek *Brady* material "in its files and in the files of related agencies reasonably expected to have possession of such information")).

**\*43** However, "knowledge on the part of persons employed by a different office of the government does not in *all* instances warrant the imputation of knowledge to the prosecutor, for the imposition of an *unlimited* duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt 'a monolithic view of government' that would 'condemn the prosecution of criminal cases to a state of paralysis.' " *United States v. Avellino,* 136 F.3d 249, 255 (2d Cir.1998) (emphases supplied) (quoting *United States v. Gambino,* 835 F.Supp. 74, 95 (E.D.N.Y.1993) (declining to "apply *Giglio* to impute the knowledge of an FBI agent and state district attorney to the federal prosecutors in an unrelated case four years later"), *aff'd,* 59 F.3d 353 (2d Cir.1995), *cert. denied,* 517 U.S. 1187, 116 S.Ct. 1671, 134 L.Ed.2d 776 (1996)).

Judge Drury found as a fact that "Buffalo police officers were directly involved through their full participation in the DEA task force in the investigation of Mr. Brown and Mr. Byrd for cocaine trafficking and the information obtained from this investigation was conveyed to detectives in the Buffalo Police Homicide Squad ...." C.P.L. § 440.10 Order at 19. According to Judge Drury, the "record [was] clear that shortly after the shooting of Mr. Brown, Detective Giardina of the

Buffalo Homicide Squad was told or already knew that Mr. Brown and Mr. Byrd were engaged in a large scale cocaine distribution operation in the Buffalo area." *Id.* at 19–20. Furthermore, Judge Drury specifically found that "the Buffalo Police were in constructive possession of the wire tap and related material," that is, the *Brady* material at issue, "given the participation of Buffalo police officers [i.e., Detectives Rinaldo, Torre, and Ferby] in the federal wire tapping and drug investigation," and their "sharing of information with Buffalo police personnel [i.e., Detectives Sadlocha and Giardina] who where not part of the task force[.]" C.P.L. § 440.10 Order at 19–20. Therefore, Judge Drury determined, "given the specific requests made [by the defense] for this information (although made to the trial court) and the bases given for such a request, the People are charged with providing the information that an inquiry by the prosecutor to the Buffalo Police would have provided." *Id.* at 20. Even if the prosecutor could have at one time claimed actual ignorance, he could not do so after trial counsel brought up the matter several times in open court. Judge Drury found that defense counsel's "request for *Brady* material ... was made to the court and not the prosecution" in that defense counsel "requested that the court sign subpoenas to compel a federal prosecutor and a federal investigator to produce documents and wire taps ...." *Id.* at 15. In short, the Erie County District Attorney's office was deemed to have constructive possession of the wiretap material, and knowledge of the federal investigation into Byrd and Brown's drug-dealing was imputed to the prosecutor handling Parker's case.

**\*44** I find it significant that *Kyles* rejected the compartmentalized, "hear no evil, see no evil, speak no evil" approach urged by the prosecution here. In *Kyles,* the state "suggested below that it should not be held accountable under *Bagley* and *Brady* for evidence known only to police investigators and not to the prosecutor" but the Supreme Court disagreed, holding that "[t]o accommodate the State in this manner would, however, amount to a serious change of course from the *Brady* line of cases." Although it could not be doubted that "police investigators sometimes fail to inform a prosecutor of all they know," "neither is there any serious doubt that 'procedures and regulations can be established to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it.' " *Id.* (quoting *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)).

2009 WL 2971575

"Since, then, the prosecutor has the means to discharge the government's *Brady* responsibility if he will, any argument for excusing a prosecutor from disclosing what he does not happen to know about, boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials." *Id. Kyles* makes clear that this is not to be countenanced. Faced with the state's complaints about having to make difficult judgments about disclosure, the court in *Kyles* stated that, "naturally, ... a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence," *id.* at 440 (citation omitted), which was "as it should be" given the prosecutor's position as " 'the representative ... of a sovereignty ... whose interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done [.]' " *id.* (quoting *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)).

I agree with Judge Drury's factual findings regarding defense counsel's specific *Brady* demands. As Judge Drury noted, the defense demanded *Brady* material well before trial commenced in October 1997. In August 1997, defense counsel specifically put the prosecutor and the trial court on notice of the possible existence of federal documents related to the wiretapping of Byrd and Brown. The prosecutor on the record denied any knowledge of a federal investigation into Byrd and Brown, and never took any steps to follow-up on defense counsel's representations. Indeed, the prosecutor aggressively tried to prevent the defense from obtaining the information through subpoenas or calling federal witnesses from the DEA and United States Attorney's Office said to be knowledgeable of the investigation. Judge Drury recounted former A.D.A. Cooper's stated reasons for opposing the subpoenas, and noted that "frankly, ... [the prosecutor] did not want one of his chief witnesses impeached on the stand as a major drug dealer." *Id.* at 18. Furthermore, Judge Drury "determine[d] that when confronted with evidence of the Brown–Byrd drug investigation [the prosecutor] turned a blind eye to these allegations and never asked either the Buffalo Police or the federal authorities about these claims in attempt to verify them." *Id.* I concur in this finding, and believe that this was an intentional and egregious hide-the-ball strategy on the part of A.D.A. Cooper. Where the government's suppression of evidence amounts to a denial of due process, the prosecutor's good faith or lack of bad faith is irrelevant. *Kyles,* 514 U.S. at 437–38; *Youngblood,* 547

U.S. at 870. Here, however, the disturbing and inescapable conclusion is that the state prosecutor here wilfully and actively thwarted the defense from obtaining information concerning Byrd and Brown's drug-dealing.

**\*45** After finding constructive possession and imputation of knowledge to the state prosecutor, Judge Drury turned to the defense request for subpoenas. Judge Drury noted that it "was not within the court's power to honor since '[s]tate courts are without authority to compel production of such files without the Federal Government's consent." *People v. Rodriguez,* 155 A.D.2d 257, 259, 545 N.Y.S.2d 861 (App.Div. 1st Dept.1989) (citing *Touhy v. Regan,* 340 U.S. 462, 468, 71 S.Ct. 416, 95 L.Ed. 417 (1951)). Judge Drury stated that subpoenas were "not the proper avenue to obtain the production of the evidence that was requested" because "the federal government would have ... moved to quash the subpoenas" given that the investigation into Brown and Byrd "was still proceeding at the time of the trial, and disclosure of the wire taps would have impacted [sic] on it." C.P.L. § 440.10 Order at 15. "[T]he question arises as to whether the People can be obligated to provide discovery material, such as wire taps and related documents, which are in the possession of the federal government, which won't disclose them." C.P.L. § 440.10 Order at 20 (citing testimony of AUSA Guerra that disclosure of the wire taps would have affected the ongoing investigation into Byrd's drug-dealing activities). Judge Drury did not answer this question but went on to state that "the Defendant's right to a fair trial includes the disclosure by the prosecution of all favorable information in its possession, and probably includes the disclosure of any such information that would be in its possession within a reasonable time in the future." *Id.* Judge Drury commented, "Assuming that the trial could have been delayed until the material was available or that the federal authorities would have agreed to provide the material, what then? The question then is, is the information material in the context of the trial that has been conducted." *Id.* at 21.

At this juncture, I wish to point out that the sovereign immunity issue presented by the subpoena request should not obscure the prosecution's shirking of its *Brady* duty to discover favorable information in this case. Although there were legal impediments to production of the federal wiretap documents, the prosecutor nevertheless was on notice of defense counsel's specific disclosure request for them. Even assuming, *arguendo,* that the prosecutor

2009 WL 2971575

would not have been able to obtain copies of the wiretap documents while the Byrd–Brown investigation was still underway, the prosecutor at the very least should have, and easily could have, verified the information that these documents reflected—i.e., the prosecution's chief eyewitness was a major drug dealer under surveillance by the DEA—by speaking with any one of a number of members of the Buffalo Police Department.

I now turn to the final issue concerning "suppression" of the wiretap documents. Respondent disputes Judge Drury's finding of "suppression" by arguing that the information was not truly "suppressed" because trial counsel had learned about the federal investigation of Byrd and Brown through other sources. *See* C.P.L. § 440.10 Order at 22. Respondent also asserts the "defense could have called the various federal officers as witnesses and chose not to do this." *Id.* at 22–23. However, Judge Drury rejected these arguments, acknowledging that he had "precluded the defense from calling these people as witnesses" prior to trial. *Id.* at 23.

 **\*46** It is true that " '[e]vidence is not "suppressed" if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence.' " *Leka v. Portuondo,* 257 F.3d 89, 100 (2d Cir.2001) (holding that the eyewitness evidence of an off-duty police officer who observed the incident from the second-floor window of his apartment, was favorable to the defense because it would have been inconsistent in important respects with the testimony of the two eyewitnesses at trial; that the prosecution failed to disclose the testimony, and for a critical time actively suppressed it; and that "the potency of such testimony" by a former policeman on behalf of the defense would have been material, "particularly in a case in which the jury was initially deadlocked"; reversing the district court's denial of relief and remand for the entry of judgment conditionally granting a writ of habeas corpus and ordering petitioner's release unless the State provides him a new trial within 90 days) (quoting *United States v. LeRoy,* 687 F.2d 610, 618 (2d Cir.1982); *accord, e.g., Douglas,* 225 F.3d at 245.

Judge Drury found that trial counsel "was able to skillfully cross-examine Mr. Byrd as to his drug background and the incongruity of a $600.00 a month laborer driving an $85,000.00 Mercedes" and the $20,000 in cash that mysteriously disappeared from the victim's van after the

shooting. C.P.L. § 440.10 Order at 6, 7 (noting that defense counsel "did cross-examine Mr. Byrd extensively, implying that he was a drug dealer but without the use of the material sought in the sbubpoenas"). The only question to which Judge Drury sustained an objection was when defense counsel asked Byrd if he was aware that Brown was being investigated by the DEA. *Id.* Judge Drury noted that when defense counsel asked Byrd if he was being investigated, he responded, "Not that I know of." *Id.* (citing T.282). Because the subpoenas had not been signed, the wiretap applications and orders sought therein were not available to defense counsel, so he had no means of impeaching Byrd and was bound by his answer. I note that A.D.A. Cooper failed to call attention to what he reasonably should have known was Byrd's perjury.

Significantly, Judge Drury found that although defense counsel "was able to argue to the jury that Mr. Brown's killing was a drug hit, and that the eyewitnesses were part of a plan to make his client 'the fallguy' ", the defense "was *seriously prejudiced* by being deprived of the very strong proof that the eavesdropping tapes would have furnished that Mr. Brown and Mr. Byrd were major drug dealers." C.P.L. § 440.10 Order 22. This left the prosecutor "free to argue in his summation that there was no proof that either William Byrd or Tyrone Brown were drug dealers," *id.* at 22, or that Brown's slaying was a gangland type hit," *id.* at 7. Indeed, the prosecutor repeatedly called the defense argument "absurd," *id.* at 7. Cooper affirmatively argued that Byrd was not a drug dealer even though, as he testified at the hearing, he believed the opposite to be true since Byrd did not have a decent enough job to pay for the $85,000.00 Mercedes–Benz automobile he was driving. *Id.* at 22; *see also* 7/1/00 C.P.L. § 440.10 Tr. at 73–75.

 **\*47** Respondent's argument, relying on cases such as *United States v. Zagari,* 111 F.3d 307 (2d Cir.1997), that evidence is not "suppressed" when the defense knows of the essential facts regarding the exculpatory evidence and is able to take advantage of such, would have more force were it not for the shocking misconduct of the prosecutor here in thwarting defense counsel's attempts to obtain the *Brady* material on his own. Furthermore, here the wiretap documents were not a part of the public record and were, in fact, confidential. Moreover, this is certainly not a case where defense counsel failed to obtain them because of lack of diligence. *Cf. Zagari,* 111 F.3d 307 ("*Brady* cannot be violated if the defendants had actual knowledge of the relevant information or if the documents are part of

public records and 'defense counsel should know of them and fails to obtain them because of lack of diligence in his own investigation.' *Payne,* 63 F.3d at 1208 (citing *United States v. Bermudez,* 526 F.2d 89, 100 (2d Cir.1975) (state investigative files were available to defense with the exercise of due diligence)). It is true that defense counsel somehow had gained independent knowledge regarding the federal investigation into Byrd, but he was not able to take full advantage of it. Indeed, the trial court found that trial counsel was "seriously prejudiced" by not having more evidence to back up his accusations against Byrd.

For respondent to argue (as A.D.A. Cooper attempted to do in his testimony at the hearing ordered by Judge Drury) that it was defense counsel's fault for not obtaining the *Brady* information, shows unspeakable gall. The prosecutor tried every way imaginable to prevent the defense from confirming that Byrd was a major drug dealer or obtaining usable impeachment information from the DEA or U .S. Attorney's Office. The prosecutor derided the request for subpoenas as a "fishing expedition" and characterized Byrd's alleged drug-dealing activity as a "collateral mess." He vigorously argued that the trial court should not sign the subpoenas and wilfully failed to follow-up on any of the leads that defense counsel had provided by, such as, instance, talking to any of the detectives in the Buffalo homicide bureau. Unfortunately, the trial court accepted the prosecutor's arguments at time of trial. It was not until after the trial, and after the C.P.L. § 440.10 hearing, that Judge Drury acknowledged that defense counsel had offered substantial information to support his claims about Byrd and Brown's drug dealing. I note that the Supreme Court has stated that a defendant is not required to "scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed." *Banks v. Dretke,* 540 U.S. at 695.

It is clear from Judge Drury's C.P.L. § 440.10 Order that he denied Parker's *Brady* claim solely on the basis that he had failed to meet the "materiality" component. Thus, although Judge Drury did not separately address the "suppression" prong, I find that his decision must be read as implicitly finding that the material was suppressed. Under the facts presented here, this Court has no trouble concluding that the wiretap documents concerning the investigation into Byrd and Brown were "suppressed" for purposes of *Brady.*

### 3.) Materiality

**\*48** Although Judge Drury found that the defense was *"seriously prejudiced* by being deprived of the very strong proof that the eavesdropping tapes would have furnished that Mr. Brown and Mr. Byrd were major drug dealers," he nevertheless inexplicably concluded that the this *Brady* evidence was not "material" for *Brady* purposes. *See* C.P.L. § 440.10 at 22–23 (emphasis supplied) (Docket No. 1). For the following reasons, I cannot agree, and I conclude that non-disclosure of this material has seriously undermined my confidence in the outcome of Parker's trial. Thus, I conclude that the information was "material," and Parker has demonstrated a true *Brady* violation. After all, it is illogical to conclude on the one hand that the defense was seriously prejudiced by being improperly deprived of certain evidence, and on the other hand to say that the very same evidence is not material. The fact that petitioner was seriously prejudiced by being deprived of the evidence, validates its materiality. Because the prosecution's case hinged so heavily on Byrd's identification of Parker as the shooter, I cannot in good conscience find that the verdict is worthy of confidence when the omitted *Brady* material is taken into account.

In his discussion on "materiality," and during his remarks at the sentencing hearing, Judge Drury pointedly noted that the prosecution's case against Parker was less than overwhelming.

> While there were discrepancies between the testimony and descriptions furnished by the witnesses to the shooting, eye witnesses and otherwise, this does not obscure the fact that Mr. Byrd was only one of the three eye witnesses to the shooting. The other two were not connected in any way to him. [21] If the witnesses to the shooting were the extent of the People's proof, this court may well be prepared to find that there was a reasonable possibility that the verdict would have been otherwise if the *Brady* material relative to the cross-examination of one of

the witnesses [i.e., Byrd] had been available.

C.P.L. § 440.10 Order at 25. This Court has reviewed the record in its entirety and does not find the other two eyewitnesses (Hill and Hollis) who, in addition to Byrd, claimed to be able to identify Parker as the shooter, to have substantially buttressed the prosecution's case. Neither of them came across as particularly reliable or credible. Defense counsel's cross-examination of both of them exposed significant weaknesses. Apparently, Judge Drury agreed with this, for he observed that "[i]f the witnesses to the shooting were the extent of the People's proof, this court may well be prepared to find that there was a reasonable possibility" of a different result.

This Court is also constrained to disagree with the extremely heavy emphasis placed by Judge Drury on the testimony that Parker and one of his associates, "Goobie," allegedly bribed Johnson and Hill not to testify at trial. Judge Drury found the rebuttal testimony offered by Hill's girlfriend, Johnson, to be persuasive and substantial evidence of Parker's guilt.

*49 However, the last thing the jury heard was the rebuttal testimony of [Johnson,] the girlfriend of [Hill,] one of the eye witnesses who testified that an associate of the Defendant [i.e., Goobie] had bribed her with thousands of dollars to commit perjury and that the Defendant and the associate had bribed her boyfriend with thousands of dollars not to testify. The jury was told by defense counsel that she was supposed to be his witness, and that she had been expected to testify that her boyfriend was too drunk to make the observation about which he testified ( [T.]724 & 725).

[Glenda Johnson's] testimony and her appearance in court was the most devastating blow to a party's case this court has ever witnessed in its years involved in trials. Defense counsel on cross-examination concentrated on the statement he took from her in his office in part to distance himself from the bribes and to preserve his own credibility[, asking] "Are you suggesting that I did something underhanded?" ( [T.]728). [Counsel stated,] "I was being nice to you when I was talking to you ...." ( [T.]735). The woman was highly credible when she testified that she paid bills with the bribe money and when she

related what her boyfriend had spent his money on. The Defendant was on bail up to this moment and the prosecutor in summation was able to remind the jury that the bribe occurred on a day when the court was in recess and the Defendant was free to go about his business. The prosecutor was able to point out that Debrien [sic] Hill, the boyfriend, did not appear and testify with the other eye witnesses because that was the day after he was bribed. The prosecutor stated that he [i.e., Hill] only testified at the very end of the case after the court had told the jury that there was another witness for whom the People were still looking. In other words, the jury was able to relate to events that harmonized with the testimony concerning the bribes.

This incident was a strong indication of the Defendant's guilt and could not be explained or countered by the defense at trial. It was so telling and inexplicable that it was never mentioned by the defense in any of its eight submissions relative to the instant motion.

Given this turn of events at the very end of the trial, this court concludes that even if the eavesdropping tapes and materials had been available for the defense to use to cross-examine Mr. Byrd relative to his drug trafficking activities with Mr. Brown, that, while a different verdict would have been possible, it would not have been reasonably possible.

C.P.L. § 440.10 Order at 25–26. Upon this Court's review of the transcript, it cannot agree that Johnson's testimony struck a "devastating blow" to the defense case. Furthermore, this Court disagrees with the state court's description of the incident as "so telling and inexplicable .... " Johnson did come across as frightened and intimidated-but it seemed just as likely that she was scared of her boyfriend, Hill. The defense's cross-examination of Hill was scathing, exposing serious credibility issues and character flaws. For instance, when questioned as to whether he had "slapped" Johnson around, Hill preferred the term "strangled." Hill, if not technically an alcoholic, certainly had a troubling drinking problem. Defense counsel pointed out that Johnson had come into his office on Monday, while Hill was in jail for beating her up the Friday before. Defense counsel also noted that it was not until after Hill was released from jail that Johnson recanted her statement to trial counsel. These circumstances could have led the jury to conclude that the alleged bribery incident was a fabrication induced by her fear of Hill.

**\*50** This Court also disagrees that the alleged bribery incident "was a *strong* indication of the Defendant's guilt ...." C.P.L. § 440.10 Order at 26 (emphasis supplied). Rather, state courts in New York have found that as a matter of state evidentiary law, that type of evidence merely " 'has some tendency to prove a consciousness of guilt ....' " *People v. Whaley,* 144 A.D.2d 510, 510, 534 N.Y.S.2d 201, 202 (N.Y.App.Div.2d Dept.1988) (holding that the trial court did not err in permitting the complainant to testify that the defendant attempted to induce him to drop the criminal charges during a conversation several months prior to trial) (quoting *People v. Griffin,* 126 A.D.2d 743, 744, 511 N.Y.S.2d 136 (2d Dept.1987); citing *People v. Shilitano,* 218 N.Y. 161, 179, 112 N.E. 733, 739 (N.Y.1916) ("The action of the defendant's brother and his attorney in dealing with the witnesses is indicative of an effort to coerce witnesses and suppress evidence against the defendant. That such efforts *may have some tendency* to prove a consciousness of guilt seems to be a fair deduction, and therefore they were properly received in evidence.") (emphasis supplied). As several courts in New York have stated, "Evidence of consciousness of guilt, while weak, is admissible[.]" *People v. Reyes,* 162 A.D.2d (*People v. Ali,* 146 A.D.2d 636, 638, 536 N.Y.S.2d 541).

As a matter of Federal evidentiary law, "[e]vidence of a party's consciousness of guilt *may* be relevant if reasonable inferences can be drawn from it and if the evidence is probative of guilt." *United States v. Perez,* 387 F.3d 201, 209 (2d Cir.2004) (emphasis supplied) (citing 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 401.08 (2d ed.1997). "Such evidence is admissible if the court (1) determines that the evidence is offered for a purpose other than to prove the defendant's bad character or criminal propensity, (2) decides that the evidence is relevant and satisfies Rule 403, and (3) provides an appropriate instruction to the jury as to the limited purposes for which the evidence is introduced, if a limiting instruction is requested." *Id.* (citing *United States v. Mickens,* 926 F.2d 1323, 1328–29 (2d Cir.1991) (holding that testimony about defendant's hand gesture in shape of a gun "was relevant since an effort to intimidate a key prosecution witness was probative of Mickens' state of mind"). The Second Circuit has held that "proof of defendant's flight after a charged crime occurred may be admissible even though that evidence might be subject to *varying interpretations.*" *Id.* (citing *United States v. Ayala,*

307 F.2d 574, 576 (2d Cir .1962)). "While falsehoods told by a defendant in hope of evading prosecution are not themselves sufficient evidence on which to base a conviction, such falsehoods may strengthen an inference of guilt supplied by other evidence." *Perez,* 387 F.3d at 209 (citing *United States v. Glenn,* 312 F.3d 58, 69 (2d Cir.2002); *United States v. Johnson,* 513 F.2d 819, 824 (2d Cir.1975)). "[A]lthough evidence of after-the-fact consciousness of guilt may have independent probative force, and may strengthen inferences supplied by other pieces of evidence, such evidence is 'insufficient proof on which to convict where other evidence of guilt is weak and the evidence before the court is as hospitable to an interpretation consistent with the defendant's innocence as it is to the Government's theory of guilt.' " *United States v. Cassese,* 428 F.3d 92, 101 (2d Cir.2005) (quoting *United States v. Johnson,* 513 F.2d 819, 824 (2d Cir.1975); citing *United States v. Glenn,* 312 F.3d 58, 69 (2d Cir.2002); *United States v. Scheibel,* 870 F.2d 818, 822 (2d Cir.1989)).

**\*51** Thus, given the circumstances of Johnson's testimony and her demeanor and her inconsistent testimony, this Court finds that it is highly questionable whether her testimony about the bribery incident was even true. Moreover, Judge Drury gave a very one-sided picture of Johnson's testimony, neglecting to mention that Johnson was afraid of Hill, who previously had beaten her up and threatened her. The court also did not mention that Johnson's change-of-heart occurred just when Hill was released from jail, after being arrested for assaulting her. It certainly strikes this Court as curious that Johnson coincidentally changed her mind about testifying that her boyfriend had been drunk and had lied about his observations of shooting after said abusive boyfriend was no longer behind bars. Furthermore, the trial judge failed to mention that Johnson admitted to defense counsel, on cross-examination, that she had told him, just before getting on the stand at trial, that she was scared and that was why she was recanting her prior statement regarding Hill's drunkenness and inability to actually see the shooting.

That said, I believe that the state court assigned far too much importance to the bribery incident as substantive evidence that Parker was the shooter. Rather, the evidence "might be subject to varying interpretations," *Perez,* 387 F.3d at 209. For instance, accepting that Parker sought to bribe witnesses should not lead inescapably to the conclusion that he was guilty of murdering Brown.

Another logical inference could be that petitioner was charged mistakenly. Wanting to avoid conviction, he set out to influence the witnesses in an attempt—albeit an improper one—to tip the scales in his favor.

Finally, in my opinion, state court ascribed too much importance to the fact that the bribery incident "was not mentioned by the defense in any of its eight submissions" relating to the C.P.L. § 440.10 motion. The defense's purpose in bringing the C.P.L. § 440.10 application was assert a *Brady* challenge; to the extent the bribery incident was relevant, it was for the state to raise it in the context of its materiality argument, which it. The alleged bribery incident obviously was not favorable to the defense, and it would seem that as a matter of litigation strategy, no purpose would be served in highlighting it.

Thus, although the alleged bribery incident was damaging to the defense, I agree with petitioner that the Judge Drury placed far too much emphasis on it, especially in light of his other, contradictory comments regarding the relative weakness of the prosecution's eyewitness proof and his belief that the defense was *"seriously prejudiced* by being deprived of the very strong proof that the eavesdropping tapes would have furnished that Mr. Brown and Mr. Byrd were major drug dealers." *See* C.P.L. § 440.10 at 22–23 (emphasis supplied). Despite the "serious prejudice" occasioned by the suppression of the wiretap evidence, Judge Drury nevertheless concluded that it was not "material" for *Brady* purposes. Judge Drury stated that a different result "would have been possible," but "it would not have been reasonably possible." I find this conclusion puzzling and internally inconsistent; indeed, I find that it bears that increment of incorrectness beyond error so as to make it an unreasonable application of the Supreme Court's definition of "materiality" as explicated in *Brady v. Maryland* and *Kyles v. Whitley.* [22] I agree with petitioner that there is a logical inconsistency between finding, on the one hand, that the defense was "'seriously prejudiced' by the non-disclosure of exculpatory information which would have allowed him to establish a central theme of the defense," while at the same time concluding that "there is no reasonable possibility or reasonable probability that the verdict would have been different had this suppressed information been disclosed." Pet'r Ex. A at 36 (Docket No. 1).

**\*52** Looking at the materiality issue from a somewhat different angle, the state's protestations about the

insignificance of the wiretap information are belied by the fact that the prosecutor "turned a blind eye" to sources of highly impeaching information about his chief witness and actively sought to prevent defense counsel from obtaining this information. As petitioner argues, the prosecutor presumably would not have fought so hard to keep the material "suppressed" if had not "had a *bona fide* fear that the impact of such information [about Byrd] could affect the outcome of the trial." Petition, Exhibit A at 36 (Docket No. 1). As discussed above, because the prosecution's case hinged so heavily on Byrd's identification of Parker as the shooter, I cannot in good conscience find that the verdict is still worthy of confidence when the omitted *Brady* material is taken into account. After reviewing the file in its entirety, the non-disclosure here severely undermines my confidence in the outcome of Parker's trial. Thus, I recommend concluding that the wiretap information was "material," and Parker has demonstrated a true *Brady* violation.

### b. The note found on the Brown's body

#### 1.) Whether the note was favorable to the accused

Based on this Court's review of all the parties' submissions, there does not appear to be any real dispute that the Brown note constitutes *Brady* material. Turning to the "favorable to the accused" prong, it seems equally clear that the note was potent exculpatory and impeachment material. A DEA agent testified that the note lists Byrd as having an outstanding debt in the amount of $25,000 to the deceased. There should be no doubt in the reasonable person's mind at this point in time that, as petitioner points out, "Byrd was, contrary to his sworn testimony, a high level cocaine trafficker with a significant debt owed to Tyrone Brown" for drugs Byrd had purchased from Brown. Pet'r 1/30/09 Reply Mem. at 5 (Docket No. 34). This Court agrees that "Byrd had a motive as well as the means to benefit from the death of Tyrone Brown, Byrd's drug boss, and to ultimately gain control of Brown's drug empire." *Id* . While it was not unreasonable to argue, as the Government did at Byrd's sentencing hearing in federal court, that Byrd stood to lose by Brown's death because he lost his supplier and his way to make money, it would have been even more plausible for the Government to have argued—and as defense counsel did argue—that Byrd stood to gain by inheriting the drug business and ridding himself of a $25,000 debt at the same time. However, the prosecutor at Parker's trial hardly wanted to argue that Byrd had no motive to kill his

Case 9:16-cv-01458-DNH-CFH    Document 31    Filed 05/13/19    Page 122 of 134
Parker v. Herbert, Not Reported in F.Supp.2d (2009)
2009 WL 2971575

cousin because he needed him around as a drug source. That would necessitate portraying Byrd as at least a drug user, which would blemish his credibility. Rather, the prosecutor wanted to—and did—argue that Byrd was just an innocent bystander who held his dying cousin in his arms and tried to help him. The point is, the note found on Brown's body would have been extremely powerful evidence supporting the defense theory of the case.

**\*53** According to petitioner's version of events, Byrd's actions immediately after the shooting, make the picture of Byrd as the bereaved relative less plausible. Byrd testified that he stopped his vehicle in front of Brown's van. Thus, what he essentially did was to trap Brown for the shooter. Immediately after the shooting, as Brown is dying, Byrd had the presence of mind to remove Brown's jacket and make arrangements to move Brown's minivan in order to conceal from the police the $20,000 in cash allegedly stashed in the van. R.606–07, 612–14, 617–19, 622.

As was made clear during Byrd's federal sentencing hearing, Agent Kasprzyk and the joint Task Force continued to pursue its investigation of Byrd after Brown's death and developed information establishing that Byrd had taken over Brown's drug-trafficking business. When he learned that Brown actually had suppliers above him, Byrd attempted to obtain cocaine directly from them (i.e., Williams and Naseer). Eventually, they allowed Byrd to begin working the Buffalo area with them. 10/02 Tr. at 502–05. In January 1998, Williams was shot, and Byrd visited him in the hospital. Williams gave Byrd $100,000, which Byrd used to buy cocaine in New York City. *Id.* at 297, 502. Byrd also started collecting the debts owed to Brown by various other drug dealers; the total amount was about $597,900.

### 2.) Suppression of the note

Respondent has stated that the note could "arguably" be considered suppressed if trial counsel did not have it. Trial counsel has affirmed that he did not have the note. Indeed, the Court has reviewed the trial transcript, and it appears to this Court quite plain that trial counsel did not have access to the note. Given trial counsel's arguments to the trial court in his attempts to obtain the other *Brady* material, and his cross-examinations of the prosecution's witnesses, it seems that trial counsel would have made use of the note had he been in possession of it. Furthermore, although the Court hesitates to make such

a accusation, it appears that several of the police witnesses were less than forthcoming when answering questions about the search of the vehicle. At least one detective, Michael Lyons, was asked a question by defense counsel about what specifically was found during the search of the Mercedes. Detective Lyons admitted that when he went to the garage to examine the white Mercedes–Benz and the maroon Dodge Caravan mini-van, there were three agents present from the DEA who were also there to look at the Mercedes–Benz and the Dodge Caravan, but were not investigating the Brown homicide. R.434–36. Detective Lyons did not refer to the note in his answer and testified affirmatively that he did not "find any receipts saying that people owed [money] for drug transactions in either of those vehicles[,]" or any cash or currency. Detective Lyons replied in the negative when defense counsel asked him whether he or the DEA agents took anything from the Mercedes–Benz or the Dodge Caravan required to be vouchered or inventoried. R.441–42, 445.

**\*54** The Supreme Court in *Kyles v. Whitley* explained that *Brady* material may also be suppressed where the prosecution introduces testimony that it knows, or should know, is perjury. The possibility that suborned perjury was placed before the jury is extremely troubling to the Court. Furthermore, I note that he Supreme Court in *Kyles v. Whitley* explained that *Brady* material may also be suppressed where the prosecution introduces testimony that it knows, or should know, is perjury. The Court believes that not only has the prosecutor failed to fulfill his obligations under *Kyles,* but may have also violated *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) and *Giglio v. United States,* 405 U.S. 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), which requires the prosecution to disclose information regarding the truthfulness and reliability of witnesses and not to allow perjured testimony to be presented. The Supreme Court has " 'consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " *Drake v. Portuondo,* 553 F.3d 230, 241 (2d Cir.2009) (quoting *United States v. Agurs,* 427 U.S. at 103) and citing, *inter alia, Shih Wei Su v. Filion,* 335 F.3d 119, 129 (2d Cir.2003) (interpreting Supreme Court precedent as holding that "if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic")). As both the Supreme Court and Second Circuit have made clear,

"a conviction obtained through testimony the prosecutor knows to be false is repugnant to the Constitution," *Drake,* 553 F.3d at 240 (citing *Mooney v. Holohan,* 294 U.S. at 112), "because, in order to reduce the danger of false convictions, we rely on the prosecutor not to be simply a party in litigation whose sole object is the conviction of the defendant before him[,]" *id.* (citing *Jenkins v. Artuz,* 294 F.3d 284, 296 n. 2 (2d Cir.2002)) (noting the duty of prosecutors under New York law "to seek justice, not merely to convict")). The prosecutor's many derelictions in this case are "incompatible with 'rudimentary demands of justice.' " *Giglio,* 405 U.S. at 153 (quoting *Pyle v. Kansas,* 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942)).

**3.) Materiality of the note**
Petitioner argues that "considering the note in the context of the other suppressed *Brady* material, it is reasonable to believe that had this evidence been available to petitioner's trial counsel there may have been an acquittal." Pet'r 1/14/09 Mem. at 6. This Court believes that this is something of an understatement. The note's impact, alone or in conjunction with the wiretap evidence concerning Byrd, would have been devastating to the prosecution's case. As discussed at length above, the notation concerning Byrd in the Brown note provided the linchpin identification; the rest of the eyewitnesses testimony was marred by credibility issues or memory issues or both. With the note, trial counsel would have severely damaged Byrd's credibility on cross-examination. Moreover, the note was powerful exculpatory evidence establishing at least a reasonable doubt that there were many other individuals in Buffalo, including Byrd, who had compelling motives to murder Brown. Thus, contrary to being "absurd," as the prosecutor said over and over to the jury, the defense theory that Brown was gunned down in a gangland hit was actually highly plausible. Trial counsel also could have used to the note to cross-examine the police about their investigation, or lack thereof, into other leads regarding Brown's shooter.

**\*55** As discussed above, the trial court found that trial counsel was "seriously prejudiced" by not having the wiretap evidence to back up his accusations against Byrd, yet concluded that there was no "reasonable possibility" of a different outcome. The County Court's analysis reveals that it erroneously, and unreasonably, performed a "sufficiency of the evidence" review in deciding the materiality issue. The Supreme Court in

*Kyles* clearly instructs that materiality does translate into evidentiary sufficiency for a guilty verdict. This Court finds, after reviewing the entirety of the record, that had the prosecution complied with its disclosure obligations by producing the wiretap evidence regarding Byrd, his credibility would have been significantly undermined. The County Court said as much when it determined that Parker's defense was "seriously prejudiced."

To conclude, under these facts, that an acquittal was not "reasonably possible" is plainly unreasonable. Furthermore, to the extent that the Supreme Court has interpreted "possible" as being a less exacting standard that "probable," the Court finds that there easily was a "reasonable probability" of a different verdict had there been compliance with *Brady* as to the wiretap evidence. If the prosecution had fully complied with its *Brady* obligation and disclosed the note found on Brown's body, there is a very significant likelihood that the prosecution's case would have collapsed. The Court believes that this conclusion is compelled no matter what standard of habeas review is employed. Therefore, the Court recommends that relief be granted on petitioner's *Brady* claim.

**B. Ground Two: The Erie County Court violated petitioner's rights as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and *Brady v. Maryland* when it refused petitioner's request during the course of the C.P.L. § 440.10 proceedings to issue an order directing the People to conduct an inquiry into the existence of *Brady* material prior to the court's issuance of its decision on petitioner's motion pursuant to C.P.L. § 440.10.**
Parker contends that the trial court violated his due process rights by refusing, during the course of the C.P.L. § 440.10 post-conviction proceedings, to order the Erie County District Attorney's Office to review and/or produce "all information contained in the joint State/ Federal Task Force records concerning the investigation of William Byrd and Tyrone Brown which would be favorable to the defense." Pet'r Ex. B at 1, 2 (Docket No. 1). Parker asserts that the trial court's refusal to issue the subpoenas resulted in an incomplete record for deciding the C.P.L. §§ 440.10 motion. According to Parker, this further denied him of his due process rights under *Brady v. Maryland* and *Kyles v. Whitley.*

Judge Drury denied the request as follows:

2009 WL 2971575

In regard to the instant motion, this court has refused to sign subpoenas for so called *Brady* material that was not specifically requested by defense counsel, since the standard for reversal for this type of evidence is higher for the defense to meet (a reasonable probability) than the standard that the defense has failed to meet for the requested *Brady* material in the instant case.[23]

**\*56** At the request of the defense, this court has issued a Subpoena Duces Tecum for records of the Buffalo Police Narcotics Squad pertaining to narcotics dealing by Tyrone Brown and William Byrd from November 1, 1995[,] to the date of the verdict. A review of the wiretap applications and orders indicate that the federal investigation of both men began in November of 1995. The report from the Buffalo Narcotics Squad in regard to the subpoenad [sic] material is that there are no such records.

C.P.L. § 440.10 Order at 26–27 (Docket No. 1). As an initial matter, Judge Drury's reasoning in the first paragraph quoted above appears to be inconsistent with his acknowledgment elsewhere that the prosecution's *Brady* obligation, as explicated in *Kyles,* extends to a duty to *learn of* favorable information. As the Supreme Court observed in *Kyles,*

> But the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached. This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.

*Kyles,* 514 U.S. at 437. It also is inconsistent with the trial record. As Parker points out, the trial record supports the conclusion that defense counsel did make the specific requests that Judge Drury claims were not made. Defense counsel, prior to trial, "submitted to

the court and the People a document entitled 'Notice of Demand for Disclosure Pursuant to CPL § 240.20, § 240.45, *Brady v. Maryland, U.S. v. Giglio, People v. Vilardi & People v. Rosiario'[.]*" Pet'r Ex. B at 2 (Docket No. 1) (quoting Exhibit D to Petitioner's Notice of Motion Pursuant to C.P.L. § 440.10 dated April 26, 1999, attached as Exhibit A to C.P.L. § 440.10 Documents submitted in connection with the habeas petition). After outlining his reasons for believing that Byrd and Brown were under investigation by the DEA at the time of Brown's death, defense counsel demanded disclosure of, specifically, information as to "whether any witness had been investigated or was the target of an investigation by local or federal law enforcement authorities, and production of all DEA–7 reports concerning the investigation of Tyrone Brown and/or William Byrd." Pet'r Ex. B at 3 (Docket No. 1). Moreover, Judge Drury acknowledged in his decision and order denying the C.P.L. § 440.10 motion that defense counsel had made repeated, and increasingly detailed, *Brady* requests:

> Each time the defense counsel received more information indicating that there was a federal drug investigation of Mr. Brown and Mr. Byrd[,] he asked for that information as *Brady* material. This information, which was the basis for his request, was detailed, it was from different sources, and taken together was reliable enough to alert the prosecutor that there was in fact a federal investigation of Mr. Brown and Mr. Byrd for drug dealing under way; this request was not just a fishing expedition on the trial counsel's part.

**\*57** C.P.L. § 440.10 Order at 16 (Docket No. 1). Thus, in this Court's opinion, determination of this issue was based on an unreasonable interpretation of the facts in light of the evidence presented, *see* 28 U.S.C. § 2254(d))(2), at trial and during the post-conviction proceedings. As noted above, this Court believes that Parker has presented more than enough material

*Brady* information (i.e., the wiretap orders and related documents, along with the note found on Brown's body), to justify granting habeas relief on Ground One. Therefore, this Court does not need further convincing by way of any additional *Brady* material that Parker's due process rights have already been seriously trammeled. The state appears to be saying that the prosecution's *Brady* obligations terminate once the guilty verdict has been handed down, but in this Court's opinion, this is not a correct reading of the federal courts' jurisprudence on the issue. *See United States v. Coppa,* 267 F.3d 132, 140 (2d Cir.2001) ("Although the government's obligations under *Brady* may be thought of as a constitutional duty arising before or during the trial of a defendant, the scope of the government's constitutional duty—and, concomitantly, the scope of a defendant's constitutional right—is ultimately defined retrospectively, by reference to the likely effect that the suppression of particular evidence had on the outcome of the trial.") (citing *Strickler v. Greene,* 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)).

Over the many years that this litigation has spanned, the state has fought to avoid fulfilling its rather obvious obligations under *Brady.* In the interest of ensuring a complete record, and to hold the prosecution to its *Brady* obligations, which were deliberately disregarded in this case, the Court recommends granting the relief requested of the prosecution, as set forth in Ground Two.

**C. Ground Three: The People's federal constitutional obligations as interpreted by the Supreme Court in *Brady v. Maryland* and *Kyles v. Whitley* required the prosecutor to at least investigate whether his exculpatory evidence disclosure duty was implicated by specific information provided by defense counsel that decedent Brown and the principle prosecution eyewitness Byrd were subjects of a federal law enforcement investigation involving Buffalo Police Department officers.**

As his third basis for habeas relief, Parker contends that "his due process rights as guaranteed by the Fifth and Fourteenth Amendments, and by the United States Supreme Court's decisions in *Brady v. Maryland,* [373 U.S. at 87], and *Kyles v. Whitley,* [514 U.S. at 434, 115 S.Ct. at ——], were violated by the People's refusal to even inquire as to whether they were in possession of exculpatory information despite having been specifically apprised by defense counsel of the fact that federal law enforcement authorities were investigating the drug

trafficking activities of the decedent, Tyrone Brown, and the People's chief trial witness, William Byrd." Pet'r Ex. C at 1 (Docket No. 1). On direct appeal, [24] Parker argued that "at a minimum" the prosecutor was "required ... to make an inquiry into whether the People possessed exculpatory material" on the strength of trial counsel's representations in open court that he had received information from various federal representatives that Byrd and Brown were the targets of an investigation by the DEA and U.S. Attorney's Office. *See id.* (Docket No. 1).

**\*58** The Appellate Division rejected this contention on the basis that the appellate record did not demonstrate that the federal law enforcement investigation referenced by defense counsel was, in fact, a joint investigation between state and federal agencies. Consequently, the Appellate Division concluded that the prosecution was not obligated to follow-up on defense counsel's representations by inquiring of about their possible joint participation between the Buffalo Police and federal employees in an investigation into Byrd and Brown's drug dealing activities.

The Supreme Court has never held, and this Court is not suggesting, that a defendant's due process right to the disclosure of favorable evidence under *Brady* "create[s] a broad, constitutionally required right of discovery." *Bagley,* 473 U.S. at 675 n. 7. In defining the contours of the government's obligations, the Supreme Court has explained that a "defendant's right to discover exculpatory evidence does not include the unsupervised right to search through the [government's] files," *Pennsylvania v. Ritchie,* 480 U.S. 39, 59, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987), or the right to require the prosecution to deliver its entire file to the defense, *United States v. Agurs,* 427 U.S. 97, 109, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

The case law makes clear " '*Brady* is nonetheless interpreted broadly in order to encourage prosecutors to carry out their "duty to *learn* of any favorable evidence known to the others acting on the government's behalf in the case, including the police." ' " *United States v. Lujan,* 530 F.Supp.2d 1224, 1232 (D.N.M.2008) (quoting *United States v. Combs,* 267 F.3d 1167, 1174–75 (10th Cir.2001) (quoting *Kyles,* 514 U.S. at 437–38) (emphasis added by Tenth Circuit)). "This duty is triggered by any *joint investigation* conducted between state, federal, and local agencies or across different federal agencies." *United States v. Ferguson,* 478 F.Supp.2d 220, 238 (D.Conn.2007)

(emphasis supplied) (citing *United States v. Paternina– Vergara,* 749 F.2d 993, 997–98 (2d Cir.1984)). [25]

The Court believes that the Appellate Division made an unreasonable factual determination in light of the evidence presented at the trial level, and moreover applied *Brady* and *Kyles* in an objectively unreasonable manner. As the Supreme Court stated in *Kyles,* "[w]hile the definition of Bagley materiality in terms of the cumulative effect of suppression must accordingly be seen as leaving the government with a degree of discretion, it must also be understood as imposing a corresponding burden." *Kyles,* 115 S.Ct. at 1567–68. "These passages clearly place responsibility on the prosecutor, rather than the trial judge [or the defendants], to determine not only whether a given piece of evidence should be produced but also when [it should be produced] (i.e., when the point of 'reasonable probability' [of a different outcome] is reached)." *United States v. Garrett,* 238 F.3d 293, 304 n. 4 (5th Cir.2000) (Fish, J. concurring), *cert. denied,* 533 U.S. 917, 121 S.Ct. 2523, 150 L.Ed.2d 695 (2001), *cert. denied,* 533 U.S. 938, 121 S.Ct. 2570, 150 L.Ed.2d 734. In other words, given that the Supreme Court has interpreted *Brady* as imposing upon prosecutors an "independent duty to identify and disclose Brady material," "the identification of Brady material is preliminarily a matter for the prosecutor's judgment." *Lockhart v. McCotter,* 782 F.2d 1275, 1282 (5th Cir.1986), *cert. denied,* 479 U.S. 1030, 107 S.Ct. 873, 93 L.Ed.2d 827 (1987).

**\*59** This is not a situation where defense counsel was relying upon an "open file" policy to obtain *Brady* material, or was simply waiting for the prosecutor to comply with his *Brady* obligations. Although the trial judge, at the time, adopted the prosecutor's assertion that defense counsel's allegations amounted to nothing more than speculation and a "fishing expedition," the trial judge later did an about-face, holding in his C.P.L. § 440.10 decision that the information defense counsel had at the time of trial about the federal investigation "was detailed, it was from different sources, and taken together was reliable enough to alert the prosecutor that there was in fact a federal investigation of Mr. Brown and Mr. Byrd for drug dealing under way; this request was not just a fishing expedition on the trial counsel's part." C.P.L. § 440.10 Order at 16 (Docket No. 1). Parker repeatedly came forward with evidence, prior to trial, demonstrating the existence of a joint federal-state investigation into illegal activities by the victim and

the chief eyewitness. By requesting that the prosecution at least verify what he had learned, defense counsel triggered the prosecutor's duty to learn of favorable information. Defense counsel gave the prosecutor names of individuals involved; one might say that defense counsel was basically doing the prosecutor's job for him with regard to *Brady*. See *Johnson v. Mechling,* 541 F.Supp.2d 651, 685 (M.D.Pa.2008) ("Johnson's trial counsel inquired of the prosecution whether Doubs had been offered any plea negotiation, thus triggering the prosecution's duty to search even an *unrelated* file for such information.") (citing *Joseph,* 996 F.2d at 41) (emphasis supplied). Here, the prosecutor stonewalled and objected, calling defense counsel's allegation absurd. See *Johnson,* 541 F.Supp.2d at 685 (finding that constructive possession and suppression where the prosecutor represented that no negotiations had taken place with the witness, and no plea agreement had been offered to her, and maintained an open file policy, implicitly representing that all *Brady* materials would be included in the open file) (citing *Strickler,* 527 U.S. at 283– 84). The prosecutor argued that even if this investigation were somehow a reality, defense counsel knew "five times as much" about it as he did. However, "[t]he reasonable access that [Parker's] counsel may have had to information about [the investigation] [wa]s nullified by h[is] reasonable reliance on the government's representations that it had met its *Brady* obligation," *Johnson,* 541 F.Supp.2d at 685, for a "[a] defendant is entitled to rely on the government's representations that it has disclosed all *Brady* material[,]" *id.* (citing *Banks,* 540 U.S. at 692–94; *Strickler,* 527 U.S. at 284–85) ("If it was reasonable for trial counsel to rely on, not just the presumption that the prosecutor would fully perform his duty to disclose all exculpatory materials, but also the implicit representation that such materials would be included in the open files tendered to defense counsel for their examination, we think such reliance by counsel appointed to represent petitioner in state habeas proceedings was equally reasonable.").

**\*60** This Court has no difficulty concluding, as the trial judge ultimately did, that defense counsel's requests at the time of trial were sufficiently reliable and concrete to at least trigger the prosecutor's "duty to learn" under *Kyles* whether there existed a joint state-federal investigation into Byrd and Brown, information which without a doubt falls within the "favorable to the accused" ambit of *Brady*. The record ultimately established that numerous employees of the Buffalo Police Department were involved in the investigation. The state cannot

argue with a straight face that the Buffalo Police Department was an agency remote and disconnected from the Erie County District Attorney's Office. The prosecutor here easily could have made a phone call; yet he did nothing. Based upon the particular facts of this case, the Court recommends concluding that the Appellate Division's conclusion that the duty to identify was not set into motion by defense counsel's representations at trial amounted to an unreasonable application of clearly established Supreme Court precedent, as explicated in *Brady* and its progeny—particularly "the individual prosecutor['s] ... duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." Accordingly, the Court recommends granting relief on Parker's third ground for relief.

### D. Ground Four: Petitioner's due process rights were violated when the Appellate Division denied leave to appeal the decision of the trial court denying the C.P.L. § 440.10 motion.

Parker contends the Appellate Division violated his due process rights by denying leave to appeal denial of the C.P.L. § 440.10 motion, asserting that "leave to appeal should have been granted as of right since his Article 440 motion, determined *before* oral argument of petitioner's direct appeal, would have provided the Appellate Division with a complete record of the information substantiating petitioner's claim that prosecutorial suppression of exculpatory material violated his due process rights pursuant to *Brady v. Maryland,* ... and *People v. Vilardi....*" Petitioner's Exhibit D at 1, ¶ 1; *see also id.* at 3, 556 N.Y.S.2d 518, 555 N.E.2d 915 (Docket No. 1) (emphasis supplied). Parker now maintains that he is entitled to an appeal as of right to the Appellate Division from the denial of the C.P.L. § 440.10 motion, and that denial of such right constitutes a deprivation of his Fifth and Fourteenth Amendment due process rights. Pet'r Ex. D at 3 (Docket No. 1).

This argument has been considered and rejected by the New York Court of Appeals in *People v. Farrell,* 85 N.Y.2d 60, 60–70, 623 N.Y.S.2d 550, 647 N.E.2d 762 (N.Y.1995). *Farrell* involved two defendants who wished to pursue appeals as of right to the Appellate Division from denials, in post-judgment collateral proceedings, of vacatur of final criminal adjudications of guilt. 85 N.Y.2d at 63, 623 N.Y.S.2d 550, 647 N.E.2d 762. In 1971, the New York Legislature "curtailed such appeals as of right,

restricting their availability only to a permissive procedure involving review and allowance by a single Justice of the Appellate Division before a full panel could review the merits [.]" *Id.* (citing N.Y.Crim. Proc. Law §§ 450.10, 450.15 (L.1971, ch. 671), 460.15). The appellants in *Farrell* argued that the 1971 change in the law "transgresse[d] th[e] constitutional limitation on legislative power" set forth in Article VI, § 4(k) of the New York Constitution "freezing" the floor of the Appellate Division's jurisdiction as it was in 1962. *Id.* As of its effective date, N.Y. Const., Art. VI, § 4(k) "permits the Legislature to expand the jurisdiction of the Appellate Division but not contract it, *except with regard to appeals from nonfinal orders[.]*" *People v. Farrell,* 85 N.Y.2d at 66, 623 N.Y.S.2d 550, 647 N.E.2d 762 (quotation omitted; emphasis in original). Thus, the appellants in *Farrell* argued that the denial of their C.P.L. § 440.10 motions to vacate "constitute[d] a final order in a separate special proceeding." *Id.*

**\*61** In a pre-C.P.L. § 440.10 case, *People v. Gersewitz,* 294 N.Y. 163, 61 N.E.2d 427, the New York Court of Appeals held that a motion collaterally attacking a judgment of conviction was not defined by statute to be a separate special proceeding; indeed, such a motion invoked only the powers of the same court in which the original judgment of conviction was had. Furthermore, a collateral motion to vacate is interrelated with the original criminal proceeding so as to lead to the conclusion that a denial of a such a motion was an intermediate, not final, order. *Farrell,* 85 N.Y.2d at 67–68, 623 N.Y.S.2d 550, 647 N.E.2d 762 (citing *People v. Gersewitz,* 294 N.Y. at 168–69, 61 N.E.2d 427). The New York Court of Appeals held that the "reasoning and result in *People v. Gersewitz*" "applies with equal analytical and jurisprudential force in the CPL 440.10 arena[.]" *Id.* (citations omitted).

Parker contends that his situation is distinguishable from *Farrell* because his "post-judgment motion is not merely 'incident to the original, seminal, finalized criminal proceeding that already ran its direct procedural appellate course,' " Pet'r Ex. D at 3 (quoting *Farrell,* 85 N.Y.2d at 70, 623 N.Y.S.2d 550, 647 N.E.2d 762), since "all the necessary actions had been undertaken *before* the appellant's direct appeal had run its course," *id.* (emphasis supplied). I agree that the situation in Parker's case is somewhat unusual due to the timing of the C.P.L. § 440.10 hearing while the direct appeal was still pending. Parker's argument, logically speaking, has some force. However, "[i]t is well established that a federal habeas court may

not second-guess a state court's construction of its own law." *Policano v. Herbert,* 453 F.3d 92 (2d Cir.2006) (citing *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)* ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Mullaney v. Wilbur,* 421 U.S. 684, 691, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) (holding that "state courts are the ultimate expositors of state law"); *see also Bradshaw v. Richey,* 546 U.S. 74, 76, 126 S.Ct. 602, 163 L.Ed.2d 407 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.").

Most important, Parker has not demonstrated that he was deprived of any right guaranteed to him by the Constitution, laws, or treaties of the United States. *See* 28 U.S.C. § 2254(a). The Supreme Court has consistently held that a defendant has no right under the federal Constitution to appeal a criminal conviction. *E .g., Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) ("There is, of course, no constitutional right to an appeal ....") (citing *Griffin v. Illinois,* 351 U.S. 12, 18, 76 S.Ct. 585, 100 L.Ed. 891 (1955) ("It is true that a State is not required by the Federal Constitution to provide appellate courts or a right to appellate review at all.") (citing *McKane v. Durston,* 153 U.S. 684, 687–88, 14 S.Ct. 913, 38 L.Ed. 867 (1894)); *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963) (no constitutional right to appeal, but if the state statutorily provides for an appeal, it must meet the constitutional requirements of due process). If defendants such as Parker do not have a constitutional right to a *direct* appeal of their criminal convictions, then, *a fortiori,* one cannot find a constitutional entitlement of an appeal as of right in the context of a statutorily-created, collateral vehicle such as a C . P.L. § 440.10 post-judgment motion for *vacatur.* Because Parker has failed to demonstrate that New York's limitation on the right to appeal the denials of C.P.L. § 440.10 motions violates any federal Constitutional right cognizable on habeas review, the Court recommends that Ground Four of the Petition be dismissed.

**E. Ground Five: The prosecutor's misconduct during summation deprived petitioner of his due process right to a fair trial under the Fifth and Fourteenth Amendments.**

**\*62** Parker asserts that the prosecutor "improperly referred to extraneous matters not before the jury and essentially acted as an unsworn witness" during his closing argument. Pet., Ex. E at 1 (Docket No. 1). By "extraneous matters," petitioner is referring to the portion of the prosecutor's summation in which he argued to the jury that an unidentified young man in the spectator section of the courtroom was an individual named "Goobie," whom rebuttal witness Johnson claimed had participated in the attempt to bribe her and her boyfriend, Hill. *See* Pet., Ex. E at 1, 2–3 (Docket No. 1). In addition, Parker alleges that the prosecutor acted as an "unsworn witness when he explained during summation certain aspects of the People's preparation for trial which related to his argument that Hill's failure to appear as scheduled to testify was a direct result of the alleged bribery attempt regarding Hill, although no evidence regarding the cause of Hill's absence was introduced during the course of the trial. *See id.* at 1–2 (Docket No. 1).

**A. General legal principles applicable to claims of prosecutorial misconduct**

Improper remarks in a prosecutor's summation warrant habeas corpus relief when the comments "so infect[ed] the trial as to make the resulting conviction a violation of due process." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)); *accord, e.g., Floyd v. Meachum* (2d Cir.1991). The question to be answered by the habeas court is whether the prosecutorial remarks were so prejudicial that they rendered the trial "fundamentally unfair." *Garofolo v. Coomb,* 804 F.2d 201, 206 (2d Cir.1986). Stated another way, "[t]o be entitled to relief, [the petitioner] must show 'that he suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict.' " *Tankleff,* 135 F.3d at 252 (quoting *Bentley v. Scully,* 41 F.3d 818, 823 (2d Cir.1994) (internal quotation marks and citation omitted).

In *United States v. Modica,* 663 F.2d 1173 (2d Cir.1981) (*per curiam* ), the Second Circuit delineated the following factors to be considered in determining whether In deciding whether a defendant has suffered "actual prejudice" as a result of the prosecutorial misconduct: " 'the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements.' " *Tankleff,* 135 F.3d at 252 (quoting *Floyd v. Meachum,* 907 F.2d 347, 355, 356 (2d Cir.1990) (quoting *United States v. Modica,* 663 F.2d at 1181 (internal quotation marks omitted in

2009 WL 2971575

original) and citing *United States v. Parker,* 903 F.2d 91, 98 (2d Cir.1990) (upholding conviction despite the prosecutor's improper reference to the defendant's failure to call his sister as a witness; the prosecution's conduct did not evidence bad faith, trial court's instructions had a substantial curative effect, and the strong evidence of guilt made it highly probable that the jury would have convicted the defendant regardless of the prosecutor's comments); [26] *accord, e.g., Blissett v. LeFevre,* 924 F.2d at 440 (2d Cir.1991).

## B. Application of the *Modica* factors to the instances of misconduct

### 1. Severity of the misconduct and adequacy of the curative measures

#### a. The "Goobie" argument
**\*63** Two instances of improper argument during summation are challenged here. I turn first to the prosecutor's attempt to argue that an unnamed person in the courtroom, who was never identified by any testifying witness, was the so-called "Goobie," Parker's henchman in the alleged bribery incident. As set forth above in the section summarizing the trial transcript, the prosecutor presented Glenda Johnson as a rebuttal witness to prove that a young black male named "Goobie" had come to her house and paid her $2,000 for her help in keeping her boyfriend, Dabrien Hill, from testifying at petitioner's trial. Johnson also testified that, several days after Goobie's first visit, Goobie and petitioner returned to her house and paid Hill, in her presence, $5,000 to "stay away" until the trial was over. *See* R.1068–72. As petitioner notes, there was no proof introduced at trial as to the actual identity of this "Goobie," and no evidence corroborating Johnson's testimony in that regard. Nevertheless, the prosecutor attempted to bolster her credibility on this point by urging the jury to accept that an unidentified spectator in the courtroom was "Goobie." The prosecutor remarked,

> Now it's very interesting. She gave a description of this Goobie. She said blue jacket with yellow stripes, and a—and a hat with a yellow stripe. I asked her. How many of you were looking back here earlier at the guy right there with the blue

hat with the yellow stripe on it sitting on a jacket with yellow and blue? This guy sitting right here in the courtroom. Look at the hat. Blue hat, yellow stripe. Sitting right here in the courtroom for this trial. Right there, ladies and gentleman.

R.1247. Defense counsel did not object at this point. Apparently, this person, after being singled out by A.D.A. Cooper, left the courtroom. Later, towards the end of his summation, the prosecutor pointed out that individual's absence, asking the jury, "Where's Goobie now? Look at the jacket, ladies and gentleman, yellow and blue, for the empty chair the guy scurried out of the courtroom. Where's Goobie now?" R.1250.

Even looking at the remark standing alone, the Court finds that this was a particularly severe instance of misconduct. "It is clear, of course, that it is improper for a prosecutor to mischaracterize the evidence or refer in summation to facts not in evidence." *United States v. Rosa,* 17 F.3d 1531, 1549 (2d Cir.1994) (citing *United States v. Richter,* 826 F.2d 206, 209 (2d Cir.1987); *accord, e.g., Tankleff,* 135 F.3d at 252. As the Second Circuit has observed, "[a]lthough the inherent controversial nature of litigation permits substantial latitude in the closing arguments of counsel, the prosecutor in a criminal case has a 'special duty not to mislead,' *United States v. Universita,* 298 F.2d 365, 367 (2d Cir.), *cert. denied,* 370 U.S. 950, 82 S.Ct. 1598, 8 L.Ed.2d 816 (1962), and should not deliberately misstate the evidence, *United States v. Suarez,* 588 F.2d 352, 354 (2d Cir.1978); *United States v. Burse,* 531 F.2d 1151, 1154 (2d Cir.1976)." *United States v. Richter,* 826 F.2d at 209. *See also United States v. Young,* (citing ABA Standards for Professional Conduct).

**\*64** Trial counsel did not object until after the prosecutor concluded his summation. R.1254–113–55. Trial counsel requested a mistrial, which the trial court immediately denied. R.1259. The trial judge was skeptical that it was even misconduct, but he did offer to give the jury a very insipid curative instruction. Defense counsel disagreed with the judge's proposed wording and requested a differently worded instruction. Ultimately, the prosecutor stated that he had no problem with the curative instruction proposed by defense counsel. Defense counsel maintained that a mistrial was warranted, but agreed to have the

2009 WL 2971575

trial court read the instruction that he had drafted and in which the prosecutor concurred. Respondent, and the Appellate Division, rely heavily on this, stating that the curative instruction nullified any prejudice by the prosecutor's improper argument. This Court does not agree, given the particular circumstances of this case—namely, that defense counsel first requested a mistrial, which was denied. Clearly, the defense believed that something was required in order to prevent the jury from drawing a conclusion not supported by facts in evidence. When his motion for a mistrial was denied, to decline a curative instruction would be tantamount to "cutting off his nose to spite his face," and obviously not helpful for his client. This Court does not believe that petitioner should be penalized in this way for his attorney's attempt to obtain whatever curative measures he could to rectify what he believed was a prejudicial situation for his client. And, the Court wishes to point out, the Second Circuit has consistently held that where the misconduct is particularly severe, and where the only arguably curative measure adopted by the trial judge is trial court's normal instruction in the course of his charge that argument of counsel is not evidence, that is inadequate. *Floyd,* 907 F.2d at 355; *see also Modica,* 663 F.2d at 1182 ("The court's pattern instruction to the jury —that the arguments of counsel are not to be considered evidence—was proper, but was an insufficient response to the prosecutor's conduct.").

### b. The argument concerning the chronology of witness testimony

To bolster his contention that Parker and "Goobie" had bribed Hill and his girlfriend, Johnson, the prosecutor made an argument concerning the order in which witnesses had testified and the days in which the court was in recess. Hill had been expected to testify on the same day as the other eyewitnesses but failed to appear that day, and the prosecutor pointed out that prior to Hill's scheduled testimony, the court had been in recess and Parker had been out on bail, free to go about his business. The prosecutor argued that it was no mere coincidence that Hill had not appeared to testify the following day, the implication being that Parker had "gotten to him" and bribed him not to testify. Parker argues that the prosecutor thereby acted as an "unsworn witness" because no evidence regarding the cause of Hill's absence was introduced during the course of the trial. *See id.* at 1–2 (Docket No. 1).

*65 The Second Circuit has consistently held that "the Government 'has broad latitude in the inferences it may reasonably suggest to the jury during summation,' " *United States v. Cohen* (2d Cir.2005) (quoting *United States v. Edwards,* 342 F.3d 168, 181 (2d Cir.2003) (holding that and the prosecutor's comments "while arguably imprecise, were by no means unreasonable in light of the evidence presented at trial and the nature of the charged [narcotics] distribution and importation scheme"). In other words, on summation, "counsel are free to make arguments which may be *reasonably* inferred from the evidence presented." *United States v. Roldan–Zapata,* 916 F.2d 795, 807 (2d Cir.1990) (citing *United States v. Suarez,* 588 F.2d 352, 354 (2d Cir.1978); *United States v. Dibrizzi,* 393 F.2d 642, 646 (2d Cir.1968) (emphasis supplied)). However, I convinced that is this case the prosecutor went far beyond the bounds of reasonableness. To speculate that because a witness had failed to appear because the defendant had "gotten to him" without any evidence whatsoever, is unacceptable innuendo and without any relationship to evidence, logic or any other reasonable inferences to be drawn from the evidence. There are several factors that lead this Court to conclude that given the particular facts of this case, the prosecutor's timeline argument was not proper comment. First, the obvious purpose of the argument was to bolster the alleged bribery of Hill and Johnson. Judge Drury found that the evidence of the bribery was the linchpin of the state's case. Second, the timeline argument was inextricably related to the prosecutor's blatantly improper and factually unsupported comments regarding the identity of the alleged "Goobie" which, again, related to the bribery incident, which was given prominence in the prosecutor's case. Given importance of the subject matter of the misconduct to securing the conviction against Parker, as discussed below, I recommend concluding that both lines of argument were improper.

### 2. The prejudice caused by the misconduct

Finally, I turn to the substantial prejudice occasioned by the prosecutor's numerous instances of egregious misconduct. The Second Circuit and the Supreme Court have instructed that remarks in a prosecutor's summation cannot be judged in isolation and must be examined in the context of the trial as a whole. Accordingly, this Court has reviewed the transcript of Parker's trial several times. It is clear that prosecutorial bad faith and sharp practice permeated the entire proceeding, making the

2009 WL 2971575

prejudicial effect of the misconduct on summation even more pronounced and impossible to overlook.

As discussed above, the prosecutor committed flagrant *Brady* violations by failing to disclose powerful impeachment material regarding his chief eyewitness' drug dealing activities. The prosecutor ignored the incongruities of his chief eyewitness' purported employment and actual financial status and his bizarre actions immediately after the shooting as his cousin was dying—facts which easily led to the common-sense conclusion, as the prosecutor admitted during the C.P.L. § 440.10 hearing, that Byrd was a drug dealer. After actively preventing the defense from obtaining the information needed to support his theory that this was part of a gangland drug-slaying, the prosecutor turned around argued strenuously to the jury that neither Byrd nor Brown were drug dealers and called defense counsel's theory "absurd," when he knew, as he made these statements, that they were untrue. In this Court's opinion, it is not going too far to say that, by feigning ignorance of the joint state-federal investigation into Byrd and Brown, the prosecutor arguably not only allowed perjured testimony to be put before the jury, but he also vouched for it and built his case upon it. *See United States v. Valentine,* 820 F.2d 565, 570 (2d Cir.1987) (holding that it was a due process violation for the prosecutor to suggest that certain witnesses, who had not testified at trial but who had testified before the grand jury, supported the government's theory of the case, when in fact their testimony before the grand jury did not; stating that this "violated the due process prohibition against a prosecutor's making 'knowing use of false evidence,' including by misrepresenting the nature of nontestimonial evidence").

**\*66** Moreover, Cooper's testimony before the trial court on Petitioner's § 440.10 motion was so disingenuous as to suggest perjury, but for petitioner's motion counsel's effective examination of him, resulting in his changing of testimony time-and-again. Thus, this Court cannot call the misconduct on summation an "aberration" in an "overall fair and temperate" proceeding. *Contrast with Tankleff v. Senkowski,* 135 F.3d at 253 (finding that misconduct was not prejudicial enough to warrant reversal where, *inter alia,* the Second Circuit was "also mindful that the prosecutor's comments were short and fleeting, and thus much less likely to have had a substantial effect on the jury's verdict").

Furthermore, the prejudice caused by this particularly misleading argument on summation about "Goobie" was exacerbated by the relative importance placed upon it by the prosecutor in urging that it demonstrated petitioner's guilt. As the trial judge explained in his C.P.L. § 440.10 decision, he believed the rebuttal testimony offered by Johnson about the Goobie incident to be extremely powerful evidence—essentially, it "tipped the scales" in the prosecution's favor, having enjoyed special prominence as the last proof that the jury heard before they began deliberating. In this Court's opinion, this was one of those special cases "in which the evidence was so closely balanced that the prosecutor's comments were likely to have had a substantial effect on the jury," *Tankleff v. Senkowski,* 135 F.3d at 253 (citing *United States v. Saa,* 859 F.2d 1067, 1077 (2d Cir.1988) ("[B]ased on the other evidence against [the defendants], we find ... that any adverse inference improperly drawn by the jury would not have tilted the scales from not guilty to guilty."). Accordingly, I recommend concluding that Parker has met his burden of showing that he was substantially prejudiced by improper comments by the prosecutor concerning Goobie's identity. This was not one of those cases in which a prosecutor made a few offensive comments insufficient to implicate due process, *see Darden v. Wainwright,* at 181. Rather, this was part of a "persistent trial strategy," *see United 50 States v. Weiss,* 914 F.2d 1514, 1524 (2d Cir.1990), incorporating summation "remarks ... so prejudicial that they rendered the [whole] trial ... fundamentally unfair." *Garofolo v. Coomb,* at 206; *see also Donnelly,* at 647–48; *Floyd v. Meacham,* at 354. It is the prosecution's duty as much "to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). In this Court's opinion, the means used here were not proper, and the outcome was not just. Indeed, the prosecutor's conduct in this case was a disgrace to the legal profession. This is a prosecutor who arguably suborned perjury, possibly committed perjury himself, misrepresented facts to the court, wilfully suppressed evidence and obstructed justice. For the foregoing reasons, I recommend that habeas relief be granted with regard to Ground Five.

## VII. Conclusion

**\*67** For the reasons set forth above, the Court recommends that the petition for a writ of habeas corpus

filed by petitioner be **granted** with regard to Grounds One, Two, Three, and Five of the petition. Should the District Court agree that issuance of the writ is appropriate, this Court recommends that respondent be ordered to retry Parker, or set aside his conviction for second degree murder and criminal possession of a weapon, within sixty (60) days from the date of the District Court's Order.

The Court recommends that Ground Four be **dismissed** as not cognizable on federal habeas review and that no certificate of appealability issue with regard to that claim. *See* 28 U.S.C. § 2253(c)(2).

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED,** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72.3(a) (3).

The District Court ordinarily will refuse to consider on *de novo* review arguments, case law and evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g., Patterson–*

*Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985, 990–91 (1st Cir.1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir.1988); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection .**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to petitioner and respondent.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2971575

---

Footnotes

1     Citations to "R. ___" refer to the sources submitted in connection with Parker's direct appeal of his conviction in state court.

2     Trial counsel indicated to the trial court that the sources of his information were 1) *Rosario* material turned over by the prosecutor in Parker's case; 2) conversations trial counsel had with another client of his (Adrian Price) in an unrelated case; 3) conversations with the AUSA involved in the Brown/Byrd investigation; 4) a report prepared by the DEA; 5) a newspaper article quoting an officer from the Buffalo Police Department's homicide bureau who was involved in the Brown shooting; and 6) certain statements made by A.D.A. Cooper himself in a state-court forfeiture proceeding before a different judge regarding the Mercedes that Byrd was driving.

3     Later, during post-trial C.P.L. § 440.10 proceedings, the trial judge completely reversed his position:

        However, the prosecution was still on notice of the defense request, even though the request was made to the court. It was same as if it had been made to the prosecutor. While the request [for the subpoenas] came late, just before the jury selection was to begin, defense counsel was repeating a request he had made much earlier [at the pre-trial conference in August 1997]. Each time the defense counsel received more information indicating that there was a federal drug investigation of Mr. Brown and Mr. Byrd he asked for that information as Brady material. His information, which was the basis for his request, was detailed, it was from different sources, and taken together was reliable enough to alert the prosecutor that there was in fact a federal investigation of Mr. Brown and Mr. Byrd for drug dealing underway; this request was not just a fishing expedition on the trial counsel's part.

County Court Order dated January 26, 2001 Denying Petitioner's C .P.L. § 440.10 Motion C.P.L. ("the C.P.L. § 440.10 Order") at 16. A copy of this Order is attached as an exhibit to Parker's habeas petition (Docket No. 1).

4    Taking this as true, the $3,000 represented nearly *two months* salary for Byrd.

5    Hollis later learned that this man was James Moses. R.534. Hollis admitted that she did not mention seeing Moses in her statement to the police or in her grand jury testimony. R.545.

6    Immediately after the incident, Hollis had given a different description to the police: She stated that the shorter was wearing dark shorts, not long pants, and that he was shirtless. R.562.

7    Following the conclusion of Byrd's testimony, the prosecutor made an application for a material witness warrant for Hill, who had been subpoenaed to testify earlier that morning, but he had not appeared. Hill was not at the Edison Street residence that he shared with Johnson. R.668. Hill eventually appeared on October 28, 1997, to testify.

8    Chuck Craven ("Craven"), an investigator with the Erie County District Attorney's Office, investigated a 1993 green Cadillac registered to Talia Salter ("Salter"), petitioner's girlfriend, residing at 48 Domedion Street. R.820. Craven testified that this vehicle's license plate number was K36–8EG. R.820. Craven visited 48 Domedion Street, which is about a mile and a half (three-minute drive) from where the shooting occurred on Edison/Weston. R.822. Craven was never able to locate Salter at that address. R.822. Craven admitted that he only went there during the daytime, and did not know whether she worked during the day. R.827.

9    However, after being shown a series of photographs by the prosecutors, Hunt testified that he now knew it to be a newer model Cadillac, since he had seen cars like that since the incident. R.676.

10    Hokes was not called to testify by the prosecution. Byrd's address was in the portion of the police report written by Hokes, so the trial court did not allow Roman to testify as to that part of it. R.806.

11    There was differing testimony from the eyewitnesses as to the color of the shooter's weapon.

12    The prosecutor is referring to Elliott's house; as noted above, Elliott operated a daycare business out of her home.

13    The fact that Byrd left the Buffalo area and moved to South Carolina after this occurred could be viewed as supporting defense counsel's argument that the shooting was part of a "turf war" between drug dealers in Buffalo. If the jury had concluded that Byrd was a drug dealer, and Brown's underboss, and owed Brown money, and was somehow involved in the shooting, it would make sense for him to leave town after Brown was slain in order to avoid reprisals from Brown's supporters.

14    At the time of the C.P.L. § 440.10 hearing, Cooper had left the Erie County District Attorney's Office and had gone into private practice.

15    As noted above in this Report and Recommendation, when Cooper had objected at trial to the subpoenas, he claimed the defense counsel did not have a good faith basis for his request.

16    The ellipses in the quotation were necessary because, on the photocopy of the transcript provided to the Court, it appears that something was placed across the corner of the page, obscuring the text during the copying process.

17    At Parker's trial, Byrd claimed that he was just a mechanic earning $400 per week (in cash) at the Car Corner in Buffalo, and denied that he was a drug dealer. The defense's primary theory was Byrd was that Brown's "underboss" in the cocaine operation. According to the defense, Brown was shot in a gangland-type coup orchestrated by Byrd and others in order to take over Brown's drug business. After playing a role in setting up the "hit" against Brown, Byrd then made Parker the "fall guy."

18    This testimony corroborated the representations made by Parker's trial counsel to Judge Drury in October 1997.

19    Judge Drury made this finding notwithstanding several of his observations concerning former A.D.A. Cooper, based on Cooper's testimony at the hearing—namely, that Cooper "did not know about the Brown–Byrd drug dealing investigation until the issue was raised in court by defense counsel"; that "there was never any contact between him and the federal authorities ... or between him and the Buffalo police in regard to this investigation"; that the information about the Brown–Byrd drug investigation "was not part of the Buffalo Police Department Homicide file"; that the "limited contact" between the prosecutor and the DEA relative to the forfeiture proceeding before Judge Michalek "pertained to the vehicle and never involved the Byrd–Brown drug investigation." *Id.* at 17.

20    The context makes clear that Judge Drury here is referring to Byrd, not Brown.

21    On the record, there is a reasonable inference to be drawn that Sandra Hollis, at least, was not impartial. Hollis had been a childhood friend of the victim, having known him for about 15 years. The victim's cousin was Byrd. Hollis became extremely defensive and indignant when being cross-examined by petitioner's counsel. Thus, in this Court's opinion, it is misleading to say that Hollis was not in any way connected to Byrd.

22    *Cf. United States v. Frady,* 456 U.S. 152, 168, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982) (discussing prejudice in terms of the "cause and prejudice" test and stating that "[a]ctual prejudice is established when a petitioner demonstrates that the errors "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions").

23    As a matter of federal law, the Supreme Court has "abandoned the distinction between the second and third *Agurs* circumstances, i.e., the "specific-request" and "general- or no-request" situations," holding in " *Bagley* ... that regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Kyles,* 514 U.S. at 434 (quoting *Bagley,* 473 U.S. at 682, (opinion of Blackmun, J.); *id.* at 685 (White, J ., concurring in part and concurring in judgment). In New York,

24    Parker notes that his *Brady* claim "on direct appeal was limited to this particular claim because the appellate record was not sufficiently developed to address the more expansive *Brady* claim advanced on the fuller record developed during the Article 440 proceedings." Pet'r Ex. C at 2 n. 1 (Docket No. 1).

25    In *United States v. Paterina–Vergara,* a case involving the Jencks Act, which requires the United States to produce any pertinent statement of a prosecution witness "in the possession of the United States," 18 U.S.C. § 3500(b), Second Circuit noted that it had "ruled that documents of local police are not subject to the Jencks Act, at least in the absence of a joint federal-state investigation," and holding in the instant case that "even in the course of a joint investigation undertaken by United States and foreign law enforcement officials the most the Jencks Act requires of United States officials in [sic] a good-faith effort to obtain the statements of prosecution witnesses in the possession of the foreign government") (citing *United States v. Bermudez,* 526 F.2d 89, 100 & n. 9 (2d Cir.1975); *see also United States v. Rittweger,* 524 F.3d 171, 181 n. 4 (2d Cir.2008) ("Complying with the Jencks Act, of course, does not shield the government from its independent obligation to timely produce exculpatory material under *Brady*—a constitutional requirement that trumps the statutory power of 18 U.S.C. § 3500."). In *United States v. Pa tern ina-Vergara,* the Second Circuit found that there was cooperation between the United States and Canadian officials supporting the contention that there existed a joint investigation; however, because of the "manifest" good faith efforts by the prosecutor to secure documents in possession of Canadian law enforcement authorities relating to the cocaine conspiracy with which defendants were charged, Jencks Act did not require either production of the withheld documents or any limitation on the testimony of the Canadian witnesses.

26    *Compare Floyd,* 907 F.2d at 356 (granting habeas relief to petitioner, observing that the prosecutorial misconduct was severe, the corrective measures taken by the trial court were inadequate, and it was "by no means clear or even probable that appellant would have been convicted absent the prosecutor's misconduct.") (internal quotation marks and citations omitted) with *Parker,* 903 F.2d at 98 (upholding conviction despite the prosecutor's improper reference to the defendant's failure to call his sister as a witness; the prosecution's conduct did not evidence bad faith, trial court's instructions had a substantial curative effect, and the strong evidence of guilt made it highly probable that the jury would have convicted the defendant regardless of the prosecutor's comments).

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.